## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JORDAN ECK, *et al.*** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 19-1873** |
| | : | |
| **OLEY VALLEY SCHOOL DISTRICT,** | : | |
| *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                  **December 17, 2019**

We again balance students' constitutional rights with a high school's disciplinary steps. Can three high school drama club members recover damages because their school district suspended them from classes or extra-curriculars after they each complained about their drama director's theatrics at a public meeting? Our drama opens with the school's drama director's choice of the lead for the Spring 2019 musical. The unsuccessful lead who also served as drama club president, along with his girlfriend and another student, decided to complain about the drama director at a school board meeting. Learning the students' plan, the drama director e-mailed parents the night before the board meeting possibly suggesting improper conduct by the unsuccessful lead. Following the board meeting and a closed rehearsal, the unsuccessful lead spoke to the drama director. Following e-mails later the same night and then early the next morning, the superintendent and principal met the unsuccessful lead and his mother to suspend him. Hours later, they suspended his also-complaining actor girlfriend from classes seemingly without explanation. After the musical closed, the drama director removed the third complaining student actor from a post-show extra-curricular activity. The students allegedly promised revenge.

Weeks later, they sued the school district and three state actors for retaliating against them for complaining about the drama director at a public meeting and depriving them of due process in suspending them from either classes or the post-musical extra-curricular activity. The unsuccessful lead also sued the drama director for defamation and false light invasion of privacy under Pennsylvania law based on her pre-meeting e-mail to parents. After three amended complaints, many of the quandaries require our jury evaluating who to believe. But we must grant summary judgment dismissing three claims, along with the conspiracy theories related to them, in our upcoming trial: the disappointed lead's claim for First Amendment retaliation against the drama director as there is no evidence of her role in his suspension based on his alleged First Amendment protected conduct; due process claims brought by the disappointed lead suspended during a meeting attended by his mother and him and the student precluded from a post-musical extra-curricular activity; and, the students' claim against the district's superintendent for negligent supervision for allowing the First Amendment retaliation.

## I. Undisputed facts[1]

At this time last year, Oley Valley High School seniors Jordan Eck, his girlfriend Haley Hartline, and Vincent Ferrizzi participated in the high school's Drama Club and hoped to play a role in the school's spring musical.[2] Student Eck served as the Drama Club's President and hoped to win the lead role in the Spring 2019 school musical. Stacy Lyons is the Drama Club's Director.[3]

### *Director Lyons selects J.M. rather than Student Eck for the lead in the school musical.*

In December 2018, Director Lyons held performance try-outs for the school's spring musical scheduled to be performed in April 2019.[4] Student Eck and at least one other student, J.M., tried out for the lead role.[5] J.M. won the lead role, leaving Student Eck "initially disappointed

2

that he didn't get the part that he wanted ...."[6] Students Hartline and Ferrizzi won roles in the musical.[7]

The parties dispute Student Eck's conduct after learning he did not win the lead role in the school musical. The School District contends Student Eck attempted to dissuade J.M. from keeping the lead role and instead play the lead as an understudy and asked Director Lyons for an "understudy show," a request she denied.[8] Student Eck denies his present claims have anything to do with "failing to get the part that he wanted."[9] While Student Eck concedes his relationship with J.M. became "tense" because they both auditioned for the same part, he contends the two worked out their differences and committed to work together in the show and Student Eck and J.M. both agreed to ask Director Lyons to organize a separate "understudy show" to allow all understudy cast members to play lead characters.[10] While Student Eck may have wanted to get over this rejection, there is no dispute Director Lyons's choice of J.M. over her son upset his mother.[11]

### *"Fruit Video" between boyfriend and girlfriend.*

Sometime in March 2019, Haley Hartline videoed her boyfriend, Jordan Eck, either "flirting" or "performing ... a type of skit" for her "Fruit Video."[12] In the video, Student Eck holds a banana and says to the camera "Girl, can you call me sometime?"; tosses an apple and says, "My heart fell for you like an apple from the tree"; holds a pear and says, "We make a good pair"; holds a loaf of bread and says, "You are the bread to my butter"; and, holding a jar of marshmallow fluff says, "You make me feel fluffy inside."[13]

Student Hartline posted the video on the social media platform Snapchat.[14] J.M.'s mother learned of the video and became upset because J.M. is allergic to fruit.[15] J.M.'s mother contacted the high school saying she intended to contact police because she perceived the video as a threat to her son's health.[16] The Students dispute whether J.M. or his mother actually perceived the Fruit

3

Video as threatening, contending there is only hearsay evidence from the school's guidance counselor Ann Marie Borovik reporting the mother's concern.[17]  Guidance Counselor Borovik contacted the Central Berks Regional Police Department on March 19, 2019 to report "an incident between two students" and told police "there was a Snapchat video involving a student named [J.M.]. She said another student [Eck], posted the video of [J.M.] and added comments about certain fruits. She said [J.M.] is allergic to the fruits that were mentioned in the post. She said there has been some animosity between them because [JM.] got the lead in the school play and [Eck] did not. She did say that [J.M's] mother was aware of the incident and was going to contact police at her leisure. Borovik also mentioned that [Eck's] mother was seen in the parking lot of a dance studio that both males attend even though [Eck] was not present. At the time of this report no reports have been made regarding the above information. Nothing further."[18]

Christopher Becker, Principal of Oley Valley High School in spring 2019, learned of the Fruit Video from school counselors. Defendant Tracy Shank, Superintendent of Schools for the Oley Valley School District, and Director Lyons learned about the Fruit Video either through Principal Becker or J.M.'s mother.[19]

## *Director Lyons's March 19, 2019 e-mail.*

At some unknown time and for unexplained reasons, Student Eck decided to complain about Director Lyons to the School Board at its March 20, 2019 Meeting. The parties adduce no evidence of acrimony between Student Eck and the state actors until then, other than Student Eck's disappointment in Director Lyons's decision to cast J.M. rather than him as the lead in the school musical. Student Eck's mother notified the School Board's President her son intended to express concerns about Director Lyons's "stewardship of the Drama Club."[20]

4

On March 19, 2019, Superintendent Shank warned Director Lyons of Student Eck's intent

to speak against her at the School Board Meeting the following night.[21] For unknown reasons,

Director Lyons immediately decided to preempt Student Eck's perceived momentum as she could

not attend the Board Meeting. She e-mailed some of the Drama Club parents on March 19, 2019

curiously referring to facts possibly from the "Fruit Video" to challenge Student Eck's credibility:

> I need your help. I've spent the last 2 months shielding the kids from some very horrible
> stuff happening behind the scenes with a student and his mother. Unfortunately the
> situation has escalated to the point that this student posted something against the other
> student and police were called in. This mother and her son want me fired and in the
> mothers [sic] words "she is going to destroy me" – all of this because her son was not
> cast as Jack [the lead role].
>
> I have been working closely with Dr[.] Shank and the administration since January. This
> parent has made friends with Mrs[.] Zackon on the school board. This is helping to fuel
> the fire.
>
> Dr[.] Shank let me know today that this parent is planning on attending the school board
> meeting tomorrow night at 7 pm in the HS library.
>
> I am reaching out to ask any and all parents that believe in this program and students that
> love the program to please show up to show your support. We are in jeopardy of losing
> this program.
>
> Any questions feel free to call me ....[22]

Director Lyons admittedly sought to garner support to answer Student Eck's complaint at

the next night's Board Meeting. The parties do not explain what the other school officials did

relating to speech at the upcoming School Board Meeting. After discovery, the Students cite

Director Lyons's March 19, 2019 e-mail as the only pre-Meeting communication at issue.

### *Students speak at March 20, 2019 School Board Meeting.*

On March 20, 2019, Students Eck, Hartline, and Ferrizzi attended the School Board

Meeting held in the Oley Valley High School library. The public attended. The School Board

allowed the Students to speak at the Meeting with one edit: the Board allegedly restricted the

5

Students' speech by mandating "there would be no 'character assassinations'" of Director Lyons and Students could not mention Director Lyons by name.[23]

Student Eck told the School Board his remarks were made in his capacity as the Drama Club President expressing his "many disagreements with [Director] Lyons artistically, how rehearsals were being run, and how she sent [the March 19, 2019 e-mail] filled with lies about me and my mother."[24]

Student Hartline, apparently going further than her boyfriend, told the School Board of her disagreement with Director Lyons including Director Lyons's dismissal of Student Hartline's complaint against J.M. for throwing a binder at her; unprofessional conduct; an accusation Student Eck abused Student Hartline; disrespect shown to the students; failing to start rehearsals on time; arriving late to rehearsals; ending rehearsals late causing parents to wait for their children; directing thirty students to do cartwheels next to each other which Student Hartline perceived as dangerous; leaving students unattended; "calling out" students and seniors by saying students were "a bad influence" on underclassmen; making students "feel bad" by comparing them to middle school students; and, telling the cast they "weren't trying hard enough and ... had to put more effort into practicing when everyone was trying as hard as they could."[25]

Student Ferrizzi then spoke to the School Board, expressing concern about the way in which Director Lyons ran the drama program; the lack of oversight by the School Board and administration over Director Lyons; and "calling out" students.[26] The School Board interrupted Student Ferrizzi's speech telling him he "was not allowed to use any character assassinations or names involving any negativity."[27]

Students Eck, Hartline, and Ferrizzi were the only three students who spoke against Ms. Lyons at the March 20, 2019 School Board Meeting. Other Drama Club students attended the

6

Meeting and spoke positively about Director Lyons. Unlike the complaining Students, the School Board permitted those students making positive comments to refer to Director Lyons by name.[28]

### *Student Eck speaks with Director Lyons and two other school employees in the hallway after the March 20, 2019 School Board Meeting.*

Immediately after the School Board Meeting, Director Lyons held a closed-door meeting with the actors other than Students Eck, Hartline, and Ferrizzi. The three Student protagonists eventually snuck in the back door to the rehearsal.[29] Following rehearsal, Students Eck and Ferrizzi asked Director Lyons if she would speak with them privately.[30] Director Lyons agreed but requested the presence of two other adults: Abagail Hartenstine, a fifth grade teacher in the school district and the Assistant Director of the musical, and Maria Jones, the School Board secretary.[31] The conversation between Student Eck and Director Lyons occurred in a school hallway in view of Student Eck's parents, Student Hartline, Student Ferrizzi, and other students leaving rehearsal.[32] A surveillance camera in the school hallway recorded the exchange between Director Lyons and Student Eck.[33] The School District contends Students submitted an altered version of the surveillance video.[34]

The parties dispute the tone and language of the conversation between Director Lyons and Student Eck. The School District contends Student Eck's language used in his conversation with Directory Lyons "was received, and understood by the adults in attendance, as aggressive" and his language to Ms. Hartenstine "aggressive and insubordinate."[35] At one point in the conversation, Ms. Hartenstine shared her personal experience auditioning for, but not getting, the lead part in her high school play and her reconciliation with the disappointment and her friend who won the lead role.[36] The parties dispute Student Eck's response to Ms. Hartenstine. Ms. Hartenstine's version is Student Eck responded he "just couldn't believe that [she] wasn't upset and wanted to be comforted about not getting the leading part that [she] auditioned for."[37] Student Eck contends

7

he responded "that it wasn't as easy for me to reconnect with [J.M.]"; "[he] 'was disappointed' that they expected the tension with J.M. 'to go away faster than it did'"; "[he] had a hard time believing [Ms. Hartenstine's] feelings because [his] were so different. And I said that politely"; and the conversation "was emotional ... [he] was tired ... because it was late night with School Board Meeting, but was ready to 'move on.'"[38] According to Ms. Hartenstine, Director Lyons then asked Student Eck if "he was accusing [Ms. Hartenstine] of lying" to which he responded he "still did not believe [Ms. Hartenstine] making [her] feel like he was calling [her] a liar about a situation he knows nothing about that happened 10 years ago."[39]

The School District contends Student Eck's behavior so upset Ms. Hartenstine she became "inconsolable" and later the same evening told Superintendent Shank she felt "threatened and disrespected" by Student Eck and it "will not be tolerated any longer."[40] Ms. Jones also wrote a memo to Superintendent Shank relating the events of Student Eck's conversation with Director Lyons and Ms. Hartenstine, calling Student Eck "angry" with a "lack of empathy" as well as "head shaking and clenching of fists" "whenever something was said that he did not agree with" and concluded in her "daily interactions with students, I have not seen this level of anger and lack of awareness of other's feelings."[41]

Student Eck disputes the School District's version of this hallway conversation. He contends the surveillance video shows no aggressive behavior; he did not become angry or act disrespectfully and instead spoke politely; he denies ever seeing Ms. Hartenstine cry during their conversation and he gave her no reason to cry; and when the conversation ended, Director Lyons, Ms. Hartenstine, and Ms. Jones walked past Student Eck and his parents and never said anything to his parents about objectionable behavior.[42]

After the conversation, Ms. Jones immediately reported to Superintendent Shank, still on

school premises for the School Board Meeting, Ms. Hartenstine's distress after the conversation.[43]

### *Superintendent Shank previews an investigation and discipline.*

At 11:39 PM on the same March 20 evening, Superintendent Shank e-mailed all School

Board members:

> I went to the auditorium tonight after the meeting to speak with the Directors only to walk
> into the aftermath of a negative situation whereby [Student Eck] was speaking to the cast
> thanking them for supporting him and helping him get things changed. He then verbally
> accosted the assistant director [Ms. Hartenstine] and accused her of lying and not speaking
> up and then closed with "this is not over and I will be getting more people to come
> forward." The teacher was visible [sic] upset, crying, and felt threatened by him. The
> teacher used the words "verbally attacked."
>
> I am obtaining the statements from the teacher and witnessed by Maria [Jones] and the
> teacher.
>
> I am going to issue discipline regarding tonights [sic] situation and depending on what the
> rest of the investigation reveals tomorrow [Student Eck] may have just finished his last
> rehearsal tonight. Students are angry with him for his actions when he returned to the
> auditorium after he left the Board meeting.
>
> According to [Student Eck's] own words, "this is not over" but I will end his role in it.
>
> We will run the process in the morning.
>
> Thank you for your support and understanding in a very difficult situation. [44]

Superintendent Shank e-mailed Principal Becker the next morning regarding Student Eck:

"This will be a 3 out and he will be out of the show based on his behavior last night after the board

mtg."[45] Superintendent Shank did not mention the public complaints. Superintendent Shank has

authority to suspend students.[46]

### *Superintendent Shank and Principal Becker suspend Student Eck the next day.*

Superintendent Shank and Principal Becker then met with Student Eck and his mother mid-

morning on March 21, 2019, issuing him a three-day suspension from school and removing him

9

from the cast of the musical and as Drama Club President.[47] The School District contends it suspended Student Eck for his aggressive, threatening, and disrespectful behavior toward Ms. Hartenstine.[48] Student Eck denies he acted in this way towards Ms. Hartenstine.[49] There is a particular dispute over whether Student Eck "lunged" at Ms. Hartenstine; Student Eck contends Superintendent Shank accused him of "lunging" at Director Lyons and Ms. Hartenstine while Superintendent Shank denies she ever said anything about "lunging." Student Eck argues the surveillance video shows he did not act aggressively. The School District contends it suspended Student Eck for insolence regardless of whether he manifested his conduct physically or verbally.[50]

### *Superintendent Shank and Principal Becker suspend Student Hartline on March 21, 2019.*

After Student Eck's suspension on the morning of March 21, Superintendent Shank called a meeting of the musical's cast and Principal Becker.[51] Student Hartline learned of her boyfriend Student Eck's suspension. Superintendent Shank told the assembled cast there should be no further "disruptions" or "negative" statements about Director Lyons or the program and the cast should be "positive."[52] Superintendent Shank told the cast, in substance, "if anyone wants to quit, you can quit. The door is right there. But if you leave, you're not allowed to come back."[53] Student Hartline understood Superintendent Shank intended this comment to be directed at her and reacted to it by standing up, packing up her book bag, announcing "fine, I quit," throwing her script in the trash, and leaving the auditorium.[54]

Superintendent Shank directed Principal Becker to suspend Student Hartline from school for a day-and-a-half.[55] Principal Becker met with Student Hartline, told her to go home for the rest of the day and to stay home the next day, but did not tell her the time off from school constituted a suspension.[56] Student Hartline's mother called the school to speak to Principal Becker and Superintendent Shank about the suspension, but they refused to meet with her.[57]

10

### *Director Lyons disciplines Student Ferrizzi after the musical.*

On March 24, 2019, four days after the School Board Meeting, Superintendent Shank, Principal Becker, and Director Lyons exchanged e-mails regarding Student Ferrizzi.[58] Director Lyons e-mailed Superintendent Shank and Principal Becker: "I think [Ms. Hartenstine] and [Principal Becker] would agree that based on some of the behavior we saw from Vinny Ferrizzi, we may have a mole in our midst. It was apparent that at one point he was trying to ease-drop [sic] on our conversation. The kids are also being very cautious. I will continue to keep a close eye on this behavior."[59] Superintendent Shank responded "if his [Student Ferrizzi] behavior becomes problematic let [Principal Becker] know and we will address it. I do understand from a source that wishes to remain anonymous that he [Student Ferrizzi] is reporting directly to two board members. Vinnie has been known to ease drop [sic] on conversations with me, my office, Katie and other teachers."[60] Director Lyons responded "[t]hanks for the intel" to which Superintendent Shank responded "[h]ave a back up plan for Vinnie's part. If this is anything like the rest of the year, he will continue to push the line as far as he can."[61] Director Lyons responded, "I do – would prefer that we make the change this week instead of the week of the show when he decides to act up" and Superintendent Shank responded, "I would try to develop an understudy for him so when he pulls the week of the show for affect [sic] we are ready."[62]

The same day, March 24, 2019, Superintendent Shank e-mailed School Board members advising, "Musical rehearsals went much better this weekend. Only two students have removed themselves from the show. One I removed because of his behavior and his girlfriend then quit. The 3rd [sic] student who is and has been problematic, Vinnie F, is acting out and beginning to undermine other cast members, ease drop [sic] on conversations, and not follow directions. If he

11

continues I will address it. The other students are beginning to complain about his negativity and immaturity."[63]

The Drama Club held its last performance of the musical on April 13, 2019. The cast and crew held a party in the Auditorium after the show. Director Lyons "gave nice comments about everyone," but when addressing Student Ferrizzi, she said, "I'll never forgive you for what you said, but this may be a life lesson to you."[64] The School District contends between shows on April 13, 2019, Student Ferrizzi told the cast "that there was a big lawsuit coming" and "the bitch was going down," referring to Director Lyons.[65] Student Ferrizzi denies any "documents show" he used the word "bitch" or referenced Director Lyons.[66]

On April 14, 2019, the cast and crew planned to return to the school for a "set strike" to take down the set and props.[67] Director Lyons texted Superintendent Shanks and Principal Becker on the morning of April 14: "Hi Tracy and Chris – the shows went great this weekend! It was however clouded by Vinny last night talking to the kids about that there's going to be a big law suit and that he's been taking notes the whole time and 'someone' is going down. He told them he is planning on coming late and leaving early today for set strike. [T]he kids we're [sic] very upset. I told them that they need to see their counselor, Mr. Becker, or Dr. Shank on Monday. If Vinny shows up I will ask Mr. Conrad (he's a retired State Trooper) to be on the alert as I will ask Vinny to leave. I will not have him here to continue to hurt this cast. If he shows [sic]."[68] Superintendent Shank responded, "If he shows just send him home" and Principal Becker responded, "I agree. No need for it[.] And once again-wonderful job. I also heard yesterday was awesome."[69]

Thirteen minutes after receiving Director Lyons's text message, Superintendent Shank e-mailed School Board members reporting, "Just an FYI – the musical went very well. All 3 shows

12

were outstanding. Then last night Vinnie F was very negative with the cast and crew stating he took notes on everything, someone is going down, and there is going to be a 'big law suit.' Students and parents were very upset ... set strike is today so I have instructed [Director Lyons] if Vinnie shows up just send him home."[70]

Student Ferrizzi arrived for set strike. Director Lyons asked to speak to Student Ferrizzi in the hallway in the presence of Defendant Lyons's husband and two other adult men.[71] Director Lyons told Student Ferrizzi to leave school premises "because of things that were said last night" and the three men escorted Student Ferrizzi from the school.[72] Student Ferrizzi testified he submitted a complaint to Principal Becker for being escorted from the school on April 14 and contends he never received a response to his complaint.[73] Student Ferrizzi contends as a result of being escorted from the school on April 14, rumors began circulating he "ditched" the drama program and he experienced depression and missed a few days of school.[74]

### *The Students bring the drama to federal court.*

Within twenty days of being escorted from school, Student Ferrizzi, along with Students Eck and Hartline, sued the School District, its Superintendent Shank, Principal Becker and Drama Director Lyons. The Students, through four versions of complaints refined after we dismissed several claims in August 2019, allege two principal harms: the District and its actors conspired to suspend each Student without due process in retaliation for exercising their First Amendment rights to public speech at the public Board Meeting; and, Director Lyons's pre-Meeting March 19, 2019 e-mail defamed Student Eck and cast him in a false light.

13

## II.    Analysis[75]

The School District, Superintendent Shank, Principal Becker, and Director Lyons move for summary judgment on the remaining claims: First Amendment retaliation against the School District and Superintendent Shank, Principal Becker, and Director Lyons; due process violations against the School District and Superintendent Shank, Principal Becker, and Director Lyons; failure to supervise the protection of First Amendment Rights against Superintendent Shank at the public Meeting; defamation and false light by Student Eck against Director Lyons; and, civil conspiracy against Superintendent Shank, Principal Becker, and Director Lyons for retaliating against First Amendment exercise of speech during the Board Meeting and depriving them of due process.[76] Student Eck seeks partial summary judgment on his First Amendment retaliation claim and state law defamation and false light claims.[77] Student Hartline seeks partial summary judgment on her First Amendment retaliation and due process claims.[78] Student Ferrizzi seeks summary judgment on his First Amendment retaliation and due process claims.[79]

Through four complaints, the Students specifically allege their First Amendment harm arises from being suspended because they spoke at a public School Board Meeting. They also allege the District and its administrators including Director Lyons deprived them of due process in suspending them. Student Eck also alleges reputational damage from Director Lyons's pre-Meeting March 19, 2019 e-mail. The Students never allege protected conduct outside of speaking at the public Meeting; for example, the Students never allege the state actors retaliated based on the hallway conversation with Director Lyons after the public Board Meeting. The Students also never alleged the state actors violated the First Amendment by allegedly precluding them from referring to Director Lyons by name but allowing supporting students to identify her by name.[80] Guided by the Students' specific allegations evolved over four complaints, our focus is on whether:

14

the District and its actors unconstitutionally retaliated against the Students by suspending them for their public speech at the public Board Meeting; the District and its actors deprived them of due process in suspending them; and, Director Lyons defamed or placed Student Eck in false light in the pre-Meeting March 19, 2019 e-mail.

## A. We grant summary judgment in favor of Director Lyons on the First Amendment retaliation claim but disputed facts require trial on the First Amendment retaliation claims against the other Defendants.

Each Student alleges the School District, Superintendent Shank, Principal Becker, and Director Lyons suspended them from school for speaking at the March 20, 2019 public School Board Meeting. The state actors cite facts showing the Superintendent and Principal suspended each Student for separate disciplinary reasons. No student adduces evidence Director Lyons decided to suspend them. We grant Director Lyons's motion for summary judgment on Student Eck's retaliation claim but the jury must decide why the District, Superintendent Shank and Principal Becker suspended Student Eck and why all Defendants suspended all three Students; was it for speaking at the public School Board Meeting or for post-Meeting disciplinary reasons?

The elements of a First Amendment retaliation claim are: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.[81] "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity."[82]

Students allege their comments at the March 20, 2019 School Board Meeting on a matter of public concern is protected speech. Defendants concede the Students' statements at the School Board Meeting are protected speech under the First Amendment.[83]

15

Students argue they experienced retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights: Student Eck received a three day suspension; Student Hartline received a day-and-a-half suspension after being "goaded into quitting the musical" and "under a bait-and-switch tactic after being told she could go home"; and the school removed Student Ferrizzi from the April 14, 2019 set strike. Defendants do not contest these facts.

The parties contest the third element—causation. Defendants and Students seek summary judgment arguing there is no genuine issue of fact on the causal link between protected speech at the School Board Meeting and their suspensions from school. Defendants argue there is no genuine issue of fact the School District suspended Student Eck for disrespectful and threatening language to Ms. Hartenstine; suspended Student Hartline for insubordination to Superintendent Shank when she left the cast meeting, quit the play, and threw her script in the trash; and, removed Student Ferrizzi from an extra-curricular activity for threatening Director Lyons by telling fellow cast members "there is going to be a big lawsuit and [either someone or 'the bitch'] is going down."

### 1. Fact questions on the causal link between the Students' speech at the public Board Meeting and their suspensions preclude summary judgment on all claims.

Each Student sues each Defendant for First Amendment retaliation. Each Student must thus adduce evidence as to each Defendant sued on this claim. After parsing through the varied arguments, we find several genuine issues of material fact concerning why Defendants may have suspended each Student with the exception of no issue of fact about Director Lyons's lack of personal involvement in Student Eck's suspension.

To establish the requisite causal link, Students must prove either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action,

16

or (2) a pattern of antagonism coupled with timing to establish a causal link."[84] "In the absence of that proof the plaintiff must show that from 'the evidence gleaned from the record as a whole' the trier of the fact should infer causation."[85] Our Court of Appeals explained "unusually suggestive" temporal proximity means "within a few days but no longer than a month."[86]

Student Eck argues Superintendent Shank e-mailed the School Board hours after his speech at the School Board Meeting, telling the Board "Jordan may have just finished his last rehearsal tonight" and "I will end his role in it."[87] The next day, Principal Becker, at Superintendent Shank's direction, suspended Student Eck for three days and removed him from the Drama Club. Parties disagree as to the cause of the suspension; Defendants argue the School District suspended Student Eck for his behavior after the Board Meeting when speaking to Director Lyons, Ms. Hartenstine, and Ms. Jones in the school hallway after the School Board Meeting, including language and behavior "so insubordinate and aggressive" Ms. Hartenstine became visibly upset and shaken. Student Eck denies this behavior and the parties disagree about the conversation between Student Eck and Director Lyons, Ms. Hartenstine, and Ms. Jones.

Student Hartline argues the day after the School Board Meeting, Superintendent Shank called a meeting where she told the cast "to end the drama in Drama Club and that if any of them didn't like it, they could leave."[88] Student Hartline testified she felt Superintendent Shank spoke directly to her and, feeling "called out," left the meeting. Principal Becker then suspended Student Hartline for a day-and-a-half. Student Hartline attributes the suspension to retaliation for her speech against Director Lyons at the School Board Meeting. Defendants attribute the suspension to Student Hartline's "insubordination" to Superintendent Shank for leaving the meeting and points to Student Ferrizzi's deposition testimony Student Eck "was on the verge of quitting the show anyway when she learned that her boyfriend, [Student Eck], had already been suspended"

17

arguing "had [Student Eck] not been suspended, it is likely that [Student Hartline's] behaviors may have changed dramatically at the cast meeting on March 21 and not ended in her quitting in a dramatic and disrespectful fashion and getting suspended for the rest of the week because of it."[89]

Student Ferrizzi argues Director Lyons announced at the show's closing on April 13, 2019, "I will never forgive you for what you said about me" and the next day Director Lyons ordered three men, including her husband, to escort Student Ferrizzi from school premises. Defendants argue his dismissal from the set strike is "not a violation of any constitutional right he may have had to be sent home early from a non-mandatory Sunday function at the high school" and, in any case, Director Lyons and Superintendent Shank ordered him to leave the set strike because of his comment about a law suit perceived as a threat against Director Lyons.

Superintendent Shank and Principal Becker suspended Students Eck and Hartline the day after they spoke at the School Board Meeting. Director Lyons, at the direction of Superintendent Shank and Principal Becker, removed Student Ferrizzi from the extra-curricular activity three weeks after his speech at the School Board Meeting. Fact issues preclude summary judgment on the causal link between Students' protected speech and their suspensions.

### 2. We grant Director Lyons summary judgment on Student Eck's First Amendment retaliation claim.

To establish a § 1983 claim against Director Lyons in her individual capacity, Student Eck must prove Director Lyons, acting under color of law, violated his federal constitutional or statutory rights and caused the alleged injury.[90] Student Eck must prove Director Lyons's "personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."[91] Student Eck can show "personal involvement" by proving the individual's "participation in or actual knowledge of and acquiescence in the wrongful conduct."[92]

18

Director Lyons argues Students failed to adduce evidence of her involvement in Student Eck's suspension which the Students argue arises from the complaints to the School Board in a public Meeting. Apparently ignoring the basis of his retaliation claim, Student Eck responds Director Lyons "goaded him" during their hallway conversation after the School Board Meeting by asking him whether he thought Ms. Hartenstine lied about her experience in losing a lead part in a show. According to Defendants, Student Eck's response to the question upset, threatened, and disrespected Ms. Hartenstine leading to his suspension, not because of his speech at the School Board Meeting. Even viewing the facts and drawing all reasonable inferences in the light most favorable to Student Eck, Director Lyons did not suspend him. Student Eck fails to allege Director Lyons's personal involvement in his suspension.

In our August 15, 2019 memorandum dismissing without prejudice Student Eck's First Amendment retaliation claims against Director Lyons for failing to allege personal involvement, we explained to Student Eck only Superintendent Shank and Principal Becker attended the suspension meeting.[93] Student Eck still filed a second and third amended complaint against Director Lyons in her individual capacity for First Amendment retaliation.

Student Eck must point to some evidence of Director Lyons's personal involvement in his suspension. Superintendent Shank and Principal Becker suspended Student Eck for his conduct toward Ms. Hartenstine. Student Eck argues Director Lyons's conduct forms the basis of his claim because she "goaded him" into answering a "loaded question" which he contends is "in and of itself, protected speech under the First Amendment."[94] But this is not the basis for Student Eck's First Amendment retaliation claim; his third amended complaint alleges First Amendment retaliation based on his comments at the School Board Meeting, not the conversation he had with Director Lyons in the hallway after the Meeting.[95] There is no evidence suggesting a genuine issue

19

of fact as to Director Lyons's personal involvement in suspending Student Eck for his alleged protected activity in speaking at the public School Board Meeting. Student Eck is the master of his pleading (four versions); he does not allege protected activity outside of speaking in the public Meeting in any of his four complaints.

We cannot proceed on Student Eck's retaliation claim against Director Lyons when there is no evidence she played a role in his suspension in retaliation for speaking at the Board Meeting.

## B.    We grant summary judgment dismissing Students Eck's and Ferrizzi's due process claims, but questions of fact preclude summary judgment on Student Hartline's due process claim.

Defendants move for summary judgment on the Students' due process claims. Students Hartline and Ferrizzi cross-move for summary judgment on their due process claims. We grant Defendants summary judgment dismissing Students Eck's and Ferrizzi's due process claims but fact questions preclude summary judgment on Student Hartline's due process claim.

To state a procedural due process claim under Section 1983, the Students must show (1) a deprivation of "an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,'" and (2) "the procedures available to him [or her] did not provide 'due process of law.'"[96] In *Goss v. Lopez*, the Supreme Court established the requirements of due process for a suspension of ten days or less of a public school student.[97] "Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[98]

School District policy provides: "The Board recognizes that exclusion from the educational program of the schools, whether by suspension or expulsion, is the most severe sanction that can

20

be imposed on a student and one that cannot be imposed without due process. The Board shall define and publish the types of offenses that would lead to exclusion from school. … The Board may, after a proper hearing, suspend a student for such time as it deems necessary or may permanently expel a student."[99]

"The principal or person in charge of the school may suspend any student for disobedience or misconduct for a period of one (1) to ten (10) consecutive days and shall immediately notify the suspension to the parent/guardian and the Superintendent in writing when the student is suspended. No student may be suspended without notice of the reasons for which s/he is suspended and an opportunity to be heard on his/her own behalf before the school official who holds the authority to reinstate the student. Prior notice is not required where it is clear that the health, safety, or welfare of the school population is threatened. Suspensions may not run consecutively beyond the ten-school-day time period."[100]

Where the suspension exceeds three days, the student and parent are entitled to an informal hearing "with the designated school official" and due process requirements, including written notice of the reasons for suspension, sufficient notice of time and place of the informal hearing, and the opportunity to question and present witnesses.[101] The School District's policy provides "[n]o student may be suspended without notice of the reasons for which s/he is suspended and an opportunity to be heard on his/her own behalf before the school official who holds the authority to reinstate the student. …" Under the policy, a suspension exceeding three days requires informal hearing with certain due process requirements. There is no dispute Students Eck, Hartline, and Ferrizzi were all suspended for three days or less.

21

#### *Student Eck received the procedural due process owed to him under Goss.*

Defendants argue Student Eck received notice of his meeting with Superintendent Shank and Principal Becker and he and his mother met with them on the morning of March 21 where a three-day suspension was imposed. Defendants contend this is all the due process required under *Goss.* Student Eck responds the School District denied him a right to be heard "in a meaningful manner" because Superintendent Shank's e-mail to Principal Becker already decided—before the meeting with Student Eck and his mother—on a three-day suspension. Student Eck argues he could not meaningfully present his side of the story because "Defendants admit that it was dead on arrival."

Under *Goss*, the process owed to Students is "oral *or* written notice of the charges against [them] and, if [they deny] them, an explanation of the evidence the authorities have and an opportunity to present [their] side of the story." Student Eck alleges he "was called to the office" on March 21, 2019 "and told that he could have a guardian present for an important meeting" with Superintendent Shank and Principal Becker and he elected to call his mother.[102] There is no dispute Student Eck, his mother, Superintendent Shank, and Principal Becker all met to discuss a three-day suspension.[103] Student Eck concedes the "parties disagree on what was said during the meeting,"[104] but the fact remains he and his mother had a meeting where the reasons for his suspension were discussed. This is all procedural due process requires. Student Eck may dispute the substance of the decision, but Defendants provided him with procedural due process.

#### *Fact questions preclude summary judgment on Student Hartline's due process claim.*

Student Hartline argues she did not receive notice or an opportunity to be heard before her suspension. Student Hartline argues she did not know Principal Becker suspended her until after he told her to take the rest of the day off and the next day off after the cast meeting called by

22

Superintendent Shank.[105] After learning her day-and-a-half time off from school constituted a suspension, Student Hartline's mother contacted the school "multiple times" to speak with Superintendent Shank and Principal Becker, but her requests were refused.[106] Principal Becker admitted he did not tell Student Hartline of the suspension at the time he sent her home and Defendants admit they did not meet with Student Hartline's mother.[107]

Defendants offer no meaningful response. They argue Student Hartline "quickly learned confronting [Superintendent Shank] after being given an ultimatum has consequences" leading to a meeting with Principal Becker "whose gentle mannerisms were lost on her."[108] Defendants argue Student Hartline "allowed herself to believe she was simply excused from school for 1 ½ days because she was upset and crying" instead of "hearing and realizing she was being suspended."[109] Defendants concede Principal Becker testified he "should have been clearer" in issuing the suspension, but it is excusable because "his choice at the time was to be gentle with an emotionally delicate young lady who had just made a very bad choice and was about to be given some time on the street to think about her insolent behaviors."[110]

As the moving party, Defendants failed to adduce evidence of no genuine issues of material fact and they are not entitled to judgment as a matter of law. Under *Goss*, Student Hartline is entitled to be given oral or written notice of the charges against her and, if she denied the charges, the opportunity to explain herself. On the present state of the record, Student Hartline contends she did not know Principal Becker suspended her and, upon learning her day-and-a-half off of school intended to be a suspension, Superintendent Shank refused her mother's request for a meeting. On the other hand, Student Hartline met with Principal Becker, albeit without her mother. We know Superintendent Shank and Principal Becker had a meeting with Student Eck and his mother before his three-day suspension, so we are left to wonder why Principal Becker or

23

Superintendent Shank failed to hold a meeting with Student Hartline and her mother. The jury will resolve these fact issues.

### *We grant Defendants summary judgment on Student Ferrizzi's due process claim.*

Defendants argue Student Ferrizzi's due process claim fails as a matter of law because he did not earn a suspension from mandatory school attendance like Students Eck and Hartline.[111] Director Lyons simply turned him away from the set strike in which he has no protected speech interest. Student Ferrizzi responds he testified the set strike "was mandatory for Drama Club members" and Defendants stipulated he received a *de facto* suspension.[112] Student Ferrizzi affirmatively moves for summary judgment arguing his removal from the set strike constitutes a suspension and not afforded the procedure required by *Goss*.[113]

In *Goss*, the Supreme Court held a state must "recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause."[114] Student Ferrizzi argues his ejection from the set strike is a protected property interest. But most district and appellate courts considering the issue hold a public school student does not have a protected property interest in participating in extracurricular activities.[115]

Student Ferrizzi argues the Defendants earlier stipulated to his *de facto* suspension. But Student Ferrizzi's only possible suspension is being removed from the extra-curricular set strike. Stipulations in a Rule 26(f) report are for purposes of discovery only; not binding admissions of fact. Further, this stipulation is a question of law. The parties cannot stipulate to the status of the legal effect of a removal from extra-curricular activities. There is no question of material fact as to whether participation in extra-curricular activities creates a property interest affording Student Ferrizzi the same level of due process afforded students suspended from classes.

24

## C. We grant summary judgment in favor of Superintendent Shank on a failure to supervise the protection of First Amendment Rights claim.

In their third amended complaint, Students allege Superintendent Shank failed to supervise the protection of their First Amendment rights while speaking at the March 20, 2019 School Board Meeting.[116] Superintendent Shank seeks summary judgment arguing Students all spoke at the School Board Meeting and nothing she did or did not do prevented the exercise of those rights. In response, Students adopt a new theory of liability not plead in their four versions of a complaint. Apparently conceding no claim by Students Hartline and Ferrizzi, the Students now argue Superintendent Shank failed to properly train Director Lyons, Ms. Hartenstine, and Ms. Jones about their hallway conversation with Student Eck. There is no argument about Students Hartline and Ferrizzi.

Student Eck's First Amendment retaliation theory is Superintendent Shank, Principal Becker, and Director Lyons "invented" a tale of aggressive and insubordinate behavior towards Ms. Hartenstine during the hallway conversation to justify his suspension but the true reason for his suspension is to retaliate against him for speaking out against Director Lyons at the School Board Meeting.[117]

Student Eck's new and unplead theory is Superintendent Shank failed to train Director Lyons, Ms. Hartenstine, and Ms. Jones on how to "balance [Students'] right to disagree with a teacher with actual insubordination" by: "(1) in private conversations students are free to candidly vent their frustration and to share their feelings, which is qualitatively distinct from classroom disruption or insubordination; (2) if the private conversation becomes emotionally tense, for either student or adult, it is incumbent upon the teacher or staff to end or adjourn the conversation in order to restore calmness; (3) the teacher-student relationship is an authority relationship and that relationship is abused if a teacher or staff member goads a student by asking a question so the

25

student can be disciplined for having answered it; and (4) 12th grade students are free to form personal opinions about the veracity of a teacher or staff member, and cannot have their free expression reduced to that of a 5th grader."[118]

But Student Eck's identified First Amendment right he alleges he exercised is speaking at the School Board Meeting, not speaking in the hallway to Director Lyons. Student Eck cannot create a new cause of action at summary judgment based on the disagreement in the hallway. His claim is based on retaliation for speaking at the School Board Meeting. The Defendants claim the suspension is based upon his conduct in the hallway.

Student Eck never sued a party claiming the conduct in the hallway is the protected conduct for which the Defendants retaliated. His claim has always been, through four complaints, speaking at the School Board Meeting caused the retaliation. Thus, this failure to train about a discussion in the hallway is of no moment to the claims in the case. There is no allegation of a failure to train concerning managing the conduct at the School Board Meeting. In fact, there is no evidence the Defendants interfered with the right to speech other than not allowing the complaining Students to identify Director Lyons. Student Eck alleged the School Board President restricted his speech by prohibiting "character assassination" and referencing Director Lyons by name.[119] But no Student makes this argument and we do not see how this limited restriction on the content by precluding identification of the Drama Director by name evidences a lack of supervision over other state actors. Absent this claim, we cannot address a failure to train for conduct not raised in the third amended complaint.

**D.     Student Eck may proceed on his defamation and false light claims against Director Lyons.**

Director Lyons and Student Eck cross-move for summary judgment on Student Eck's defamation and false light claims arising from the March 19, 2019 e-mail Director Lyons sent to

26

families of Drama Club students. Student Eck alleges this e-mail "harmed [him] in the eyes of his fellow students and in the eyes of their parents"; "may have contributed to the response at the School Board meeting regarding [Director] Lyons"; and "was exacerbated by [his] subsequent three-day suspension from school which in the eyes of students will likely appear as a ratification of the claim that he exhibits some sort of violent behavior"[120] and the e-mail "would be highly offensive to a reasonable person and would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities" making Director Lyons liable to Student Eck for "damages for false light."[121] Director Lyons does not challenge the quantum of damages on summary judgment.

In support of his motion for summary judgment on defamation, Student Eck argues at least nineteen families received Director Lyons's March 19, 2019 e-mail. Student Eck complains Director Lyons's e-mail constitutes both defamation and false light because it falsely claims (1) he posted something (the Fruit Video); (2) against another student (meaning J.M.); (3) warranting "police [to be] called in" to "deal with" Student Eck "reasonably communicating that [Student Eck] had physically threatened or harmed another student"; and (4) his actions created "jeopardy of losing this program."[122] Student Eck contends everyone knew the e-mail pertained to him because everyone knew he did not get the lead role as "Jack" in the musical; Superintendent Shank admitted other Drama Club members became angry with Student Eck after the School Board Meeting because "they were frustrated with the gossip and the anger and the continued disruption that is being caused" when the March 19 e-mail "instigated the gossip and the disruption"; and the e-mail "lowered his reputation and deterred other members from associating with him and those close to him." Student Eck argues Director Lyons waived a conditional privilege because she did not raise it in her Answer and the School District's "courtesy call to the police concerning" the Fruit Video is not "legitimate" because he did not pose any threat.[123] Defendant Lyons raises the

27

affirmative defense of conditional privilege in Defendants' Answer to the Third Amended Complaint.[124]

Director Lyons moves for summary judgment on Student Eck's defamation claim arguing her March 19, 2019 e-mail is incapable of having a defamatory meaning and did not apply to Student Eck because: she does not mention Student Eck by name; she simply explains a controversy resulting from a casting decision with the potential to "destroy the program and implicitly, the work she put into it"; she did not share with parents the "radical disappointment of [Student] Eck about not winning the lead role and his bad disposition and temperament toward the boy who did win that role" before sending her e-mail; and, she intended only to "alert her small audience of cast parents that the program was in jeopardy because of this controversy and that they should appear for the meeting and speak in favor of the program."[125]

On his false light claim, Student Eck argues Director Lyons knew or acted with reckless disregard of the truth of whether police were called in because she did not watch the Fruit Video; although she knew the police met with J.M.'s mother, her e-mail implied Student Eck did something "horrible" warranting police response; no reasonable person would view the Fruit Video as a threat requiring police involvement; and, Director Lyons does not regret having sent the e-mail.

Director Lyons moves for summary judgment on Student Eck's false light claim arguing the publicity element is not satisfied because she only sent her March 19 e-mail to a "handful" of people, there is no evidence she acted with reckless disregard of the falsity of the e-mail because it is true, and Student Eck failed to show the publication would be highly offensive to a reasonable person, pointing to his failure to produce evidence anyone, including his girlfriend Student Hartline

or friend Student Ferrizzi, found the e-mail to be so highly offensive to consider him a criminal and to choose to disassociate with him.[126]

### *The March 19, 2019 e-mail can have defamatory meaning.*

Under Pennsylvania law, Student Eck has the burden of proving (1) the defamatory character of the communication; (2) its publication by Director Lyons; (3) its application to Student Eck; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to Student Eck; (6) special harm resulting to Student Eck from its publication; and (7) abuse of a conditionally privileged occasion.[127]

"Whether a communication is capable of defamatory meaning is a 'threshold issue' to be determined by the court."[128] Student Eck bears the burden of making this showing and "[i]f [we] determin[e] that the challenged publication is not capable of defamatory meaning, there is no basis for the matter to proceed to trial."[129] The truth of the communication and "privileged character" of the communication are defenses to defamation under Pennsylvania law.[130]

To determine whether a statement is capable of defamatory meaning, we consider "whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him."[131] "The statement must be examined in context to determine its likely effect on the reader" and we "should evaluate the effect it is likely to produce 'in the minds of the average persons among whom it is intended to circulate.'"[132] "[T]he statement must do more than merely annoy or embarrass the purported victim."[133]

Director Lyons seeks summary judgment on the defamation claim arguing only the e-mail is incapable of defamatory meaning and did not apply to Student Eck because she did not identify him by name. As a threshold matter, Director Lyons's March 19, 2019 e-mail is capable of

29

defamatory meaning viewing it in the factual context in which it is made. There is no dispute Director Lyons sent her e-mail to at least nineteen recipients. The e-mail refers to "horrible stuff happening behind the scenes with a student and his mother" and the "situation has escalated to the point that this student posted something against the other student and the police were called in." In determining whether a statement is capable of defamatory meaning, "[a] critical factor … is the nature of the audience hearing the remark" and whether "the effect of the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average person among whom it is intended to circulate."[134]

Director Lyons's statements "horrible stuff [is] happening behind the scenes with a student and his mother" escalating to the point "this student posted something against the other student and the police were called in" is capable of defamatory meaning when viewed in its factual context. Parents reading such an e-mail could have understood these statements to mean Student Eck's behavior in "posting something" — which we now know as the Fruit Video and which Student Eck did not post — required police intervention. In today's reality of bullying and school violence, parents of high school students receiving such an e-mail could likely assume Student Eck threatened another student on social media requiring police intervention. In this context, the statements in Director Lyons's e-mail are capable of defamatory meaning.

As to the application to Student Eck, Director Lyons's e-mail refers to a "student and his mother" and attributes their conduct "because her son was not cast as Jack." Student Eck asserts only two people —he and J.M.—auditioned for the role.[135] Defendants deny this, asserting "the facts of record show Defendant Lyons auditioned several students for the part of 'Jack' and did not previously intend to share with the cast parents the problems created by [Student] Eck towards the successful candidate, [J.M.]"[136] The "facts of record" referred to by Defendants are the

30

testimony of Director Lyons and Superintendent Shank. Director Lyons testified several students auditioned for the role of "Jack," but only Student Eck and J.M. were "[a]t the end, the two that were up against each other in the end ...."[137] Superintendent Shank testified because "there are no names in [the e-mail]. So if you don't even - if you're a parent of a freshman – and I'm just saying, you know, an example – if you're a parent of a freshman and you don't know anything about this alleged Snapchat video and you got this email, you wouldn't have any clue if it was [J.M.] or [Student Eck]" and "many students tried out for Jack that were not cast as Jack."[138] When asked "So you don't believe, based on this email, that it was clear who was being referred to," Superintendent Shank responded: "I can't answer that because I know who it referred to because I have been dealing with this case since January 2019. I can't say what a freshman parent is going to say, who doesn't have this information that I already have. ...."[139] Director Lyons's and Superintendent Shank's testimony only creates fact issues regarding who among the parents receiving the e-mail understood it to refer to Student Eck.

Director Lyons next asserts two affirmative defenses: truth and conditional privilege. Under Pennsylvania law, truth is an affirmative defense to defamation.[140] "Under Pennsylvania law, proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader from which the pleaded truth would have produced."[141] "Determining the truth of an alleged defamatory statement is typically a matter for a jury."[142]

Defendant Lyons argues it is true Student Hartline posted the Fruit Video, J.M. is allergic to fruit, and "the police were called by [J.M.'s mother] and by the school administration."[143] Director Lyons contends the "sting" of her e-mail is the inference Student Eck "was involved in some time [sic] of criminal activity that required police involvement" but the "gist" of the e-mail

31

"as intended by Defendant Lyons, was an effort to engender support for a program that was coming under attack by the very student who performed a skit using fruits to which his cast member nemesis, [J.M.], was highly allergic, all in an effort to entertain and flirt with his girlfriend."[144]

Fact issues preclude summary judgment on the Director Lyons's truth defense. We know Student Eck did not post the Fruit Video although the e-mail states he did so. We know Guidance Counselor Borovik contacted the Central Berks Regional Police Department on March 19, 2019 to report "an incident between two students" and told police "there was a Snapchat video involving a student named [J.M.]" but we do not have evidence J.M.'s mother made a police report or any evidence the police did anything other than take a report from Guidance Counselor Borovik much less evidence the "police were called in," suggesting police came into the school to investigate.

Director Lyons also argues conditional privilege bars claims for this communication. "Communications are privileged when they are 'made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause ....' "[145] "Stated differently, a conditional privilege arises 'whenever circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.'"[146] Whether a conditional privilege exists is a question of law, but an abuse of the privilege is a question of fact.[147] Once a conditional privilege is raised and shown, the burden of proving an abuse of the privilege is on the allegedly defamed person.[148]

Director Lyons contends her e-mail is conditionally privileged because she could not be at the School Board Meeting and wanted to rally the support of parents "who loved the programs ... to attend the meeting and speak favorable in support of the program, lest the possibility of a shut

32

down could become a reality."[149] She argues proper occasion, motive, manner and cause for a conditional privilege.

Student Eck responds the "program" and Director Lyons are "not one and the same" and Director Lyons knew the Drama Club program "was not in jeopardy when she sent" the e-mail, pointing to her deposition testimony stating neither Superintendent Shank nor any member of the School Board told her the program is in jeopardy.[150]

As a matter of law, we do not find a conditional privilege existed between Director Lyons and the parents of cast members she perceived "believe[d] in [the Drama Club] program and students that love it" in sharing allegations Student Eck "posted something against another student" requiring "the police were called in." While Director Lyons may have a common interest with certain parents to support the drama program, we do not see how allegations suggesting threatening behavior between two students can be fairly read to be included in this privilege. Director Lyons cannot avail herself of a conditional privilege to possibly defame Student Eck with facts unrelated to the management of the musical.

### *The jury will decide whether the e-mail casts Student Eck in a false light.*

Pennsylvania defines the tort of "false light invasion of privacy" by the Restatement (Second) of Torts, Section 652E: "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."[151] Unlike defamation, "false light invasion of privacy offers redress not merely for the publication of matters

33

that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression."[152]

The elements of a false light invasion of privacy claim are: "(1) the defendant makes a false communication; (2) the defendant acted with at least reckless disregard; (3) the communication would be highly offensive to a reasonable person; and (4) publicity or widespread dissemination of the communication."[153] Even a communication that is literally true may be actionable where "discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed."[154]

Director Lyons seeks summary judgment arguing the publicity element is not met because she only sent her e-mail to a "handful" of people; the e-mail does not put Student Eck in a false light as would be highly offensive to a reasonable person; and, Student Eck fails to show she acted with reckless disregard of the falsity of the e-mail because the content is true. Director Lyons additionally argues Student Eck failed to show he suffered "from being ostracized by his friends."

Student Eck seeks summary judgment for the same reasons argued in support of summary judgment on his defamation claim, but also arguing Director Lyons acted with reckless disregard as to the truth of whether police were "called in" regarding the Fruit Video.

Issues of material fact preclude the entry of summary judgment for either party. On the issue of publicity, a matter must be made public "by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."[155] "[P]ublicity must be such that the communication 'reaches, or is sure to reach, the public.'"[156] Director Lyons contends only a handful of parents received her e-mail, pointing to a list of nineteen e-mail addresses.[157] Student Eck responds Defendants spoliated evidence, pointing

34

to his request for an original copy of Director Lyons's e-mail showing all recipients which Defendants still have not produced. [158] There are fact issues surrounding who received the e-mail. Even Defendants contend before the March 20 School Board Meeting "several parents and their children distributed copies of the e-mail from Mrs. Lyons, some of which landed in the hands of the Plaintiffs and some of their friends," including another student, L.G., whose parents do not appear to be included in the nineteen e-mail addresses identified by Defendants.[159]

Whether Director Lyons's e-mail telling parents "horrible stuff happening" and an escalated situation of a "student post[ing] something against another student and the police were called in" would be highly offensive to a reasonable person—here, a high school senior—is a question for the jury.[160] And questions of fact surround whether, in sending her e-mail, Director Lyons acted with reckless disregard of its falsity. Even a true communication may be actionable if the information is "susceptible to inferences casting one in a false light." Student Eck argues Director Lyons only knew J.M.'s mother met with the police, but the e-mail suggests Student Eck did something "horrible" warranting a police response and Director Lyons did not see the Fruit Video which, argues Student Eck, is silly and not a threat. Student Eck also argues Director Lyons does not regret having sent the e-mail, demonstrating her intent.

Neither party adduced undisputed facts which would allow us to find a lack of intent. Circumstantial evidence supports each party's theory. Director Lyons sent the e-mail upset at being challenged in a public meeting in her absence. She went beyond defending herself to attack the credibility of the possible complaining student with references to events which arguably cast him in a false light. Director Lyons argues innocent intent designed to save the musical. But her testimony confirms she knew the District would not cancel the musical. A jury will decide these questions of credibility.

35

### E. The Students may proceed on the civil conspiracy claim on the remaining First Amendment and due process claims.

Students claim Principal Becker and Director Lyons conspired with the School District and Superintendent Shank to retaliate against them for exercising their First Amendment right to speak at the School Board Meeting and to deprive them of due process.[161] Defendants move for summary judgment on this claim.

To prevail on a conspiracy claim under section 1983, Students must prove persons acting under color of state law "reached an understanding" to deprive them of their constitutional rights.[162] After establishing the object of the conspiracy is the deprivation of a federally protected right, "'the rule is clear that' the plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.'"[163] To show agreement, Students must show "the state actors named as defendants in the[ ] complaint somehow reached an understanding to deny [Students] [their] rights" and "in the absence of direct proof, that 'meeting of the minds' or 'understanding or agreement to conspire' can be 'infer[red]' from circumstance evidence ...."[164]

Superintendent Shank, Principal Becker, and Director Lyons concede Students have a protected right to attend the School Board Meeting and to speak about the Drama Club. But they argue each Student earned their suspensions as a consequence of their post-Meeting, unprotected speech and behavior, not because of their speech at the School Board Meeting.[165] This, of course, puts the proverbial rabbit in the hat because whether the suspensions occurred because of their protected speech or because of their behavior is a disputed fact for the jury to decide.

Defendants concede Superintendent Shank and Principal Becker comprised the administrative team disciplining Students Eck and Hartline and meeting with Student Eck and his mother. Director Lyons argues she had nothing to do with the discipline meted out to the Students.

All three defendants argue none of their "alleged misconduct ... was unlawful or done unlawfully for an unlawful purpose, but in a manner consistent with due process safeguards and for behaviors that warranted discipline."[166]

Students respond Director Lyons involved herself in Student Eck's discipline because she "goaded" Student Eck by "asking him a loaded question so he could be disciplined for answering it" and traded e-mails with Superintendent Shank and Principal Becker on how to remove Student Ferrizzi from the musical. There is no explanation of how Director Lyons conspired to deprive Student Hartline of her constitutional rights.

Again, whatever Director Lyons did in the hallway conversation with Student Eck, including whether she "goaded" him into answering a "loaded question," is not the protected activity. The protected activity Students allege Defendants conspired to deprive them of is the deprivation of First Amendment rights to speak at the School Board Meeting and due process rights regarding their suspensions from school.

We today find summary judgment must be entered in favor of Director Lyons as to Student Eck's First Amendment retaliation claim and in favor of all Defendants on Student Eck's and Student Ferrizzi's due process claims. There can be no conspiracy claim under section 1983 if there is no deprivation of a federal constitutional right.[167] But fact issues remain on Superintendent Shank's and Principal Becker's conduct with regard to First Amendment retaliation against Student Eck, and all Defendants' conduct with regard to Students Hartline and Ferrizzi as well as due process claims regarding Student Hartline.

The District and its state actors do not argue a lack of evidence of an agreement and concerted action mandates summary judgment. They instead resort to the same theory: the suspensions arise from post-Board Meeting disciplinary reasons. All well and good. But the jury

37

could disagree as the Students adduce evidence of their protected speech and later suspensions. Absent the Defendants challenging the conspiracy claim on its elements, we cannot grant summary judgment to the Defendants on the conspiracy claim. The jury will decide.

## III.    Conclusion

Following a disappointed Drama Club President not winning the lead in his senior high school musical, a possibly defamatory e-mail to Drama Club parents from a Drama Club Director, and two suspensions and a removal from extra-curricular activity following public speech critical of the Drama Club Director, the suspended Students resorted to this federal court with several constitutional tort theories. We dismissed several based on the pleadings. We dismiss others today. But neither the Students nor the District and its administrators adduce undisputed issues of fact warranting judgment as a matter of law of most of the issues except for Student Eck's First Amendment retaliation claim against Director Lyons, a negligent supervision claim against the Superintendent, and Students Eck's and Ferrizzi's due process claims. This drama will open in less than two months in our courtroom where our jury will decide among the protagonists as to why the District and its state actors either individually or in concert suspended the Students or denied due process to Student Hartline, and whether Director Lyons's March 19, 2019 e-mail warrants damages to Student Eck for defamation or false light invasion of privacy.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. The parties prepared a Joint Appendix in support of their cross-motions for summary judgment (ECF Doc. Nos. 48-1, 54). References to the Joint Appendix are by Bates number, for example, "JA 1." Defendants filed their Motion for summary judgment and supporting memorandum of law at ECF Doc. No. 41, 48 and SUMF at ECF Doc. No. 49 ("School District's SUMF"). Students Eck, Hartline, and Ferrizzi each filed partial motions for summary judgment and supporting memoranda of law: Eck at ECF Doc. Nos. 43, 51; Hartline at ECF Doc. Nos. 45, 50; Ferrizzi at ECF Doc. Nos. 44, 52. Students Eck, Hartline, and Ferrizzi collectively filed a Statement of Undisputed Material Facts ("Students' SUMF"). The School District responded to Student Eck's motion at ECF Doc. No. 55; to Student Hartline's motion at ECF Doc.

No. 56; and to Student Ferrizzi's motion at ECF Doc. No. 57. Students Eck, Hartline, and Ferrizzi collectively responded to the School District's motion at ECF Doc. No. 58 and responded to the School District's SUMF at ECF Doc. No. 59 and added additional facts. The School District responded to the Students' SUMF at ECF Doc. No. 63.

[2] Students' SUMF at ¶ 3 (ECF Doc. No. 53).

[3] School District's SUMF at ¶ 5 (ECF Doc. No. 49).

[4] *Id.* at ¶ 7.

[5] *Id.* at ¶ 8. Students dispute the School District's assertion "several" students tried out for the lead, contending only Student Eck and J.M. tried out for the lead. ECF Doc. No. 59 at ¶ 8. The number of students trying out for the lead is not material.

[6] ECF Doc. No. 49 at ¶ 14; ECF Doc. No. 59 at ¶ 14.

[7] ECF Doc. No. 49 at ¶¶ 12, 13.

[8] *Id.* at ¶¶ 16-19; ECF Doc. No. 59 at ¶¶ 16-19.

[9] ECF Doc. No. 59 at ¶ 14.

[10] *Id.* at ¶¶ 14, 16.

[11] ECF Doc. No. 49 at ¶ 21.

[12] The parties dispute the nature of the video; the Students contend the video is flirting while the School District contends it is a "skit." The label put on the video is not material.

[13] ECF Doc. No. 48-1 at JA 317-18.

[14] ECF Doc. No. 49 at ¶ 42.

[15] ECF Doc. No. 53 at ¶ 24.

[16] *Id.* at ¶ 24.

[17] ECF Doc. No. 59 at ¶ 46.

[18] ECF Doc. No. 54 at JA 328-29.

[19] ECF Doc. No. 53 at ¶ 25; ECF Doc. No. 49 at ¶ 48; ECF Doc. No. 53 at ¶ 26.

[20] ECF Doc. No. 53 at ¶ 19.

[21] *Id.* at ¶ 6.

[22] ECF Doc. No. 54 at JA 326.

[23] ECF Doc. No. 53 at ¶¶ 19-20. While the Students allege this fact, they did not claim this conduct constituted viewpoint discrimination under the First Amendment in any of their four complaints.

[24] *Id.* at ¶ 15; ECF Doc. No. 49 at ¶ 63.

[25] ECF Doc. No. 49 at ¶¶ 64-65.

[26] ECF Doc. No. 49 at ¶ 66(a),(b),(d).

[27] ECF Doc. No. 48-1 at JA 90; ECF Doc. No. 53 at ¶ 21.

[28] ECF Doc. No. 53 at ¶ 18.

[29] *Id.* at ¶ 34; ECF Doc. No. 49 at ¶ 79.

[30] ECF Doc. No. 53 at ¶ 35; ECF Doc. No. 49 at ¶¶ 81, 83.

[31] ECF Doc. No. 53 at ¶ 35.

[32] *Id.* Director Lyons spoke to Student Eck and Student Ferrizzi separately in the hallway, with Student Ferrizzi going first followed by Student Eck. ECF Doc. No. 48-1 at JA 16.

[33] ECF Doc. No. 53 at ¶ 36.

[34] ECF Doc. No. 63 at ¶¶ 2, 36.

[35] ECF Doc. No. 49 at ¶¶ 84-85.

[36] ECF Doc. No. 54 at JA 272.

[37] *Id.*

[38] ECF Doc. No. 53 at ¶ 38.

[39] ECF Doc. No. 54 at JA 272.

[40] *Id.*; ECF Doc. No. 49 at ¶ 87.

[41] ECF Doc. No. 54 at JA 273-74; ECF Doc. No. 49 at ¶ 86.

[42] ECF Doc. No. 59 at ¶ 84.

[43] ECF Doc. No. 53 at ¶ 40.

[44] ECF Doc. No. 54 at JA 296.

[45] ECF Doc. No. 53 at ¶ 51; ECF Doc. No. 54 at JA 303.

[46] ECF Doc. No. 53 at ¶ 52.

[47] ECF Doc. No. 49 at ¶ 92.

[48] *Id.*

[49] ECF Doc. No. 59 at ¶¶ 84, 92.

[50] ECF Doc. No. 53 at ¶¶ 56-61; ECF Doc. No. 63 at ¶¶ 56-61.

[51] ECF Doc. No. 53 at ¶ 90.

[52] *Id.* at ¶¶ 90, 91.

[53] *Id.* at ¶ 92.

[54] *Id.* at ¶¶ 92, 94-96; ECF Doc. No. 49 at ¶ 98.

[55] ECF Doc. No. 53 at ¶ 97.

[56] ECF Doc. No. 49 at ¶ 103.

[57] ECF Doc. No. 53 at ¶ 99.

[58] *Id.* at ¶ 69.

[59] ECF Doc. No. 54 at JA 306.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* at JA 308.

[64] ECF Doc. No. 53 at ¶ 71.

[65] ECF Doc. No. 49 at ¶ 104.

[66] ECF Doc. No. 59 at ¶ 104.

[67] ECF Doc. No. 53 at ¶ 72.

[68] ECF Doc. No. 60 at JA 314.

[69] *Id.*

[70] ECF Doc. No. 54 at JA 309.

75 Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson,* 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris,* 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg,* 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis,* 808 F.3d at 643 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis,* 808 F.3d at 643 (citing *Celotex Corp.,* 477 U.S. at 322-323).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.,* 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.,* 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.,* 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 2016)).

76 ECF Doc. No. 40.

77 ECF Doc. No. 51.

78 ECF Doc. No. 50.

79 ECF Doc. No. 52.

80 Student Ferrizzi argued "viewpoint discrimination" under the First Amendment in his Reply in support of his motion for partial summary judgment. ECF Doc. No. 66. But the Students never

alleged this First Amendment theory. The case always involved First Amendment retaliation arising from the alleged suspensions after speaking at the Board Meeting. We cannot address changed theories never plead in the any of the four complaints as a claim.

[81] *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003)).

[82] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[83] ECF Doc. No. 48 at 5.

[84] *Kaszuba v. Borough of Dickson City*, 779 F. App'x 980, 983–84 (3d Cir. 2019) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[85] *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

[86] *Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181, 185 (3d Cir. 2013) (citing *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)).

[87] ECF Doc. No. 53 at JA 296.

[88] ECF Doc. No. 49 at ¶ 94.

[89] ECF Doc. No. 48 at 7.

[90] *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (*citing Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)).

[91] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parrott v. Taylor*, 451 U.S. 527, 537 n.3 (1981)).

[92] *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode*, 845 F.2d at 1207).

[93] ECF Doc. No. 19.

[94] ECF Doc. No. 58 at 5.

[95] ECF Doc. No. 40 at ¶¶ 91, 93-95.

[96] *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

[97] *Goss v. Lopez*, 419 U.S. 565 (1975).

[98] *Id.* at 581.

[99] ECF Doc. No. 54 at JA 280.

[100] *Id.*

[101] *Id.* at JA 280-81.

[102] ECF Doc. No. 40 at ¶ 45.

[103] ECF Doc. No. 53 at ¶ 53.

[104] *Id.*

[105] *Id.* at ¶¶ 97-98.

[106] *Id.* at ¶ 99.

[107] *Id.*

[108] ECF Doc. No. 56 at 3.

[109] *Id.* at 3-4.

[110] *Id.* at 4.

[111] ECF Doc. No. 48 at 10.

[112] ECF Doc. No. 58 at 12.

[113] ECF Doc. No. 52 at 11-12.

[114] *Goss*, 419 U.S. at 574.

[115] *Dominic J. v. Wyoming Valley West High Sch.*, 362 F. Supp. 2d 560, 571-72 (M.D. Pa. 2005) (collecting cases).

[116] ECF Doc. No. 40 at ¶ 112.

[117] ECF Doc. No. 58 at 4.

[118] *Id.* at 15-16.

[119] ECF Doc. No. 53 at ¶ 20.

[120] ECF Doc. No. 40 at ¶¶ 118-119, 121.

[121] *Id.* at ¶¶ 143-44.

[122] ECF Doc. No. 51 at 22.

[123] *Id.* at 23.

[124] ECF Doc. No. 62.

[125] ECF Doc. No. 48 at 13-14.

[126] ECF Doc. No. 51 at 20-24; ECF Doc. No. 55 at 5-9.

[127] *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa. C.S. § 8343(a)).

[128] *Gibney v. Fitzgibbon*, 547 F. App'x 111, 113 (3d Cir. 2013) (quoting *Kurowski v. Burroughs*, 994 A.2d 611, 617 (Pa. Super. Ct. 2010)).

[129] *Id.*

[130] 42 Pa. C.S. § 8343(b)(1), (2).

[131] *Id.* (quoting *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) (internal quotation marks omitted)).

[132] *Id.* (quoting *Tucker v. Fischbein*, 237 F.3d 275, 282 (3d Cir. 2001) (internal quotation marks omitted)).

[133] *Id.* (citing *Phila. Daily News*, 848 A.2d at 124).

[134] *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987) (citations omitted).

[135] ECF Doc. No. 53 at ¶ 7.

[136] ECF Doc. No. 63 at 7.

[137] ECF Doc. No. 54 at JA 207.

[138] *Id.* at JA 250.

[139] *Id.*

[140] 42 Pa. C.S.A. § 8343(b)(1).

[141] *Abdellatif v. Alza Wrae Industrial Co.*, No. 18-2297, 2019 WL 1284689, at *9 (E.D. Pa. Mar. 30, 2019) (quoting *Emekekwue v. Offor*, 26 F. Supp. 3d 348, 362 (M.D. Pa. 2014)).

[142] *Martin v. Finley*, 349 F. Supp. 3d 391, 427 (M.D. Pa. 2018) (citing *Krochalis v. Ins. Co. of N. Am.*, 629 F. Supp. 1360, 1366 (E.D. Pa. 1985)).

[143] ECF Doc. No. 48 at 14.

[144] *Id.* at 15.

[145] *Martin,* 349 F.Supp. 3d at 428 (quoting *Emekekwue*, 26 F. Supp. 3d at 364).

[146] *Id.*

[147] *Id.*

[148] *Id.* (citing *Simms v. Exeter Architectural Prod., Inc.*, 916 F. Supp. 432, 436 (M.D. Pa. 1996)).

[149] ECF Doc. No. 48 at 15.

[150] ECF Doc. No. 54 at JA 209.

[151] *Krajewski v. Gusoff,* 53 A.3d 793, 805–06 (Pa. Super. Ct. 2012) (quoting RESTATEMENT (SECOND) OF TORTS, § 652E).

[152] *Krajewski,* 53 A.3d at 806 (citing *Larsen v. Phila. Newspapers,* 543 A.2d 1181, 1189 (Pa. 1988)).

[153] *Vonderheide v. Harrisburg Area Cmty. Coll.*, No. 19-3096, 2019 WL 5423089, at *9 (E.D. Pa. Oct. 23, 2019) (citing *Martin,* 349 F. Supp. 3d at 423-24).

[154] *Mallory v. S&S Publishers,* 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016) (quoting *Graboff v. Colleran Firm,* 744 F.3d 128, 136-37 (3d Cir. 2014)).

[155] *Sottosanti-Mack v. Reinhart,* 173 F. Supp. 3d 94, 107 (E.D. Pa. 2016) (quoting *Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 567 (E.D. Pa. 2013)).

[156] *Id.*

[157] ECF Doc. No. 54 at JA 327.

[158] On December 13, 2019, we ordered Director Lyons to produce an unredacted copy of her e-mail identifying each and every recipient and all linked e-mails. ECF Doc. No. 64. We may revisit this publication issue following the close of the evidence.

[159] ECF Doc. No. 49 at ¶¶ 29-30.

[160] *Mzamane v. Winfrey,* 693 F. Supp. 2d 442, 511 (E.D. Pa. 2010) (citing *Harris v. Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1387 (Pa. Super. Ct. 1984) and *Martin v. Municipal Publ'ns,* 510 F. Supp. 255, 259 (E.D. Pa. 1981)).

[161] ECF Doc. No. 40 at ¶¶ 135-140.

[162] *Jutrowski v. Twp. of Riverdale,* 904 F.3d 280, 293-94 (3d Cir. 2019).

[163] *Id.* at 295.

[164] *Id.* (internal citations omitted).

[165] ECF Doc. No. 48 at 16-17.

[166] *Id.* at 17.

[167] *Lazaridis v. Wehmer*, 591 F. 3d 666, 672 (3d Cir. 2010).