IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

JORDAN ECK,                           :
HALEY HARTLINE, and                   :
VINCENT FERRIZZI,                     :
                Plaintiffs,           :
                                      :       NO. 5:19-cv-01873-MAK
        v.                            :
                                      :       JURY TRIAL DEMANDED
OLEY VALLEY SCHOOL DISTRICT,          :
et al.                                :
                Defendants.           :       FILED ELECTRONICALLY

## TABLE OF CONTENTS TO JOINT APPENDIX

| | |
|---|---|
| Deposition Transcript of Jordan Eck | 1 - 43 |
| Deposition Transcript of Haley Hartline | 44 - 75 |
| Deposition Transcript of Vincent Ferrizzi | 76 - 110 |
| Deposition Transcript of Lily Glick | 111 - 130 |
| Deposition Transcript of Haley Richard | 131 - 147 |
| Deposition Transcript of Christopher Becker | 148 - 198 |
| Deposition Transcript of Stacy Lyons | 199 - 236 |
| Deposition Transcript of Tracy Shank | 237 - 271 |
| Letter from Abagale Hartenstine to Tracy Shank (3/20/2019) | 272 |
| Memo from Maria H. Jones | 273 - 274 |
| OVSD Policy 220 Student Expression/Distribution and Posting of Materials | 275 - 279 |
| OVSD Policy 233 Suspension and Expulsion | 280 - 284 |
| OVHS Code of Conduct | 285 - 290 |
| Memo from Maria H. Jones | 291 - 292 |
| Discipline Referral Form - Haley Hartline (3/21/2019) | 293 |
| Email from Chris Becker to Tracy Shank (3/20/2019) | 294 - 295 |
| Email from Tracy Shank to "All" (Board Members) (3/20/2019) | 296 |
| Email from Chris Becker to Tracy Shank, Stacy Lyons (3/25/2019) | 297 - 298 |
| Email from Chris Becker to Tracy Shank (3/19/2019) | 299 - 300 |
| Email from Stacy Lyons (3/20/2019) | 301 - 301-a |
| Email from Tracy Shank to "All" (Board Members) (3/20/2019) | 302 |

| | |
|---|---|
| Email from Tracy Shank to Chris Becker (3/21/2019) | 303 |
| Discipline Referral Form - Jordan Eck - Bullying | 304 |
| Discipline Referral Form - Jordan Eck - Disrespect | 305 |
| Email from Tracy Shank to Chris Becker and Stacy Lyons (3/24/2019) | 306 - 307 |
| Email from Tracy Shank to all board members (3/24/2019) | 308 |
| Email from Tracy Shank to all board members (4/14/2019) | 309 |
| Email from Chris Becker to Tracy Shank (4/2/2019) | 310 - 312 |
| Text messages (3/19-3/20/2019) | 313 - 314 |
| Right-to-Know Response Form | 315 |
| Oley Valley School District Agreement of Co-Curricular/Extra Curricular Assignment signed by Stacy Lyons | 316 |
| Submission of Video Evidence | 317 - 318 |
| Joint Report of Rule 26(f) Conference | 319 - 325 |
| Email from Stacy Lyons (3/19/2019) | 326 - 327 |
| Central Berks Regional Police Department Incident Report Form | 328 - 329 |

Respectfully submitted,

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

DATE: 12/5/2019          BY:   */s/Sharon M. O'Donnell*
                               Sharon M. O'Donnell, Esquire
                               PA I.D. No. 79457
                               100 Corporate Center Dr., Suite 201
                               Camp Hill, PA  17011
                               (717) 651-3503  Fax (717) 651-3707
                               smodonnell@mdwcg.com
                               *Attorneys for Defendant, Oley Valley School
                               District*

**CERTIFICATE OF SERVICE**

I, Sharon M. O'Donnell, Esquire, of Marshall Dennehey Warner Coleman & Goggin, do hereby

certify that on this 5th day of December, 2019, I served a copy of the foregoing Joint Appendix - Part 2

(Revised), electronically, as follows:

Joel A. Ready, Esquire
Cornerstone Law Firm, LLC
8500 Allentown Pike, Suite 3
Blandon, PA  19510

<div style="margin-left: 40%;">

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

BY: /s/Sharon M. O'Donnell
Sharon M. O'Donnell, Esquire
PA I.D. No. 79457
100 Corporate Center Dr., Suite 201
Camp Hill, PA  17011
(717) 651-3503
Fax (717) 651-3707
smodonnell@mdwcg.com

</div>

1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3     JORDAN ECK, HALEY        :
     HARTLINE and VINCENT    :
     FERRIZZI,               :
4             Plaintiffs   :  NO. 5:19-CV-01873-MAK
                          :
5       vs.               :
                          :
6     OLEY VALLEY SCHOOL     :
     DISTRICT; TRACY SHANK,   :
7     individually and as    :  JURY TRIAL DEMANDED
     Superintendent of the  :
8     Oley Valley School     :
     District; CHRISTOPHER M. :
9     BECKER, individually and :
     as Principal of Oley   :
10    Valley High School; and :
     STACEY LYONS,         :
11    individually and as an  :
     employee of Oley Valley :
12    High School,        :
             Defendants   :
13

14

15       DEPONENT:  CHRISTOPHER M. BECKER

16

17       DATE AND TIME:  Monday, November 11, 2019
                        at 12:45 p.m.

18

19       LOCATION:   Oley Valley High School
                  17 Jefferson Street
20                   Oley, Pennsylvania

21

22

23         BERKS COURT REPORTING SERVICE
            By: Lori A. Dilks
          Certified Court Reporter
24          10 Fox Glen Drive
      Sinking Spring, Pennsylvania 19608
25          (610) 678-9984
       berkscourtreporting@gmail.com         1

Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 2 of 181

```
1    APPEARANCES:

2
         CORNERSTONE LAW FIRM, LLC
3        By:  Joel A. Ready, Esquire
         8500 Allentown Pike
4        Suite 3
         Blandon, PA  19510
5
             Representing the Plaintiffs
6

7
         MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
8        By:  Sharon M. O'Donnell, Esquire
         100 Corporate Center Drive
9        Suite 201
         Camp Hill, PA  17011
10
             Representing the Defendants
11

12
     ALSO PRESENT:
13
         Dr. Tracy Shank
14

15

16

17    _____

18       STIPULATION:  It has been stipulated by and between
      counsel that they waive the sealing of the transcribed
19    testimony by the witness and the filing of the original
      with the Court, and all objections, except as to form,
20    until the time of trial.
      _____

21

22

23

24

25
```

                                                    2

Joint Appendix00149

1

I N D E X

2

WITNESS              EXAMINED BY              PAGE

3

Christopher M. Becker    Mr. Ready              4

4

5

EXHIBITS

6

NUMBER              DESCRIPTION

7

1        Letter dated March 20, 2019

8

2        Maria Jones Narrative

9

3        Discipline Referral Form

10

4        E-mail dated March 20, 2019

11

5        E-mail dated March 21, 2019 and April 25,
         2019

12

13

6        Initial Evaluation Form for Jordan Eck
         dated 2/22/19, with attachments

14

7        Teacher Input Form, with attachments

15

8        Letter dated March 27, 2019, with
         attachments

16

17

9        E-mail chain dated 3/24/19

18

10       Discipline Referral Form for Jordan Eck

19

11       Discipline Referral Form for Jordan Eck

20

12       Joint Report of Rule 26(f) Conference

21

13       Letter dated May 9, 2019

22

14       Prior Written Notice for Initial
         Evaluation and Request for Consent Form
         for Vincent Ferrizzi

23

24

15       Newsies Cast Members List

25

16       Memorandum dated March 21, 2019

3

Joint Appendix00150

| NUMBER | DESCRIPTION |
|---|---|
| 17 | Section 220, Student Expression/Distribution and Posting of Materials |
| 18 | Section 233, Suspension and Expulsion |
| 19 | Section 248, Unlawful Harassment |
| 20 | Section 252, Bullying and Cyber Bullying |
| 21 | May 19, 2019 Required Information |
| 22 | E-mail dated March 19, 2019 |
| 23 | E-mail dated March 20, 2019 |
| 24 | E-mail dated March 20, 2019 |
| 25 | E-mail dated March 21, 2019 with handwritten notes |
| 26 | E-mail chain starting March 25, 2019 |
| 27 | E-mail chain starting April 2, 2019 |
| 28 | E-mail dated April 24, 2019 |
| 29 | E-mail dated April 24, 2019 |
| 30 | OVSD Code of Conduct |
| 31 | Text messages |

4

1   PROCEEDINGS

2     CHRISTOPHER M. BECKER

3 was called as a witness and, having been first duly sworn
4 by the Reporter-Notary Public, was examined and testified
5 as follows:
6 BY MR. READY:
7   Q.  Good morning, Mr. Becker.
8   A.  Good morning.
9   Q.  My name is Joel Ready, and I represent
10 Jordan Eck, Haley Hartline and Vinny Ferrizzi in this
11 lawsuit.
12   A.  Okay.
13   Q.  If I refer to the Plaintiffs throughout
14 this conversation, you'll understand I'm referring to
15 those three; correct?
16   A.  Correct.
17   Q.  I want to just ask you, have you ever had
18 your deposition taken before?
19   A.  No.
20   Q.  Well, congratulations to you. You can
21 scratch this off your list of things to do.
22   So a few rules that we're going to go by.
23 I'm going to ask you to let me finish every sentence, and
24 I will strive to do the same before interjecting, and
25 that's for the benefit of Ms. Dilks so that she can take
    5

1 everything down. Is that okay?
2   A.  Sure.
3   Q.  If at any point I ask you a question
4 you're not sure you understand, please ask me to clarify
5 it and I'll be happy to do so, but if you answer I will
6 assume you understood the question. Is that fair?
7   A.  Sure.
8   Q.  At any point if you need to take a break,
9 that's fine. I'll just ask you to finish the question
10 we're on, and then just let us know and we'll be happy to
11 do that. All right?
12   A.  Okay.
13   Q.  I want to ask you some questions here.
14 First of all, I understand, just as a clerical matter,
15 that you're no longer employed here at the Oley Valley
16 School District. Is that right?
17   A.  Correct.
18   Q.  Where do you work now?
19   A.  Daniel Boone Area High School – School
20 District, technically.
21   Q.  What do you do there?
22   A.  I'm the Assistant Principal at the high
23 school.
24   Q.  And you were a high school Principal here
25 at the Oley Valley School District?
    6

1   A.  Um-hum.
2   Q.  I'm sorry. We need you to verbalize your
3 responses as yes or no because they're hard to take down
4 as just uh-huh.
5   A.  Sure, yes.
6   Q.  So you were a high school Principal here.
7 Is that right?
8   A.  Correct.
9   Q.  And then tell me, how does one become a
10 high school Principal?
11   A.  Well, I mean, first of all, you have to
12 teach. At the time when I was a teacher, it was five
13 years of successful teaching experience. So you do that,
14 you go through to get the five years experience as a
15 teacher.
16   On top of that you have to get a Master's
17 degree in educational leadership, and you have to pass the
18 Praxis to have your Principal Certification, which is
19 kindergarten through 12th grade. So I was able to do
20 that, and you're K to 12 certified to be a Principal.
21   Q.  What did you teach?
22   A.  Middle school math in the Reading School
23 District.
24   Q.  When did you begin working at Oley Valley
25 School District?
    7

1   A.  So I started at Oley Valley School
2 District -- it was officially July of 2018.
3   Q.  And when was your last day here at the
4 Oley Valley School District, if you recall?
5   A.  The last day that I worked in the school
6 was like May -- I believe it was right before May 20th
7 'cause I was Board approved at Daniel Boone May 20th, I
8 believe, which was a Monday.
9   Q.  Okay.
10   A.  So, yeah, May of 2019 because I was
11 hired in July of 2018.
12   Q.  During your time here you had a
13 work-related e-mail account that was cbecker@ovsdpa.org.
14 Is that correct?
15   A.  Correct.
16   Q.  And everything to and from that address
17 would have been sent or received by you; correct?
18   A.  From my understanding.
19   Q.  Assuming no IT glitches, in other words,
20 there wasn't someone else monitoring your inbox like your
21 secretary or somebody; correct?
22   A.  Not that I believe, no.
23   Q.  I'm sorry, it's not a trick question.
24 Sometimes people will have like a secretary who sends or
25 receives their e-mails for them. You handled your own
    8

Joint Appendix00152

1  inbox on a day-to-day basis?
2      A.   Yeah. I mean, I responded to e-mails
3  and it was my e-mail box, sure.
4      Q.   Before we get into the facts of this
5  case, I want to ask you a few general questions about
6  your training in respect to student discipline.
7          So what have you done, either
8  educationally or otherwise, to learn the standard
9  practices of student disciplinary procedures?
10     A.   Well, like I said, I have a Master's
11  degree in educational leadership, which involves a course
12  in most programs in terms of school law, so on and so
13  forth, so I was able to take that. I passed the Praxis,
14  which is an exam that you need to pass.
15         But once you're an Administrator I think
16  you have those ongoing conversations and you receive
17  various professional development needs through the BCIU,
18  through your school district --
19     Q.   I'm sorry to interrupt. What is the BCIU?
20     A.   Berks County Intermediate Unit.
21     Q.   Okay.
22     A.   So there's training that's going on for
23  everything in terms of school law, school prac- -- you
24  know, best practices in the classroom, whatever it may
25  be.

9

1          So when you're an Administrator, just like
2  I'm sure in your profession, there's opportunities to
3  learn and grow once you're in a role.
4      Q.   It was part of your job as the Principal
5  of the high school to handle student discipline then. Is
6  that right?
7      A.   Correct, yeah.
8      Q.   So can you tell me, in dealing with
9  student discipline, how do you handle student discipline
10  about verbal statements made by students?
11     A.   Such as?
12     Q.   Well, let me ask it like this. You're
13  aware this is a First Amendment lawsuit; correct?
14     A.   Correct, yeah.
15     Q.   How do you, as a school disciplinarian,
16  handle the line between legitimate student statements and
17  those that you believe cross a line of appropriate
18  student conduct?
19     A.   I'm not understanding the question.
20     Q.   Student statements are generally
21  protected by the First Amendment; correct?
22         MS. O'DONNELL: Object to the form.
23         MR. READY: Okay. You can answer.
24         MS. O'DONNELL: A student statement is
25  protected by the First Amendment, so I object.

10

1  BY MR. READY:
2      Q.   Let me ask it like this. Are student
3  statements protected by the First Amendment?
4      A.   I suppose. I don't know.
5      Q.   That's a perfectly acceptable answer.
6  You would agree that some statements by students are
7  subject to First Amendment protection; correct?
8      A.   What I do know is that when students
9  come to me and say something, I'll do the best thing in
10  my ability to investigate it because I'm in the business
11  of students. So if they have a question or a comment or
12  a concern about a staff member or another student, I
13  believe it's in my best interest to look into that.
14     Q.   So a student makes a comment in a
15  classroom and it's reported to you, how do you balance
16  their First Amendment right to make a statement versus
17  what's appropriate discipline for a statement that you
18  think crosses the line?
19         MS. O'DONNELL: Objection to form because
20  I don't know that a student has a First Amendment right to
21  say anything that he or she wishes to say in a classroom.
22  BY MR. READY:
23     Q.   Okay. Let me ask you this. Mr. Becker,
24  you've done training, as you told us, in school law and
25  in how to deal with students; correct?

11

1      A.   Yeah, I've had courses. I've had
2  conversations. I mean --
3      Q.   So you've taken courses in your Master's
4  program, and I think you said some of that was covered?
5      A.   Yeah. At Wilkes University I had a
6  course, yeah.
7      Q.   And you've had ongoing training, I take
8  it, in some areas of school law and student discipline?
9      A.   Sure. I mean, through the conversations
10  with Superintendents or, you know, people have come in to
11  give us special education, for example. That's a hot
12  topic in education. We'll receive seminars or advice
13  depending on a given situation, so those things happen as
14  the Districts felt the need to.
15     Q.   So when a teacher approaches you and says
16  a student said something in a classroom or on school
17  grounds that was inappropriate and I think that should be
18  disciplined, how do you weigh whether that statement was
19  protected by the First Amendment versus not as a
20  disciplinarian in the school?
21         MS. O'DONNELL: Again, I'm going to
22  object, but go ahead.
23  BY MR. READY:
24     Q.   Within your understanding. I'm not
25  asking you for legal --

12

Joint Appendix00153

Case 5:19-cv-01873-MAK  Document 86-2  Filed 01/13/20  Page 10 of 186
Case 5:19-cv-01873-MAK  Document 85-2  Filed 12/05/19  Page 10 of 186
Case 5:19-cv-01873-MAK  Document 48-2  Filed 12/03/19  Page 7 of 181

1    A.    Any situation, when a teacher comes to
2  me and reports something, I look into it.  So if a
3  teacher says a kid cursed me out, I'm going to look into
4  it.
5          Sometimes it's very cut and dry.  You have
6  a certified teacher who says something happened in his or
7  her classroom, you deal with it accordingly.  Or if it's
8  something that they say, hey, I think this kid took
9  somebody's pencil or I think they cursed me out under
10  their breath, there's different things you could do.
11          Generally speaking, what you do is you
12  investigate the situation by talking with other students
13  or, if there's a co-teacher in the room, you try to get
14  your facts so when you make a decision you feel that you
15  stand by it.
16          In my practice, I worked closely with
17  Superintendents or, as an Assistant Principal for many
18  years, with my building Principal because you want to be
19  in concert with those people to make the decision that you
20  feel is best.
21    Q.    So let's say that a teacher wants a
22  student disciplined for something they said that was a
23  political opinion during class.  How do you handle making
24  sure that you respect that student's First Amendment
25  rights and also bring appropriate discipline for that

13

1  situation?
2          MS. O'DONNELL:  Again, objection to form,
3  but you can answer.
4          THE WITNESS:  I don't have a response for
5  that because I -- it really is situational.  It depends on
6  what exactly was said and then that would depend on what I
7  would do.
8          I've been an Administrator for, I think,
9  nine years.  I've worked in roles as Principal, Assistant
10  Principal K to 12.  Every situation every day is different
11  in my role.
12          So it really is situational based about
13  which avenue or which step that I would take depending on
14  where I'm working, am I the Principal, am I the Assistant
15  Principal, what was said.  It's hard for me to give you an
16  exact response to that question.
17  BY MR. READY:
18    Q.    Let me go about it a different way.  Has
19  there ever been a time that someone has asked you to
20  discipline a student for something they said, and you
21  questioned whether you were allowed to do so consistent
22  with the First Amendment?
23    A.    I don't believe so.  I think when I'm in
24  doubt with any discipline, whether it's First Amendment
25  or whether it's a dress code violation, I've always tried

14

1  to bounce that off somebody else.
2          You know, in my role at Oley, Dr. Shank
3  and I worked very closely together.  In my role now I have
4  a building Principal and I have an Assistant Principal,
5  and I think that's kind of the relationship we have;
6  where we're making a decision, we feel that two or three
7  heads is better than one.
8    Q.    I understand -- what you're telling me is
9  that your collaborative about every decision you make;
10  correct?
11    A.    When you need to be.  I mean, there are
12  certain things that are clear-cut.  If a kid is late to
13  school, those things are easy.
14    Q.    Without going into those types of topics
15  right now, what I'm just really trying to zone in on is,
16  of course, there's a collaborative process.  You're
17  telling me about the process of discipline.
18          What I'm really asking you, has there ever
19  been a time that you've told someone, referring a student
20  for discipline, I really can't take action against that
21  student because what you want me to punish him for or her
22  for is a First Amendment protected statement?
23          Have you ever had to do that, or has that
24  ever been something you've had to consider?
25    A.    I'm sure it's been something that I've

15

1  had to consider.  I don't have an exact example of that,
2  but being in the field for as long as I have and working
3  with people that I've worked with, those conversations
4  have come up, you know, in terms of different things.
5          We talk a lot in school about, you know,
6  door to door.  We talk about social media.  We talk about
7  all of those things.  And there's times where you can use
8  the School Code and there's times you cannot, but all
9  those conversations have taken place, you know, over the
10  course of my tenure as an Administrator.
11    Q.    When you said door to door, what is that?
12    A.    Like as far as the school being
13  responsible for a student from door to door.
14    Q.    From when they come in to when they
15  leave?
16    A.    Correct.  So there's sometimes that I
17  remember where, you know, there's a fight that may occur
18  in the school which you handle at the school.  But, you
19  know, sometimes when things happen off of school
20  property, for example, or on a Saturday evening, it may
21  be handled a little bit differently for that reason.
22    Q.    Why is it handled differently if a
23  student maybe says something -- let me back up.
24          I presume that if a student -- there are
25  some things a student might say on social media, whether

16

Joint Appendix00154

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 11 of 186

**[Page 17]**

1  on a video or a Facebook post or what have you, that you
2  would treat differently than if they had said it in the
3  classroom. Is that correct?
4      A.  Yeah. I mean, it would depend, I think.
5      Q.  Let's say a student cussed in a Facebook
6  video and went on a string of profanities as opposed to
7  doing so in the classroom during class.
8          I presume you would handle those -- one of
9  those would be subject to discipline and, perhaps, the
10  other not, but you correct me if I'm wrong.
11     A.  Yeah, I would assume, based upon that
12  situation, that would be correct.
13     Q.  Why would the student's statement outside
14  the school, though recorded and easily emailed, why
15  would that be different than what he said during school?
16     A.  Well, from my understanding, we're
17  responsible during the school day, door to door, for
18  students' behavior. There's things that we have learned
19  outside of school in some other places that I've been in
20  where the school has done their best to intervene.
21          Like you said, if we hear somebody cursing
22  up a storm on Facebook and it is shown that it's a
23  Saturday night and a student brings it to your attention
24  or whatever, you know, we'll try to provide the
25  interventions that we can for that student.

**[Page 18]**

1          Because they're cursing, we might call
2  their parents, hey, we learned about this. We're trying
3  to help them, try to work together because we really focus
4  on the whole child.
5      Q.  So you believe that if a student makes a
6  statement outside of school that that is still something
7  that you might interact with that student about?
8      A.  It all depends on the statement, too.
9  I've had situations where students have put a threat to
10  school on their social media account so, obviously, we
11  have to call the police and that's a whole different
12  thing. So it really is situational.
13     Q.  But you would, also -- I mean, obviously,
14  situations that deal with safety -- and I do want to
15  follow up with you about that in a second -- deal with
16  safety, that might be one thing.
17          But even a student saying or doing
18  something outside of school that's recorded on social
19  media or that you hear about, you would still potentially
20  pursue discipline with that student if you thought it
21  warranted it.
22          MS. O'DONNELL: Object to the form. He
23  said intervention. He didn't say discipline.
24  BY MR. READY:
25     Q.  So let me ask. You tell me. I'm asking

**[Page 19]**

1  you. I mean, intervention versus discipline, is there a
2  line there that you would not cross?
3      A.  I can tell you this. I can be very
4  clear on this. If a student says something about me in a
5  classroom, that would be school discipline as the high
6  school Principal; if someone would say, F- Mr. Becker or
7  whatever, and they stand up in front of the class and say
8  that.
9          But if I would learn that that took place
10  on an Instagram post on a Saturday night, that's out of my
11  jurisdiction.
12     Q.  Why?
13     A.  Because it's not during the school day.
14     Q.  So I take it then there's a reason that
15  you wouldn't want them -- again, you tell me -- maybe you
16  don't want the student disrupting the classroom. Is that
17  the difference?
18     A.  Correct, or speaking like that about a
19  Principal or a teacher or staff member during the school
20  day. That's disrespectful.
21     Q.  But even if all their friends follow them
22  on Snapchat, and they made the same cuss word, same
23  inappropriate remark, right, you would say that is
24  something you wouldn't discipline versus something in the
25  classroom. Why?

**[Page 20]**

1      A.  I thought I was clear when I spoke about
2  it, that that was outside of the school day.
3          And people can say what they want outside
4  of school about any of us, but when they say it in the
5  classroom, as a Principal, as an Administrator, I feel
6  it's the job for an Administrator to handle, you know, per
7  the school regulations and per the handbook, to keep a
8  safe, orderly environment for students to come to school
9  and learn and be safe.
10     Q.  You mentioned threats, so let me ask you
11  about those. When you hear a threat outside of school --
12  obviously, we're living in a day and age where this
13  happens occasionally -- you find a threat online, you
14  hear a student has orally told others he is threatening
15  to hurt someone or hurt the school population at large --
16  what steps do you take to deal with that threat? Talk
17  about that process.
18     A.  So in my experience we've called our
19  Superintendent to inform them of that. I've worked with
20  an SRO in the past who -- we've worked very closely with
21  the School Resource Officer and the Chief of Police for
22  that township, so we work very collaboratively to make a
23  decision that we felt was necessary.
24          And sometimes you find that information
25  out -- you don't go fishing for it -- but you have a

1  parent who has a son or daughter who's friends with such
2  and such and they see something, and they need to alert
3  the school to do the right thing because they feel that
4  something bad could happen.
5      Q.   You mentioned earlier that you also do
6  investigation, that you talk to students about what they
7  heard or that you gather second opinions about what
8  happened in the classroom. Is that right?
9      A.   Correct.
10      Q.   If you hear about a threat and it's
11  online, you ask for evidence of that threat?
12      A.   Yeah, sure.
13      Q.   Are there meaningful differences in
14  disciplining students based on what grade they're in?
15      A.   I think it all depends on the situation.
16      Q.   Do you deal differently with a 5th grader
17  versus a 12th grader?
18      A.   I think it all depends. I've been an
19  elementary Principal, I've been a high school Principal.
20  A student, for example, was fighting in school and
21  they're in 5th grade or they're in 12th grade; it's a
22  fight. And general practice is a minimum of at least
23  three days out of school suspension for a fight.
24          If you're in 5th grade or you're in 12th
25  grade and that happens, that's the policy that I followed.

21

1      Q.   Okay.
2      A.   In the District it's followed.
3      Q.   Are there meaningful differences between
4  a student being disrespectful versus being engaged in
5  self-expression?
6      A.   I suppose. I mean, students can have a
7  conversation, they can vent, they can talk to you about
8  their feelings.
9          As adults we can do the same thing. We
10  can sit around a table and we can have a conversation and
11  we can disagree, or we could become very disrespectful.
12  So you can have the same conversation, I think, two
13  different ways.
14      Q.   Do you deal differently with students who
15  have been disrespectful versus those who have merely
16  expressed their opinion?
17      A.   Yeah, absolutely. I try to be the type
18  of person -- personal life and in my professional life --
19  that the door is always open, and I'll talk to kids and
20  I'll talk to staff about anything that they want to talk
21  about, and we can definitely have those conversations.
22  That's why I'm an educator, you know, I love -- I want to
23  help kids. I'm in the business of kids.
24          But at the same time, just like a friend
25  or a family member, if a conversation starts becoming very

22

1  disrespectful, the conversation is taking a different
2  tone, a different route, and then you need to decide which
3  way you need to go, whether you stop and you reconvene
4  that conversation, or you tell the person I took offense
5  to that, however it is that the people in the room or how
6  you are at that given time, that you would like things to
7  continue or not to continue.
8      Q.   As a high school Principal, part of your
9  job of preparing students is to prepare them for the
10  outside world; correct?
11      A.   Correct. Yeah, to become college and/or
12  career ready, and a good person, give back to society,
13  absolutely.
14      Q.   In dealing with that, part of what you do
15  -- you tell me -- would be changing the way you deal with
16  students as they grow older in the system. Is that
17  correct?
18      A.   What do you mean by that?
19      Q.   Do you accord students different
20  liberties and freedoms as they get older in the system?
21      A.   I try to treat all kids with respect. I
22  mean, I'm a middle school teacher. I was an elementary
23  Principal, I was a middle school Assistant Principal for,
24  I believe, close to four years at Pottsgrove, and it was
25  my first experience as a high school Principal at Oley

23

1  last year.
2          So whether I was a teacher, an Assistant
3  Principal, Principal, elementary school and middle school,
4  high school, I try to build the relationship with all
5  students, talk to them, help them, guide them. And, like
6  you said previously, help them when they get out of high
7  school and they're a graduate, to help them chase their
8  dreams and go after whatever it is that they want to go
9  after.
10      Q.   And I don't so much mean respect for a
11  student because, obviously, you respect all students
12  equally. But there are certain liberties that students
13  start to get as they get older in the system; they can go
14  on a work release, they can take college classes
15  part-time, as I understand it.
16          Is that an accurate statement, that there
17  are liberties you give students when they're older that
18  they don't have when they're younger?
19          MS. O'DONNELL: I'm going to object to the
20  form. Privileges might be what you're looking for.
21  Liberties are something different.
22  BY MR. READY:
23      Q.   Fair. Are there privileges you give
24  older students in the system, 12th graders, for example,
25  that you don't give 9th graders?

24

**Page 25**

1     A.  I mean, I guess it depends on the
2 school, it depends on the situation.
3     Q.  Specifically you, as Principal of the
4 Oley Valley School District, were there privileges that
5 students received or -- there's an objection to the word
6 liberties, but are there things that students are allowed
7 to do in 12th grade that they're not allowed to do in 9th
8 grade because of their age and their advanced --
9     A.  I suppose. I mean, you know, you
10 mentioned work release, you know, from my understanding
11 of that program. You know, kids are going on college
12 visits, dual enrollment. They're taking some credits for
13 whatever it is that they want to do.
14     Sports, obviously, those things are in
15 play depending on the school, where at the middle school,
16 elementary school, per se, they're not because of their
17 age.
18     Q.  Do you agree or disagree with the
19 statement, a 12th grade student may form and express a
20 personal opinion on the abilities of a teacher?
21     A.  I think all students could do that.
22     Q.  You believe every student could form and
23 express a personal opinion about the abilities of a
24 teacher?
25     A.  Sure.

**Page 26**

1     Q.  Do you agree or disagree with this
2 statement, a 12th grade student may form a personal
3 opinion on the credibility or veracity of a teacher?
4     A.  I think we all can form opinions about
5 teachers and situations and schools and whatever --
6 whatever topic it is, sure.
7     Q.  You agree then that it would be wrong to
8 discipline a student solely for expressing an opinion
9 about the veracity or effectiveness or abilities of a
10 teacher?
11     A.  Sure. If somebody just -- sure.
12     Q.  In your training and experience as an
13 educator, the relationship between teacher and student is
14 an authority relationship. Is that correct?
15     A.  That's correct, yeah.
16     Q.  And you expect that same relationship
17 applies in an extra -- or you call them co-curricular
18 activities such as the drama club; correct?
19     A.  Correct.
20     Q.  If a teacher asks a student a direct
21 question and the student believes that candor about the
22 answer would be unpalatable to the teacher, how should
23 that student respond?
24     A.  What do you mean by that?
25     Q.  If a student is asked a direct question

**Page 27**

1 by a teacher in school hours and believes that the answer
2 is going to be something the teacher is not going to want
3 to hear, how should that student respond?
4     MS. O'DONNELL: Object to the form. I
5 don't even know how this is evidence but go ahead, if you
6 can.
7     THE WITNESS: I would need another example
8 to answer that question.
9 BY MR. READY:
10     Q.  Sure. If a student is asked by a teacher
11 a question and the student, in their mind, thinks I know
12 the answer to this question, if it's about a classmate,
13 about the teacher, about something else, and the teacher
14 is not going to like my opinion about this, how should
15 that student respond? Should they share the opinion?
16 Should they keep it to themselves and say I decline to
17 answer?
18     A.  I don't know how other students would
19 respond. That would be up to the individual.
20     I've had, in my experience, individuals
21 tell teachers that and they want to come down and talk to
22 me about it. I've had some --
23     Q.  Tell them what? You said, that,
24     A.  You know, maybe they're asked a question
25 and the student feels like this is the answer they don't

**Page 28**

1 want to hear but it's the answer I'm going to tell them,
2 and they know the teacher takes offense to it; or I've
3 had students come down and say, hey, Mr. or Mrs. Such and
4 Such asked me this question, but I didn't feel
5 comfortable saying it in front of 20 kids, so I want to
6 tell you.
7     Some kids aren't comfortable at all; they
8 don't say anything. Some kids aren't comfortable talking
9 to anybody at school; they tell their parents and their
10 parents call us as building Administrators.
11     So it really all depends on the student,
12 in my professional opinion.
13     Q.  Do you believe it's right to discipline a
14 student for sharing an answer that a teacher doesn't like
15 when directly asked?
16     A.  No.
17     Q.  I'm going to point your direction here to
18 the documents in front of you. We've marked these with
19 tabs to, hopefully, make this a little easier.
20     I'm going to ask you to look at
21 Exhibit 17, Tab 10.
22     A.  (Witness complies.)
23     Q.  I'll represent to you this is a
24 multi-page document starting at Bates stamp 801. This is
25 called the Student Expression/Distribution and Posting of

Joint Appendix00157

Materials Policy. Have you ever seen this policy before?

A.   I've seen School Board policy, sure. I haven't read everything, to be honest, from first to last page during my tenure at Oley Valley. Sure.

Q.   But you are familiar, in other words, with this specific document or no? Either way is fine. I'm just trying to find out.

A.   Yeah, I've -- I know of it, sure.

Q.   Did you ever give any training or receive any training on this document and how to implement its statements with the teaching staff or the faculty?

A.   I mean, I'm aware of School Board policies, and you should be familiar with them.

Q.   This specific policy, though, you said you're not sure if you've ever seen it. Is that accurate?

A.   Yeah. I mean, I know most schools there's a binder of policies, you know, from the first one to the last one. Things get adapted, things get revised as the years go on.

Q.   So in your tenure you don't recall specifically reading this policy?

A.   I don't recall.

Q.   You don't recall ever receiving training on how to implement the requirements in this policy for the student body?

A.   (Witness reviewed document.) I don't know how to answer that question.

Q.   Did anyone ever sit down with you and this policy, either in a room full of people or by yourself, and say hear's how we want this policy implemented?

MS. O'DONNELL: I'm going to object to the form. And it's not just you, Joel, it's many, many Plaintiff's attorneys who start their question out with, did anyone ever sit down and do this. They could do it standing, they could do it by phone, they could do it by video. What are you really asking?

BY MS. READY:

Q.   Mr. Becker, did anyone stand, sit or by video train you on this policy? It's a very simple question. I'm not trying to be complicated.

And, really, I understand there's a lot of policies that you've seen as a Principal. I understand that. I'm just asking you, did anyone ever sit, stand or by video train you on this policy?

A.   I don't believe so. I know there's policies, and I know as a Principal maybe you should be able to read all of them.

But I think in most of my experience, when

29

something happens or you're looking into something, you would find the Board policy and then read it.

Q.   So in your time at Oley Valley School District, did you ever find the need to consult this policy on a specific occasion?

A.   I don't recall.

Q.   I take it from your answers that you also never held a training session with the faculty or the staff to talk about this policy, specifically?

A.   Not to my knowledge, no.

Q.   I want to ask you some questions about oversight of the Drama Department. As high school Principal, did you supervise Mrs. Lyons or did she report to someone else?

A.   I believe, technically, she reported to me.

Q.   What steps did you take to supervise her in her role as a Director, a Co-Curricular Director?

A.   I mean, I talked to Stacy. I tried to be supportive, whether we had our meetings -- you know, she came in to meet me when I first started to kind of give me an overview of the program and the work that she's done and just always tried to create that open-door policy with Stacy in terms of having that communication with her.

31

I attended like the school plays, so on and so forth, like in terms of -- there's two plays, one around this time of the year and then there was, of course, Newsies in the springtime, so just that communication to try to be supportive.

And then, of course, you would get some parents or some students that would want to talk about the play, so that's kind of how I oversaw that.

Q.   Did you hire or have oversight of the other people that were brought on to help with the play, such as Ms. Hartenstine or -- I'm sorry, I don't have the other names in front of me; I know there were some other people who helped -- did you have oversight or did you hire those individuals?

A.   No.

Q.   I suppose you left to Mrs. Lyons the job of picking --

A.   Yeah, honestly, I don't know. I don't know if those people were previously -- like I said, I started at Oley Valley about a week before the students did.

I was new to the role. Things were happening very quickly. I had an Assistant Principal who was with me who left, and then just trying to get my feet wet in a brand-new position, a brand-new role.

32

**Page 33**

1    So there was a lot going on at the
2  beginning of the year. And then before you know it there
3  was, like I said, the play, from my memory, in November
4  that took place, the fall play last year, so I was there
5  to support that. I believe I was here on night one for
6  that. So I don't know if the people that were with her
7  for that show, honestly, were brand-new to the last school
8  year or if they were returning.
9    Like I know with coaching, for example,
10  you know, generally speaking, you do the sport and you
11  have the meeting and then you decide on next year, am I
12  coming back or am I not coming back, if you're asked to
13  come back, and then you're expected to come back and have
14  that same team in place.
15    Now, emergencies or whatever happen,
16  people leave the district or whatever, that might create a
17  vacancy down the line.
18    Like I said, when I first met Stacy Lyons
19  she came into my office and wanted to meet me and talk to
20  me about her experience in the program and where Oley
21  Valley was heading, and she wanted to meet me and put a
22  face with the name as the new high school Principal.
23    Q.    I want to take you to the events of
24  March 19th of this year, March 19th, 20th and 21st.
25    A.    Okay.

**Page 35**

1    Q.    Correct. Did you have any conversation
2  with Mrs. Lyons about sending an e-mail of this nature?
3    A.    I don't remember.
4    Q.    And I'm going to walk you through some
5  statements in this e-mail. And maybe for your context,
6  in the second paragraph she says this: I've been working
7  closely with Dr. Shank and the Administration since
8  January.
9    So I'm going to ask you just kind of -- if
10  you are familiar with some of what she's referring to
11  because she said she was working closely with you. Okay?
12    A.    Yeah.
13    Q.    In the first two sentences she says: I
14  need your help. I've spent the last two months shielding
15  the kids from some very horrible stuff happening behind
16  the scenes with a student and his mother.
17    Are you familiar with what she was
18  shielding the kids from?
19    A.    I can probably assume.
20    MS. O'DONNELL: I'm going to instruct you
21  not to. Don't guess.
22    THE WITNESS: I'm not going to guess.
23  BY MR. READY:
24    Q.    You don't have to guess at anything you
25  don't know or assume anything you don't know.

**Page 34**

1    Q.    I want to have you turn to Exhibit 4 in
2  this binder (indicating).
3    A.    4.
4    (Witness complies.)
5    Q.    This is an e-mail that says it's from
6  Stacy Lyons. Have you ever seen this e-mail before?
7    A.    (Witness reviewed document.)
8    I don't recall.
9    Q.    You don't recall seeing this e-mail in
10  the past?
11    A.    I try to do my -- I don't recall.
12    Q.    To help maybe refresh your recollection
13  or maybe not, March 20th, 2019, it looks like it was sent
14  about 12:17 in the morning. This would have been the
15  day -- that day would have been the School Board meeting
16  at issue in this case.
17    A.    Okay.
18    Q.    Do you recall the day of that School
19  Board meeting or, I guess, the day before at any point
20  discussing with Stacy Lyons the content of an e-mail she
21  proposed to send?
22    MS. O'DONNELL: Are you asking him, did
23  she talk to Chris Becker about this e-mail before she sent
24  it? Is that your question?
25  BY MR. READY:

**Page 36**

1    I'm just asking -- she said she'd been
2  working closely with Dr. Shank and the Administration, and
3  I know we'll get the chance to speak with Dr. Shank. So
4  I'm just curious if you would know, from the context of
5  this e-mail, immediately what the very horrible stuff was
6  that she was shielding the kids from?
7    A.    I can tell you two things for sure;
8  that, yeah, Dr. Shank and I, in the roles that we were in
9  and working together, that Mrs. Lyons did speak with us.
10  At one point Dr. Shank, I think, laid out a very detailed
11  bulletin for Mrs. Lyons about some guidelines and things
12  to follow, looking back at some records that I had that I
13  obtained to try to be very clear.
14    And then Mrs. Lyons and I had some
15  conversations about the play in terms of like practice
16  time, which was a concern. I know Dr. Shank, as well,
17  spoke to her about the perception of --
18    Q.    Let me stop you there for just a second.
19  You said practice time. What specifically about practice
20  time?
21    A.    That practice was very, very long.
22    Q.    Practices were going too long and --
23    A.    Saturday I remember, you know, practice
24  time was lengthy, on top of the daily life for a high
25  school student, you know, and also that maybe if practice

Page 37 / Page 39:

```
 1   was -- I don't know -- scheduled from 6 to 9, that we
 2   start at 6 and we end at 9.
 3        Q.   To the best of your recollection, did you
 4   have those conversations with her before this time,
 5   before this e-mail was sent?
 6        A.   Mrs. Lyons, yeah, Dr. Shank and I both
 7   spoke to her.
 8        Q.   Where did you hear these concerns?  Was
 9   it from students, parents?  Was it something you observed
10   personally about the practice time?
11        A.   I think I had a couple phone calls or
12   maybe a student or two voiced their concern, so that's
13   where I received the information from.
14        Q.   One such student would have been the
15   Bertin family, correct, Grace Bertin and her parents?
16        A.   Correct.
17        Q.   So they expressed those concerns to you.
18   Is that right?
19        A.   Via phone, if I remember correctly, yes.
20        Q.   What were some of their other concerns,
21   if any, if you recall?
22        A.   I don't remember exactly those concerns.
23   I remember time was a big issue.  And for me, that was
24   something that I wanted to try to get in touch with Mrs.
25   Lyons about and talk about.
                                           37
```

```
 1   to Jordan once.
 2        Q.   For context, who's Mrs. Cambria?
 3        A.   She was the Director of Special Ed.
 4        Q.   So I want to return back to this
 5   sentence:  I spent the last two months shielding the kids
 6   from some very horrible stuff that was happening behind
 7   the scenes with a student and his mother.
 8             Do you who what this very horrible stuff
 9   was?
10        A.   Like I said, I used the word assuming
11   before.  But just looking back at my notes the previous,
12   you know, couple weeks -- and you said March 20th was the
13   night of the Board meeting.
14             So if I have my dates correct, I believe
15   it was the 19th -- but I know the e-mails that I supplied
16   would confirm that to be a hundred percent accurate or
17   not -- but that there was the Snapchat report that was
18   made, along with the report that the mother, which I'm
19   assuming -- you know, being on the premises -- I believe,
20   it's on Pricetown Road, the ice skating -- or not the ice
21   skating -- skating -- whatever the practice was that they
22   were at, Jared.
23        Q.   So Jared had reported to you a concern
24   that she had seen -- and I'm -- seeing someone at a
25   skating rink.  Is that right?
                                           39
```

Page 38 / Page 40:

```
 1        Q.   I interrupted you earlier.  You were
 2   saying that the time of the shows -- and I think you were
 3   going to suggest some other things you talked to her
 4   about the show before March 20th of this year.
 5             Were there other conversations that you
 6   had with Mrs. Lyons or with her and Dr. Shank about the
 7   show and how it was being run?
 8        A.   I just think we had that ongoing
 9   dialogue, I want to say, since January, maybe, of 2019,
10   that some things regarding the show would pop up, like
11   you said, in terms of phone calls or students'
12   displeasure with their roles and some things about the
13   process, in terms of the way that casting was determined
14   and the timing of that.
15             You know, those types of things were some
16   common concerns that I heard roughly since January, I
17   would say, of 2019.
18        Q.   What other students and parents, other
19   than the Bertins, did you hear these concerns from?
20        A.   Definitely Jordan.  I remember speaking
21   with Jordan.
22        Q.   Anyone else?
23        A.   Not really that I distinctly remember.
24   I know Jordan and I spoke numerous times.  I think, in
25   fact, we spoke alone.  I think Mrs. Cambria and I spoke
                                           38
```

```
 1        A.   Yeah, Jared and his mother.  And, like I
 2   said, I believe it was maybe the day before this, if I
 3   have everything in my head correct.  But, again, I know I
 4   supplied it via e-mail.  I believe it was the 19th of
 5   March, 18th or 19th of March, that Monday or Tuesday, if
 6   I remember correctly.
 7        Q.   So Jared and his mother had seen Mrs.
 8   Eck, is that right, or someone?
 9        A.   I think it was Jared that maybe was at
10   practice, if I remember correctly, because he was at
11   practice, leaving to get in his car, told his mom, if I
12   remember correctly, and then they then came to the school
13   and wanted to talk to somebody.
14        Q.   They believed they had seen Mrs. Eck in a
15   public place, and they brought that concern to you?
16        A.   Correct.
17        Q.   And is that the very horrible stuff that
18   was happening behind the scenes, or was it something
19   else, something more?
20        A.   I assuming.  I didn't write this e-mail,
21   Stacy Lyons did.  But the ongoing stuff with the play in
22   terms of whatever was escalating between the students.
23   Like I said, that week I know the Snapchat video was
24   something that I was involved in and also the report of
25   the parking lot.  So those are the things that come to
                                           40
```

Joint Appendix00160

1  mind when I first read that.

2  Q.   The next sentence: Unfortunately, the
3  situation has escalated to the point that this student
4  *posted something against another student and police were*
5  *called in.*

6  What is this referring to? Is this
7  referring to the Snapchat video you're talking about?

8  A.   Yes.

9  Q.   When did you first hear about this
10 Snapchat video?

11 A.   Like I said, my e-mail would confirm it,
12 but it was either, I believe, the 18th or 19th of March.
13 I was in a meeting in the library conference room. I
14 believe that's where the meeting took place, as generally
15 they did for IEP meetings, the EIP meetings. And I was
16 alert --

17 Q.   I'm sorry, there's a lot of abbreviations
18 in schools, so help me out. What does that stand for,
19 IEP?

20 A.   Like an Individualized Education Plan.
21 And then the GIP is a Gifted plan.

22 So we routinely have to meet those
23 deadlines and meet with students and their parents every
24 year, or we can reconvene at any time to have those
25 meetings. And that's something that involved a Principal

41

1  and a teacher and the caseload teacher.

2  So those are things that are on your
3  calendar, and you block off time to accommodate and make
4  those things happen.

5  Q.   So you were interrupted on the -- roughly
6  about the 19th, you're thinking, to deal with this video?

7  A.   Yeah. And I think basically -- I
8  believe it was an IEP meeting or a meeting. I believe it
9  was an IEP meeting, and basically the parents decided --
10 Jared and his mom decided to wait. And from what I
11 recall, it wasn't a lengthy time. It wasn't like they
12 were waiting an hour, but they were waiting a little bit
13 of time till the meeting or IEP meeting, whatever it was
14 that I was at, had to conclude.

15 And then I called them back to my office,
16 and I was with one of my School Counselors at the time,
17 AnnMarie Borovik. And like we would with any parent, we
18 listened to what they had to say and that's what they were
19 upset about at that given time.

20 Q.   What was their concern about this video?

21 A.   I believe they thought the video was
22 disrespectful because it was posted, and it was talking
23 about, I believe, fruit that the student was allergic to.

24 And they brought up the concern, as well,
25 about the other mother being in the parking lot.

42

1  Q.   So they told you there was a video about
2  fruit. Did they tell you anything more about the content
3  of this video?

4  A.   Not that I remember; just that I assume
5  they told it to Jared at the time or Jared was allergic
6  to the fruit.

7  So not only was the video out there but it
8  was -- I think in their mind it was directed towards them
9  because -- I don't know if he's allergic to two fruits or
10 whatever -- those happened to be the two fruits or however
11 many other fruits there were, which I don't recall, that
12 were portrayed or discussed in the video.

13 Q.   Did you watch the video?

14 A.   I don't believe so.

15 Q.   Did you ask to see it?

16 A.   I don't think so.

17 Q.   What did you tell them to do about their
18 concerns about the fruit?

19 A.   They, I think, said that they were going
20 to file a police report, go to the police in terms of
21 that, and they wanted me to talk to Jared.

22 Q.   Jared or Jordan?

23 A.   Jordan. I'm sorry.

24 Q.   I do the same thing all the time, so it's
25 okay. They wanted you to talk to Jordan about the video?

43

1  A.   Correct.

2  Q.   Did you have the opportunity to do that?

3  A.   I believe, yes. And I believe he
4  explained to me it was something that was a joke because
5  I believe that that weekend maybe was the middle school
6  play. I think he was helping out at that.

7  Q.   And so did you participate in the calling
8  of the police?

9  A.   Yeah. Mrs. Borovik and I called the
10 police, as is -- you know, we talked earlier about things
11 that you do.

12 And we have a really good relationship
13 with Central Berks Police Department, and we just liked to
14 tell them, you know, hey, if a family is going to call in,
15 or do whatever the situation may be, to kind of give them
16 the courtesy or give them the heads-up just like we would
17 expect that in our profession; that if something's going
18 on and someone's aware of it that they would give you that
19 call or whatever.

20 So Mrs. Borovik and I called -- I believe
21 it was Officer Smith and spoke to him --

22 Q.   So....

23 A.   Just to let -- go ahead.

24 Q.   I want to make sure I understand.
25 There's, I guess, two possible reasons you could have

44

Joint Appendix00161

Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 18 of 186

1  called. One was to tell them that there was a report
2  about to be made by a student and their parent. The
3  other is because you perceived a threat that you were
4  concerned about.
5          Was it one or both of these or something
6  else that caused you to call?
7      A.    I just think we wanted to call them to
8  alert them.
9      Q.    Alert them to what?
10     A.    That this is going on, and that a parent
11 and/or student is going to be in touch with you in
12 regards to this. And the Officer took the notes and made
13 their report that we called in -- I believe it was that
14 morning. And.....
15     Q.    You mentioned earlier that you take three
16 steps when you perceive a threat to another student or
17 when it's reported to you; that you call the
18 Superintendent, call the School Resource Officer and call
19 the Chief of Police.
20         Did you take each of those steps in this
21 case? Did you call the Superintendent?
22     A.    I don't remember if I called Dr. Shank
23 or not about that. I think we've always operated,
24 whether it's this situation or others, that we would tell
25 Central Berks 'cause it's always -- I feel it's always

                        45

1  better to tell than not to tell.
2          We don't have an SRO here or Chief -- my
3  previous District did -- so that's kind of different when
4  you're working side by side with those guys.
5      Q.    Fair enough. So you're not sure if you
6  called the Superintendent, may or may not have, and you
7  don't have a School Resource Officer. And rather than
8  the Police Chief, you called the police directly to let
9  them know that a report was going to be made. Is that
10 correct?
11     A.    I called them to alert them of what we
12 heard in the school.
13     Q.    Did you do anything to gather any other
14 evidence or statements about this or to speak with Jordan
15 about it?
16     A.    Like I said, I spoke to Jordan about it.
17 But I felt if they're going to go to the police or it's
18 gonna be a police issue or not a police issue, that's for
19 the police to determine. I'm not a police officer.
20         I've always kind of taken that -- you
21 know, that's what I've done in the past.
22     Q.    When did you speak with Jordan about it?
23 Do you recall?
24     A.    I don't recall. No.
25     Q.    Was it the same day? Was it the

                        46

1  following day?
2      A.    I believe -- I mean, I believe it would
3  be the same day.
4      Q.    Do you know if you spoke with him before
5  or after calling the police?
6      A.    I don't remember.
7      Q.    Have you seen that video as of today?
8  The Snapchat fruit video, have you ever seen it?
9      A.    I don't remember. I think maybe at one
10 point -- I don't know.
11     Q.    I'm going to play it for you now, and
12 then I'll ask you some questions about it at the end.
13 I'm going to turn this around so that your Counsel can
14 see it. Just give me one second.
15         (Video was shown.)
16 BY MR. READY:
17     Q.    Do you recall ever seeing that video
18 before?
19     A.    I don't.
20     Q.    It's memorable enough that you probably
21 would remember it; right?
22     A.    Yes.
23     Q.    Do you perceive any threat in that video
24 toward Jared Mazeika or any other individual?
25     A.    I don't know. I wouldn't make a video

                        47

1  like that so I don't know what they were trying to get
2  at.
3          I was in high school a couple of years ago
4  so I don't know -- I don't know. If I was -- if -- I
5  don't know. If my son -- I don't know.
6      Q.    Seeing this video here today, do you
7  think this video was a threat towards Jared Mazeika?
8      A.    I don't know that. What I can tell you
9  for sure, though, you know -- I have two sons -- if my
10 son was allergic to everything on that video I would have
11 a concern, or had a food allergy or whatever the
12 situation may be I, as a parent, would absolutely have a
13 concern. I can tell you that.
14     Q.    Again, you were a Principal, are an
15 Assistant Principal?
16     A.    Correct.
17     Q.    You deal with students who have hurt
18 feelings, disagreements all the time; right?
19     A.    Yeah, sure.
20     Q.    Social media, I think, has probably
21 exploded this problem for you, I'd imagine?
22     A.    Yeah, sure.
23     Q.    I'm just kind of wondering, if you can
24 help me understand, like a student shoots a video with a
25 Snickers in it, is that a threat against all the kids who

                        48

Joint Appendix00162

| | |
|---|---|
| 1 have peanut allergies? | 1 Principal of Oley Valley School District in response to a |
| 2     A.   I would say -- | 2 parent or student concern? |
| 3     MS. O'DONNELL: I object to the form | 3     A.   I don't know that. I don't know that |
| 4 because it calls for speculation. It's so farfetched and | 4 number. |
| 5 it's so overly broad I don't know how anybody could | 5     Q.   Can you give me an idea? Did it happen |
| 6 testify under oath whether it is or not. It's totally | 6 once a month? |
| 7 unfair. | 7     A.   I don't know. I don't know. |
| 8 BY MR. READY: | 8     Q.   It wasn't only this time; right? |
| 9     Q.   And the objection is noted, but what do | 9     A.   Like I said, Central Berks Police |
| 10 you think? You're a disciplinarian, you're a Principal, | 10 Department, we had a very good working relationship. |
| 11 you deal with these issues. If a kid comes to you with a | 11 They helped us out a lot. We had a Detective who |
| 12 video and shows that at some point in this video there's | 12 provided professional development for our teachers here. |
| 13 a Snickers bar, is that a threat towards kids with peanut | 13 They would routinely stop by. |
| 14 allergies? | 14     Q.   What I'm asking you is, how many times |
| 15     A.   I can tell you that if two students are | 15 did you call the police about a threat or concern like |
| 16 having a conflict for whatever the reason, play, sports, | 16 this? |
| 17 they have a friend who's not their friend anymore and | 17     A.   I don't have that number. |
| 18 there's a conflict between two people and there's a video | 18     Q.   It was more than just that one time? |
| 19 made about Snickers -- just like you and I, if we're | 19     A.   I assume. I don't have the number. |
| 20 friends and there's something that happens between us and | 20     Q.   But you don't remember ever calling the |
| 21 you're allergic to Snickers, and I'm on whatever social | 21 police on any other occasion? I mean, surely you |
| 22 media outlet and I have a Snicker bar in my hand and I | 22 remember some other occasion where someone came in and |
| 23 post a random video about that, you may or may not take | 23 said, I feel threatened or there's a video on Snapchat or |
| 24 offense to that. | 24 whatever that you called the police, or am I incorrect? |
| 25     And then if something happened with us | 25 You tell me. |
| **49** | **51** |
| 1 yesterday as friends and then you see that today, right | 1     A.   I don't know. Like I said, I've been a |
| 2 now, you might act differently when -- if we were friends | 2 Principal for like nine years. I've called the police a |
| 3 and I would post that, I don't know if you would take | 3 lot. |
| 4 offense to that or not take offense to that or why did you | 4     Specifically, last year I don't know |
| 5 post that or what was that about or ask me about it or not | 5 because it was last year. I mean, this year we've called |
| 6 ask me about it, I don't know. | 6 the police a bunch of times in my role. To think back and |
| 7     But I think when there's -- generally when | 7 tell you a specific number from last school year or if you |
| 8 there's a disagreement or a rift between specific students | 8 had asked me before, I wouldn't know. |
| 9 or a group of students or whomever, those things become | 9     Q.   But this was not the only time last year |
| 10 magnified and you start looking at them maybe a little bit | 10 that you called -- |
| 11 differently than you would if you would not. | 11     A.   I called the police about things that |
| 12     Q.   Having seen the video, do you think it | 12 would arise at our school. |
| 13 was appropriate, in hindsight, to call the police over | 13     Q.   Again, I want to just narrow it down for |
| 14 this video? | 14 just a second. Was there any other time, other than |
| 15     A.   I called the police to let them know and | 15 this, last year that you called the police in response to |
| 16 give them the heads-up and the foresight that something | 16 a believed threat by one student against another? |
| 17 was coming their way because my -- | 17     MS. O'DONNELL: I'm going to object. |
| 18     MS. O'DONNELL: It's okay. Because -- go | 18 Asked and answered. He's answered that same question |
| 19 ahead. | 19 about four times now, and you keep asking him as if it's a |
| 20     THE WITNESS: That's my job. I mean, I | 20 different question. I can answer that now. I know the |
| 21 have a student and I have a parent who's upset, and that's | 21 answer. We all will know the answer. |
| 22 what your job is as a Principal. I have somebody in my | 22 BY MR. READY: |
| 23 office who's upset and angry; I need to take those steps. | 23     Q.   And I'm asking you because I haven't |
| 24 BY MR. READY: | 24 heard the answer, so -- |
| 25     Q.   How often did you call the police as | 25     MS. O'DONNELL: You didn't hear the answer |
| **50** | **52** |

Joint Appendix00163

1  you wanted to hear but that's the answer he's given you.
2  BY MR. READY:
3      Q.   No, no, and let me be very, very clear
4  about the question. I understand you have a working
5  relationship with the Police Department. You have a
6  Detective who comes in and provides financial
7  professional development.
8      A.   Yes.
9      Q.   You told me that you occasionally
10  communicate with them about various things, and I
11  understand that. I understand they probably come in and
12  do random searches sometimes --
13      A.   They do.
14      Q.   -- or bring dogs to the lockers; right?
15  But I'm asking, specifically, if last year there was any
16  other time that you called the police specifically
17  because you believed one student had threatened another?
18      A.   I don't remember.
19      MS. O'DONNELL:   That was no surprise.
20  BY MR. READY:
21      Q.   I mean, it is a little bit of a surprise
22  to me, Mr. Becker. And I'll be honest, because I look at
23  this video and this is about as boring and mundane as it
24  gets. We've got a kid flirting with his puppy love
25  girlfriend and somehow the police got called over this,

53

1  Officer Smith was appreciative that we made that call.
2      Q.   I'm looking back now at Exhibit 4, this
3  e-mail that was sent out. It says that the situation
4  escalated to the point where the police were called in
5  because a student had posted something against another
6  student.
7      Do you believe that accurately portrayed
8  what happened to the parents who received this e-mail?
9      A.   I don't know who received this. I mean,
10  unfortunately, the situation has escalated to the point
11  that the student posted something against another
12  student --
13      MS. O'DONNELL:   She's just typing what
14  you're saying. You have to read slower.
15      THE WITNESS:   I'm going to read it to
16  myself.
17      (Witness reviewed document.)
18      THE WITNESS:   Yeah. I didn't write this
19  e-mail.
20  BY MR. READY:
21      Q.   I do understand that. I'm just asking
22  you, you were familiar with all the facts that gave rise
23  to this situation. You see this e-mail now, and it
24  describes everything we've just gone over for the last 15
25  minutes, and it says it escalated to the point that the

55

1  and I'm just trying to understand what made that the
2  appropriate next disciplinary step.
3      MS. O'DONNELL:   Don't answer that
4  question. That's not even a question.
5      First of all, it's not a question.
6  Secondly, he's already told you if his sons were involved
7  and they were allergic to that fruit he would absolutely
8  perceive that there may be a threat, especially if there
9  was some negative interaction that occurred between the
10  two kids.
11      You're not listening, Joel. He is
12  testifying as honestly and truthfully and completely as he
13  can, and you are not listening.
14  BY MR. READY:
15      Q.   Thank you. I've got your answer. And
16  I'm asking you, you believe, as you sit here today, this
17  was a threat by Jordan against Jared?
18      A.   I had a student who was upset, who
19  explained to me why they were upset. They believed that
20  Jordan's mom was in the parking lot. They came to the
21  school to report that to myself and the School Counselor.
22  They said they were gonna call the Police Department.
23      I explained I had a working relationship
24  with the police. I called them and I gave them the
25  heads-up. And from my e-mail, which I believe you have,

54

1  student posted something against another student and the
2  police were called in.
3      And what escalated to this point is the
4  very horrible stuff, which you told me was practices not
5  starting on time and some students concerned about their
6  roles. That escalated to the point where something was
7  posted against another student and the police were called
8  in.
9      Does that accurately describe what
10  happened in this scenario?
11      A.   I don't know. I know there was issues,
12  drama, from January until this date.
13      And like I said, this week, the 18th or
14  19th, that police report was made because of the
15  escalation that occurred. And instead of going away or
16  the students involved coming together as one, there was a
17  situation between the parties and it escalated to the
18  Snapchat video and everything from there.
19      Q.   It says at the end:  We are in jeopardy
20  of losing this program -- it's the second-to-last
21  statement there -- we are in jeopardy of losing this
22  program.
23      Were you aware of any discussions about
24  terminating the drama program at this time?
25      A.   Not that I remember.

56

Joint Appendix00164

1    Q.    During your conversation with Jared the
2  day that he and his mother met with you about the
3  Snapchat video, did you have any conversation with him
4  about how he should respond to the situation?
5    A.    From what I remember, I talked to him
6  about seeing a trusted adult in the school, you know, if
7  something were to be going on or there'd be drama or
8  there'd be issues to seek somebody out, just like I would
9  with any student.
10   Q.    Did you tell him who he should seek out
11 or just he should find an adult that --
12   A.    I always tell kids, you know, I want
13 them to have at least one trusted adult in the school,
14 somebody they feel comfortable talking to.
15   Q.    Did you day attend the Oley Valley School
16 Board meeting held that evening, March 20th?
17   A.    I did not, no.
18   Q.    Were you aware that Jordan, Haley and
19 Vinny were going to be speaking at that School Board
20 meeting?
21   A.    I had a feeling -- I mean, I don't
22 remember exactly who I knew was going to speak. I knew
23 there was a Board meeting. I knew people were going to
24 come and speak.
25        Jordan, as I think I said when we were

57

1  talking about a previous question, came to see me a
2  handful of times from January, and we had a conversation
3  and I knew Jordan was not happy with things that I
4  mentioned earlier, so he had some things on his mind.
5        So Jordan and I, like I said, talked a
6  handful of times last year from January up until, you
7  know, March.
8    Q.    During the time that you spoke with him
9  did you ever know Jordan to be threatening about any
10 other person? Did he ever express a threat to harm
11 another individual?
12   A.    No, not that I remember. Jordan and I,
13 I think, had a nice rapport. And I felt good that
14 somebody could come and talk to me about their issues,
15 whether it's a teacher or they didn't get a role or
16 they're not the starting quarterback or whatever.
17        I pride myself on that as a Principal. I
18 want to connect with kids, and I want kids to know that
19 they can come and talk to me because I think that's
20 important.
21   Q.    I guess you have a lot of that, don't
22 you, as a high school Principal, a lot of kids who don't
23 get what they wanted or didn't get a role or, as you
24 said, a starting position? That's a common thing.
25   A.    Sure. They didn't get an A on a test.

58

1  I mean, it's -- yeah, sure.
2    Q.    After the School Board meeting that
3  night -- at the same time there was a rehearsal going on
4  for the school show. Were you aware of that?
5    A.    I know now, and I knew back in March
6  that there was. I mean, I knew there was a Board meeting
7  and I did not go to the Board meeting. I didn't have to
8  go to the Board meeting, so I was home that evening with
9  my family.
10   Q.    Maybe I can shortcut this a bit. Are you
11 aware of any of the events that happened at the rehearsal
12 that night, as far as the students when they returned
13 from speaking at the School Board meeting?
14   A.    Am I aware of it?
15   Q.    Yes.
16   A.    Yeah, I'm aware of it. I was aware of
17 it the next morning when I woke up.
18   Q.    How did you become aware?
19   A.    I checked my e-mail, as you do in your
20 role. And you wake up and -- probably in your role,
21 you're 24/7 -- so I routinely wake up 5, 5:30 in the
22 morning, give or take, have your routine at home, check
23 your e-mail, get ready for the school day. I leave my
24 dog out, do whatever it is I gotta do around the house
25 before getting on the road coming to school.

59

1        And most mornings you wake up -- because I
2  try to be on top of my e-mail and be on top of my job, I
3  take it very serious -- and I would routinely check my
4  e-mail, which might be a mistake, as they say, before you
5  go to bed, but I would do that. And with doing that and
6  sleeping for six, seven, eight hours, depending on the
7  night, you generally wake up, you don't really have too
8  much e-mail traffic the next morning.
9        But when I woke up the next morning I had
10 an e-mail and -- I don't know -- sent close to, I think,
11 11:30 at night, and it was from Dr. Shank. And she
12 explained to the group -- and I forget who was attached to
13 the e-mail to all -- but she explained about, you know,
14 what occurred, I guess, at the rehearsal or after the
15 Board meeting, and that there would be discipline issued,
16 and we would move forward tomorrow morning.
17        So when I'm reading this, it was that
18 morning, which I believe would have been the 21st of
19 March.
20   Q.    I'm going to ask you to turn to what's
21 been marked Exhibit 25.
22   A.    (Witness complies.)
23   Q.    Is this the e-mail that you received? I
24 realize it has some notes and I'm not sure who wrote
25 these, but is this the e-mail that you received

60

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 22 of 186

1  (indicating)?

2      A.    (Witness reviewed document.) No, no.
3  There was another e-mail. It was the e-mail from
4  March 20th. Like I said, 11 -- I don't know, it was
5  late -- it was 11:30, 11:45 at night, something like
6  that.

7      Q.    So there was another e-mail before this
8  one that you received?

9      A.    Yeah.

10     Q.    Did you speak with or hear about -- let
11 me rephrase that. Did you speak with anyone or hear
12 about the rehearsal that night and the students'
13 discussion after the School Board meeting?

14     A.    Can you say that again?

15     Q.    Did you speak with anyone or hear about
16 the rehearsal that went along with the School Board
17 meeting?

18     A.    No. Like I said, I wasn't there and
19 when I woke up I read the summary of what occurred, that
20 we had a staff member, I think, that was visibly upset --
21 I forget the word of choice that was used. That was,
22 like I said, around 5:30 in the morning or so when I read
23 that.

24           And then this e-mail down here was later
25 that morning. It looks like 7:27 from the e-mail I'm

                                          61

1  looking at right here at the bottom, as it goes from the
2  bottom up.

3      Q.    At the rehearsal that night during and, I
4  believe, after the School Board meeting was over, Mrs.
5  Lyons tells us that she locked the front doors to the
6  auditorium because of concerns about the safety of Jared
7  Mazelka.

8           MS. O'DONNELL: Object to the form. Mrs.
9  Lyons told you that she locked one door. The other one
10 was already closed and locked.

11 BY MR. READY:

12     Q.    So she locked the second and only
13 remaining open door, I guess, to the front of the
14 auditorium in response to these safety concerns. Were
15 you aware of that?

16     A.    I wasn't here. I was at home.

17     Q.    As I'm sure you're aware now, there was a
18 conversation between Jordan Eck, Mrs. Lyons, Ms.
19 Hartenstine and Ms. Jones, Maria Jones, in the hallway
20 after the rehearsal. Are you aware of that?

21     A.    Yeah. What I should add is, you know,
22 on top of the late night e-mail that I got from Dr. Shank
23 that I believe -- I don't know if it was late night or
24 early morning that we had the statement from Mrs.
25 Hartenstine or her letter. It was a letter which I

                                          62

1  submitted that I had in my records, but it was a letter
2  that was dated, and she talked about the incident, in her
3  words, and put her name at the bottom.

4      Q.    I believe that is Exhibit 1, if you'll
5  turn there with me for a moment.

6      A.    Sure.

7           (Witness complies.)

8           Yeah, right here, yeah.

9      Q.    So this is the letter that you received;
10 correct?

11     A.    Yeah, correct.

12     Q.    When did you first see this?

13     A.    I don't have that exact time because
14 from my records I had this. As I was reviewing them, I
15 didn't have like the e-mail that was attached to it, so I
16 don't know the exact time.

17     Q.    Looking at the statement near the bottom
18 of the second paragraph, it begins Mrs. Lyons asked
19 Jordan. Do you see that sentence?

20     A.    Yes.

21     Q.    Mrs. Lyons asked Jordan if he was
22 accusing me of lying. He vocalized that he still did not
23 believe me, making me feel like he was calling me a liar
24 about a situation which he knows nothing about that
25 happened ten years ago. I felt threatened and

                                          63

1  disrespected.

2           Did I read that accurately?

3      A.    Yes.

4      Q.    Is a teacher feeling threatened and
5  disrespected a reason for suspension?

6      A.    I think you look into the situation and
7  then if someone feels threatened, as a staff member, or
8  disrespected, sure, it's a suspendable offense.

9      Q.    What if you find that objectively what
10 was said should not have made someone feel that way?

11          MS. O'DONNELL: Object to the form.
12 That's impossible to answer.

13 BY MR. READY:

14     Q.    Do you do any objective analysis on the
15 actual statement to decide if it was offensive or merely
16 if it was subjectively felt as offensive?

17     A.    You talk to the staff member, you hear
18 their side of the story, and you go from there.

19     Q.    You go where from there? Do you talk to
20 the student, as well?

21     A.    I think it all depends, you know, on the
22 exact situation.

23     Q.    Do you talk to the student about their
24 side of the story?

25     A.    What I can tell you is this was

                                          64

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 20 of 181

1   submitted by the teacher. And then you see Dr. Shank,
2   who was there that evening, made the decision that this
3   was a three and out, and he'll be out of the show based
4   upon his behavior.
5         That decision was made at around 7:37, and
6   then you see here we met with the parent and Jordan at
7   9:35 a.m. on the 21st.
8         These are some -- those are the notes from
9   the meeting because I believe that meeting lasted for
10   about 25 minutes, as I put in another document
11   (indicating).
12      Q.   To clarify, because we have a paper
13   record, when you say these, you were signaling to the
14   handwritten notes on Exhibit -- is that 25?
15      MS. O'DONNELL: Yes.
16   BY MR. READY:
17      Q.   Is that correct?
18      A.   That these are the notes from the
19   meeting? Is that what you're asking?
20      Q.   You were just saying these and you were
21   moving your hands. You were referring to the handwritten
22   notes on Exhibit 25?
23      A.   Yeah, that occurred during our meeting
24   at 9:35 on March 21st. Correct.
25      Q.   I want to direct your attention to

65

1   Exhibit 10 now.
2      A.   (Witness complies.)
3      Q.   Do you recognize this document?
4      A.   That's the Discipline Referral. Yeah.
5      Q.   And this document -- is that your
6   signature at the bottom?
7      A.   That is my signature.
8      Q.   So you approved this, I take it, during
9   the meeting?
10      A.   Yeah, I did both. I did the referral,
11   which is our practice, and took notes, as you would when
12   there's a discipline referral or a situation that you're
13   handling as an Administrator. Correct.
14      Q.   It says here that he was suspended for
15   three days for bullying. Is that correct?
16      A.   That's what was checked off.
17      Q.   Who was being bullied?
18      A.   Well, the person in this case was Abby.
19   She's the one who wrote the letter that you read to me,
20   or you read most of it, Exhibit 1.
21      Q.   Let's go back to that letter for a
22   second. I'm going up to the top here. It says: At
23   approximately 10:00 p.m. Wednesday, March 20th, Jordan
24   Eck asked to speak privately with Mrs. Stacy Lyons at the
25   conclusion of rehearsal. And then Mrs. Hartenstine is

66

1   speaking, and Ms. Hartenstine says: She asked that I,
2   along with Maria Jones, be there as a witness to the
3   conversation; Jordan did not object.
4         Is that correct?
5      A.   That's what it says.
6      Q.   So Jordan is there, and it says at the
7   bottom here he's asked a direct question of -- If he was
8   accusing Ms. Hartenstine of lying about a situation that
9   happened ten years ago.
10         Is that correct?
11      A.   That's what it says.
12      Q.   So it sounds like Jordan answered this
13   question, and that's the reason he was accused of
14   bullying and got suspended. Am I missing something?
15      MS. O'DONNELL: Yeah, that he was
16   disrespectful and he's threatening.
17      THE WITNESS: Yeah.
18   BY MR. READY:
19      Q.   Mr. Becker, am I missing something?
20      A.   I don't think you read the sentence that
21   Abby, the teacher, the staff member, wrote: I felt
22   threatened and disrespected.
23      Q.   Okay. I did read that earlier. So that
24   is really the issue, that she felt threatened and
25   disrespected, and that's why he got suspended?

67

1      A.   Yeah. She felt threatened and
2   disrespected by Jordan's actions on that evening.
3      Q.   Do you know what it was that he did? It
4   doesn't say here, so what is it that he did that made her
5   feel threatened and disrespected?
6      A.   I don't have that information here. I
7   know --
8      Q.   It seems like important information,
9   doesn't it? I mean --
10      A.   Dr. Shank, in her e-mail earlier that
11   night, had some information, as well, in regards to this
12   incident.
13      MS. O'DONNELL: Exhibit 24. I guess he
14   doesn't want to show it to you.
15      THE WITNESS: Yeah. I wanna be clear --
16   BY MR. READY:
17      Q.   Your Counsel wants to look at Exhibit 24,
18   so let's go there. It looks like this is the original
19   e-mail from that night you referred to.
20      A.   Correct. 11:39 and that's what I was
21   referring to. Yeah.
22      Q.   So what in here helps to explain the
23   suspension?
24      A.   (Witness reviewed document.)
25         When the Superintendent of Schools, who's

68

1 the Superintendent, writes: He then verbally accosted the
2 Assistant Director and accused her of lying and not
3 speaking up and then closed with -- so on and so forth.
4        You know, the teacher was visible --
5 upset, crying and felt threatened by him. The teacher
6 used the words verbally attacked. That was some
7 additional information on top of the letter that was
8 written by the teacher.
9    Q.  So the allegation here is that he
10 verbally accosted the Assistant Director and that he
11 accused her of lying, which -- as we saw was in response
12 to a direct question -- and allegedly that he also said,
13 this is not over, I'll be getting more people to come
14 forward. Is that correct?
15    A.  Yeah. I don't know how to answer your
16 question. What I do know is that you have a certified
17 teacher who writes in a letter that she felt threatened
18 and disrespected.
19    Q.  And that triggers a three-day suspension?
20    A.  You have the Superintendent, who was
21 there that night and wrote her e-mail. And when the
22 Superintendent, who is the Superintendent of Schools,
23 writes that somebody will be out of school for three
24 days, this will be a three-day suspension, you, as the
25 high school Principal, have -- you know, I guess you have
                              69

1 a decision to make.
2        But what I've always been taught and what
3 I believe is when your Supervisor is your Supervisor and
4 they make the decision, that's a decision. And in this
5 case, and according to my notes -- I don't even know what
6 statement that was on -- we were very clear with Jordan in
7 regards to this being a life lesson; that you can't have
8 somebody -- you can't threaten somebody or disrespect
9 somebody in the real word; it's going to cause trouble in
10 you're job, in you're profession, whatever the situation
11 may be. That's not behavior.
12        So if you go back to the notes from the
13 meeting that took place, that 25, 30-minute meeting, that
14 was a point that we discussed during that meeting when we
15 explained the suspension, and we explained the discipline
16 referral.
17    Q.  You mentioned the threat, and I'm
18 interested in learning more because you said that she
19 felt threatened, so we've got that she subjectively felt
20 threatened.
21        What was it he said that was a threat?
22 Did he say I'm going to harm you? Did he say I'm going to
23 --
24    A.  I don't know. It says staff member felt
25 threatened and disrespected. The Superintendent says
                              70

1 this will be a three out, and he'll be out of the show
2 based on his behavioral last night after the Board
3 meeting. That was at 7:37 in the morning; the decision
4 was made.
5        Two hours later the Superintendent and
6 myself sit down with the student and his mother, and we
7 explained the situation, and that was the course of that
8 25-minute meeting that took place.
9        And from my recollection, that meeting was
10 very calm. I've been in meetings where I've had to stop
11 them, I've had to get security, whatever the case may be.
12 This meeting we went through the referral. You see the
13 notes that I wrote here. We went through those things.
14 We had a conversation and that was it.
15    Q.  You called Jordan down that morning and
16 told him that he could bring his mother to that meeting;
17 correct?
18    A.  Correct, because my e-mail from a couple
19 days before that spoke about how mom wanted to be
20 present, so we were honoring the mother's request. So I
21 believe Mrs. Snyder actually called Jordan down for us,
22 who's our Attendance Secretary there when you walk in the
23 building.
24    Q.  By the time you had this meeting the
25 decision to suspend had already been made; correct?
                              71

1    A.  Correct.
2    Q.  Was there anything that Jordan or his
3 mother could have said at that meeting that would have
4 changed your mind about the suspension?
5    A.  Not that I believe.
6    Q.  In these documents, both Exhibit 1 and --
7 specifically Exhibit 1, I think, is the clearest example.
8 It says that Jordan asked to speak privately with Mrs.
9 Lyons.
10        Do you think that changes the tenor of
11 this conversation? That it wasn't in front of other
12 people, that he was trying to address her privately about
13 his concerns?
14    A.  I don't know. I wasn't there. I'm not
15 Jordan. I don't know.
16    Q.  But as an educator who deals with
17 discipline issues, you see a difference, you said, in
18 whether something's on social media, right, versus
19 whether it's in a classroom, whether it's going to cause
20 disruption in the school or not.
21        So him asking to speak privately with Mrs.
22 Lyons, doesn't that make it a different situation than him
23 standing up in class and saying a teacher is dishonest.
24    A.  I don't know.
25    Q.  You don't think that makes an effect,
                              72

Joint Appendix00168

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 22 of 181

1 really, on whether the discipline was appropriate here or
2 not?
3      A.     I don't know.
4      Q.     Jordan Eck's suspension was a Tier 3
5 suspension. Is that correct?
6      A.     I think the terminology was Level 3 from
7 our handbook.
8      Q.     Okay. I'm going to direct your attention
9 to Exhibit 30.
10     A.     Okay.
11            (Witness complies.)
12     Q.     This is a document we received from your
13 Counsel in discovery. This is a part of the student
14 handbook, and I'm going to specifically take you to what
15 is the third page here of this document -- actually, I'm
16 sorry, the second page. It is OVSD 849 on the bottom
17 right-hand corner.
18     A.     Got it.
19     Q.     It says: Level 3 -- and I'm going to
20 read this for us -- Includes offenses against persons or
21 property or offenses whose consequences may endanger the
22 health, safety or welfare of self or others in the
23 school. Level 3 offenses may result in the notification
24 of law enforcement agencies, seriousness of the violation
25 may require initiation of discipline at a higher level,

73

1 as deemed appropriate by the Administration.
2            The infractions under this list --
3            MS. O'DONNELL: Now wait, you forgot a
4 sentence.
5            MR. READY: I'm sorry?
6            MS. O'DONNELL: You forgot a sentence.
7 BY MR. READY:
8      Q.     Disciplinary options are examples of
9 alternatives and should not be interpreted as an
10 all-inclusive sequential list.
11            The list of infractions is the following:
12 Continuation of unmodified Level 2 misbehavior; hazing;
13 obscene and/or threatening calls or messages; possession
14 of fireworks, smoke bombs, et cetera; smoking and/or
15 violation of tobacco policy; student to student
16 assault/battery or physical attack (no injury occurred -
17 intent to harm); tampering with fire extinguisher or other
18 emergency equipment; petty theft over $200; sexual
19 misconduct of any nature; threatening another student
20 (verbal, written or inciting); vandalism (major);
21 gambling.
22            Can you tell me where in Level 3 this
23 offense falls?
24            MS. O'DONNELL: Object to the form.
25            THE WITNESS: I can tell you the sentence,

74

1 I think, that you forgot to read about, Disciplinary
2 options are examples of alternatives and should not be
3 interpreted as an all-inclusive sequential list. It's
4 listed there at Level 3.
5            And also, if you look at the Level 2, you
6 can see that disciplinary options -- there's suspension
7 that is listed there for disruptive behavior in the areas
8 that are mentioned there at Level 2.
9 BY MR. READY:
10     Q.     And I didn't forget to read it because
11 that --
12     A.     No problem.
13     Q.     -- disciplinary options really is
14 referring to the next section, which I didn't read. So
15 we can read the rest of disciplinary options --
16 Disciplinary Options: Any appropriate disciplinary
17 option from -- I guess it should be preceding groups --
18 suspension, possible expulsion, referral to law
19 enforcement agency and/or District Justice.
20            So those are not your only disciplinary
21 options, but this list appears to be inclusive of the
22 potential infractions that would cause a Level 3. And
23 maybe not -- we can discuss that in a moment -- but my
24 question is, where on this list is what Jordan did? And
25 if it's not on this list, why did we choose Level 3?

75

1      A.     I don't know why Level 3 was chosen.
2 But, like I said, Level 2 is a suspendable -- there are
3 offenses listed there that are suspendable.
4      Q.     And it's your position that this should
5 have been then a Level 2 infraction?
6      A.     I don't know if it would have been a
7 Level 2 or a level whatever.
8            Generally speaking, and the way that I was
9 brought up, is that disrespect and defiance are
10 suspendable offenses. And you look at Level 3; it says
11 continuation of Level 2 misbehavior --
12     Q.     And Jordan had been cited for Level 2
13 misbehavior in the past?
14     A.     I don't know. I don't have those
15 records in front of me.
16     Q.     So looking at the Level 2 infractions
17 then -- and I'll read these -- I'll read all of them so
18 there's no concerns or questions about that.
19            Continuation of unmodified Level 1
20 misbehavior; cyber bullying; cutting class, study hall,
21 activity period; cutting school and/or cutting more than
22 one class; disruptive behavior at social functions,
23 athletic contests or co-curricular/extracurricular
24 activities; disruptive behavior on school property, the
25 properties bordering the school, on the school bus or at a

76

Joint Appendix00169

| | |
|---|---|
| 1 | bus stop; failure to identify oneself correctly; fighting; |
| 2 | *harassment or bullying of other persons; horseplay or* |
| 3 | *pushing (no harm intended or inflicted); in an* |
| 4 | *unauthorized area; inappropriate use of electronic* |
| 5 | *devices; insubordination; lying; theft (minor - under* |
| 6 | *$200); or vandalism (minor).* |
| 7 | Did he commit one of those? |
| 8 | A.    We said bullying on the referral. |
| 9 | Q.    How do you understand bullying? |
| 10 | A.    It's a repeated offense, repeated |
| 11 | disrespect towards another individual. |
| 12 | Q.    What repeated disrespect brought about a |
| 13 | charge of bullying here? |
| 14 | A.    I'm just guessing the -- the |
| 15 | conversations that he had with Mrs. Hartenstine. |
| 16 | Q.    So telling Ms. Hartenstine that he didn't |
| 17 | believe a story she told to the students about something |
| 18 | *that happened to her, that he didn't believe that that* |
| 19 | *was accurate, that is bullying?* |
| 20 | MS. O'DONNELL:  24. |
| 21 | THE WITNESS:  Where's the referral, I |
| 22 | should say? |
| 23 | BY MR. READY: |
| 24 | Q.    Exhibit 10. |
| 25 | A.    Yeah.  If you look at the e-mail, what |

77

| | |
|---|---|
| 1 | it says on the e-mail at the top, teacher is visibly |
| 2 | upset, crying, felt threatened, the teacher used the |
| 3 | words verbally attacked. |
| 4 | And then the referral you could check -- |
| 5 | it's been awhile since I looked at this referral. |
| 6 | Q.    Let me see if I can help you. |
| 7 | MS. O'DONNELL:  Wait, he's not finished |
| 8 | answering the question.  *You don't have to help him.  He* |
| 9 | *can -- he's a big boy.* |
| 10 | (Witness reviewed document.) |
| 11 | THE WITNESS:  I'm just looking at this. |
| 12 | Disrespect, insubordination could have been checked. |
| 13 | BY MR. READY: |
| 14 | Q.    You might want to look at Exhibit 11, as |
| 15 | well, because it appears to be a very similar copy of |
| 16 | this and maybe -- and that was one of my next |
| 17 | questions -- maybe you can explain it to me.  There |
| 18 | appear to be two same copies, same date, your signature |
| 19 | at the bottom, if I'm not mistaken, so maybe the notes on |
| 20 | that one will help you. |
| 21 | A.    In terms of why? |
| 22 | MS. O'DONNELL:  (Indicating.)  It's got |
| 23 | the same thing. |
| 24 | THE WITNESS:  So I don't know.  So the |
| 25 | same referral -- |

78

| | |
|---|---|
| 1 | MS. O'DONNELL:  Different. |
| 2 | THE WITNESS:  Right, *different problem,* |
| 3 | *behavior.* |
| 4 | Yeah, I don't remember exactly, but |
| 5 | sometimes somebody in the office -- they would have |
| 6 | referrals that would go missing, and they would ask for -- |
| 7 | MS. O'DONNELL:  Go ahead.  What's the |
| 8 | question?  I'm sorry.  What's the question?  Could you |
| 9 | read the question back, please? |
| 10 | BY MR. READY: |
| 11 | Q.    I'm asking you -- I'm just trying to |
| 12 | understand.  We've got this policy back here that says, |
| 13 | you know, these Level 3 infractions are a big deal.  They |
| 14 | happen when there's like fireworks and smoking and bombs. |
| 15 | Basically what happened here is a kid told |
| 16 | a teacher, when asked a direct question, something that |
| 17 | she didn't want to hear, and it's now on the level of |
| 18 | sexual misconduct of any nature and vandalism (major). |
| 19 | And I think you've given your answer, but |
| 20 | I'm just kind of making sure I'm not missing something |
| 21 | here that happened that contributed to this decision. |
| 22 | A.    Generally speaking, you can be suspended |
| 23 | if you're disrespectful, defiant towards a teacher or |
| 24 | towards other students. |
| 25 | And, like you said, yeah, Level 3 mentions |

79

| | |
|---|---|
| 1 | fireworks, and I believe you said gambling.  I mean, |
| 2 | there's a whole array of discipline and consequences and |
| 3 | actions that are listed in the handbook. |
| 4 | Q.    Okay. |
| 5 | A.    But just because it's not those higher |
| 6 | offenses doesn't mean that it would mean that it's a |
| 7 | detention or whatever a lesser consequence would be. |
| 8 | Q.    So you're saying that his words to Ms. |
| 9 | Hartenstine that night were of a seriousness that puts it |
| 10 | on a Level 3 offense? |
| 11 | A.    I'm saying that, yes, when the teacher |
| 12 | writes that they felt threatened and disrespected. |
| 13 | But, again, Dr. Shank, as you see in the |
| 14 | e-mails, she made the decision, in terms of the |
| 15 | suspension, and she had -- she was there that evening and |
| 16 | spoke to the teacher from the exhibit -- I think you said |
| 17 | it was 24. |
| 18 | And when -- you know, whether I'm in a |
| 19 | role now that my Principal makes a decision or I'm a high |
| 20 | school Principal or middle school Principal, whatever, and |
| 21 | the Superintendent makes a decision, I'm the type of |
| 22 | person that -- you know, I'm going to be with them in that |
| 23 | sense; that they're my boss; that's the way that I was |
| 24 | brought up; that a decision like that is made -- this |
| 25 | wasn't a decision that someone walked in the office and |

80

Joint Appendix00170

1 said something and someone said, okay, you said this,
2 you're out of here for three days. This was -- there was
3 more to that as we went through.
4         Q.   I want to move on here to the question of
5 who made the decision to suspend Haley Hartline?
6         A.   I believe that was Dr. Shank, as well.
7 When she stood up and she left the meeting, yelled I
8 quit. She made a loud exit from the auditorium when we
9 were trying to get everybody together.
10         Q.   You're referring to Exhibit 3 as you say
11 that. Is that right?
12         A.   I think that's -- yes, 3.
13         Q.   And that's the Haley Hartline suspension
14 notice. So that was a decision that Dr. Shank made as a
15 result of that meeting with the student body on
16 March 21st?
17         A.   When she stood up and she said what she
18 said in front of everybody as we were trying to reconvene
19 and get the group together.
20         Q.   You told Haley that she could go home for
21 the day, but you did not tell her she was suspended?
22         A.   Yeah, correct, correct. She was in the
23 auditorium where everything happened. I was alerted that
24 Haley, who had a connection with Mrs. Borovik, was with
25 the School Counselor.

81

1         Q.   Mrs. Borovik, I'm sorry, she's the School
2 Counselor?
3         A.   Correct. She was with her, she was
4 angry.
5         Q.   And you were in the auditorium for this
6 March 21st cast meeting; correct?
7         A.   Correct.
8         Q.   Did you address the group at that time?
9         A.   I think I said a couple words. I think
10 Dr. Shank took the lead.
11         Q.   Do you remember what you said?
12         A.   I don't, specifically, no.
13         Q.   Do you remember -- I'm going to direct
14 your -- you were about to tell us you heard that Ms.
15 Borovik was meeting with Haley --
16         A.   I mean, if you ask -- I'm sure you're
17 going to ask a couple of questions so I don't wanna --
18         Q.   Sure. So you went up there, Haley was
19 upset, and you spoke with her. Is that right?
20         A.   Haley was with Mrs. Borovik, who she had
21 a relationship with, and I understand was upset. And I
22 was under the impression that she found out that not only
23 did she quit the play at that point, which is probably
24 very emotional for a student, but that she was, you know,
25 going to be suspended the next school day, on that -- I

82

1 think that was a Friday because that was a Thursday, if I
2 remember correctly.
3         So at the point in time -- we have a
4 monthly meeting for the Berks County Principals, the high
5 school Principals. We get together, we collaborate, we
6 get together. That's held at Alvernia.
7         And we actually had the meeting during
8 Lynx period, which is kind of -- I guess a good way to
9 describe it would be like the middle of the day because it
10 goes the middle of the day and last year, at least, it
11 went into the last period of the day; it flip-flopped.
12         So when the meeting ended with Jordan's
13 mother and himself at the middle of the day, Lynx was
14 actually the middle of the day, I had a little bit of time
15 because I was asked to go to the monthly meetings for the
16 Berks County Principals. So that was in March, the March
17 meeting, which was on a Thursday.
18         So I knew that Haley was with the School
19 Counselor, upset, so on and so forth, but I'm gonna say
20 that if the meeting started at 12, it was probably around
21 11:30. I had to report to Alvernia. I had to be there by
22 12 o'clock. I got in my car and reported to where I
23 needed to report to at that time.
24         Q.   So --
25         MS. O'DONNELL:   He's not finished.

83

1         THE WITNESS:   Then I was driving, and I
2 remember it was pouring down rain, and you're already
3 feeling like, wow, how am I going to get to this place on
4 time, and you don't want to be late and all of that.
5         And then I got a text from AnnMarie around
6 -- about five minutes or so after I left the school. I
7 was close to the Oley Valley Vet -- which I don't know if
8 you're familiar with the area but the Oley Valley Vet
9 Clinic down here -- and I got the word that Dr. Shank
10 asked me to turn back around and talk to -- come back and
11 talk to Haley. That was from AnnMarie.
12         So I turned around and spoke to Haley in
13 my office when AnnMarie brought her up.
14 BY MR. READY:
15         Q.   And at that point you were supposed to
16 come back and suspend her?
17         A.   I don't know if they wanted me to
18 exactly say that or just come back and talk to her and
19 make sure she was okay, calm her down. I mean, just --
20 I was directed to come back.
21         Q.   You told me that Dr. Shank is the one who
22 decided that she be suspended after the outburst. Is
23 that correct?
24         A.   Right, after the outburst of -- in the
25 auditorium.

84

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/05/19   Page 28 of 186

1    Q.    So was it at that point that you were
2 informed that's what she wanted you to do?
3    A.    Who informed me?
4    Q.    When did Dr. Shank tell you to suspend
5 Haley?
6    A.    She was standing in the auditorium.
7    Q.    So you turned back around to come back
8 and meet with Ms. Borovik and --
9    A.    In between, like I explained, in the
10 auditorium I got word from AnnMarie that Haley was with
11 her and upset, but I knew they had a previous connection,
12 as kids do with their School Counselors or whomever.
13        And from the time that was going on and we
14 cleared the auditorium out and I went back to my office,
15 did whatever it is that I needed to do, got my belongings
16 and got in my car, there was plenty of time between those
17 instances. It wasn't like I got word that she was with
18 AnnMarie, and I ran out the door. It wasn't anything like
19 that.
20    Q.    I understand. So you went up to meet
21 with her. During that conversation you told her she
22 could go home, but you didn't tell her she was suspended?
23    A.    Correct.
24    Q.    I understand you feel that you should
25 have been more clear about that?

85

1    A.    I should have been more clear. I told
2 her mother on the phone. I told Haley when I was in -- I
3 visited her in Mr. Daysher's class when she came back to
4 school earlier that week to try to, you know, repair the
5 relationship and have a face-to-face conversation with
6 her. Correct.
7    Q.    I want to turn your attention to Exhibit
8 27. And actually it's the second page here that's marked
9 OVSD 911.
10    A.    Yes.
11    Q.    Up at the top, this appears to be an
12 e-mail from your account and it says -- regarding Haley's
13 mother: The original request was to meet with all three
14 of us, referring to you, Dr. Shank and Stacy. Now my
15 impression is that she -- mom -- wants to meet with you
16 or you and I. However, the conversation did not give me
17 the feeling whatsoever a meeting would be cordial and
18 helpful.
19        Do you recall this conversation that you
20 related here that you had with Ms. Hartline?
21    A.    Yes.
22    Q.    Do you recall why you felt that a meeting
23 would not be helpful?
24    A.    When someone is on the phone yelling and
25 screaming at you and are upset, you know it's not going

86

1 to be productive. She made a comment when I said
2 something about when is she available -- and I included
3 notes; I was looking over them somewhere -- but she said
4 something like it doesn't matter, it can be early or it
5 can be 10 o'clock at -- like a late hour.  I forget if it
6 was 10 o'clock at night or what.  Basically, saying she
7 was available.
8    Q.    Okay.
9    A.    But then she made a comment at one of
10 the phone conversations -- 'cause there was two or three
11 times she would call in -- and she made a comment about
12 -- something like I'm coming to school, but you might not
13 want me to come to school; made a comment like that that,
14 in my experience, you know that things aren't going to
15 end well.
16        You can call people in -- if you're upset
17 I can tell you to come in right now, but I know that's
18 probably not going to be productive.
19        When if you wait till tomorrow and we have
20 a meeting, we can sit down, we can be cordial, we can
21 agree to disagree, but we can have a meeting that's
22 actually going to be productive.
23    Q.    What did she want to meet with you about?
24    A.    She was upset -- and, again, I don't
25 know if you have my notes -- but she was upset about a

87

1 couple things, from recollection.  But if you have that
2 in here, I'd be more than happy to walk you through it.
3    Q.    Candidly, I'm not sure whether I have
4 those in here or not, but you can just tell, from the
5 best of your ability.  I understand there may be notes,
6 but what do you recall?
7    A.    I looked back last night, you know, that
8 she called Mrs. Lyons -- a pet weasel, I believe, was the
9 thing she mentioned on the phone.
10        She was upset that Dr. Shank and Mrs.
11 Cambria spoke to her student -- her daughter about --
12 everything was according to her -- something about we can
13 talk tomorrow, Stacy Lyons lies about parents, records
14 need to be straight, discussed the Board meeting.
15        She said basically take the suspension
16 away and I will go away; this is bullying my daughter; can
17 my daughter just graduate now, she brought up.
18        She talked about -- from people bullying
19 my daughter to special education paperwork. She was upset
20 about some special education document and something about
21 -- she referred to something with Mrs. Cambria, a
22 conversation about eating or an eating disorder, something
23 along those lines.  She was upset about that.
24        It was kinda all over the place, the
25 conversation.

88

Joint Appendix00172

1    Q.   You understand that Haley and -- not just
2  Haley, all -- particularly Haley and Jordan and, to some
3  extent all three, will always have to answer yes if
4  asked, have you ever been disciplined in an academic
5  setting?
6    A.   Sure, right.
7    Q.   So Ms. Hartline was asking you -- you
8  never met with her after the suspension of Haley
9  Hartline, did you, in person?
10    A.   No.  I talked to her on the telephone
11  the day after or the day we had the Alvernia Principal
12  meeting.  So when the Principal meeting concluded on that
13  day I called her and spoke to her that day, as I would
14  with any other parent, on that Thursday.
15    And then she called the school and called
16  me -- I forget whatever it was -- two or three times.
17    Q.   You've referenced the incident in which
18  Haley -- do you need a minute to look at anything?
19    A.   No.
20    MS. O'DONNELL:  Well, maybe.  Exhibit 26.
21    THE WITNESS:  This one (indicating)?
22    MS. O'DONNELL:  Yeah, because if you look
23  on the second page of the exhibit -- yes, the second page,
24  that's where you're -- that's 26.
25    THE WITNESS:  908?

89

1    MS. O'DONNELL:  Yeah.
2    THE WITNESS:  Yeah, that's what I was
3  referring to.  So I talked to her around 7:10 in the
4  morning; it was over ten minutes.  I wanted to update to
5  everybody that day that I spoke with her.
6    She was bothered about the suspension and
7  the wording that I used last week.  But then the
8  conversation went quickly in asking for a meeting with the
9  two of you.  Throughout the phone call, mom and her
10  emotions were calm; she was loud and she was crying.  She
11  used the word staff bullying about the play, cast meeting
12  last week.
13    She was saying how, you know, when Dr.
14  Shank was speaking she felt she was looking directly at
15  Haley, not the group.  And she spoke about the recent food
16  conversation with another student and not getting parent
17  notification.
18    She brought up something about the Board
19  meeting.  I believe, from memory, it was a speaker and how
20  they were affected two years after leaving high school
21  with that situation, and that's what I was referring to.
22  She's available any time to meet, but she may need to be
23  calmed down during our meeting.
24  BY MR. READY:
25    Q.   And that was your assessment, that she

90

1  may need to be calmed down?
2    A.   I think she used those words.  And
3  that's what I -- in my experience in dealing with parents
4  who get upset and parents who I've been able to calm down
5  or parents I've been able to talk to, I know we need to
6  make meetings meaningful, and at that point in time I did
7  not have a good feeling.
8    I mentioned this but, as you see,
9  mentioned student was one of Mrs. Lyons -- felt she was
10  calling a pet weasel to the student, not Mrs. Lyons, so
11  I'll clarify that.
12    Q.   You never met with Ms. Hartline after the
13  suspension then in person?
14    A.   Correct.
15    Q.   You mentioned this incident that involved
16  Jordan being referred for keeping Haley from eating.
17    A.   I don't know.  I know mom was going off
18  about it, and she was upset about it.
19    Q.   So you were not previously informed of an
20  accusation that Mrs. Lyons passed on from another
21  individual, as a mandatory reporter, that Jordan was
22  keeping Haley from eating; you were not informed of that?
23    A.   I don't believe at the time I was
24  informed.
25    I know reports happen all the time, you

91

1  know, that people have to report and there's other people
2  that look into it, similar to what I said about the
3  police.
4    Q.   So you were not involved at all in that
5  report?
6    A.   I don't believe so.
7    Q.   I want to ask you about the after party.
8  Did you hear a report from the after party about Jared
9  Mazeika's speech?
10    A.   I did after the fact.  Yeah.
11    Q.   Who informed you about that?
12    A.   I don't remember exactly who brought
13  that up.
14    Q.   Did you hear that he had used profanity
15  in reference to the three Plaintiffs in this case?
16    A.   I forget exactly what he did.  I
17  remember I was brought up about that and then something
18  maybe along the lines of what Jared wrote in the --
19    Q.   In the program?
20    A.   -- in the program.
21    Q.   Did you speak with Jared about any of
22  this?
23    A.   I don't remember.
24    Q.   Did anyone report to you that Jordan
25  [sic] also said if anyone comes for Mrs. Lyons, you'll to

92

1  have deal with me?
2      A.    Say that again.
3      Q.    If anyone comes for Mrs. Lyons, you'll
4  have to deal with me.
5      A.    And who said that? Jordan said that?
6      Q.    Jared. I'm sorry if I said Jordan. I'll
7  do it again. Were you aware that Jared said that?
8      A.    I don't remember.
9      Q.    Did you do any further investigation on
10 that matter?
11     A.    No, not that I remember. I mean, I
12 think that whatever -- the play happened and they had
13 their cast party, and that was the end of the chapter in
14 terms of where I was going.
15           You know, my future conversations, if I
16 was going to remain in my role, would have been with Dr.
17 Shank in terms of next steps and in terms of what we do
18 moving forward for 19/20 and the play.
19           Because those things, from my
20 understanding, occurred, but if they occurred on a
21 Saturday night and we learned of it whenever -- it was
22 after the fact -- we couldn't go back in time and take
23 those comments away from whatever was said at a cast party
24 or whatever the situation was.
25     Q.    So that same day, I guess, after

93

1  everybody slept, the cast party went late, they came back
2  for a set strike, and at that time Vinny Ferrizzi was
3  told to go home, removed from the school.
4           Were you aware of that decision before it
5  was made?
6      A.    Yeah. There was a group text.
7      Q.    Who was on that group text?
8      A.    It was Stacy and Dr. Shank and I.
9      Q.    And what was discussed?
10     A.    I was out to breakfast with my family, I
11 remember, and had my phone and a text came, Stacy asking
12 for some sort of guidance with set strike and whatnot in
13 terms of Vinny. And then Dr. Shank responded and said
14 what she said.
15     Q.    What was that?
16     A.    I don't have that in front of me, but
17 something about you can send Vinny home or whatever. And
18 I think Stacy said, okay, thank you or whatever, and that
19 was that. That was a Sunday morning, if I remember
20 correctly, here at the school.
21     Q.    With all of this going on, leading up to
22 and during this kind of time of conflict, did you and
23 Mrs. Lyons and/or Dr. Shank have any conversations about
24 how to balance the Plaintiffs' rights to civilly disagree
25 with Mrs. Lyons, with your other concerns about

94

1  threatening or disrespectful behavior?
2           MS. O'DONNELL: Object to the form.
3  There's a lot built in there and you might be incorrect
4  about whether or not students have rights to civilly
5  disrespect, disagree.
6  BY MR. READY:
7      Q.    And certainly, Mr. Becker, you can say
8  that if that's your understanding.
9      A.    I don't know how to answer.
10     Q.    So let me ask it like this. Did you have
11 any conversations with Mrs. Lyons or Dr. Becker [sic] --
12     A.    Dr. --
13           MS. O'DONNELL: Shank.
14 BY MR. READY:
15     Q.    I just promoted you, didn't I?
16     A.    It's confusing enough. That's fine, I'm
17 fine.
18     Q.    Did you have any conversations with Mrs.
19 Lyons or Dr. Shank about balancing the students' rights
20 to civil disagreements versus disrespect or
21 insubordination?
22           MS. O'DONNELL: I'm going to object to the
23 form. I don't know what you're talking about.
24           MR. READY: Objection noted.
25           MS. O'DONNELL: You can still answer. I

95

1  have no idea.
2           THE WITNESS: I can tell you, like I think
3  I said to you a few minutes ago, that the play happened
4  and, in my head, it was over. We were moving on to
5  whatever was next with the school year.
6  BY MR. READY:
7      Q.    But even before that time, even before
8  the play was over and you're moving on to the next school
9  year, as this thing was heating up was there ever a
10 conversation about how to make sure that you guys were
11 balancing their rights to disagree with a teacher, right,
12 versus insubordination?
13           MS. O'DONNELL: Object to the form, but
14 you can answer.
15           THE WITNESS: I mean, Dr. Shank, like I
16 said, put a very clear bulletin, memo to Stacy Lyons in
17 terms of expectations for the play, which was very clear.
18           And then as this conversation was going on
19 about the play and Haley's mom and everything like that,
20 Dr. Shank wrote to me -- in the exhibit that you had me
21 point to, I believe -- here that I need you to keep
22 running the high school and get the tasks accomplished
23 that will be moving things forward for students.
24           So as of April the 2nd I said, thanks,
25 I'll continue to work hard and put our students first, I

96

Joint Appendix00174

1 hope you have a good day.
2           Like in my mind, you know, there's a memo
3 in place. I was branded to the high school. I was a new
4 high school Administrator who never, you know, was in a
5 high school before. I never saw a play before. I never
6 was in a situation like this.
7           And, you know, we're working through the
8 situation, taking it day by day, it's a busy world, it's a
9 busy job. And I was asked to just focus on running the
10 high school, and that's what I tried to take very serious
11 from when I was here.
12 BY MR. READY:
13      Q.    So I take it then there were no
14 discussions about the specific topic I'm asking about,
15 about whether you could balance students' rights to
16 disagree with their teacher versus concerns about
17 insubordination; that conversation did not occur?
18      A.    Not from my understanding. I don't
19 understand where exactly you're going with that, like
20 trying to get at.
21      Q.    You don't understand the question, or you
22 don't recall that conversation? I'll ask the question a
23 different way if it'll help, but I'm --
24      A.    If you want to, go ahead.
25      Q.    So students have a right, you said at the

                                                         97

1 beginning when we were talking about this, to disagree
2 with a teacher.
3      A.    Correct.
4           MS. O'DONNELL: No, he did not say that.
5 He said --
6 BY MR. READY:
7      Q.    I'm sorry. Mr. Becker, do students have
8 a right to disagree with a teacher?
9      A.    Students have a right to disagree with a
10 teacher or not see the things the teachers are seeing.
11 We all have that liberty.
12      Q.    And I believe you said that at the
13 beginning. I'm not trying to put words in your mouth.
14      A.    Yeah. I think it was the three or four
15 questions you asked me yes or no.
16      Q.    Yeah. So if that's the case, were there
17 any conversations between you, Mrs. Lyons and Dr. Shank
18 or you and either one of them about how to balance that
19 right to disagree with a teacher with your concerns about
20 insubordination or making the teacher feel threatened?
21 Was there any discussion about this being a balance or
22 how to walk a fine line here?
23      A.    I don't believe so, no.
24      Q.    Let's turn to Exhibit 16. You just
25 mentioned it, and I do have a question or two about it.

                                                         98

1 This is a memo from Dr. Shank to Mrs. Lyons. Did you
2 have any hand in the drafting of this memo?
3      A.    I mean, Dr. Shank and I, we talked every
4 day in the role that we both were in. I mean, almost
5 every day we ate lunch together.
6      Q.    You would say you impacted some of the
7 content of this memo?
8      A.    We tried to keep each other abreast of
9 everything that was going on in the high school and, you
10 know, especially with the play and everything like that.
11           And Dr. Shank created the memo, and I
12 believe she cc'd me, yeah, and Mrs. Cambria and Mrs.
13 Lyons, as you see it was addressed to.
14      Q.    At the top of this memo it says -- and
15 this is Dr. Shank speaking: As a follow-up to our
16 conversations regarding the concerns expressed by several
17 students and parents/guardians throughout the Spring 2019
18 musical rehearsal season, I will be summarizing the
19 expectations in this memo.
20           I don't want to assume. So those
21 conversations -- she says our conversations -- do you
22 believe those involved you, or was that Dr. Shank and Mrs.
23 Lyons?
24      A.    You'll have to ask Dr. Shank. But, like
25 I said, Dr. Shank and I spoke about the play.

                                                         99

1           And as you see, one thing I know -- and I
2 didn't read this document in a couple seconds here, but
3 one thing I talked about was rehearsals, about being on
4 time, and that's No. 1.
5      Q.    So that was a concern you had raised with
6 the --
7      A.    Right. Then I heard, you know, from
8 students and parents, like I said earlier, and Dr. Shank
9 and I spoke about that. There it is, No. 1 in the memo.
10      Q.    And you had conveyed that to Mrs. Lyons
11 previously; right?
12      A.    Yeah.
13      Q.    Let's go to No. 11 here on Page 2. It
14 says: Applications for the Drama Club scholarship will
15 be provided to the Superintendent and Administration for
16 their review and selection of the successful candidate.
17           Did you receive applications for the Drama
18 Club scholarship from Mrs. Lyons?
19      A.    Not to my understanding and memory. I
20 was not here in -- you know, after the middle of May, so
21 I don't know --
22      Q.    So, as you sit here today, you don't
23 believe you were involved in any way in the process to
24 determine who would get the Drama Club scholarship?
25      A.    No. I wasn't here for the award

                                                        100

Joint Appendix00175

**Page 101**

1 ceremonies at the end of the year, so I — no. I wasn't
2 here for graduation, so I don't --
3     Q.    Okay. Understood. Let's look at
4 Exhibit 28. This is an e-mail from Dr. Shank to you on
5 April the 24th, and there's reference, I suppose, to this
6 civil suit: Considering this high school issue is now a
7 legal issue, with the potential for a civil lawsuit for
8 the lack of administrative action to protect the students
9 emotional well-being, and you have failed to keep me
10 informed regarding this ongoing issue, I expect your
11 written detailed reply no later than Friday, April 26,
12 2019.
13          Do you agree that you had failed to keep
14 Dr. Shank informed regarding this issue?
15     A.    I don't know if I failed. I had
16 conversations with Dr. Shank a lot March and April in
17 terms of my performance and in terms of the school, in
18 terms of the high school piece.
19          I remember I received, you know, some
20 memos myself from Dr. Shank and some things she wanted me
21 to improve on as a high school Principal.
22          And it was a hard time for me --
23 especially close to Easter, I remember -- and not knowing
24 what was going to happen for me here.
25          So I remember, as I mentioned before, we

**Page 102**

1 had lunch together almost every day. And I received an
2 e-mail -- I believe Dr. Shank and I received an e-mail
3 from Mrs. Bertin the day before spring break, and I was in
4 the cafeteria when I received the e-mail.
5          And at that point in time Dr. Shank didn't
6 stop by the cafeteria to have lunch for a little bit of
7 time. I don't know if she wasn't really happy with my job
8 performance or, you know, there was other things going on,
9 and it was a hurtful time for me.
10         And I received this e-mail and, of course,
11 I try to be very responsive with my e-mails. And I was
12 not going to call this parent -- call this parent in the
13 cafeteria, and it wasn't appropriate to do so.
14         Fast forward to the end of the day, I
15 remember I tried to leave. I was directed I had to stay
16 till 4 o'clock every day, at least. I'm here, I'm doing
17 work. I received numerous tasks from Dr. Shank to
18 complete during that time frame -- not specifically on
19 that date, per se -- but received a bunch of tasks to
20 complete.
21         And it was getting late, and my son, who
22 has daycare, they asked politely to pick up every day
23 before 5 o'clock, and it's about 15 minutes away from
24 here.
25         So it was getting late and I'm like, you

**Page 103**

1 know what, I have one more thing to do, and it's to return
2 this call from this parent because this parent asked for a
3 phone call. And I got in my car and I drove the 15
4 minutes or whatever to daycare, and I called the parent
5 back as part of my duty.
6          I felt like -- I tried to be responsive as
7 a Principal, but I also felt like here's an e-mail that I
8 got; if I don't call a parent back -- I try to follow a
9 24-hour policy -- you know, hour 25 or so I didn't want to
10 be insubordinate for not doing it, so I called the parent
11 back, as I said, after a trying time and just trying to do
12 what was right.
13         And I called the parent back, and I was
14 driving and reception was spotty down 73. I don't know
15 how your cell phone service is but it's spotty, and I
16 just, you know, did that. And I got to daycare, and that
17 was the end of the phone call, right around that time
18 period.
19         And I don't have that date in front of me,
20 but it was the last day before spring break. And then
21 randomly, a week or two later, I received this e-mail on
22 April 24th asking me to provide the conversation, and
23 that's what I did before the date that I was directed to.
24     Q.    So do you agree that you failed to keep
25 Dr. Shank informed regarding these issues?

**Page 104**

1     A.    I don't think I failed. I think I just
2 didn't know. I think I was trying do the right thing. I
3 had a parent who wanted me to give them a call. And at
4 that point in time, in April, I gave a parent a call as I
5 would --
6     Q.    What were the parent's concerns?
7     A.    I wrote -- I don't know if that's a part
8 of my e-mail back.
9     Q.    You responded via e-mail?
10    A.    Yeah, which would be the clearer picture
11 because at that point, in April, I guess when I
12 responded, it would be much clearer in my head than it
13 would be here in November.
14    Q.    After the School Board meeting Jordan,
15 Vinny and Haley were each issued referrals for special
16 needs analysis, to see if they needed an IEP or other
17 help. Do you know why that was done?
18    A.    There was other students, as well, from
19 my recollection. And that was a conversation that Dr.
20 Shank and Mrs. Cambria and -- I don't know if the School
21 Counselors were involved -- but the permission to
22 evaluate -- I believe that letter and that form was
23 mailed out to those people.
24    Q.    Were you involved in that decision at
25 all?

Joint Appendix00176

1      A.    I didn't mail anything out.  No.
2      Q.    Were you involved in the decision to mail
3  anything out?
4      A.    I don't believe -- I mean, I was the
5  high school Principal.
6      Q.    I guess what I'm asking is, the decision
7  was made, you said, for a number of students to be
8  assessed.  Were you involved in that decision?  Did you
9  have a conversation and say these guys need permission to
10  be evaluated?
11      A.    No, I don't believe so, and I wasn't at
12  the meeting.  So I don't know at the Board meeting what
13  exactly occurred or who talked or who said what or who
14  did whatever or --
15      Q.    But after that Board meeting -- so you're
16  saying the Board meeting is why they needed these
17  permissions to evaluate?
18      A.    I guess it was from that or, if I
19  remember, at the Board meeting it was their behavior
20  throughout the play or whatever was going on.
21      Q.    You were involved in that discussion as
22  to them needing to be --
23      A.    I believe my involvement was pretty much
24  this is what's gonna happen.  The permission to evaluate
25  is going to go out to so many people.

105

1      The one name I believe that I remember
2  hearing was Richard, who I believe her grandfather was a
3  part of the Board, and she was -- I knew her because she
4  was our representative for like Miss Berks County or --
5      Q.    That'd be Haley Richard?
6      A.    Correct, yeah.
7      Q.    And --
8      A.    But I didn't come to anybody and say I
9  think this, this, this needs to happen in terms of
10  permission to evaluate to go home which, as a Principal,
11  sometimes you do depending on a situation or what you
12  see, discipline, or if you're in a classroom or you talk
13  to a School Psychologist or whatever.  I've been in that
14  before.
15      Q.    So if somebody came to you and said they
16  needed to be evaluated --
17      A.    I don't think those words were used.
18  They said they needed to send the form home.
19      Q.    And who made the decision to send the
20  form --
21      A.    I don't remember who specifically said
22  that, if it was a conversation with Dr. Shank or Mrs.
23  Cambria, our School Counselor.  It would all go through
24  the Special Education office for something like that.
25      Q.    Are you aware of what -- I guess you're

106

1  not.  You're not aware of what behavior or statements or
2  what triggered that decision?
3      A.    Just generally, I guess, whatever
4  occurred, you know, through the observation of the play
5  or something with the play, with the drama that took
6  place.
7      Q.    In this lawsuit there have been requests
8  in discovery for both of the Co-Defendants and of Jordan
9  himself as to whether he has mental disabilities.
10      And I'll also turn your attention to
11  No. 6, Exhibit 6.  This is a -- I believe this is a PTE
12  form, a Permission to Evaluate.  You can correct me if I'm
13  wrong.  It seems there has been a long-standing belief
14  that Jordan has some sort of mental disability.  And
15  you'll see on Page 2, I believe it specifically says that
16  a psychological evaluation is what they wanted.
17      Do you know, did you ever suspect that
18  Jordan had psychological issues that needed to be
19  addressed?
20      A.    I'm not a school psychologist.  I'm not
21  a doctor.  I don't know.  That would be unfair for me to
22  say.
23      Q.    Do you know why he was singled out so
24  many times for this question?
25      MS. O'DONNELL:  Objection to the form.

107

1  What do you mean, singled out so many times for this
2  question?  What does that mean?
3  BY MR. READY:
4      Q.    On February 22nd someone -- maybe singled
5  out is the wrong word -- somebody chose him for a PTE to
6  evaluate him.  Do you know why?
7      A.    You would have to ask the person that
8  referred him or the information here provided.
9      I know Mrs. Cambria and I spoke to Jordan
10  at some point along February, and we tried to have a
11  conversation with him, as I had a couple conversations
12  with him in the past, as I alluded to, in terms of -- you
13  know, my message to Jordan with my meeting one on one with
14  him, whether it was once or twice, and with Mrs. Cambria
15  was there's going to be jobs that you're gonna be the best
16  candidate for and you're not going to get, or you're not
17  going to be part of a relay and maybe you should be a part
18  of the relay, but it's about what we do with what we have.
19      And I would have those types of
20  conversations with him to try to motivate him and try
21  to -- I also spoke with him, and I'm familiar with the
22  theatre in Ephrata, and I knew he was going to Philly for
23  school.  And I tried to always say like -- and I talked to
24  him about some personal stuff that I had throughout high
25  school, you know, my experiences with extracurricular,

108

Joint Appendix00177

Case 5:19-cv-01873-MAK Document 86-2 Filed 01/03/20 Page 34 of 186
Case 5:19-cv-01873-MAK Document 86-2 Filed 12/05/19 Page 34 of 186

Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 31 of 181

1 that you get that high school diploma and you're moving
2 on. Next year, when you're performing here or there,
3 you're gonna not be so concerned about what happened in
4 high school.
5 And those conversations occurred with
6 Jordan and I. And one of them -- you know, Mrs. Cambria
7 and I spoke with Jordan, and it was probably around
8 February -- we spoke to Jordan in her office about so --
9 Q. Okay.
10 A. But, you know, I think, too, is to
11 mention here, whether it's an initial evaluation or
12 whatever, my feeling is always whoever suspects it -- I
13 would tell parents generally that we're just trying to
14 help our students.
15 And I'm not making any determination about
16 Jordan specifically -- I'm just speaking generally -- a
17 general practice with issuing a form like this or whatever
18 the situation may be is, that's the world we live in and
19 that's the business that we're in. We're just trying to
20 help -- trying to help all students.
21 Q. I asked you a couple questions about your
22 background in the beginning. I'm going to circle back
23 and we'll end on that.
24 A. Thank you.
25 Q. How old are you?

109

1 A. 35.
2 Q. You've accomplished a lot at 35.
3 A. Thank you. I appreciate that.
4 Q. How long have you been in education at
5 this point?
6 A. I was hired July of 2006. I graduated
7 college in May of 2006, and then I was hired in July.
8 Q. And that's when you became a teacher?
9 A. Teacher, correct.
10 Q. And then you taught, you said, for five
11 years?
12 A. Yep.
13 Q. And then you went into a program as an
14 Administrator. Is that right?
15 A. Yeah. I was influenced by my Principal
16 at Northwest Middle School. So you have take 24 credits
17 your first six years, by the end of my first year I
18 took a class or two. Second year I took another class,
19 and they were kind of -- you can go any way with them
20 'cause I didn't know if I wanted to be a college coach,
21 swimming coach, or I wanted to teach and coach, this and
22 that, 'cause I was a high school coach as well.
23 And then my second year my Principal
24 continued to influence me, and I said, you know what, I
25 got a couple credits; they all are eligible to be

110

1 educational leadership credits, and a Master's is 42
2 credits. And I said, I'm going to try to map this out and
3 finish by the end of my fifth year, which I did.
4 And then when I finished my fifth year of
5 teaching, there was openings in the Reading School
6 District and they immediately -- shortly after that, that
7 summer, moved me in.
8 So then in August -- when I was going back
9 to teach for my sixth year, I immediately was asked to
10 begin as an Administrator. So I made it five years as a
11 teacher and have been an Administrator since.
12 Q. So August of 2011 then, is that when you
13 became an Administrator?
14 A. I was hired 2006, 7, 8, 9, 10, so
15 correct, August of 2011.
16 Q. And since that time you've been an
17 Administrator?
18 A. That's correct.
19 Q. Is there anything -- obviously, Ms.
20 O'Donnell may have some questions for you. Is there
21 anything that I asked you that you wanted the chance to
22 expound on? Is there anything you feel that you left out
23 or wanted the chance to say at this time?
24 MS. O'DONNELL: We can follow up with some
25 questions. That's a good segue.

111

1 THE WITNESS: Sure, yeah.
2 BY MS. O'DONNELL:
3 Q. I'm not sure if you testified, and I just
4 want some clarification. Did you testify that Jordan's
5 attendance at the Board meeting was one of the reasons
6 for his IEP? Did you say that?
7 A. I would -- again, without having that
8 information, so it looks like the permission was
9 February 22nd, so that wouldn't make sense because the
10 Board meeting was March.
11 Q. Correct.
12 A. Yeah.
13 Q. I'd like you to turn to Page 22 -- not
14 Page 22 -- Exhibit 22.
15 A. (Witness complies.)
16 Yeah.
17 Q. Do you recognize this as something that
18 you wrote?
19 A. Yeah. That's my e-mail.
20 Q. If you come down to the second full
21 paragraph -- well, the second full paragraph under, At
22 7:50 a.m. Do you see that?
23 A. Um-hum.
24 Q. AnnMarie, Jared, Jared's mother and I met
25 to review the incident. And she says, Safety was a big

112

Joint Appendix00178

1  focus and take away of the meeting. Jared's mom also
2  mentioned that Jared thought Mrs. Eck was in the parking
3  lot at the dance studio last evening as they were
4  leaving.
5        A.    On Pricetown Road, that dance studio,
6  yeah.
7        Q.    You said something earlier about skating.
8        A.    My apologies. It's a dance studio.
9  Dance studio located close to Pricetown Road.
10       Q.    Is this the incident that you're making
11  reference to, though, Jared thought Mrs. Eck was --
12       A.    Jared thought -- yep. Thank you for
13  clarifying with the dance studio. I'm just trying to
14  reread all this and get the information straight for
15  today to try to do the best job that I could.
16       Q.    What was the point of Mrs. Eck being at
17  the dance studio?
18       A.    That's what, you know, they reported;
19  that Mrs. Eck was at the dance studio, and they felt that
20  she should not have been there. And that's why I wrote
21  at the top about safety was the big focus.
22       Q.    Did they say that she was stalking them?
23       A.    I don't know if the word stalking was
24  used, but they -- that's basically what they were -- they
25  either said stalking or they felt like why is this lady

                                                      113

1  in the parking lot with my son, this is a dangerous
2  situation.
3        Q.    If you flip to the next page, OVSD 896,
4  if you come down to the last full paragraph where it says
5  at 2:59 p.m. we made that phone call, do you see that?
6        A.    Yes.
7        Q.    It says right above that, just to give
8  you some reference to where we are in the day, Mrs. Eck
9  called Mr. Becker's phone line around 1:30 p.m., above
10  that; right?
11       A.    Correct.
12       Q.    I will be calling her back with a witness
13  (AnnMarie) later today. And then at 2:59 it says, We
14  made that phone call, right? You called Tara Eck?
15       A.    Yeah.
16       Q.    Here's where she says, Mom asked that
17  whatever is going on, she wants to be present?
18       A.    Yes. That's correct.
19       Q.    And then she's really upset about him,
20  being Jordan, being questioned. Is that correct?
21       A.    Correct.
22       Q.    Then it says, AnnMarie and I both spoke
23  about the review of the notes above from Jordan's office
24  visit today.
25            And that was essentially what? Is that

                                                      114

1  when he was suspended?
2        A.    No. This was before. This was a
3  Snapchat video and this was the Police Report that took
4  place a couple days before the suspension, so March 19th.
5        Q.    Underneath that it says: Social media
6  conversation occurred. Mom and Jordan has this talk
7  often.
8            Do you see that?
9        A.    Yeah. So what I was just looking at
10  here to refresh my memory was, after AnnMarie and I spoke
11  to Jared and his mother. I read in my e-mail that at the
12  conclusion of the meeting, so basically after Jared and
13  his mom left, AnnMarie and I called down Jordan Eck.
14            We spoke to Jordan, and we spoke to him
15  about work release. We asked him about the recent drama
16  and incidents regarding the play. He mentioned he wanted
17  to talk to Dr. Shank and about six or seven other students
18  were planning to do that today.
19            When he mentioned -- when we mentioned Dr.
20  Shank was not available, we told him to see Deb to
21  schedule a meeting. He then spoke to AnnMarie about a
22  notebook situation yesterday that she handled with Haley,
23  and he also stated two to three times about wanting Jared
24  to get the help that he needed.
25            He also mentioned that Jared was seen on

                                                      115

1  the Snapchat video showing his middle finger. He
2  mentioned an example of a dance-off that occurred at the
3  middle school production this weekend, which was the focus
4  of the Snapchat video.
5            So that's what I was referring to earlier,
6  that -- something about -- I guess the Snapchat video had
7  something to do with the middle school production, which I
8  wasn't present at, but something I guess a lot of the kids
9  helped with because of being in the high school.
10       Q.    Is this the fruit video?
11       A.    Looking back at this, I should have been
12  clearer, I guess. I don't know if he's talking about --
13  I guess he's talking about the fruit video because
14  Jared's would be the middle finger, and he mentioned the
15  dance-off -- I'm assuming would be the Snapchat video
16  that AnnMarie and I questioned him about.
17       Q.    And then underneath that --
18       A.    And we called the cops at 10:45 to
19  report -- to file an incident Report. And Officer Smith
20  was very thankful. And then Mrs. Eck called around 1:30.
21       Q.    Right.
22       A.    And then what I think was going on at
23  dismissal, AnnMarie and I were in my office, and I was
24  just kinda typing this up to keep everybody informed of
25  what was going on.

                                                      116

1    So then after dismissal at 2:59 we made a
2 phone call, and I just kinda kept notes in terms of what
3 that phone call was about before sending this to the
4 parties involved.
5    Q.    It says: Social media conversation
6 occurred, mom and Jordan has -- I guess or have -- this
7 talk often?
8    A.    Yeah.
9    Q.    Do you know specifically whether it was
10 about the fruit video or something else?
11    A.    I don't remember. I don't know if it
12 was in general about social media or what, but that was a
13 record that I kept.
14    And probably knowing what I was doing is
15 when the mom was on the phone, I was just typing 'cause I
16 just tend to write or, in this case, type what's being
17 said to kinda keep a record of that.
18    Q.    Underneath that it says: Jordan was
19 accused of "abuse" by the Drama Director in the past.
20    Do you know what that makes reference to?
21    A.    No. I just guess she made that comment,
22 so I wrote that down.
23    Mom requested again that when he is
24 questioned a parent needs to be present. Kids are tired
25 of Stacy. Mom went on to the idea of favoring one student

117

1 over the other. The conversation ended at 3:15.
2    Q.    Was that a summary of or a synopsis of
3 the conversations that you had with both students, Jared
4 and Jordan, and their parents regarding this Snapchat
5 video?
6    A.    Yeah, I think that's a good summary from
7 that whole day. The 19th from 7:30 -- and I was right --
8 IEP meeting together. So from 7:30 in the morning till
9 3:15, that was a summary of March 19th with Snapchat,
10 with everybody involved in that day.
11    And I wanted to keep Dr. Shank involved
12 and -- who was my boss -- and keep her involved with
13 everything that happened, just try to keep everybody in
14 the loop of what was going on.
15    MS. O'DONNELL: I have no further
16 questions.
17 BY MR. READY:
18    Q.    I have just a couple follow-ups real
19 quick. You mentioned here that there was some concern
20 about a -- Jordan brought up something about a notebook
21 situation. Do you remember what he said?
22    MS. O'DONNELL: 22.
23    THE WITNESS: Thank you. No, I mean, just
24 what I wrote down here that -- with AnnMarie -- spoke to
25 AnnMarie about a notebook situation yesterday that she

118

1 handled with Haley.
2    And he, at that point, was talking -- I
3 remember Mrs. Borovik in my office -- I guess, you
4 know, the way, I guess, she handled that or looked into
5 that which, again, I guess she did privately in her office
6 that day before or that school day before, and he had that
7 conversation with her when I was present.
8    Q.    Mrs. Lyons testified about this earlier
9 and Mr. Eck testified about it, Jordan Eck testified
10 about it. Jordan said that -- and Haley, I believe, as
11 well -- that the binder was thrown by Jared at Haley.
12 Mrs. Lyons disagreed and said that's different than what
13 Jared told her.
14    Do you remember any of what they told you
15 about that incident?
16    A.    Now that you said that, I remember there
17 was the allegation that it was thrown. But as I think I
18 wrote, you know, that AnnMarie handled the notebook
19 situation, so he spoke to AnnMarie about that.
20    Q.    Did you talk to Jared about that at all?
21    A.    I don't know. I'm sure I did. You
22 know, I try to follow up on everything. But based upon
23 the notes that I reviewed and I submitted, I didn't
24 remember seeing anything written down, and I don't think
25 there's anything in here.

119

1    Q.    Did you call the police about this binder
2 incident?
3    A.    I don't believe I did. I don't have a
4 record of that.
5    Q.    Jordan also testified -- and this is a
6 little bit different than what you said earlier. You
7 said that you -- just now -- that you spoke to Jordan
8 that day about the Snapchat video, the fruit video and
9 whatever else.
10    Jordan said he tried to come find you that
11 day. Does that help to refresh your recollection at all?
12    A.    I mean, whatever I wrote on this day is
13 what happened. I don't know if it was that day we were
14 referring to or what.
15    I know there was times where people would
16 come down, and I would be out of the building or I'd be
17 here or I'd be there, so I don't know if we're talking
18 about the same day or not.
19    I know there's plenty of times that Jordan
20 would come down, with work release or whatever, that we
21 would connect, and I would always try to make time for
22 him. And there's times that, for whatever the reason, for
23 other things going on in the building or whatever, that we
24 would have to wait till the next school day or whatever
25 because we talked to him on that day, on the 19th, so....

120

Joint Appendix00180

1   Q.   You mentioned the IEPs, and I know that
2   we certainly looked at one IEP that was sent out on the
3   22nd. So if you'll look at Exhibit 5 for just a second.
4   A.   (Witness complies.)
5   Q.   This is an e-mail from Dawn Cambria to
6   Pam Luft, and there's a number of people cc'd, Dr. Shank,
7   yourself. And it says: Pam, as a result of behaviors
8   observed during and after the drama discussion last
9   evening and today at DVHS, please send PTEs for ED for
10   the following students.
11   So, first of all, PTEs, that's permission
12   to evaluate. Is that right?
13   A.   Correct.
14   Q.   What is ED?
15   A.   Emotional disturbance, I believe, from
16   this e-mail is the way I would --
17   Q.   Were you involved in that decision at
18   all?
19   A.   Like I said, I don't believe I was
20   involved. And that day was the 21st, which was the day
21   of the suspension; correct?
22   Q.   Yes, that's correct.
23   A.   And that was the day that I left, came
24   back to speak to Haley, and I went to Alvernia. And I
25   was at Alvernia roughly from 12 o'clock, 12:30 until the

121

1   end of business, and I did not return to school till then
2   the following business day. So 3:41 p.m., and that
3   afternoon I was not here.
4   MR. READY: Okay. All right. I have
5   nothing further.
6   MS. O'DONNELL: Nothing further.
7   (Whereupon, the deposition concluded at
8   3:00 o'clock p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

122

1                    CERTIFICATE
2
3   I, Lori A. Dilks, the officer before whom
4   the deposition of CHRISTOPHER BECKER was taken, do hereby
5   certify that CHRISTOPHER BECKER, the witness whose
6   testimony appears in the foregoing deposition, was duly
7   sworn by me on November 11, 2019, and that the
8   transcribed deposition of said witness is a true record
9   of the testimony given by him; that the proceedings are
10   herein recorded fully and accurately to the best of my
11   ability; that I am neither attorney nor counsel in or
12   related to any of the parties to the action in which this
13   deposition was taken; and, further, that I am not a
14   relative of any attorney or counsel employed by the
15   parties hereto or financially interested in this action.
16
17
18         Lori Dilks
19         Lori A. Dilks
20
21   PA Court Reporter
     Notary Public in and for the
     Commonwealth of Pennsylvania
22
23   My Commission expires
     November 29, 2023
24
25

123

Joint Appendix00181

Case 5:19-cv-01873-MAK   Document 854   Filed 01/13/20   Page 38 of 186
Case 5:19-cv-01873-MAK   Document 854   Filed 01/02/20   Page 38 of 186
78100xxcdscdvgu9w001873-MAK   Document 48-2   Filed 12/02/19   Page 35 of 181

**$**

**$200** [2] - 74:18, 77:6

**1**

**1** [6] - 3:7, 63:4, 66:20, 72:6, 72:7, 78:19, 100:4, 100:9
**10** [7] - 1:24, 3:18, 66:1, 77:24, 87:5, 87:6, 111:14
**100** [1] - 2:8
**10:00** [1] - 66:23
**10:45** [1] - 116:18
**11** [6] - 1:16, 3:19, 61:4, 78:14, 100:13, 123:7
**11:30** [3] - 60:11, 61:5, 83:21
**11:39** [1] - 68:20
**11:45** [1] - 61:5
**12** [6] - 3:20, 7:20, 14:10, 83:20, 83:22, 121:25
**12:17** [1] - 34:14
**12:30** [1] - 121:25
**12:45** [1] - 1:17
**12th** [8] - 7:19, 21:17, 21:21, 21:24, 24:24, 25:7,

**2**

**2** [13] - 3:8, 4:12, 74:12, 75:5, 75:8, 76:2, 76:5, 76:7, 76:11, 76:12, 76:16, 100:13, 107:15
**2/22/19** [1] - 3:13
**20** [6] - 3:7,

25:19, 26:2
**13** [1] - 3:21
**14** [1] - 3:22
**15** [4] - 3:24, 55:24, 102:23, 103:3
**16** [2] - 3:25, 98:24
**17** [4] - 1:19, 4:1, 28:21
**17011** [1] - 2:9
**18** [1] - 4:3
**18th** [3] - 40:5, 41:12, 56:13
**19** [3] - 4:4, 4:6, 4:7
**19/20** [1] - 93:18
**19522** [1] - 2:4
**19608** [1] - 1:24
**19th** [12] - 33:24, 39:15, 40:4, 40:5, 41:12, 42:6, 56:14, 115:4, 118:7, 118:9, 120:25
**1:30** [2] - 114:9, 116:20

3:10, 4:5, 4:8, 4:9, 28:5
**2006** [3] - 110:5, 110:7, 111:14
**201** [1] - 2:9
**2011** [2] - 111:12, 111:15
**2018** [2] - 8:2, 8:11
**2019** [24] - 1:16, 3:7, 3:10, 3:11, 3:12, 3:15, 3:21, 3:25, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 8:10, 34:13, 38:9, 38:17, 99:17, 101:12, 123:7
**2023** [1] - 123:23
**20th** [9] - 8:6, 6:7, 33:24, 34:13, 38:4, 39:12, 57:16, 61:4, 66:23
**21** [4] - 3:11, 3:25, 4:6, 4:10
**21st** [7] - 33:24, 60:18, 65:7, 65:24, 81:16, 82:6, 121:20
**22** [5] - 4:7, 112:13, 112:14, 118:22
**220** [1] - 4:1
**22nd** [2] - 108:4,

112:9, 121:3
**23** [1] - 4:8
**233** [1] - 4:3
**24** [8] - 4:9, 4:13, 4:14, 68:13, 68:17, 77:20, 80:17, 110:16
**24-hour** [1] - 103:9
**24/7** [1] - 59:21
**248** [1] - 4:4
**24th** [2] - 101:5, 103:22
**25** [9] - 3:11, 4:10, 4:11, 60:21, 65:10, 65:14, 65:22, 70:13, 103:9
**25-minute** [1] - 71:8
**252** [1] - 4:5
**26** [4] - 4:11, 89:20, 89:24, 101:11
**26(f** [1] - 3:20
**27** [3] - 3:15, 4:12, 86:8
**28** [2] - 4:13, 101:4
**29** [2] - 4:14, 123:23
**2:55** [3] - 114:5, 114:13, 117:1
**2nd** [1] - 96:24

**3**

**3** [17] - 2:4, 3:9, 73:4, 73:6, 73:19, 73:23, 74:22,

75:4, 75:22, 75:25, 76:1, 76:10, 79:13, 79:25, 80:10, 81:10, 81:12
**30** [2] - 4:15, 73:9
**30-minute** [1] - 70:13
**31** [1] - 4:16
**35** [2] - 110:1, 110:2
**3:00** [1] - 122:8
**3:15** [2] - 118:1, 118:9
**3:41** [1] - 122:2

**4**

**4** [6] - 3:3, 3:10, 34:1, 34:3, 52:2, 102:16
**42** [1] - 111:1

**5**

**5** [4] - 3:11, 59:21, 102:23, 121:3
**5:19-CV-01873-MAK** [1] - 1:4
**5:30** [2] - 59:21, 61:22
**5th** [3] - 21:16, 21:21, 21:24

**6**

**6** [6] - 3:13, 37:1, 37:2, 107:11
**610** [1] - 1:25
**678-9984** [1] - 1:25

**7**

**7** [2] - 3:14, 111:14
**73** [1] - 103:14
**7:10** [1] - 90:3
**7:27** [1] - 61:25
**7:30** [2] - 118:7, 118:8
**7:37** [2] - 65:5, 71:3
**7:50** [1] - 112:22

**8**

**8** [2] - 3:15, 111:14
**801** [1] - 28:24
**849** [1] - 73:16
**8500** [1] - 2:3
**896** [1] - 114:3

**9**

**9** [5] - 3:17, 3:21, 37:1, 37:2, 111:14
**908** [1] - 89:25
**911** [1] - 86:9
**9:35** [2] - 65:7, 65:24
**9th** [2] - 24:25, 25:7

**A**

**a.m** [2] - 65:7, 112:22
**abbreviations** [1] - 41:17
**Abby** [2] - 66:18, 67:21
**abilities** [3] - 25:20, 25:23, 26:9
**ability** [3] -

11:10, 88:5, 123:11
**able** [5] - 7:19, 9:13, 30:24, 91:4, 91:5
**abreast** [1] - 99:8
**absolutely** [4] - 22:17, 23:13, 48:12, 54:7
**abuse** [1] - 117:19
**academic** [1] - 89:4
**acceptable** [1] - 11:5
**accommodate** [1] - 42:3
**accomplished** [2] - 96:22, 110:2
**accord** [1] - 23:19
**according** [2] - 70:5, 88:12
**accordingly** [1] - 13:7
**accosted** [2] - 69:1, 69:10
**account** [2] - 8:13, 18:10, 86:12
**accurate** [4] - 24:16, 29:16, 39:16, 77:19
**accurately** [4] - 55:7, 56:9, 64:2, 123:10
**accusation** [1] - 91:20
**accused** [4] - 67:13, 69:2, 69:11, 117:19
**accusing** [2] - 63:22, 67:8

**act** [1] - 60:2
**action** [4] - 15:20, 101:8, 123:12, 123:15
**actions** [2] - 68:2, 80:3
**activities** [2] - 26:18, 76:24
**activity** [1] - 76:21
**actual** [1] - 64:15
**adapted** [1] - 29:19
**add** [1] - 62:21
**additional** [1] - 69:7
**address** [3] - 8:16, 72:12, 82:8
**addressed** [2] - 99:13, 107:19
**Administration** [4] - 35:7, 36:2, 74:1, 100:15
**administrative** [1] - 101:8
**Administrator** [3] - 9:15, 10:1, 14:8, 16:10, 20:5, 20:6, 66:13, 97:4, 110:14, 111:10, 111:11, 111:13, 111:17
**Administrators** [1] - 28:10
**adult** [3] - 57:6, 57:11, 57:13
**adults** [1] - 22:9

**advanced** [1] - 25:8
**advice** [1] - 12:12
**affected** [1] - 90:20
**afternoon** [1] - 122:3
**age** [3] - 20:12, 25:8, 25:17
**agencies** [1] - 73:24
**agency** [1] - 75:19
**ago** [4] - 48:3, 63:25, 67:9, 96:3
**agree** [7] - 11:6, 25:18, 26:1, 26:7, 87:21, 101:13, 103:24
**ahead** [6] - 12:22, 27:5, 44:23, 50:19, 79:7, 97:24
**alert** [6] - 21:2, 41:16, 45:8, 45:9, 46:11
**alerted** [1] - 81:23
**all-inclusive** [2] - 74:10, 75:3
**allegation** [2] - 69:9, 119:17
**allegedly** [1] - 69:12
**Allentown** [1] - 2:3
**allergic** [6] - 42:23, 43:5, 43:9, 48:10, 49:21, 54:7
**allergies** [2] - 49:1,

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 39 of 186

49:14
allergy [1] - 48:11
allowed [3] - 14:21, 25:6, 25:7
alluded [1] - 108:12
almost [2] - 99:4, 102:1
alone [1] - 38:25
ALSO [1] - 2:12
alternatives [2] - 74:9, 75:2
Alvernia [5] - 83:6, 83:21, 89:11, 121:24, 121:25
Amendment [12] - 10:13, 10:21, 10:25, 11:3, 11:7, 11:16, 11:20, 12:19, 13:24, 14:22, 14:24, 15:22
analysis [2] - 64:14, 104:16
AND [1] - 1:16
and.... [1] - 45:14
angry [2] - 50:23, 82:4
AnnMarie [18] - 42:17, 84:5, 84:11, 84:13, 85:10, 85:18, 112:24, 114:13, 114:22, 115:10, 115:13, 115:21, 116:16, 116:23,

118:24, 118:25, 119:18, 119:19
answer [28] - 6:5, 10:23, 11:5, 14:3, 26:22, 27:1, 27:8, 27:12, 27:17, 27:25, 28:1, 28:14, 30:3, 52:20, 52:21, 52:24, 52:25, 53:1, 54:3, 54:15, 64:12, 69:15, 79:19, 89:3, 95:9, 95:25, 96:14
answered [3] - 52:18, 67:12
answering [1] - 78:8
answers [1] - 31:7
apologies [1] - 113:8
appear [1] - 78:18
APPEARANCES [1] - 2:1
applications [2] - 100:14, 100:17
applies [1] - 26:17
appreciate [1] - 110:3
appreciative [1] - 55:1
approaches [1] - 12:15
appropriate [9] - 10:17, 11:17,

13:25, 50:13, 54:2, 73:1, 74:1, 75:16, 102:13
approved [2] - 8:7, 66:8
April [11] - 3:11, 4:12, 4:13, 4:14, 96:24, 101:5, 101:11, 101:16, 103:22, 104:4, 104:11
Area [1] - 6:19
area [2] - 77:4, 84:8
areas [2] - 12:8, 75:7
arise [1] - 52:12
array [1] - 80:2
assault/battery [1] - 74:16
assessed [1] - 105:8
assessment [1] - 90:25
Assistant [11] - 6:22, 13:17, 14:9, 14:14, 15:4, 23:23, 24:2, 32:23, 48:15, 68:2, 69:10
assume [7] - 6:6, 17:11, 35:19, 36:25, 43:4, 51:19, 99:20
assuming [5] - 8:19, 39:10, 39:19,

40:20, 116:15
ate [1] - 89:5
athletic [1] - 76:23
attached [2] - 60:12, 63:15
attachments [3] - 3:13, 3:14, 3:16
attack [1] - 74:16
attacked [2] - 69:6, 78:3
attend [1] - 57:15
attendance [1] - 112:5
Attendance [1] - 71:22
attended [1] - 32:1
attention [3] - 17:23, 65:25, 73:8, 86:7, 107:10
attorney [2] - 123:11, 123:14
attorneys [1] - 30:10
auditorium [9] - 62:6, 62:14, 81:8, 81:23, 82:5, 84:25, 85:6, 85:10, 85:14
August [3] - 111:6, 111:12, 111:15
authority [1] - 26:14
available [4] - 87:2, 87:7, 90:22, 116:20
avenue [1] - 14:13

award [*] - 100:25
aware [18] - 10:13, 29:12, 44:18, 56:23, 57:18, 59:4, 59:11, 59:14, 59:16, 59:18, 62:15, 62:17, 62:20, 93:7, 94:4, 106:25, 107:1
awhile [1] - 78:5

**B**

background [1] - 109:22
bad [1] - 21:4
balance [5] - 11:15, 94:24, 97:15, 98:18, 98:21
balancing [2] - 95:19, 96:11
bar [2] - 49:13, 49:22
based [6] - 14:12, 17:11, 21:14, 66:3, 71:2, 119:22
basis [1] - 9:1
Bates [1] - 28:24
BCIU [2] - 9:17, 9:19
became [2] - 110:8, 111:13
BECKER [5] - 1:9, 1:15, 5:2, 123:4, 123:5
Becker [11]

- 3:3, 5:7, 11:23, 19:6, 30:15, 34:23, 53:22, 67:19, 95:7, 95:11, 98:7
Becker's [1] - 114:9
become [5] - 7:9, 22:11, 23:11, 50:9, 59:18
becoming [1] - 22:25
bed [1] - 60:5
begin [2] - 7:24, 111:10
beginning [4] - 33:2, 98:1, 98:13, 109:22
begins [1] - 63:18
behavior [10] - 17:18, 65:4, 70:11, 75:7, 76:22, 76:24, 79:3, 95:1, 105:19, 107:1
behavioral [1] - 71:2
behaviors [1] - 121:7
behind [1] - 35:15, 39:6, 40:18
belief [1] - 107:13
believes [2] - 26:21, 27:1
belongings [1] - 85:15
benefit [1] - 5:25
Berks [7] - 9:20,

44:13, 45:25, 51:9, 83:4, 83:16, 105:4
BERKS [1] - 1:22
berkscourtreporting@gmail.com [1] - 1:25
Bertin [3] - 37:15, 102:3
Bertins [1] - 38:19
best [10] - 9:24, 11:9, 11:13, 13:20, 17:20, 37:3, 88:5, 108:15, 113:15, 123:10
better [2] - 15:7, 46:1
between [14] - 2:18, 10:16, 22:3, 26:13, 40:22, 49:18, 49:20, 50:8, 54:9, 56:17, 62:18, 85:9, 85:16, 98:17
big [5] - 37:23, 78:9, 79:13, 112:25, 113:21
binder [4] - 29:18, 34:2, 119:11, 120:1
bit [2] - 16:21, 42:12, 50:10, 53:21, 59:10, 83:14,

102:6, 120:6
Blandon [1] - 2:4
block [1] - 42:3
Board [30] - 8:7, 29:2, 29:12, 31:2, 34:15, 34:19, 39:13, 57:18, 57:19, 57:23, 59:2, 59:8, 59:7, 59:8, 59:13, 60:15, 61:13, 61:16, 62:4, 71:2, 88:14, 90:18, 104:14, 105:12, 105:15, 105:16, 105:19, 106:3, 112:5, 112:10
body [2] - 30:1, 81:15
bombs [2] - 74:14, 79:14
Boone [2] - 6:19, 8:7
bordering [1] - 76:25
boring [1] - 53:23
Borovik [8] - 42:17, 44:9, 44:20, 81:24, 82:1, 82:15, 82:20, 85:8, 119:3
boss [2] - 80:23, 118:12
bothered [1] - 90:6
bottom [8] -

62:1, 62:2, 63:3, 63:17, 66:6, 67:7, 73:16, 78:19
bounce [1] - 15:1
box [1] - 9:3
boy [1] - 78:9
brand [3] - 32:25, 33:7
brand-new [3] - 32:25, 33:7
branded [1] - 97:3
break [3] - 6:8, 102:3, 103:20
breakfast [1] - 94:10
breath [1] - 13:10
bring [1] - 13:25, 53:14, 71:16
brings [1] - 17:23
broad [1] - 49:5
brought [12] - 32:10, 40:15, 42:24, 76:9, 77:12, 80:24, 84:13, 88:17, 90:18, 92:12, 92:17, 118:20
build [1] - 24:4
building [8] - 13:18, 15:4, 28:10, 71:23, 120:16, 120:23
built [1] - 95:3
bulletin [2] - 36:11,

Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 40 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 40 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 37 of 181

96:16
bullied [1] -
66:17
Bullying [2]
- 4:5
bullying
[11] -
66:15,
67:14,
76:20,
77:2,
77:8,
77:9,
77:13,
77:19,
88:16,
88:18,
90:11
bunch [2] -
52:6,
102:19
bus [2] -
76:25,
77:1
business
[8] - 11:10,
22:23,
109:19,
122:1,
122:2
busy [2] -
97:8, 97:9
BY [40] -
3:2, 5:6,
11:1,
11:22,
12:23,
14:17,
18:24,
24:22,
27:9,
30:14,
34:25,
35:23,
47:16,
49:8,
50:24,
52:22,
53:2,
53:20,
54:14,
55:20,
62:11,
64:13,
65:16,
67:18,
68:16,
74:7,
76:9,
77:23,
78:13,
79:10,
84:14,
90:24,

95:5,
95:14,
96:6,
97:12,
98:6,
108:3,
112:2,
118:17

**C**

cafeteria
[3] - 102:4,
102:6,
102:13
calendar
[1] - 42:3
calm [4] -
71:10,
84:19,
90:10,
91:4
calmed [2] -
90:23,
91:1
Cambria
[3] - 38:25,
39:2,
88:11,
104:20,
106:23,
108:9,
109:6,
121:5
cambria [3]
- 88:21,
99:12,
108:14
Camp [1] -
2:9
candidate
[2] -
100:16,
108:16
Candidly
[1] - 88:3
candor [1] -
26:21
cannot [1] -
16:8
car [4] -
40:11,
83:22,
85:16,
103:3
career [1] -
23:12
case [9] -
9:5,
34:16,
45:21,
66:18,
70:5,
71:11,

92:15,
99:16,
117:16
caseload
[1] - 42:1
cast [5] -
82:5,
90:11,
93:13,
93:23,
94:1
Cast [1] -
3:24
casting [1]
- 38:13
caused [1] -
45:6
cbecker@
ovsdpa.
org [1] -
8:13
cc'd [2] -
99:12,
121:6
cell [1] -
103:15
Center [1] -
2:8
Central [3] -
44:13,
45:25,
51:9
ceremonie
s [1] -
101:1
certain [2] -
15:12,
24:12
certainly [2]
- 96:7,
121:2
CERTIFIC
ATE [1] -
123:1
Certificati
on [1] -
7:18
Certified [1]
- 1:23
certified [3]
- 7:20,
13:6,
89:16
certify [1] -
123:5
cetera [1] -
74:14
chain [2] -
4:11, 4:12
chance [3] -
36:3,
66:18,
70:5,
71:11,

changed
[1] - 72:4
changes [1]
- 72:10
changing
[1] - 23:15
chapter [1]
- 93:13
charge [1] -
77:13
chase [1] -
24:7
check [3] -
59:22,
60:3, 78:4
checked [3]
- 59:19,
66:16,
78:12
Chief [4] -
20:21,
45:19,
46:2, 46:8
child [1] -
18:4
choice [1] -
61:21
choose [1]
- 75:25
chose [1] -
108:5
chosen [1]
- 76:1
Chris [1] -
34:23
Christoph
er [1] - 3:3
CHRISTO
PHER [5] -
1:8, 1:15,
5:2,
123:4,
123:5
circle [1] -
109:22
cited [1] -
76:12
civil [3] -
95:20,
101:6,
101:7
civilly [1] -
94:24,
95:4
clarificatio
n [1] -
112:4
clarify [3] -
6:4,
65:12,
91:11
clarifying

113:13
class [8] -
13:23,
17:7,
19:7,
72:23,
76:20,
76:22,
86:3,
110:18
classes [1]
- 24:14
classmate
[1] - 27:12
classroom
[14] - 9:24,
11:15,
11:21,
12:16,
13:7,
17:3,
17:7,
19:5,
19:16,
19:25,
20:5,
21:8,
72:19,
106:12
clear [11] -
15:12,
19:4,
20:1,
36:13,
53:3,
68:15,
70:6,
85:25,
86:1,
96:16,
96:17
clear-cut
[1] - 15:12
cleared [1]
- 85:14
clearer [3] -
104:10,
104:12,
116:12
clearest [1]
- 72:7
clerical [1] -
6:14
Clinic [1] -
84:9
close [5] -
23:24,
60:10,
84:7,
101:23,
113:9
closed [2] -
62:10,
69:3

closely [8] -
13:16,
15:3,
20:20,
35:7,
35:11,
36:2
Club [5] -
100:14,
100:18,
100:24
club [1] -
26:18
co [3] -
13:13,
26:17,
76:23
Co [2] -
31:18,
107:8
co-
curricular
[1] - 26:17
Co-
Curricular
[1] - 31:18
co-
curricular
/
extracurricular
[1] - 76:23
Co-
Defendants
[1] - 107:8
co-teacher
[1] - 13:13
coach [4] -
110:20,
110:21,
110:22
coaching
[1] - 33:9
code [1] -
14:25
Code [2] -
4:15, 16:8
COLEMAN
[1] - 2:7
collaborat
e [1] - 85:5
collaborati
ve [2] -
15:9,
15:16
collaborati
vely [1] -
20:22
college [6] -
23:11,
24:14,
25:11,
110:7,
110:20

comfortab
le [4] -
28:5,
28:7,
28:8,
57:14
coming [6]
- 33:12,
50:17,
56:16,
59:25,
87:12
comment
[7] - 11:11,
11:14,
87:1,
87:9,
87:11,
87:13,
117:21
commenta
[1] - 93:23
Commissi
on [1] -
123:23
commit [1]
- 77:7
common
[2] - 38:16,
58:24
Commonw
ealth [1] -
123:21
communic
ate [1] -
53:10
communic
ation [2] -
31:24,
32:5
complete
[2] -
102:18,
102:20
completel
y [1] -
54:12
complicat
ed [1] -
30:17
complies
[6] - 28:22,
34:4,
60:22,
63:7,
66:2,
73:11,
112:15,
121:4
concern
[13] -
11:12,
36:16,

37:12,
39:23,
40:16,
42:20,
42:24,
48:11,
48:13,
51:2,
51:15,
100:5,
116:19
concerned
[3] - 45:4,
66:6,
109:3
concerns
[16] - 37:8,
37:17,
37:20,
37:22,
38:18,
38:19,
43:18,
62:6,
62:14,
72:13,
76:18,
94:25,
97:16,
98:19,
99:16,
104:6
concert [1]
- 13:19
conclude
[1] - 42:14
concluded
[2] - 89:12,
122:7
conclusio
n [2] -
66:25,
115:12
Conduct [1]
- 4:15
conduct [1]
- 10:18
Conferenc
e [1] - 3:20
conferenc
e [1] -
41:13
confirm [2]
- 39:16,
41:11
conflict [3]
- 49:16,
49:18,
94:22
confusing
[1] - 95:16
congratula
tions [1] -
5:20

connect [2]
- 58:18,
120:21
connectio
n [2] -
81:24,
85:11
Consent [1]
- 3:22
conseque
nce [1] -
80:7
conseque
nces [2] -
73:21,
80:2
consider
[2] - 15:24,
16:1
Consideri
ng [1] -
101:6
consistent
[1] - 14:21
consult [1] -
31:4
content [3]
- 34:20,
43:2, 99:7
contests
[1] - 76:23
context [3]
- 35:5,
36:4, 39:2
continuati
on [1] -
74:12,
76:11,
76:19
continue
[3] - 23:7,
96:25
continued
[1] -
110:24
contribute
d [1] -
79:21
conversati
on [36] -
5:14,
22:7,
22:10,
22:12,
22:25,
23:1,
23:4,
35:1,
57:1,
57:3,
58:2,
62:18,
67:3,

71:14,
72:11,
85:21,
86:5,
86:16,
88:19,
88:22,
88:25,
90:8,
90:16,
96:10,
96:18,
97:17,
97:22,
103:22,
104:19,
105:9,
106:22,
108:11,
115:6,
117:5,
118:1,
119:7
conversati
ons [24] -
9:16,
12:2,
12:9,
16:3,
16:9,
22:21,
36:15,
37:4,
38:5,
77:15,
87:10,
93:15,
94:23,
95:11,
95:18,
98:17,
99:16,
99:21,
101:16,
108:11,
108:20,
109:5,
118:3
conveyed
[1] -
100:10
copies [1] -
78:18
cops [1] -
116:18
copy [1] -
78:15
cordial [2] -
86:17,
87:20
corner [1] -
73:17
CORNERS
TONE [1] -

2:2
Corporate
[1] - 2:8
correct [73]
- 5:15,
5:16,
6:17, 7:8,
8:14,
8:15,
8:17,
8:21,
10:7,
10:13,
10:14,
10:21,
11:7,
11:25,
15:10,
16:16,
17:3,
17:10,
17:12,
19:18,
21:9,
23:10,
23:11,
23:17,
26:14,
26:15,
26:18,
26:19,
35:1,
37:15,
37:16,
39:14,
40:3,
40:16,
44:1,
46:10,
48:16,
63:10,
63:11,
65:17,
65:24,
66:13,
66:15,
67:4,
67:10,
68:20,
69:14,
71:17,
71:18,
71:25,
72:1,
73:5,
81:22,
82:3,
82:6,
82:7,
84:23,
85:23,
86:6,
91:14,
106:6,

107:12,
110:9,
111:15,
111:16,
112:11,
114:18,
114:20,
114:21,
121:13,
121:21,
121:22
Correct [2]
- 98:3,
114:11
correctly
[1] - 37:19,
40:6,
40:10,
40:12,
77:1,
83:2,
94:20
counsel [3]
- 2:18,
123:11,
123:14
Counsel [5]
- 47:13,
68:17,
73:13
Counselor
[5] - 54:21,
81:25,
82:2,
83:19,
106:23
Counselor
s [9] -
42:16,
85:12,
104:21
County [4] -
9:20,
83:4,
83:16,
106:4
couple [13]
- 37:11,
39:12,
48:3,
71:18,
82:9,
82:17,
88:1,
100:2,
108:11,
109:21,
110:25,
115:4,
118:18
course [8] -
9:11,
12:6,
15:16,

16:10,
32:4,
32:6,
71:7,
102:10
courses [2]
- 12:1,
12:3
COURT [2]
- 1:1, 1:22
Court [3] -
1:23,
2:19,
123:20
courtesy
[1] - 44:16
covered [1]
- 12:4
create [2] -
31:23,
33:16
created [1]
- 99:11
credibility
[1] - 26:3
credits [5] -
25:12,
110:16,
110:25,
111:1,
111:2
cross [2] -
10:17,
19:2
crosses [1]
- 11:18
crying [3] -
69:5,
78:2,
90:10
curious [1]
- 36:4
Curricular
[1] - 31:18
curricular
[1] - 26:17
curricular/
extracurricular
[1] - 76:23
cursed [2] -
13:3, 13:9
cursing [2]
- 17:21,
18:1
cuss [1] -
19:22
cussed [1] -
17:5
cut [2] -
13:5,
15:12
cutting [3] -
76:20,

76:21
Cyber [1] -
4:5
cyber [1] -
76:20

D

daily [1] -
36:24
dance [9] -
113:3,
113:5,
113:8,
113:9,
113:13,
113:17,
113:19,
116:2,
116:15
dance-off
[2] - 116:2,
116:15
dangerous
[1] - 114:1
Daniel [2] -
6:19, 8:7
DATE [1] -
1:16
date [5] -
56:12,
78:18,
102:19,
103:19,
103:23
dated [14] -
3:7, 3:10,
3:11,
3:13,
3:15,
3:21,
3:25, 4:7,
4:8, 4:9,
4:10,
4:13,
4:14, 63:2
dates [1] -
39:14
daughter
[5] - 21:1,
88:11,
88:16,
88:17,
88:19
Dawn [1] -
121:5
day-to-day
[1] - 9:1
daycare [1]
- 102:22,
103:4,
103:16
days [6] -
21:23,

66:15,
69:24,
71:19,
81:2,
115:4
deadlines
[1] - 41:23
deal [14] -
11:25,
13:7,
18:14,
18:15,
20:16,
21:16,
22:14,
23:15,
42:6,
48:17,
49:11,
79:13,
93:1, 93:4
dealing [3]
- 10:8,
23:14,
91:3
deals [1] -
72:16
Deb [1] -
115:20
decide [3] -
23:2,
33:11,
64:15
decided [3]
- 42:9,
42:10,
84:22
decision
[28] -
13:14,
13:19,
15:6,
15:9,
20:23,
65:2,
65:5,
70:1,
70:4,
71:3,
71:25,
79:21,
80:14,
80:19,
80:21,
80:24,
80:25,
81:5,
81:14,
94:4,
104:24,
105:2,
105:6,
105:6,
106:19,

107:2,
121:17
decline [1] -
27:16
deemed [1]
- 74:1
defendant
s [1] - 1:12
Defendant
s [2] -
2:10,
107:8
defiance [1]
- 76:9
defiant [1] -
79:23
definitely
[3] - 22:21,
38:20
degree [2] -
7:17, 9:11
DEMANDE
D [1] - 1:7
DENNEHE
Y [1] - 2:7
Departme
nt [5] -
31:12,
44:13,
51:10,
53:5,
54:22
DEPONEN
T [1] - 1:15
deposition
[6] - 5:18,
122:7,
123:4,
123:6,
123:8,
123:13
describe
[2] - 56:9,
83:9
describes
[1] - 55:24
dESCRIPT
ION [1] -
3:6
detailed [2]
- 36:10,
101:11
Detective
[2] - 51:11,
53:6
detention
[1] - 80:7
determinat
ion [1] -
109:15
determine
[2] - 46:19,
100:24

determine
d [1] -
38:13
developm
ent [2] -
9:17,
51:12,
53:7
devices [1]
- 77:5
Deysher's
[1] - 86:3
dialogue
[1] - 38:9
difference
[2] - 19:17,
72:17
difference
s [2] -
21:13,
22:3
different
[19] -
13:10,
14:10,
14:18,
16:4,
17:15,
18:11,
22:13,
23:1,
23:2,
23:19,
24:21,
46:3,
52:20,
72:22,
79:1,
79:2,
97:23,
119:12,
120:5
differently
[7] - 16:21,
16:22,
17:2,
21:16,
22:14,
50:2,
50:11
Dilks [6] -
1:23,
5:25,
123:3,
123:18,
123:19
diploma [1]
- 109:1
direct [6] -
26:20,
26:25,
65:25,
67:7,
69:12,

73:8,
79:16,
82:13
directed [4]
- 43:8,
84:20,
102:15,
103:23
direction
[1] - 28:17
directly [3]
- 28:15,
46:8,
90:14
Director [6]
- 31:18,
39:3,
69:2,
69:10,
117:19
disabilitie
s [1] -
107:9
disability
[1] -
107:14
disagree
[12] -
22:11,
25:18,
26:1,
87:21,
94:24,
95:5,
96:11,
97:16,
98:1,
98:8,
98:9,
98:19
disagreed
[1] -
119:12
disagreem
ent [1] -
50:8
disagreem
ents [2] -
48:18,
95:20
disciplinar
ian [3] -
10:15,
12:20,
49:10
Disciplinar
y [2] -
75:1,
75:16
disciplinar
y [8] - 9:9,
54:2,
74:8,

75:6,
75:13,
76:15,
75:16,
75:20
**Discipline**
[4] - 3:9,
3:18,
3:19, 66:4
discipline
[27] - 9:6,
10:5,
10:9,
11:17,
12:6,
13:25,
14:20,
14:24,
15:17,
15:20,
17:9,
18:20,
18:23,
19:1,
19:5,
19:24,
26:6,
28:13,
80:15,
66:12,
70:15,
72:17,
73:1,
73:25,
80:2,
106:12
**discipline**
**d** [3] -
12:18,
13:22,
89:4
**disciplinin**
**g** [1] -
21:14
**discovery**
[2] - 73:13,
107:8
**discuss** [1]
- 75:23
**discussed**
[4] - 43:12,
70:14,
88:14,
94:9
**discussin**
**g** [1] -
34:20
**discussio**
**n** [4] -
61:13,
98:21,
105:21,
121:8
**discussio**

ns [2] -
56:23,
97:14
**dishonest**
[1] - 72:23
**dismissal**
[2] -
116:23,
117:1
disorder [1]
- 88:22
displeasur
e [1] -
38:12
disrespect
[7] - 70:8,
76:9,
77:11,
77:12,
78:12,
95:5,
95:20
disrespect
ed [10] -
64:1,
64:5,
64:8,
67:22,
67:25,
68:2,
68:5,
69:18,
70:25,
80:12
disrespect
ful [9] -
19:20,
22:4,
22:11,
22:15,
23:1,
42:22,
67:16,
79:23,
95:1
disrupting
[1] - 19:16
disruption
[1] - 72:20
disruptive
[3] - 75:7,
76:22,
76:24
distinctly
[1] - 38:23
DISTRICT
[3] - 1:1,
1:1, 1:6
district [1] -
9:18,
33:15
District [15]
- 1:8,
6:16,

6:20,
6:25,
7:23,
7:25, 8:2,
8:4, 22:2,
25:4,
31:4,
46:3,
51:1,
75:19,
111:6
Districts [1]
- 12:14
disturbanc
e [1] -
121:15
doctor [1] -
107:21
document
[16] -
28:24,
29:6,
29:10,
30:2,
34:7,
55:17,
61:2,
65:10,
66:3,
66:5,
68:24,
73:12,
73:15,
78:10,
88:20,
100:2
document
s [2] -
28:18,
72:6
dog [1] -
69:24
dogs [1] -
53:14
done [6] -
9:7,
11:24,
17:20,
31:23,
46:21,
104:17
door [13] -
16:6,
16:11,
16:13,
17:17,
22:19,
31:23,
62:9,
62:13,
85:18
doors [1] -
62:5
doubt [1] -

14:24
down [28] -
6:1, 7:3,
27:21,
28:3,
30:4,
30:11,
33:17,
52:13,
61:24,
71:6,
71:15,
71:21,
84:2,
84:9,
84:19,
87:20,
90:23,
91:1,
91:4,
103:14,
112:20,
114:4,
115:13,
117:22,
118:24,
119:24,
120:16,
120:20
Dr [57] -
2:13,
15:2,
35:7,
36:2,
36:3,
36:8,
36:10,
36:16,
37:6,
38:6,
45:22,
60:11,
62:22,
65:1,
68:10,
80:13,
81:6,
81:14,
82:10,
84:9,
84:21,
85:4,
86:14,
86:10,
90:13,
93:16,
94:8,
94:13,
94:23,
95:11,
95:12,
95:19,
96:15,
96:20,

98:17,
99:1,
99:3,
99:11,
99:15,
99:22,
99:24,
99:25,
100:8,
101:4,
101:14,
101:16,
101:20,
102:2,
102:5,
102:17,
103:26,
104:19,
105:22,
115:17,
115:19,
118:11,
121:6
drafting [1]
- 99:2
**Drama** [6] -
31:12,
100:14,
100:17,
100:24,
117:19
drama [7] -
26:18,
56:12,
56:24,
57:7,
107:5,
115:15,
121:8
dreams [1]
- 24:8
dress [1] -
14:25
**Drive** [2] -
1:24, 2:8
driving [2] -
84:1,
103:14
drove [1] -
103:3
dry [1] -
13:5
dual [1] -
25:12
duly [2] -
5:3, 123:6
during [20]
- 8:12,
13:23,
17:7,
17:15,
17:17,
19:13,
19:19,

29:4,
57:1,
58:6,
62:3,
65:23,
66:8,
70:14,
83:7,
85:21,
90:23,
94:22,
102:18,
121:8
duty [1] -
103:5

**E**

**E-mail** [10] -
3:10,
3:11, 4:7,
4:8, 4:9,
4:10,
4:11,
4:12,
4:13, 4:14
e-mail [55] -
8:13, 9:3,
34:5,
34:6,
34:9,
34:20,
34:23,
35:2,
35:5,
36:5,
37:5,
40:4,
40:20,
41:11,
54:25,
55:3,
55:8,
55:19,
55:23,
59:19,
59:23,
60:2,
60:4,
60:8,
60:10,
60:13,
60:23,
60:25,
61:3,
61:7,
61:24,
61:25,
62:22,
63:15,
66:10,
66:19,
69:21,
71:18,

77:25,
78:1,
86:12,
101:4,
102:2,
102:4,
102:10,
103:7,
103:21,
104:6,
104:9,
112:19,
115:11,
121:5,
121:16
e-mails [5] -
8:25, 9:2,
39:15,
80:14,
102:11
early [2] -
62:24,
87:4
easier [1] -
28:19
easily [1] -
17:14
Easter [1] -
101:23
**EASTERN**
[1] - 1:1
easy [1] -
15:13
eating [4] -
88:22,
91:16,
91:22
**ECK** [1] -
1:2
**Eck** [18] -
3:13,
3:18,
3:19,
5:10,
40:8,
40:14,
62:18,
66:24,
113:2,
113:11,
113:16,
113:19,
114:8,
114:14,
115:13,
116:20,
119:9
Eck's [1] -
73:4
Ed [1] -
39:3
ED [2] -
121:9,
121:14

Education
[2] - 41:20,
106:24
education
[5] - 12:11,
12:12,
88:19,
88:20,
110:4
education
al [3] -
7:17,
9:11,
111:1
education
ally [1] -
9:8
educator
[3] - 22:22,
26:13,
72:16
effect [1] -
72:25
effectiven
ess [1] -
26:9
eight [1] -
60:6
**EIP** [1] -
41:15
either [6] -
9:7, 29:6,
30:5,
41:12,
98:18,
113:25
electronic
[1] - 77:4
elementar
y [4] -
21:19,
23:22,
24:3,
25:16
eligible [1] -
110:26
emergenci
es [1] -
33:15
emergenc
y [1] -
74:18
emotional
[3] - 82:24,
101:9,
121:15
emotions
[1] - 90:10
employed
[2] - 6:15,
123:14
employee
[1] - 1:11

end [12] -
37:2,
47:12,
55:19,
87:15,
93:13,
101:1,
102:14,
103:17,
109:23,
110:17,
111:3,
122:1
endanger
[1] - 73:21
ended [2] -
83:12,
118:1
enforceme
nt [2] -
73:24,
75:19
engaged
[1] - 22:4
enrollment
[1] - 25:12
environme
nt [1] -
20:8
**Ephrata** [1]
- 108:22
equally [1] -
24:12
equipment
[1] - 74:18
escalated
[7] - 41:3,
55:4,
55:10,
55:25,
56:3,
56:6,
56:17
escalating
[1] - 40:22
escalation
[1] - 56:15
especially
[3] - 54:8,
99:10,
101:23
**Esquire** [2]
- 2:3, 2:8
essentially
[1] -
114:25
et [1] -
74:14
evaluate [1]
- 104:22,
105:17,
105:24,
106:10,

108:6, 121:12
Evaluate [1] - 107:12
evaluated [2] - 105:10, 106:16
Evaluation [1] - 3:13
evaluation [2] - 107:16, 109:11
Evaluaton [1] - 3:22
evening [6] - 16:20, 57:16, 59:8, 65:2, 68:2, 80:15, 113:3, 121:9
events [2] - 33:23, 59:11
evidence [3] - 21:11, 27:5, 46:14
exact [5] - 14:16, 15:1, 63:13, 63:16, 64:22
exactly [9] - 14:6, 37:22, 57:22, 79:4, 84:18, 92:12, 92:16, 97:19, 105:13
exam [1] - 9:14
examined [1] - 5:4
EXAMINED [1] - 3:2
example [9] - 12:11, 16:1, 19:20, 21:20, 24:24, 27:7, 33:9, 72:7, 116:2

examples [2] - 74:8, 75:2
except [1] - 2:19
exhibit [5] - 80:16, 89:23, 96:20
Exhibit [24] - 28:21, 34:1, 55:2, 60:21, 63:4, 65:14, 65:22, 66:1, 66:20, 68:13, 68:17, 72:6, 72:7, 73:9, 77:24, 78:14, 81:10, 86:7, 89:20, 98:24, 101:4, 107:11, 112:14, 121:3
EXHIBITS [1] - 3:5
exit [1] - 81:8
expect [3] - 26:16, 44:17, 101:10
expectations [2] - 96:17, 99:19
expected [1] - 33:13
experience [1] - 7:13, 7:14, 20:18, 23:25, 26:12, 27:20, 30:25, 33:20, 87:14, 91:3
experiences [1] - 108:25
expires [1]

- 123:23
explain [2] - 68:22, 78:17
explained [9] - 44:4, 54:19, 54:23, 60:12, 60:13, 70:15, 71:7, 85:9
exploded [1] - 48:21
expound [1] - 111:22
express [5] - 25:19, 25:23, 58:10
expressed [3] - 22:16, 37:17, 99:16
expressing [1] - 26:8
expression [1] - 22:5
Expression/Distribution [2] - 4:1, 28:25
expulsion [1] - 75:18
Expulsion [1] - 4:3
extent [1] - 89:3
extinguisher [1] - 74:17
extra [1] - 26:17
extracurricular [1] - 108:25

F

face [3] - 33:22, 86:5
face-to-face [1] - 86:5
Facebook [3] - 17:1, 17:5, 17:22
fact [3] - 38:25, 92:10,

93:22
facts [3] - 9:4, 13:14, 55:22
faculty [2] - 29:11, 31:8
failed [6] - 101:9, 101:13, 101:15, 103:24, 104:1
failure [1] - 77:1
Fair [1] - 24:23
fair [2] - 6:6, 46:5
fall [1] - 33:4
falls [1] - 74:23
familiar [7] - 29:5, 29:13, 35:10, 35:17, 55:22, 84:8, 108:21
family [5] - 22:25, 37:15, 44:14, 59:9, 94:10
far [2] - 16:12, 59:12
farfetched [1] - 49:4
fast [1] - 102:14
favoring [1] - 117:25
February [4] - 108:4, 108:10, 109:8, 112:9
feelings [2] - 22:8, 48:18
feet [1] - 32:24
fell [1] - 67:21
felt [22] - 12:14, 20:23, 46:17,

58:13, 63:25, 64:16, 67:24, 68:1, 69:5, 69:17, 70:19, 70:24, 78:2, 80:12, 86:22, 90:14, 91:9, 103:6, 103:7, 113:19, 113:25
FERRIZZI [1] - 1:3
Ferrizzi [3] - 3:23, 5:10, 94:2
few [3] - 5:22, 9:5, 96:3
field [1] - 16:2
fifth [2] - 111:3, 111:4
fight [3] - 16:17, 21:22, 21:23
fighting [2] - 21:20, 77:1
file [2] - 43:20, 116:19
filing [1] - 2:19
financial [1] - 53:6
financially [1] - 123:15
fine [5] - 6:9, 29:8, 95:16, 95:17, 98:22
finger [2] - 116:1, 116:14
finish [5] - 5:23, 6:9, 111:3
finished [3] - 78:7, 83:25, 111:4
fire [1] -

74:17
fireworks [3] - 74:14, 79:14, 80:1
FIRM [1] - 2:2
First [13] - 10:13, 10:21, 10:25, 11:3, 11:7, 11:16, 11:20, 12:19, 13:24, 14:22, 14:24, 15:22, 54:5
first [16] - 5:3, 6:14, 7:11, 23:25, 29:3, 29:18, 31:21, 33:18, 35:13, 41:1, 41:9, 63:12, 96:25, 110:17, 121:11
fishing [1] - 20:25
five [5] - 7:12, 7:14, 84:6, 110:10, 111:10
flip [2] - 83:11, 114:3
flip-flopped [1] - 83:11
flirting [1] - 53:24
flopped [1] - 83:11
focus [5] - 18:3, 97:9, 113:1, 113:21, 116:3
follow [8] - 18:15, 19:21, 36:12,

99:15, 103:8, 111:24, 118:18, 119:22
follow-up [1] - 99:15
follow-ups [1] - 118:18
followed [2] - 21:25, 22:2
following [4] - 47:1, 74:11, 121:10, 122:2
follows [1] - 5:5
food [2] - 48:11, 90:15
Fox [1] - 1:24
FOR [1] - 1:1
foregoing [1] - 123:6
foresight [1] - 50:16
forget [6] - 60:12, 61:21, 75:10, 87:5, 89:16, 92:16
forgot [3] - 74:3, 74:6, 75:1
Form [6] - 3:9, 3:13, 3:14, 3:18, 3:19, 3:22
form [26] - 2:19, 10:22, 11:19, 14:2, 18:22, 24:20, 25:19, 25:22, 26:2, 26:4, 27:4, 30:9, 49:3, 62:8, 64:11, 74:24, 95:2, 95:23, 96:13,

104:22, 106:18, 106:20, 107:12, 107:25, 109:17
forth [4] - 9:13, 32:2, 69:3, 83:19
forward [6] - 60:16, 69:14, 93:18, 96:23, 102:14
four [3] - 23:24, 52:19, 98:14
frame [1] - 102:18
freedoms [1] - 23:20
Friday [2] - 83:1, 101:11
friend [3] - 22:24, 49:17
friends [5] - 19:21, 21:1, 49:20, 50:1, 50:2
front [11] - 19:7, 28:5, 28:18, 32:12, 62:5, 62:13, 72:11, 76:15, 81:18, 94:16, 103:19
fruit [10] - 42:23, 43:2, 43:6, 43:18, 47:8, 54:7, 116:10, 116:13, 117:10, 120:8
fruits [3] - 43:9, 43:10,

43:11
full [4] - 30:6, 112:20, 112:21, 114:4
fully [1] - 123:10
functions [1] - 76:22
future [1] - 93:15

G

gambling [2] - 74:21, 60:1
gather [2] - 21:7, 46:13
general [4] - 9:5, 21:22, 109:17, 117:12
generally [11] - 10:20, 13:11, 33:10, 41:14, 50:7, 60:7, 76:8, 79:22, 107:3, 109:13, 109:16
Gifted [1] - 41:21
GIP [1] - 41:21
girlfriend [1] - 53:25
given [6] - 12:13, 23:6, 42:19, 53:1, 79:19, 103:19
Glen [1] - 1:24
glitches [1] - 8:19
GOGGIN [1] - 2:7
gonna [6] - 46:18, 54:22, 83:19, 105:24, 108:15,

109:3
gotta [1] -
59:24
Grace [1] -
37:15
grade [10] -
7:19,
21:14,
21:21,
21:24,
21:25,
25:7,
25:8,
25:19,
26:2
grader [2] -
21:16,
21:17
graders [1]
- 24:24,
24:25
graduate
[3] - 24:7,
68:17
graduated
[1] - 110:6
graduatio
n [1] -
101:2
grandfath
er [1] -
108:2
grounds [1]
- 12:17
group [7] -
50:9,
60:12,
81:19,
82:8,
90:15,
94:6, 94:7
groups [1] -
75:17
grow [2] -
10:3,
23:18
guess [27] -
25:1,
34:19,
35:21,
35:22,
35:24,
44:25,
58:21,
60:14,
62:13,
68:13,
69:25,
75:17,
83:6,
93:25,
104:11,
105:5,
105:18,

106:25,
107:3,
116:6,
116:8,
116:12,
116:13,
117:6,
117:21,
119:4,
119:5
guessing
[1] - 77:14
guidance
[1] - 94:12
guide [1] -
24:5
guidelines
[1] - 36:11
guys [3] -
46:4,
96:10,
105:9

## H

HALEY [1] -
1:2
Haley [30] -
5:10,
57:18,
81:5,
81:13,
81:20,
81:24,
82:15,
82:18,
82:20,
83:18,
84:11,
84:12,
85:5,
85:10,
86:2,
89:1,
89:2,
89:8,
89:18,
90:15,
91:16,
91:22,
104:15,
106:5,
115:22,
119:1,
119:10,
119:11,
121:24
Haley's [2] -
86:12,
96:19
hall [1] -
76:20
hallway [1]
- 62:19

hand [1] -
49:22,
73:17,
99:2
handbook
[4] - 20:7,
73:7,
73:14,
80:3
handful [2]
- 58:2,
58:6
handle [7] -
10:5,
10:9,
10:16,
13:23,
16:18,
17:8, 20:5
handled [1]
- 6:25,
16:21,
16:22,
115:22,
119:1,
119:4,
119:18
handling
[1] - 66:13
hands [1] -
65:21
handwritte
n [3] -
4:10,
65:14,
65:21
happy [5] -
6:5, 6:10,
58:3,
88:2,
102:7
harassme
nt [1] -
77:2
Harassme
nt [1] - 4:4
hard [4] -
7:3,
14:15,
98:25,
101:22
harm [4] -
58:10,
70:22,
74:17,
77:3
Hartenstin
e [9] -
32:11,
62:19,
62:25,
66:25,
67:1,
67:8,

77:15,
77:16,
80:9
Hartline [1]
- 5:10,
81:5,
81:13,
86:20,
89:7,
89:9,
91:12
HARTLINE
[1] - 1:3
hazing [1] -
74:12
head [3] -
40:3,
96:4,
104:12
heading [1]
- 33:21
heads [4] -
15:7,
44:16,
50:16,
54:25
heads-up
[3] - 44:16,
50:16,
54:25
health [1] -
73:22
hear [19] -
17:21,
18:19,
20:11,
20:14,
21:10,
27:3,
28:1,
37:8,
38:19,
41:9,
52:25,
53:1,
61:10,
61:11,
61:15,
64:17,
79:17,
92:8,
92:14
hear's [1] -
30:6
heard [6] -
21:7,
38:16,
46:12,
52:24,
82:14,
100:7
hearing [1]
- 106:2
heating [1]

- 96:9
held [3] -
31:8,
57:16,
83:6
help [20] -
18:3,
22:23,
24:5,
24:6,
24:7,
32:10,
34:12,
35:14,
41:18,
48:24,
78:6,
78:8,
78:20,
97:23,
104:17,
109:14,
109:20,
115:24,
120:11
helped [3] -
32:13,
51:11,
116:9
helpful [2] -
86:18,
86:23
helping [1]
- 44:5
helps [1] -
68:22
hereby [1] -
123:4
herein [1] -
123:10
hereto [1] -
123:15
high [35] -
6:22,
6:24, 7:6,
7:10,
10:5,
19:5,
21:19,
23:8,
23:25,
24:4,
24:6,
31:12,
33:22,
36:24,
48:3,
58:22,
69:25,
80:19,
83:4,
90:20,
96:22,
97:3,

97:4,
97:5,
97:10,
99:9,
101:6,
101:18,
101:21,
105:5,
108:24,
109:1,
109:4,
110:22,
116:9
High [4] -
1:10,
1:12,
1:18, 6:19
higher [2] -
73:25,
80:5
Hill [1] - 2:9
himself [2]
- 83:13,
107:9
hindsight
[1] - 50:13
hire [2] -
32:9,
32:14
hired [4] -
8:11,
110:6,
110:7,
111:14
home [9] -
59:8,
59:22,
62:16,
81:20,
85:22,
94:3,
94:17,
106:10,
106:18
honest [2] -
29:3,
53:22
honestly [3]
- 32:18,
33:7,
54:12
honoring
[1] - 71:20
hope [1] -
97:1
hopefully
[1] - 28:19
horrible [6]
- 35:15,
36:5,
39:6,
39:8,
40:17,
56:4

horseplay
[1] - 77:2
hot [1] -
12:11
hour [3] -
42:12,
87:5,
103:9
hours [3] -
27:1,
60:6, 71:5
house [1] -
59:24
hum [2] -
7:1,
112:23
hundred [1]
- 39:16
hurt [3] -
20:15,
48:17
hurtful [1] -
102:9

## I

ice [2] -
39:20
idea [3] -
51:5,
96:1,
117:25
identify [1]
- 77:1
IEP [9] -
41:15,
41:19,
42:8,
42:9,
42:13,
104:16,
112:6,
118:8,
121:2
IEPs [1] -
121:1
imagine [1]
- 48:21
immediate
ly [3] -
36:5,
111:6,
111:9
impacted
[1] - 99:6
implement
[2] - 29:10,
29:25
implement
ed [1] -
30:7
Important
[2] - 58:20,
68:8

impossibl
e [1] -
64:12
impressio
n [2] -
82:22,
86:15
improve [1]
- 101:21
IN [1] - 1:1
inappropri
ate [3] -
12:17,
18:23,
77:4
inbox [2] -
8:20, 9:1
incident [1]
- 116:19
incident [8]
- 63:2,
68:12,
89:17,
91:15,
112:25,
113:10,
119:15,
120:2
incidents
[1] -
115:16
inciting [1]
- 74:20
included
[1] - 87:2
includes [1]
- 73:20
inclusive
[3] - 74:10,
75:3,
75:21
incorrect
[2] - 51:24,
95:3
indicating
[3] - 61:1,
78:22,
89:21
indicating)
[2] - 34:2,
65:11
individual
[5] - 27:19,
47:24,
58:11,
77:11,
91:21
individuali
zed [1] -
41:20
individuall
y [3] - 1:7,
1:9, 1:11

individual
s [2] -
27:20,
42:13
inflicted [1]
- 77:3
influence
[1] -
110:24
influenced
[1] -
110:15
inform [1] -
20:19
informatio
n [9] -
20:24,
37:13,
88:6,
68:8,
68:11,
69:7,
108:9,
112:8,
113:14
informatio
n [1] - 4:6
informed
[10] - 85:2,
85:3,
91:19,
91:22,
91:24,
92:11,
101:10,
101:14,
103:25,
116:24
infraction
[1] - 76:5
infractions
[6] - 74:2,
74:11,
75:22,
76:16,
79:13
initial [2] -
3:13, 3:22
initial [1] -
109:11
initiation
[1] - 73:25
injury [1] -
74:16
input [1] -
3:14
Instagram
[1] - 19:10
instances
[1] - 85:17
instead [1]
- 56:15
instruct [1]

- 35:20
insubordi nate [1] - 103:10
insubordi nation [6] - 77:5, 78:12, 95:21, 96:12, 97:17, 98:20
intended [1] - 77:3
intent [1] - 74:17
interact [1] - 18:7
interaction [1] - 54:9
interest [1] - 11:13
interested [2] - 70:18, 123:15
interjectin g [1] - 5:24
Intermedia te [1] - 9:20
interprete d [2] - 74:9, 75:3
interrupt [1] - 9:19
interrupte d [2] - 38:1, 42:5
intervene [1] - 17:20
interventio n [2] - 18:23, 19:1
interventio ns [1] - 17:25
investigat e [2] - 11:10, 13:12
investigati on [2] - 21:6, 93:9
involved [19] - 40:24, 41:25, 54:6, 56:16, 91:15, 92:4, 99:22,

100:23, 104:21, 104:24, 105:2, 105:8, 105:21, 117:4, 118:10, 118:11, 118:12, 121:17, 121:20
involveme nt [1] - 105:23
involves [1] - 9:11
issue [9] - 34:16, 37:23, 46:18, 67:24, 101:6, 101:7, 101:10, 101:14
issued [2] - 60:15, 104:15
issues [7] - 49:11, 56:11, 57:8, 58:14, 72:17, 103:25, 107:18
issuing [1] - 109:17
IT [1] - 8:19
it'll [1] - 97:23

J

January [6] - 35:8, 38:9, 38:16, 56:12, 58:2, 58:6
Jared [32] - 39:22, 39:23, 40:1, 40:7, 40:9, 42:10, 43:5, 43:21, 43:22, 47:24, 48:7, 54:17,

57:1, 62:6, 92:8, 92:18, 92:21, 93:6, 93:7, 112:24, 113:2, 113:11, 113:12, 116:11, 115:12, 115:23, 115:25, 118:3, 119:11, 119:13, 119:20
Jared's [3] - 112:24, 113:1, 116:14
Jefferson [1] - 1:19
jeopardy [2] - 56:19, 56:21
job [11] - 10:4, 20:6, 23:9, 32:16, 50:20, 50:22, 60:2, 70:10, 97:9, 102:7, 113:15
jobs [1] - 106:15
Joel [4] - 2:3, 5:9, 30:9, 54:11
Joint [1] - 3:20
joke [1] - 44:4
Jones [4] - 3:8, 62:19, 67:2
JORDAN [1] - 1:2
Jordan [68] - 3:13, 3:18, 3:19, 5:10, 38:20, 38:21, 38:24,

39:1, 43:22, 43:23, 43:25, 46:14, 46:18, 46:22, 54:17, 57:18, 57:25, 58:3, 58:5, 58:9, 58:12, 62:18, 63:19, 63:21, 65:6, 66:23, 67:3, 67:6, 67:12, 70:6, 71:15, 71:21, 72:2, 72:8, 72:15, 73:4, 75:24, 76:12, 89:2, 91:16, 91:21, 92:24, 93:5, 93:6, 104:14, 107:8, 107:14, 107:18, 108:9, 108:13, 109:6, 109:7, 109:8, 109:16, 114:20, 115:6, 115:13, 115:14, 117:6, 117:18, 118:4, 118:20, 119:9, 119:10, 120:5, 120:7, 120:10, 120:15
Jordan's [5] - 54:20, 68:2,

83:12, 112:4, 114:23
July [4] - 8:2, 8:11, 110:6, 110:7
jurisdictio n [1] - 19:11
JURY [1] - 1:7
Justice [1] - 75:19

K

keep [13] - 20:7, 27:16, 52:19, 96:21, 99:8, 101:9, 101:13, 103:24, 116:24, 117:17, 118:11, 118:12, 118:13
keeping [2] - 91:16, 91:22
kept [2] - 117:2, 117:13
kid [6] - 13:3, 13:8, 15:12, 49:11, 53:24, 79:15
kids [22] - 22:19, 22:23, 23:21, 25:11, 28:5, 28:7, 28:8, 35:15, 35:18, 36:6, 39:5, 48:25, 49:13, 54:10, 57:12, 58:18, 58:22, 85:12, 116:8,

117:24
kind [12] - 15:5, 31:21, 32:8, 35:9, 44:15, 46:3, 46:20, 48:23, 79:20, 83:8, 94:22, 110:19
kinda [4] - 88:24, 116:24, 117:2, 117:17
kindergart en [1] - 7:19
knowing [2] - 101:23, 117:14
knowledg e [1] - 31:10
knows [1] - 63:24

L

lack [1] - 101:8
lady [1] - 113:25
laid [1] - 36:10
large [1] - 20:15
last [28] - 8:3, 8:5, 24:1, 29:3, 29:19, 33:4, 33:7, 35:14, 39:5, 52:4, 52:5, 52:7, 52:9, 52:15, 53:15, 55:24, 56:20, 58:6, 71:2, 83:10, 83:11, 88:7, 90:7,

90:12, 103:20, 113:3, 114:4, 121:8
lasted [1] - 65:9
late [9] - 15:12, 61:5, 62:22, 62:23, 84:4, 87:5, 94:1, 102:21, 102:25
law [6] - 9:12, 9:23, 11:24, 12:8, 73:24, 75:18
LAW [1] - 2:2
lawsuit [4] - 5:11, 10:13, 101:7, 107:7
lead [1] - 82:10
leadership [3] - 7:17, 9:11, 111:1
leading [1] - 94:21
learn [4] - 9:8, 10:3, 19:9, 20:9
learned [3] - 17:18, 18:2, 93:21
learning [1] - 70:18
least [4] - 21:22, 57:13, 83:10, 102:16
leave [4] - 16:15, 33:16, 59:23, 102:15
leaving [1] - 40:11, 90:20, 113:4
left [7] - 32:16,

90:12, 103:20, 113:3, 114:4, 121:8
legal [2] - 12:25, 101:7
legitimate [1] - 10:16
lengthy [2] - 36:24, 42:11
lesser [1] - 80:7
lesson [1] - 70:7
Letter [3] - 3:7, 3:15, 3:21
letter [9] - 62:25, 63:1, 63:9, 66:19, 66:21, 69:7, 69:17, 104:22
Level [22] - 73:6, 73:19, 73:23, 74:12, 74:22, 75:4, 75:5, 75:8, 75:22, 75:25, 76:1, 76:2, 76:5, 76:7, 76:10, 76:11, 76:12, 76:16, 76:19, 79:13, 79:25, 80:10
level [3] - 73:25, 76:7, 79:17
liar [1] - 63:23
liberties [5] - 23:20, 24:12, 24:17, 24:21,

25:6
liberty [1] - 98:11
library [1] - 41:13
lies [1] - 88:13
life [4] - 22:18, 36:24, 70:7
line [7] - 10:16, 10:17, 11:18, 19:2, 33:17, 98:22, 114:9
lines [2] - 88:23, 92:18
list [8] - 5:21, 74:2, 74:10, 74:11, 75:3, 75:21, 75:24, 76:25
List [1] - 3:24
listed [4] - 75:4, 75:7, 76:3, 80:3
listened [1] - 42:18
listening [2] - 54:11, 54:13
live [1] - 109:18
living [1] - 20:12
LLC [1] - 2:2
located [1] - 113:9
LOCATIO N [1] - 1:16
locked [4] - 62:5, 62:9, 62:10, 62:12
lockers [1] - 53:14
long- standing [1] -

107:13
look [16] -
11:13,
13:2,
13:3,
28:20,
53:22,
64:6,
68:17,
75:5,
76:10,
77:25,
78:14,
89:18,
89:22,
92:2,
101:3,
121:3
looked [4] -
78:5,
88:7,
119:4,
121:2
looking [14]
- 24:20,
31:1,
36:12,
39:11,
50:10,
55:2,
62:1,
63:17,
76:16,
78:11,
87:3,
90:14,
115:9,
116:11
looks [4] -
34:13,
61:25,
68:18,
112:8
loop [1] -
118:14
Lori [4] -
1:23,
123:3,
123:18,
123:19
losing [2] -
56:20,
56:21
loud [2] -
81:8,
90:10
love [2] -
22:22,
53:24
Luft [1] -
121:6
lunch [3] -
99:5,
102:1,

102:6
lying [5] -
63:22,
67:8,
69:2,
69:11,
77:5
Lynx [2] -
83:8,
83:13
Lyons [41] -
31:13,
32:16,
33:18,
34:6,
34:20,
35:2,
36:9,
36:11,
36:14,
37:6,
37:25,
38:6,
40:21,
62:5,
62:9,
62:18,
63:18,
63:21,
66:24,
72:9,
72:22,
88:8,
88:13,
91:9,
91:10,
91:20,
92:25,
93:3,
94:23,
94:25,
95:11,
95:19,
96:16,
98:17,
99:1,
99:13,
99:23,
100:10,
100:18,
119:8,
119:12
LYONS [1] -
1:10

**M**

magnified
[1] - 50:10
mail [67] -
3:10,
3:11, 4:7,
4:8, 4:9,
4:10,

4:11,
4:12,
4:13,
4:14,
8:13, 9:3,
34:5,
34:6,
34:9,
34:20,
34:23,
35:2,
35:5,
36:5,
37:5,
40:4,
40:20,
41:11,
54:25,
55:3,
55:8,
55:19,
55:23,
59:19,
59:23,
60:2,
60:4,
60:8,
60:10,
60:13,
60:23,
60:25,
61:3,
61:7,
61:24,
61:25,
62:22,
63:15,
66:10,
68:19,
69:21,
71:18,
77:25,
78:1,
86:12,
101:4,
102:2,
102:4,
102:10,
103:7,
103:21,
104:8,
104:9,
105:1,
105:2,
112:19,
115:11,
121:5,
121:16
mailed [1] -
104:23
mails [5] -
8:25, 9:2,
39:15,
80:14.

102:11
major [1] -
74:20
major) [1] -
79:18
mandatory
[1] - 91:21
map [1] -
111:2
March [33] -
3:7, 3:10,
3:11,
3:15,
3:25, 4:7,
4:8, 4:9,
4:10,
4:11,
33:24,
34:13,
38:4,
39:12,
40:5,
41:12,
57:16,
58:7,
59:5,
60:19,
61:4,
66:24,
66:23,
81:16,
82:6,
83:16,
101:16,
112:10,
115:4,
118:9
Maria [2] -
62:19,
67:2
marked [3]
- 28:18,
60:21,
86:8
Maria [1] -
3:8
MARSHAL
L [1] - 2:7
Master's [4]
- 7:16,
9:10,
12:3,
111:1
Materials
[2] - 4:2,
28:1
math [1] -
7:22
matter [3] -
6:14,
87:4,
93:10
Mazeika [3]
- 47:24,

48:7, 62:7
Mazeika's
[1] - 92:9
mean [42] -
7:11, 9:2,
12:2,
12:9,
15:11,
17:4,
18:13,
19:1,
22:6,
23:18,
23:22,
24:10,
25:1,
25:9,
26:24,
29:12,
29:17,
31:19,
47:2,
50:20,
51:21,
52:5,
53:21,
55:9,
57:21,
59:1,
59:6,
68:9,
80:1,
80:6,
82:16,
84:19,
93:11,
96:15,
99:3,
99:4,
105:4,
108:1,
108:2,
118:23,
120:12
meaningfu
l [3] -
21:13,
22:3, 91:6
media [10] -
16:6,
16:25,
18:10,
18:19,
48:20,
49:22,
72:18,
115:5,
117:5,
117:12
meet [11] -
31:21,
33:19,
33:21,
41:22,

41:23,
85:8,
85:20,
86:13,
86:15,
87:23,
90:22
meeting
[71] -
33:11,
34:15,
34:19,
39:13,
41:13,
41:14,
42:8,
42:9,
42:13,
57:16,
57:20,
57:23,
59:2,
59:6,
59:7,
59:8,
59:13,
60:15,
61:13,
61:17,
62:4,
65:9,
65:19,
65:23,
66:9,
70:13,
70:14,
71:3,
71:8,
71:9,
71:12,
71:16,
71:24,
72:3,
81:7,
81:15,
82:6,
82:15,
83:4,
83:7,
83:12,
83:17,
83:20,
86:17,
86:22,
87:20,
87:21,
88:14,
89:12,
90:8,
90:11,
90:19,
90:23,
104:14,
105:12,

105:15,
105:16,
105:19,
108:13,
112:5,
112:10,
113:1,
115:12,
115:21,
118:8
meetings
[7] - 31:20,
41:15,
41:25,
71:10,
83:15,
91:6
member [8]
- 11:12,
19:19,
22:25,
61:20,
64:7,
64:17,
67:21,
70:24
Members
[1] - 3:24
memo [8] -
96:16,
97:2,
99:1,
99:2,
99:7,
99:11,
99:14,
99:19,
100:9
memorabi
e [1] -
47:20
Memorand
um [1] -
3:25
memory [4]
- 33:3,
90:19,
100:19,
115:10
memos [1]
- 101:20
mental [2] -
107:9,
107:14
mention [1]
- 109:11
mentioned
[22] -
20:10,
21:5,
25:10,
45:15,
58:4,
70:17,

75:8,
88:9,
91:8,
91:9,
91:15,
98:25,
101:25,
113:2,
115:16,
115:19,
115:25,
116:2,
116:14,
118:19,
121:1
mentions
[1] - 79:25
merely [2] -
22:15,
64:15
message
[1] -
108:13
messages
[2] - 4:16,
74:13
met [6] -
33:18,
57:2,
65:6,
89:8,
91:12,
112:24
middle [16]
- 7:22,
23:22,
23:23,
24:3,
25:15,
44:5,
80:20,
83:9,
83:10,
83:13,
83:14,
100:20,
116:1,
116:3,
116:7,
116:14
Middle [1] -
110:16
might [11] -
18:25,
18:1,
18:7,
18:16,
24:20,
33:16,
50:2,
60:4,
78:14,
87:12,
95:3

mind [6] -
27:11,
41:1,
43:8,
56:4,
72:4, 97:2
minimum
[1] - 21:22
minor [1] -
77:5
minor) [1] -
77:6
minute [1] -
89:18
minutes [7]
- 55:25,
65:10,
84:6,
90:4,
96:3,
102:23,
103:4
misbehavi
or [1] -
74:12,
78:11,
76:13,
76:20
misconduc
t [2] -
74:19,
79:18
Miss [1] -
106:4
missing [4]
- 67:14,
67:19,
79:6,
79:20
mistake [1]
- 60:4
mistaken
[1] - 78:19
mom [15] -
40:11,
42:10,
54:20,
71:19,
86:15,
90:9,
91:17,
96:19,
113:1,
115:6,
115:13,
117:6,
117:15,
117:23,
117:25
Mom [1] -
114:16
moment [2]
- 63:5,
75:23

Joint Appendix00190

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Monday [3] - 1:16, 6:8, 40:5 | 81:4 moved [1] - 111:7 moving [3] - 65:21, 93:18, 96:4, 96:8, 96:23, 109:1 | 35:20, 49:3, 50:18, 52:17, 52:25, 53:19, 54:3, 55:13, 62:8, 64:11, 65:15, 67:15, 68:13, 74:3, 74:6, 74:24, 77:20, 78:7, 78:22, 79:1, 79:7, 83:25, 89:20, 89:22, 90:1, 96:2, 95:13, 95:22, 95:25, 96:13, 98:4, 107:25, 111:24, 112:2, 118:15, 118:22, 122:6 | 63:17 necessary [1] - 20:23 need [11] - 6:8, 7:2, 9:14, 12:14, 15:11, 21:2, 23:2, 23:3, 27:7, 31:4, 35:14, 50:23, 58:14, 89:18, 90:22, 91:1, 91:5, 96:21, 105:9 needed [8] - 83:23, 85:15, 104:16, 105:16, 106:16, 106:18, 107:18, 115:24 needing [1] - 105:22 needs [4] - 9:17, 104:16, 106:9, 117:24 negative [1] - 54:9 never [6] - 31:8, 89:8, 91:12, 97:4, 97:5 new [6] - 32:22, 32:25, 33:7, 33:22, 97:3 Newsies [2] - 3:24, 32:4 next [15] - 33:11, 41:2, 54:2, 59:17, 60:8, 60:9, 75:14, 78:16, 82:25, | 93:17, 96:5, 96:8, 109:2, 114:3, 120:24 nice [1] - 58:13 night [21] - 17:23, 19:10, 33:5, 39:13, 59:3, 59:12, 60:7, 60:11, 61:5, 61:12, 62:3, 62:22, 62:23, 68:11, 68:19, 69:21, 71:2, 80:9, 87:6, 88:7, 93:21 nine [2] - 14:9, 52:2 Northwest [1] - 110:16 Notary [2] - 5:4, 123:21 notebook [4] - 115:22, 118:20, 118:26, 119:18 noted [2] - 49:9, 95:24 notes [19] - 4:10, 39:11, 45:12, 60:24, 65:8, 65:14, 65:18, 65:22, 66:11, 70:5, 70:12, 71:13, 78:19, 87:3, 87:25, 88:5, | 114:23, 117:2, 119:23 nothing [9] - 63:24, 122:5, 122:6 Notice [1] - 3:22 notice [1] - 81:14 notification [2] - 73:23, 90:17 November [5] - 1:16, 33:3, 104:13, 123:7, 123:23 number [6] - 51:4, 51:17, 51:19, 52:7, 105:7, 121:6 NUMBER [1] - 3:6 numerous [2] - 38:24, 102:17 | 52:25, 53:19, 54:3, 55:13, 62:8, 64:11, 65:15, 67:15, 68:13, 74:3, 74:6, 74:24, 77:20, 78:7, 78:22, 79:1, 79:7, 83:25, 89:20, 89:22, 90:1, 95:2, 95:13, 95:22, 95:25, 96:13, 98:4, 107:25, 111:24, 112:2, 118:15, 118:22, 122:6 oath [1] - 49:6 object [15] - 10:22, 10:25, 12:22, 18:22, 24:19, 27:4, 30:8, 49:3, 52:17, 62:8, 67:3, 74:24, 85:2, 95:22, 96:13 objectio [1] - 64:11 objection [6] - 11:19, 14:2, 25:5, 49:9, 95:24, 107:25 objections [1] - 2:19 objective [1] - 64:14 | objectively [1] - 64:9 obscene [1] - 74:13 observatio n [1] - 107:4 observed [2] - 37:9, 121:8 obtained [1] - 36:13 obviously [5] - 18:10, 18:13, 20:12, 24:11, 25:14, 111:19 occasion [3] - 31:5, 51:21, 51:22 occasiona lly [2] - 20:13, 53:9 occur [2] - 16:17, 97:17 occurred [14] - 54:9, 56:15, 60:14, 61:19, 65:23, 74:16, 93:20, 105:13, 107:4, 109:5, 115:6, 116:2, 117:6 OF [1] - 1:1 offense [9] - 23:4, 28:2, 49:24, 50:4, 64:8, 74:23, 77:10, 80:10 offenses [6] - 73:20, 73:21, 73:23, 76:3, 78:10, 80:8 offensive [2] - 64:15, 64:16 | office [13] - 33:19, 42:15, 50:23, 79:5, 80:25, 84:13, 85:14, 106:24, 109:8, 114:23, 116:23, 119:3, 119:5 Officer [7] - 20:21, 44:21, 45:12, 45:18, 46:7, 55:1, 116:19 officer [2] - 46:19, 123:3 officially [1] - 8:2 often [3] - 50:25, 115:7, 117:7 old [1] - 109:25 older [5] - 23:16, 23:20, 24:13, 24:17, 24:24 OLEY [1] - 1:6 Oley [2] - 1:8, 1:9, 1:11, 1:18, 1:19, 6:15, 6:25, 7:24, 8:1, 8:4, 15:2, 23:25, 25:4, 29:4, 31:3, 32:20, 33:20, 51:1, 57:15, 84:7, 84:8, 78:10, 80:8 once [5] - 9:15, 10:3, 39:1, 51:6, |
| monitorin g [1] - 8:20 month [1] - 51:5 monthly [2] - 83:4, 83:15 months [2] - 35:14, 39:5 morning [10] - 5:7, 5:8, 34:14, 45:14, 59:17, 59:22, 60:8, 60:9, 60:16, 60:18, 61:22, 61:25, 62:24, 71:3, 71:15, 90:4, 94:19, 118:8 mornings [1] - 60:1 most [5] - 9:12, 29:17, 30:25, 60:1, 86:20 mother [15] - 35:16, 39:7, 39:18, 40:1, 40:7, 42:25, 57:2, 71:6, 71:16, 72:3, 83:13, 86:2, 86:13, 112:24, 115:11 mother's [1] - 71:20 motivate [1] - 108:20 mouth [1] - 98:13 move [2] - 60:18, | MR [41] - 5:6, 10:23, 11:1, 11:22, 12:23, 14:17, 18:24, 24:22, 27:9, 34:25, 35:23, 47:16, 49:8, 50:24, 52:22, 53:2, 53:20, 54:14, 55:20, 62:11, 64:13, 65:16, 67:18, 88:16, 74:5, 74:7, 75:9, 77:23, 78:13, 79:10, 84:14, 90:24, 95:6, 95:14, 95:24, 96:6, 97:12, 98:6, 108:3, 118:17, 122:4 MS [48] - 10:22, 10:24, 11:19, 12:21, 14:2, 18:22, 24:19, 27:4, 30:8, 30:14, 34:22, | **N**<br>name [4] - 5:9, 33:22, 63:3, 106:1 names [1] - 32:12 Narrative [1] - 3:8 narrow [1] - 52:13 nature [3] - 35:2, 74:19, 79:18 near [1] - | | | | | |

Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 48 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 48 of 186
76100X00192   Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 45 of 181

108:14
one [43] -
7:9, 15:7,
17:8,
18:16,
29:19,
32:2,
33:5,
36:10,
37:14,
42:16,
45:1,
45:5,
47:9,
47:14,
51:18,
52:16,
53:17,
56:16,
57:13,
61:8,
62:9,
66:19,
76:22,
77:7,
78:16,
78:20,
84:21,
87:9,
89:21,
91:9,
98:18,
100:1,
100:3,
103:1,
106:1,
108:13,
109:6,
112:5,
117:25,
121:2
oneself [1]
- 77:1
ongoing [5]
- 9:16,
12:7,
38:8,
40:21,
101:10
online [2] -
20:13,
21:11
open [3] -
22:19,
31:23,
62:13
open-door
[1] - 31:23
openings
[1] - 111:5
operated
[1] - 45:23
opinion [9]
- 13:23,

22:16,
25:20,
25:23,
26:3,
26:8,
27:14,
27:15,
28:12
opinions
[2] - 21:7,
26:4
opportunit
ies [1] -
10:2
opportunit
y [1] - 44:2
opposed
[1] - 17:6
option [1] -
75:17
options [3]
- 74:8,
75:2,
75:6,
75:13,
75:15,
75:21
Options [1]
- 75:16
orally [1] -
20:14
orderly [1] -
20:8
original [3]
- 2:19,
68:16,
86:13
otherwise
[1] - 9:8
outburst [1]
- 84:22,
84:24
outlet [1] -
49:22
outside [8]
- 17:13,
17:19,
18:6,
18:18,
20:2,
20:3,
20:11,
23:10
overly [1] -
49:5
oversaw [1]
- 32:8
oversight
[3] - 31:12,
32:9,
32:13
overview
[1] - 31:22

OVHS [1] -
121:9
OVSD [4] -
4:15,
73:16,
86:9,
114:3
own [1] -
8:25

## P

p.m [6] -
1:17,
86:23,
114:5,
114:9,
122:2,
122:8
PA [3] - 2:4,
2:9,
123:20
Page [4] -
100:13,
107:15,
112:13,
112:14
page [8] -
28:24,
29:4,
73:15,
73:16,
86:8,
89:23,
114:3
PAGE [1] -
3:2
Pam [2] -
121:6,
121:7
paper [1] -
65:12
paperwork
[1] - 89:19
paragraph
[5] - 35:6,
63:18,
112:21,
114:4
parent [1] -
21:1,
42:17,
45:2,
45:10,
48:12,
50:21,
51:2,
65:6,
89:14,
90:16,
102:12,
103:2,
103:4,
103:8,

103:10,
103:13,
104:3,
104:4,
117:24
parent's [1]
- 104:6
parents [17]
- 18:2,
28:9,
28:10,
32:7,
37:9,
37:15,
38:18,
41:23,
42:9,
55:8,
88:13,
91:3,
91:4,
91:5,
100:8,
109:13,
118:4
parents/
guardians
[1] - 99:17
parking [5]
- 40:25,
42:25,
54:20,
113:2,
114:1
part [10] -
10:4,
23:8,
23:14,
24:15,
73:13,
103:5,
104:7,
106:3,
108:17
part-time
[1] - 24:15
participate
[1] - 44:7
particularl
y [1] - 88:2
parties [4] -
56:17,
117:4,
123:12,
123:15
party [5] -
92:7,
92:8,
93:13,
93:23,
94:1
pass [2] -
7:17, 9:14
passed [1] -

9:13,
91:20
past [6] -
20:20,
34:10,
46:21,
76:13,
108:12,
117:19
peanut [2] -
49:1,
49:13
pencil [1] -
13:9
PENNSYL
VANIA [1]
- 1:1
Pennsylva
nia [3] -
1:19,
1:24,
123:21
people [24]
- 8:24,
12:10,
13:19,
16:3,
20:3,
23:5,
30:5,
32:10,
32:13,
32:19,
33:6,
33:16,
49:18,
57:23,
69:13,
72:12,
87:16,
88:18,
92:1,
104:23,
105:25,
120:15,
121:6
per [4] -
20:6,
20:7,
25:16,
102:19
perceive [3]
- 45:16,
47:23,
54:8
perceived
[1] - 45:3
percent [1]
- 39:16
perception
[1] - 38:17
perfectly
[1] - 11:5
performan

ce [2] -
101:17,
102:8
performin
g [1] -
109:2
perhaps [1]
- 17:9
period [4] -
76:21,
83:8,
83:11,
103:18
permissio
n [8] -
104:21,
105:9,
105:24,
106:10,
112:8,
121:11
Permissio
n [1] -
107:12
permissio
ns [1] -
105:17
person [9] -
22:18,
23:4,
23:12,
58:10,
66:18,
80:22,
89:9,
91:13,
108:7
personal
[6] - 22:18,
25:20,
25:23,
26:2,
108:24
personally
[1] - 37:10
persons [2]
- 73:20,
77:2
pet [2] -
88:8,
91:10
petty [1] -
74:18
Philly [1] -
108:22
phone [11] -
30:12,
37:11,
37:19,
38:11,
85:2,
86:24,
87:10,

88:9,
90:9,
94:11,
103:3,
103:15,
103:17,
114:5,
114:9,
114:14,
117:2,
117:3,
117:15
physical [1]
- 74:16
pick [1] -
102:22
picking [1]
- 32:17
picture [1] -
104:10
piece [1] -
101:18
Pike [1] -
2:3
place [13] -
16:9,
19:9,
33:4,
33:14,
40:15,
41:14,
70:13,
71:8,
84:3,
88:24,
97:3,
107:6,
115:4
places [1] -
17:19
Plaintiff's
[1] - 30:10
Plaintiffs
[4] - 1:4,
2:5, 5:13,
92:15
Plaintiffs'
[1] - 94:24
Plan [1] -
41:20
plan [1] -
41:21
planning
[1] -
115:18
play [25] -
25:15,
115:3
police [32] -
18:11,
41:4,
43:20,
44:8,
44:10,

47:11,
49:16,
82:23,
90:11,
93:12,
93:18,
96:3,
96:8,
96:17,
96:19,
97:6,
99:10,
99:25,
105:20,
107:4,
107:5,
115:16
plays [2] -
32:1, 32:2
plenty [2] -
86:16,
120:19
point [27] -
6:3, 6:8,
26:17,
34:19,
36:10,
41:3,
47:10,
49:12,
55:4,
55:10,
55:25,
56:3,
56:6,
70:14,
82:23,
83:3,
84:15,
85:1,
91:6,
96:21,
102:5,
104:4,
104:11,
108:10,
110:5,
113:16,
119:2
Police [8] -
20:21,
44:13,
45:19,
45:8,
51:9,
53:5,
54:22,
115:3
Policy [1] -
29:1
politely [1] -
102:22
political [1]
- 13:23
pop [1] -
38:10
population
[1] - 20:15
portrayed
[2] - 43:12,
55:7
position [3]
- 32:25,
58:24,
76:4

46:8,
46:17,
46:18,
46:19,
47:5,
50:13,
50:15,
50:25,
51:15,
51:21,
51:24,
52:2,
52:6,
52:11,
52:15,
53:16,
53:25,
54:24,
55:4,
56:2,
56:7,
58:14,
92:3,
120:1
policies [4]
- 29:13,
29:18,
30:19,
30:23
policy [17] -
21:25,
29:1,
29:2,
29:14,
29:22,
29:25,
30:5,
30:6,
30:16,
30:21,
31:2,
31:5,
31:9,
31:24,
74:15,
79:12,
103:9

Case 5:19-cv-01873-MAK Document 85-2 Filed 01/13/20 Page 49 of 186
Case 5:19-cv-01873-MAK Document 85-1 Filed 12/05/19 Page 49 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 46 of 181

possessio n [1] - 74:13
possible [2] - 44:25, 75:18
post [5] - 17:1, 19:10, 49:23, 50:3, 50:5
posted [6] - 41:4, 42:22, 55:5, 55:11, 56:1, 56:7
Posting [2] - 4:1, 28:25
potential [2] - 75:22, 101:7
potentially [1] - 18:19
Pottsgrov e [1] - 23:24
pouring [1] - 84:2
prac [1] - 9:23
practice [14] - 13:16, 21:22, 36:15, 36:19, 36:21, 36:23, 36:25, 37:10, 39:21, 40:10, 40:11, 66:11, 109:17
practices [4] - 9:9, 9:24, 36:22, 56:4
Praxis [2] - 7:18, 9:13
preceding [1] - 75:17
premises [1] - 39:19
prepare [1] - 23:9
preparing [1] - 23:9
PRESENT

[1] - 2:12
present [5] - 71:20, 114:17, 116:8, 117:24, 119:7
presume [2] - 16:24, 17:8
pretty [1] - 105:23
previous [4] - 39:11, 46:3, 58:1, 85:11
previously [4] - 24:6, 32:19, 91:19, 100:11
Pricetown [3] - 39:20, 113:5, 113:9
pride [1] - 58:17
Principal [54] - 1:9, 6:22, 6:24, 7:6, 7:10, 7:18, 7:20, 10:4, 13:17, 13:18, 14:9, 14:10, 14:14, 14:15, 15:4, 19:6, 19:19, 20:5, 21:19, 23:8, 23:23, 23:25, 24:3, 25:3, 30:19, 30:23, 31:13, 32:23, 33:22, 41:25, 48:14, 48:15, 49:10, 50:22, 51:1, 52:2,

58:17, 58:22, 69:25, 80:19, 80:20, 89:11, 89:12, 101:21, 103:7, 105:5, 106:10, 110:15, 110:23
Principals [3] - 83:4, 83:5, 83:16
privately [6] - 66:24, 72:8, 72:12, 72:21, 119:5
privileges [3] - 24:20, 24:23, 25:4
problem [1] - 48:21, 75:12, 79:2
procedure s [1] - 9:9
proceedin gs [1] - 123:9
process [5] - 15:16, 15:17, 20:17, 38:13, 100:23
productio n [2] - 116:3, 116:7
productive [3] - 87:1, 87:18, 87:22
profanities [1] - 17:6
profanity [1] - 92:14
profession [2] - 10:2, 70:10
profession al [5] - 9:17, 22:18, 28:12, 51:12, 53:7

profession s [1] - 44:17
program [10] - 12:4, 25:11, 31:22, 33:20, 66:20, 66:22, 56:24, 92:19, 92:20, 110:13
programs [1] - 9:12
promoted [1] - 95:15
properties [1] - 76:25
property [3] - 16:20, 96:16, 96:25, 98:13
proposed [1] - 34:21
protect [1] - 101:8
protected [5] - 10:21, 10:25, 11:3, 12:19, 15:22
protection [1] - 11:7
provable [1] - 17:14
provide [2] - 17:24, 103:22
provided [3] - 51:12, 100:15, 108:8
provides [1] - 53:6
psycholog ical [2] - 107:16, 107:18
Psycholog ist [1] - 106:13
psycholog ist [1] - 107:20
PTE [2] - 107:11, 108:5
PTEs [2] - 121:9, 121:11

Public [2] - 5:4, 123:21
public [1] - 40:15
punish [1] - 15:21
puppy [1] - 63:24
pursue [1] - 18:20
pushing [1] - 77:3
put [7] - 18:9, 33:21, 63:3, 65:10, 96:16, 96:25, 98:13
puts [1] - 80:9

## Q

quarterba ck [1] - 58:16
questione d [4] - 14:21, 114:20, 116:16, 117:24
questions [12] - 6:13, 9:5, 31:11, 47:12, 76:18, 78:17, 82:17, 98:15, 109:21, 111:20, 111:25, 118:16
quick [1] - 118:19
quickly [2] - 32:23, 90:8
quit [2] - 81:8, 82:23

## R

rain [1] - 84:2
raised [1] - 100:5
ran [1] -

85:18
random [2] - 49:23, 53:12
randomly [1] - 103:21
rapport [1] - 58:13
rather [1] - 46:7
read [23] - 29:3, 30:24, 31:2, 41:1, 55:14, 55:15, 61:19, 61:22, 64:2, 66:19, 66:20, 67:20, 67:23, 73:20, 75:1, 75:10, 75:14, 75:15, 76:17, 79:9, 100:2, 115:11
Reading [3] - 7:22, 111:5
reading [2] - 29:22, 60:17
ready [2] - 23:12, 59:23
READY [42] - 5:6, 10:23, 11:1, 11:22, 12:23, 14:17, 18:24, 24:22, 27:9, 30:14, 34:25, 35:23, 47:16, 49:8, 50:24, 52:22, 53:2, 53:20, 54:14, 55:20,

62:11, 64:13, 65:16, 67:18, 68:16, 74:5, 74:7, 75:9, 77:23, 78:13, 79:10, 84:14, 90:24, 95:6, 95:14, 95:24, 96:6, 97:12, 98:5, 108:3, 118:17, 122:4
Ready [3] - 2:3, 3:3, 5:9
real [2] - 70:9, 118:18
realize [1] - 60:24
really [18] - 14:5, 14:12, 15:15, 16:18, 15:20, 18:3, 18:12, 28:11, 30:13, 30:18, 38:23, 44:12, 60:7, 67:24, 73:1, 75:13, 102:7, 114:19
reason [6] - 16:21, 19:14, 49:16, 64:5, 67:13, 120:22
reasons [2] - 44:25, 112:5
receive [4] - 9:16, 12:12, 29:9, 100:17

received [16] - 8:17, 25:5, 37:13, 55:8, 55:9, 60:23, 60:25, 61:8, 63:9, 73:12, 101:19, 102:1, 102:2, 102:4, 102:10, 102:17, 102:19, 103:21
receives [1] - 8:25
receiving [1] - 29:24
recent [2] - 90:15, 115:15
reception [1] - 103:14
recognize [2] - 86:3, 112:17
recollectio n [6] - 34:12, 37:3, 71:9, 88:1, 104:19, 120:11
reconvene [3] - 23:3, 41:24, 81:18
record [6] - 65:13, 117:13, 117:17, 120:4, 123:8
recorded [3] - 17:14, 18:18, 123:10
records [5] - 36:12, 63:1, 63:14, 76:15, 86:13
refer [1] - 5:13
reference [5] - 92:15,

101:5, 113:11, 114:8, 117:20
referenced [1] - 89:17
Referral [4] - 3:9, 3:18, 3:19, 66:4
referral [10] - 66:10, 66:12, 70:16, 71:12, 75:18, 77:8, 77:21, 78:4, 78:5, 78:25
referrals [2] - 79:6, 104:15
referred [4] - 68:19, 88:21, 91:16, 108:8
referring [14] - 5:14, 15:19, 35:10, 41:6, 41:7, 65:21, 68:21, 75:14, 81:10, 86:14, 90:3, 90:21, 116:5, 120:14
refresh [3] - 34:12, 116:10, 120:11
regarding [8] - 38:10, 86:12, 99:16, 101:10, 101:14, 103:25, 115:16, 118:4
regards [3] - 45:12, 68:11, 70:7
regulation s [1] - 20:7
rehearsal

[v] - 59:3, 59:11, 60:14, 61:12, 61:16, 62:3, 62:20, 66:25, 99:18
rehearsals [1] - 100:3
related [3] - 8:13, 86:20, 123:12
relationshi p [1] - 15:5, 24:4, 26:13, 26:14, 26:18, 44:12, 51:10, 53:5, 64:23, 82:21, 86:5
relative [1] - 123:14
relay [2] - 108:17, 108:18
release [4] - 24:14, 25:10, 115:15, 120:20
remain [1] - 93:16
remaining [1] - 62:13
remark [1] - 19:23
remember [45] - 18:17, 35:3, 36:23, 37:19, 37:22, 37:23, 38:20, 38:23, 40:6, 40:10, 40:12, 43:4, 45:22, 47:6, 47:9, 47:21, 51:20, 51:22,

53:18, 56:25, 57:5, 57:22, 58:12, 79:4, 82:11, 82:13, 83:2, 84:2, 92:12, 92:17, 92:23, 93:8, 93:11, 94:11, 94:19, 101:19, 101:23, 101:25, 102:15, 105:19, 106:1, 106:21, 117:11, 118:21, 119:3, 119:14, 119:16, 119:24
removed [1] - 94:3
repair [1] - 86:4
repeated [3] - 77:10, 77:12
rephrase [1] - 61:11
reply [1] - 101:11
report [17] - 31:13, 39:17, 39:18, 40:24, 43:20, 45:1, 45:13, 46:9, 54:21, 56:14, 83:21, 83:23, 92:1, 92:5, 92:8, 92:24, 116:19
Report [3] - 3:20, 115:3, 116:19
reported [6]

- 11:15, 31:15, 39:23, 45:17, 63:22, 113:18
reporter [1] - 91:21
Reporter [3] - 1:23, 6:4, 123:20
Reporter-Notary [1] - 5:4
REPORTI NG [1] - 1:22
reports [2] - 13:2, 91:25
represent [2] - 5:9, 28:23
representa tive [1] - 106:4
representi ng [2] - 2:5, 2:10
Request [1] - 3:22
request [2] - 71:20, 86:13
requested [1] - 117:23
requests [1] - 107:7
require [1] - 73:25
Required [1] - 4:6
requireme nts [1] - 29:25
reread [1] - 113:14
Resource [3] - 20:21, 45:18, 46:7
respect [5] - 9:6, 13:24, 23:21, 24:10, 24:11
respond [5] - 26:23, 27:3, 27:15,

27:19, 57:4
responded [4] - 9:2, 94:13, 104:8, 104:12
response [5] - 14:4, 14:16, 51:1, 52:15, 62:14, 69:11
responses [1] - 7:3
responsibl e [2] - 16:13, 17:17
responsiv e [2] - 102:11, 103:6
rest [1] - 75:15
result [3] - 73:23, 81:15, 121:7
return [1] - 39:4, 103:1, 122:1
returned [1] - 59:12
returning [1] - 33:8
review [3] - 100:16, 112:25, 114:23
reviewed [7] - 30:2, 34:7, 55:17, 61:2, 68:24, 78:10, 119:23
reviewing [1] - 63:14
revised [1] - 29:20
Richard [2] - 106:2, 106:5
rift [1] - 50:8
right-hand [1] - 73:17
rights [6] - 13:25,

94:24, 95:4, 95:19, 96:11, 97:15
rink [1] - 39:25
rise [1] - 55:22
Road [3] - 39:20, 113:5, 113:9
road [1] - 59:25
role [15] - 10:3, 14:11, 15:2, 15:3, 31:18, 32:22, 32:25, 52:6, 58:15, 58:23, 59:20, 80:19, 93:16, 99:4
roles [4] - 14:9, 36:8, 38:12, 56:6
room [4] - 13:13, 23:5, 30:5, 41:13
roughly [3] - 38:16, 42:5, 121:25
route [1] - 23:2
routine [1] - 59:22
routinely [4] - 41:22, 51:13, 59:21, 60:3
Rule [1] - 3:20
rules [1] - 5:22
run [1] - 38:7
running [2] - 96:22, 97:9

S
safe [2] - 20:8, 20:9
Safety [1] - 112:25
safety [6] - 18:14, 18:16, 62:6, 62:14, 73:22, 113:21
Saturday [5] - 16:20, 17:23, 19:10, 36:23, 93:21
saw [2] - 69:11, 97:5
scenario [1] - 56:10
scenes [3] - 35:16, 39:7, 40:18
schedule [1] - 115:21
scheduled [1] - 37:1
scholarshi p [1] - 100:14, 100:18, 100:24
school [121] - 6:23, 6:24, 7:6, 7:10, 7:22, 8:5, 9:12, 9:18, 9:23, 10:5, 10:15, 11:24, 12:8, 12:16, 12:20, 15:13, 16:5, 16:12, 16:18, 16:19, 17:14, 17:15, 17:17, 17:19, 17:20, 18:5, 18:10,

18:18, 19:5, 19:6, 19:13, 19:19, 20:2, 20:4, 20:7, 20:8, 20:11, 20:15, 21:3, 21:19, 21:20, 21:23, 23:8, 23:22, 23:23, 23:25, 24:3, 24:4, 24:7, 25:2, 25:15, 25:16, 27:1, 28:9, 31:12, 32:1, 33:7, 33:22, 36:25, 40:12, 44:5, 46:12, 48:3, 52:7, 52:12, 54:21, 57:6, 57:13, 58:22, 59:4, 59:23, 59:25, 69:23, 69:25, 72:20, 73:23, 76:21, 76:24, 76:25, 80:20, 82:25, 83:5, 84:6, 86:4, 87:12, 87:13, 89:15, 90:20, 94:3, 94:20, 98:5,

96:8, 96:22, 97:3, 97:4, 97:5, 97:10, 99:9, 101:6, 101:17, 101:18, 101:21, 105:5, 107:20, 108:23, 108:25, 109:1, 109:4, 110:22, 116:3, 116:7, 116:9, 119:6, 120:24, 122:1
SCHOOL [1] - 1:6
School [42] - 1:8, 1:10, 1:12, 1:18, 6:16, 6:19, 6:25, 7:22, 7:25, 8:1, 8:4, 16:9, 20:21, 25:4, 29:2, 29:12, 31:3, 34:15, 34:18, 42:16, 45:18, 46:7, 51:1, 54:21, 57:15, 57:19, 59:2, 59:13, 61:13, 61:16, 62:4, 81:25, 82:1, 83:18, 85:12, 104:14, 104:20, 106:13, 108:23,

110:16, 111:5
schools [3] - 26:5, 29:17, 41:18
Schools [2] - 68:25, 69:22
scratch [1] - 5:21
screaming [1] - 88:25
se [2] - 25:16, 102:19
sealing [1] - 2:18
searches [1] - 53:12
season [1] - 99:16
second [19] - 18:15, 21:7, 35:6, 36:18, 47:14, 52:14, 56:20, 62:12, 63:18, 66:22, 73:16, 86:8, 89:23, 110:18, 110:23, 112:20, 112:21, 121:3
second-to-last [1] - 56:20
secondly [1] - 54:6
seconds [1] - 100:2
Secretary [1] - 71:22
secretary [2] - 8:21, 8:24
Section [4] - 4:1, 4:3, 4:4, 4:5
section [1] - 75:14
security [1] - 71:11
see [26] - 21:2, 43:15,

Joint Appendix00194

47:14,
50:1,
55:23,
58:1,
63:12,
63:19,
65:1,
65:6,
71:12,
72:17,
75:6,
78:6,
80:13,
91:8,
98:10,
99:13,
100:1,
104:16,
106:12,
107:15,
112:22,
114:5,
115:8,
115:20
**seeing** [7] -
34:9,
39:24,
47:17,
48:6,
57:6,
98:10,
119:24
**seek** [2] -
57:8,
57:10
**segue** [1] -
111:25
**selection**
[1] -
100:16
**self** [2] -
22:5,
73:22
**self-expression**
[1] - 22:5
**seminars**
[1] - 12:12
**send** [5] -
34:21,
94:17,
106:18,
106:19,
121:9
**sending** [2]
- 35:2,
117:3
**sends** [1] -
8:24
**sense** [2] -
80:23,
112:9
**sent** [7] -
8:17,

34:13,
34:23,
37:5,
55:3,
60:10,
121:2
**sentence**
[8] - 5:23,
39:5,
41:2,
63:19,
67:20,
74:4,
74:6,
74:25
**sentences**
[1] - 35:13
**sequential**
[2] - 74:10,
75:3
**serious** [2]
- 60:3,
97:10
**seriousness** [2] -
73:24,
80:9
**SERVICE**
[1] - 1:22
**service** [1] -
103:15
**session** [1]
- 31:8
**set** [2] -
94:2,
94:12
**setting** [1] -
89:6
**seven** [2] -
60:6,
115:17
**several** [1] -
99:16
**sexual** [2] -
74:18,
79:18
**Shank** [54] -
2:13,
15:2,
35:7,
36:2,
36:3,
36:8,
36:10,
35:16,
37:6,
38:6,
45:22,
60:11,
62:22,
65:1,
68:10,
80:13,
81:6,

81:14,
82:10,
84:9,
84:21,
85:4,
86:14,
88:10,
90:14,
93:17,
94:8,
94:13,
94:23,
95:13,
95:19,
96:15,
96:20,
98:17,
98:1,
99:3,
99:11,
99:15,
99:22,
99:24,
99:25,
100:8,
101:4,
101:14,
101:16,
101:20,
102:2,
102:5,
102:17,
103:25,
104:20,
106:22,
115:17,
115:20,
118:11,
121:6
**SHANK** [1]
- 1:6
**share** [1] -
27:15
**sharing** [1]
- 28:14
**Sharon** [1] -
2:8
**shielding**
[4] - 35:14,
35:18,
36:6, 39:5
**shoots** [1] -
48:24
**shortcut** [1]
- 59:10
**shortly** [1] -
111:8
**show** [8] -
33:7,
38:4,
38:7,
38:10,
59:4,
65:3,

68:14,
71:1
**showing** [1]
- 116:1
**shown** [2] -
17:22,
47:15
**shows** [2] -
38:2,
49:12
**sic** [2] -
92:25,
95:11
**side** [4] -
45:4,
64:18,
64:24
**signaling**
[1] - 65:13
**signature**
[3] - 66:6,
66:7,
78:18
**similar** [2] -
78:15,
92:2
**simple** [1] -
30:16
**singled** [3]
- 107:23,
108:1,
108:4
**Sinking** [1]
- 1:24
**sit** [9] -
22:10,
30:4,
30:11,
30:15,
30:20,
54:16,
71:6,
87:20,
100:22
**situation**
[38] -
12:13,
13:1,
13:12,
14:1,
14:10,
17:12,
21:15,
25:2,
41:3,
44:15,
45:24,
48:12,
55:3,
55:10,
55:23,
56:17,
57:4,
63:24,

64:6,
64:22,
66:12,
67:8,
70:10,
71:7,
72:22,
90:21,
93:24,
97:6,
97:8,
106:11,
109:18,
114:2,
115:22,
118:21,
118:25,
119:19
**situational**
[3] - 14:5,
14:12,
18:12
**situations**
[3] - 18:9,
18:14,
26:5
**six** [3] -
60:6,
110:17,
115:17
**sixth** [1] -
111:9
**skating** [6]
- 39:20,
39:21,
39:25,
113:7
**sleeping** [1]
- 60:6
**slept** [1] -
94:1
**slower** [1] -
55:14
**Smith** [3] -
44:21,
55:1,
116:19
**smoke** [1] -
74:14
**smoking**
[2] - 74:14,
79:14
**Snapchat**
[17] -
19:22,
39:17,
40:23,
41:7,
41:10,
47:8,
51:23,
56:18,
57:3,
115:3,

116:1,
116:4,
116:6,
116:15,
118:4,
118:9,
120:8
**Snicker** [1]
- 49:22
**Snickers**
[4] - 48:25,
49:13,
49:19,
49:21
**Snyder** [1] -
71:21
**so...** [1] -
120:25
**So...** [1] -
44:22
**social** [11] -
16:6,
16:25,
18:10,
18:16,
48:20,
49:21,
72:18,
76:22,
116:5,
117:5,
117:12
**society** [1] -
23:12
**solely** [1] -
26:8
**someone**
[15] - 8:20,
14:19,
15:19,
19:6,
20:15,
31:14,
39:24,
40:8,
51:22,
64:7,
64:10,
80:25,
81:1,
86:24,
108:4
**something**
's [2] -
44:17,
72:18
**sometimes** [8] -
8:24,
13:5,
16:16,
16:19,
20:24,
23:12,

79:5,
106:11
**somewhere** [1] - 87:3
**son** [5] -
21:1,
48:5,
48:10,
102:21,
114:1
**sons** [2] -
48:9, 54:6
**sorry** [12] -
7:2, 8:23,
9:19,
32:11,
41:17,
43:23,
73:16,
74:5,
79:8,
82:1,
93:6, 98:7
**sort** [2] -
94:12,
107:14
**sounds** [1]
- 67:12
**speaker** [1]
- 90:19
**speaking**
[15] -
13:11,
19:18,
33:10,
38:20,
57:19,
59:13,
67:1,
69:3,
76:8,
79:22,
90:14,
99:15,
109:16
**Special** [2]
- 39:3,
106:24
**special** [4] -
12:11,
88:19,
88:20,
104:15
**specific** [6]
- 29:6,
29:14,
31:5,
50:8,
52:7,
97:14
**specifically** [16] -
25:3,
29:22,

79:5,
106:11
**somewhere** a [1] - 87:3
**son** [5] -
21:1,
48:5,
48:10,
102:21,
114:1
**sons** [2] -
48:9, 54:6
**sorry** [12] -
7:2, 8:23,
9:19,
32:11,
41:17,
43:23,
73:16,
74:5,
79:8,
82:1,
93:6, 98:7
**sort** [2] -
94:12,
107:14
**spotty** [2] -
103:14,
103:15
**spring** [2] -
102:3,
103:20
**Spring** [2] -
1:24,
99:17
**springtime**
[1] - 32:4
**SRO** [2] -
20:20,
46:2
**STACEY** [1]
- 1:10
**Stacy** [14] -
31:19,
31:24,
33:18,
34:6,
34:20,
40:21,
66:24,
86:14,
88:13,
94:8,
94:11,
94:18,
95:16,
117:25
**staff** [11] -
11:12,
19:19,
22:20,
29:11,
31:9,
61:20,
64:7,

64:17,
67:21,
70:24,
90:11
**stalking** [3]
- 113:22,
113:23,
113:25
**stamp** [1] -
28:24
**stand** [5] -
13:15,
19:7,
30:15,
30:20,
41:18
**standard**
[1] - 9:8
**standing**
[4] - 30:12,
72:23,
95:6,
107:13
**start** [4] -
24:13,
30:10,
37:2,
50:10
**started** [4] -
8:1,
31:21,
32:20,
83:20
**starting** [6]
- 4:11,
4:12,
28:24,
56:5,
58:16,
58:24
**starts** [1] -
22:25
**statement**
[16] -
10:24,
11:16,
11:17,
12:18,
15:22,
17:13,
18:6,
18:8,
24:16,
25:19,
26:2,
56:21,
62:24,
63:17,
64:15,
70:6
**statements** [8] -
10:10,
10:16,

10:20,
11:3,
11:6,
29:11,
35:5,
46:14,
107:1
STATES [1]
- 1:1
stay [1] -
102:15
step [2] -
14:13,
54:2
steps [8] -
20:16,
31:17,
46:16,
45:20,
50:23,
93:17
still [4] -
18:6,
18:19,
63:22,
95:25
stipulated
[1] - 2:18
STIPULATI
ON [1] -
2:18
stood [2] -
81:7,
81:17
stop [8] -
23:3,
38:18,
51:13,
71:10,
77:1,
102:6
storm [1] -
17:22
story [3] -
64:18,
64:24,
77:17
straight [2]
- 88:14,
113:14
Street [1] -
1:19
strike [2] -
94:2,
94:12
string [1] -
17:6
strive [1] -
5:24
student [92]
- 9:6, 9:9,
10:5,
10:9,
10:16,

10:18,
10:20,
10:24,
11:2,
11:12,
11:14,
11:20,
12:8,
12:16,
13:22,
14:20,
15:19,
15:21,
16:13,
16:23,
16:24,
16:25,
17:5,
17:23,
17:25,
18:5,
18:7,
18:17,
18:20,
19:4,
19:16,
20:14,
21:20,
22:4,
24:11,
25:19,
25:22,
26:2,
26:8,
26:13,
26:20,
26:21,
26:23,
26:25,
27:3,
27:10,
27:11,
27:15,
27:25,
28:11,
28:14,
30:1,
35:16,
36:25,
37:12,
37:14,
39:7,
41:3,
41:4,
42:23,
45:2,
45:11,
45:16,
48:24,
50:21,
51:2,
52:16,
53:17,
54:18,

55:5,
55:6,
55:11,
55:12,
56:1,
56:7,
57:9,
64:20,
64:23,
71:6,
73:13,
74:15,
74:19,
81:15,
82:24,
88:11,
90:16,
91:9,
91:10,
117:25
Student [2]
- 4:1,
28:25
student's
[2] - 13:24,
17:13
students
[56] -
10:10,
11:6,
11:8,
11:11,
11:25,
13:12,
18:9,
20:8,
21:6,
21:14,
22:6,
22:14,
23:9,
23:16,
23:19,
24:5,
24:11,
24:12,
24:17,
24:24,
25:5,
25:6,
26:21,
27:18,
28:3,
32:7,
32:20,
37:9,
38:18,
40:22,
41:23,
48:17,
49:15,
50:8,
50:9,
56:5,

56:16,
59:12,
77:17,
79:24,
95:4,
96:23,
96:25,
97:25,
98:7,
98:9,
99:17,
100:8,
101:8,
104:18,
105:7,
109:14,
109:20,
115:17,
118:3,
121:10
students'
[8] - 17:18,
38:11,
61:12,
95:19,
97:15
studio [7] -
113:3,
113:5,
113:8,
113:9,
113:13,
113:17,
113:19
study [1] -
76:20
stuff [8] -
35:15,
36:5,
39:6,
39:8,
40:17,
40:21,
56:4,
108:24
subject [2]
- 11:7,
17:9
subjective
y [2] -
64:16,
70:19
submitted
[3] - 63:1,
65:1,
119:23
successfu
l [2] - 7:13,
100:16
suggest [1]
- 38:3
suit [1] -
101:6
Suite [1] -

2:4, 2:9
summarizi
ng [1] -
99:18
summary
[4] - 61:19,
118:2,
118:6,
118:9
summer [1]
- 111:7
Sunday [1]
- 94:19
Superinte
ndent [14]
- 1:7,
20:19,
45:18,
45:21,
46:6,
68:25,
69:1,
69:20,
69:22,
70:25,
71:5,
80:21,
100:15
Superinte
ndents [2]
- 12:10,
13:17
supervise
[2] - 31:13,
31:17
Superviso
r [2] - 70:3
supplied
[2] - 39:15,
40:4
support [1]
- 33:5
supportive
[2] - 31:20,
32:5
suppose
[5] - 11:4,
22:6,
25:9,
32:16,
101:5
supposed
[1] - 84:15
surely [1] -
51:21
surprise [2]
- 53:19,
53:21
suspect [1]
- 107:17
suspects
[1] -
109:12

suspend
[4] - 71:25,
81:5,
84:16,
85:4
suspenda
ble [4] -
64:8,
76:2,
76:3,
76:10
suspende
d [9] -
66:14,
67:14,
67:25,
79:22,
81:21,
82:25,
84:22,
85:22,
115:1
Suspensio
n [1] - 4:3
suspensio
n [19] -
21:23,
64:5,
68:23,
69:19,
69:24,
70:15,
72:4,
73:4,
73:5,
75:6,
75:18,
80:15,
81:13,
88:15,
89:8,
90:6,
91:13,
115:4,
121:21
swimming
[1] -
110:21
sworn [2] -
5:3, 123:7
synopsis
[1] - 118:2
system [4] -
23:16,
23:20,
24:13,
24:24

T

Tab [1] -
28:21
table [1] -
22:10

tabs [1] -
28:19
tampering
[1] - 74:17
Tara [1] -
114:14
tasks [3] -
96:22,
102:17,
102:19
taught [2] -
70:2,
110:10
teach [4] -
7:12,
7:21,
110:21,
111:9
Teacher [1]
- 3:14
teacher [52]
- 7:12,
7:15,
12:15,
13:1,
13:3,
13:6,
13:13,
13:21,
19:19,
23:22,
24:2,
25:20,
25:24,
26:3,
26:10,
26:13,
26:20,
26:22,
27:1,
27:2,
27:10,
27:13,
28:2,
28:14,
42:1,
58:15,
64:4,
65:1,
67:21,
68:4,
69:5,
69:8,
69:17,
72:23,
78:1,
78:2,
79:16,
79:23,
80:11,
80:16,
96:11,
97:16,
98:2,

98:8,
98:10,
98:19,
98:20,
110:8,
110:9,
111:11
teachers
[4] - 26:5,
27:21,
51:12,
98:10
teaching
[3] - 7:13,
29:11,
111:5
team [1] -
33:14
technicall
y [2] -
6:20,
31:15
telephone
[1] - 89:10
ten [3] -
63:25,
67:9, 90:4
tend [1] -
117:16
tenor [1] -
72:10
tenure [3] -
16:10,
29:4,
29:21
terminatin
g [1] -
56:24
terminolo
gy [1] -
73:6
terms [23] -
9:12,
9:23,
16:4,
31:24,
32:2,
36:15,
38:11,
38:13,
40:22,
43:20,
78:21,
80:14,
93:14,
93:17,
94:13,
96:17,
101:17,
101:18,
106:9,
108:12,
117:2
test [1] -

58:25
testified [6]
- 5:4,
112:3,
119:8,
119:9,
120:5
testify [2] -
49:6,
112:4
testifying
[1] - 54:12
testimony
[3] - 2:19,
123:6,
123:9
text [4] -
84:5,
94:6,
94:7,
94:11
Text [1] -
4:16
thankful [1]
- 116:20
that'd [1] -
106:5
THE [23] -
1:1, 1:1,
14:4,
27:7,
35:22,
50:20,
55:15,
55:18,
67:17,
68:15,
74:25,
77:21,
78:11,
78:24,
79:2,
84:1,
89:21,
89:25,
90:2,
96:2,
96:15,
112:1,
118:23
theatre [1] -
108:22
theft [2] -
74:18,
77:5
themselve
s [1] -
27:16
there'd [2] -
57:7, 57:8
thinking [1]
- 42:6
thinks [1] -
27:11

third [1] -
73:15
threat [1b] -
18:9,
20:11,
20:13,
20:16,
21:10,
21:11,
45:3,
45:16,
47:23,
48:7,
48:25,
49:13,
51:15,
52:16,
54:8,
54:17,
58:10,
70:17,
70:21
threaten [1]
- 70:8
threatened
[17] -
51:23,
53:17,
63:25,
64:4,
64:7,
67:22,
67:24,
68:1,
68:5,
69:5,
69:17,
70:19,
70:20,
70:25,
78:2,
80:12,
98:20
threatenin
g [6] -
20:14,
58:9,
67:16,
74:13,
74:19,
95:1
threats [1] -
20:10
three [18] -
5:15,
15:6,
21:23,
45:15,
65:3,
66:15,
69:19,
69:23,
69:24,
71:1,

81:2,
86:13,
87:10,
89:3,
89:16,
92:15,
98:14,
115:23
three-day
[2] - 69:19,
69:24
throughou
t [5] - 5:13,
90:9,
99:17,
105:20,
108:24
thrown [2] -
119:11,
119:17
Thursday
[3] - 83:17,
83:17,
89:14
Tier [1] -
73:4
TIME [1] -
1:16
timing [1] -
38:14
tired [1] -
117:24
tobacco [1]
- 74:15
today [10] -
47:7,
48:6,
50:1,
54:16,
100:22,
113:15,
114:13,
114:24,
115:18,
121:9
together
[1] - 15:3,
18:3,
36:9,
56:16,
61:9,
81:19,
83:5,
83:6,
99:5,
102:1,
113:8
tomorrow
[3] - 60:16,
87:19,
88:13
tone [1] -
23:2
took [14] -

13:8,
19:9,
23:4,
33:4,
41:14,
45:12,
66:11,
70:13,
71:8,
82:10,
107:5,
110:18,
116:3
top [11] -
7:16,
36:24,
60:2,
62:22,
66:22,
69:7,
78:1,
86:11,
99:14,
113:21
topic [3] -
12:12,
26:6,
97:14
topics [1] -
15:14
totally [1] -
49:6
touch [2] -
37:24,
45:11
toward [1] -
47:24
towards [2]
- 43:6,
48:7,
49:13,
77:11,
79:23,
79:24
township
[1] - 20:22
TRACY [1] -
1:8
Tracy [1] -
2:13
traffic [1] -
60:8
train [2] -
30:16,
30:21
training [9]
- 9:6,
9:22,
11:24,
12:7,
26:12,
29:5,
29:10,
29:24,

31:8
transcribe
d [2] -
2:18,
123:8
treat [2] -
17:2,
23:21
TRIAL [1] -
1:7
trial [1] -
2:20
trick [1] -
8:23
tried [10] -
14:25,
31:19,
31:23,
97:10,
99:8,
102:15,
103:6,
108:10,
108:23,
120:10
triggered
[1] - 107:2
triggers [1]
- 69:19
trouble [1] -
70:9
true [1] -
123:8
trusted [2] -
57:6,
57:13
truthfully
[1] - 54:12
try [21] -
13:13,
17:24,
18:3,
22:17,
23:21,
24:4,
32:5,
34:11,
36:13,
37:24,
60:2,
86:4,
102:11,
103:8,
108:20,
111:2,
113:15,
118:13,
119:22,
120:21
trying [20] -
15:15,
18:2,
29:7,
30:17,

32:24,
48:1,
54:1,
72:12,
79:11,
81:9,
81:18,
97:20,
98:13,
103:11,
104:2,
109:13,
109:19,
109:20,
113:13
Tuesday [1]
- 40:5
turn [9] -
34:1,
47:13,
60:20,
63:5,
84:10,
86:7,
98:24,
107:10,
112:13
turned [2] -
85:7
twice [1] -
108:14
two [26] -
15:6,
22:12,
32:2,
35:13,
35:14,
36:7,
37:12,
39:5,
43:9,
43:10,
44:25,
48:9,
49:15,
49:18,
54:10,
71:5,
78:18,
87:10,
89:16,
90:9,
90:20,
98:25,
103:21,
110:18,
115:23
type [3] -
22:17,
80:21,
117:16
types [3] -
15:14,

38:15,
108:19
typing [3] -
55:13,
116:24,
117:15

**U**

um-hum [2]
- 7:1,
112:23
unauthoriz
ed [1] -
77:4
under [6] -
13:9,
49:6,
74:2,
77:5,
82:22,
112:21
underneat
h [3] -
115:5,
116:17,
117:18
understoo
d [2] - 8:6,
101:3
unfair [2] -
49:7,
107:21
Unfortunat
ely [1] -
41:2
unfortunat
ely [1] -
55:10
Unit [1] -
9:20
UNITED [1]
- 1:1
University
[1] - 12:5
Unlawful
[1] - 4:4
unmodifie
d [2] -
74:12,
76:19
unpalatabl
e [1] -
26:22
up [43] -
16:4,
16:23,
17:22,
18:15,
19:7,
27:19,
38:10,
42:24,
44:16,

50:16,
54:25,
58:6,
59:17,
59:20,
59:21,
60:1,
60:7,
60:9,
51:19,
62:2,
68:22,
69:3,
72:23,
76:9,
80:24,
81:7,
81:17,
82:18,
84:13,
85:20,
86:11,
88:17,
90:18,
92:13,
92:17,
94:21,
96:9,
99:15,
102:22,
111:24,
116:24,
118:20,
119:22
update [1] -
90:4
ups [1] -
118:18
upset [22] -
42:19,
50:21,
50:23,
54:16,
54:19,
61:20,
69:5,
78:2,
82:19,
82:21,
83:19,
85:11,
86:25,
87:16,
87:24,
87:25,
88:10,
88:19,
88:23,
91:4,
91:18,
114:19

**V**

vacancy [1]
- 33:17
VALLEY [1]
- 1:6
Valley [18] -
1:8, 1:10,
1:11,
1:18,
6:15,
6:25,
7:24, 8:1,
8:4, 25:4,
29:4,
31:3,
32:20,
33:21,
51:1,
57:15,
84:7, 84:8
vandalism
[3] - 74:20,
77:6,
79:18
various [2]
- 9:17,
53:10
vent [1] -
22:7
veracity [2]
- 26:3,
26:9
verbal [2] -
10:10,
74:20
verbalize
[1] - 7:2
verbally [4]
- 69:1,
69:6,
69:10,
78:3
versus [11]
- 11:16,
12:19,
19:1,
19:24,
21:17,
22:4,
22:15,
72:18,
95:20,
96:12,
97:16
Vet [2] -
84:7, 84:8
via [3] -
37:19,
40:4,
104:9
video [49] -
17:1,
17:6,

30:13,
30:16,
30:21,
40:23,
41:7,
41:10,
42:6,
42:20,
42:21,
43:1,
43:3,
43:7,
43:12,
43:13,
43:25,
47:7,
47:8,
47:15,
47:17,
47:23,
47:25,
48:6,
48:7,
48:10,
48:24,
49:12,
49:18,
49:23,
50:12,
50:14,
51:23,
53:23,
56:18,
57:3,
115:3,
116:1,
116:4,
116:6,
116:10,
116:13,
116:15,
117:10,
118:5,
120:8
Vincent [1]
- 3:23
VINCENT
[1] - 1:3
Vinny [6] -
5:10,
57:19,
94:2,
94:13,
94:17,
104:15
violation [3]
- 14:25,
73:24,
74:15
visible [1] -
69:4
visibly [2] -
61:20,
78:1

16 sheets

Joint Appendix00197

visit [1] - 114:24
visited [1] - 86:3
visits [1] - 25:12
vocalized [1] - 63:22
voiced [1] - 37:12
vs [1] - 1:5

## W

wait [5] - 42:10, 74:3, 78:7, 87:19, 120:24
waiting [2] - 42:12
waive [1] - 2:18
wake [4] - 59:20, 59:21, 60:1, 60:7
walk [4] - 35:4, 71:22, 88:2, 98:22
walked [1] - 80:25
wanna [2] - 68:15, 82:17
wants [4] - 13:21, 68:17, 86:15, 114:17
WARNER [1] - 2:7
warranted [1] - 18:21
watch [1] - 43:13
ways [1] - 22:13
weasel [2] - 88:8, 91:10
Wednesday [1] - 66:23
week [7] - 32:20, 40:23, 56:13, 86:4, 90:7, 90:12,

103:21
weekend [2] - 44:5, 116:3
weeks [1] - 39:12
weigh [1] - 12:18
welfare [1] - 73:22
well-being [1] - 101:9
wet [1] - 32:25
whatnot [1] - 94:12
whatsoever [1] - 86:17
whole [4] - 18:4, 18:11, 80:2, 116:7
Wilkes [1] - 12:5
wishes [1] - 11:21
Witness [11] - 28:22, 30:2, 34:4, 34:7, 55:17, 60:22, 61:2, 66:24, 73:11, 78:10, 121:4
witness [9] - 2:19, 5:3, 63:7, 66:2, 67:2, 112:15, 114:12, 123:5, 123:8
WITNESS [22] - 3:2, 14:4, 27:7, 35:22, 50:20, 55:15, 55:18, 67:17, 68:15, 74:25, 77:21, 78:11, 78:24,

79:2, 84:1, 89:21, 89:25, 90:2, 96:2, 96:15, 112:1, 118:23
woke [3] - 59:17, 60:9, 61:19
wondering [1] - 48:23
word [11] - 19:22, 25:5, 39:10, 61:21, 70:9, 84:9, 85:10, 85:17, 90:11, 108:5, 113:23
wording [1] - 90:7
words [10] - 8:19, 29:5, 63:3, 69:6, 76:3, 80:8, 82:9, 91:2, 98:13, 106:17
work-related [1] - 8:13
world [3] - 23:10, 97:8, 109:18
wow [1] - 84:3
write [3] - 40:20, 55:18, 117:16
writes [4] - 69:1, 69:17, 69:23, 80:12
Written [1] - 3:22
written [4] - 69:8, 74:20, 101:11,

119:24
wrote [14] - 60:24, 66:19, 67:21, 69:21, 71:13, 92:18, 96:20, 104:7, 112:18, 113:20, 117:22, 118:24, 119:18, 120:12

## Y

year [28] - 24:1, 32:3, 33:2, 33:4, 33:8, 33:11, 33:24, 38:4, 41:24, 52:4, 52:5, 52:7, 52:9, 52:15, 53:15, 58:6, 63:10, 96:5, 96:9, 101:1, 109:2, 110:17, 110:18, 110:23, 111:3, 111:4, 111:9
years [14] - 7:13, 7:14, 13:18, 14:9, 23:24, 29:20, 48:3, 52:2, 63:25, 67:9, 90:20, 110:11, 110:17, 111:10
yelled [1] - 81:7

yelling [1] - 86:24
yesterday [9] - 50:1, 115:22, 118:25
younger [1] - 24:18
yourself [2] - 30:6, 121:7

## Z

zone [1] - 15:15

Joint Appendix00198

Case 5:19-cv-01873-MAK   Document 64   Filed 01/13/20   Page 55 of 186
Case 5:19-cv-01873-MAK   Document 54   Filed 12/05/19   Page 55 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 52 of 181

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3    JORDAN ECK, HALEY           :
     HARTLINE and VINCENT        :
4    FERRIZZI,                   :
                    Plaintiffs   :   NO. 5:19-CV-01873-MAK
5                                :
                                 :
6              vs.               :
                                 :
7    OLEY VALLEY SCHOOL          :
     DISTRICT; TRACY SHANK,      :
     individually and as        :   JURY TRIAL DEMANDED
8    Superintendent of the      :
     Oley Valley School         :
9    District; CHRISTOPHER M.    :
     BECKER, individually and    :
10   as Principal of Oley       :
     Valley High School; and    :
11   STACEY LYONS,              :
     individually and as        :
12   employee of Oley Valley    :
     High School,               :
13                  Defendants   :

14   _____

15            DEPONENT:  STACY LYONS

16
              DATE AND TIME:  Monday, November 11, 2019
17                            at 10:10 a.m.

18
              LOCATION:   Oley Valley High School
19                        17 Jefferson Street
                          Oley, Pennsylvania
20

21   _____

22
              BERKS COURT REPORTING SERVICE
23                 By: Lori A. Dilks
                 Certified Court Reporter
24                 10 Fox Glen Drive
            Sinking Spring, Pennsylvania 19608
25                   (610) 678-9984
               berkscourtreporting@gmail.com
```

1

Joint Appendix00199

```
 1    APPEARANCES:

 2
           CORNERSTONE LAW FIRM, LLC
 3         By:  Joel A. Ready, Esquire
           8500 Allentown Pike
 4         Suite 3
           Blandon, PA 19510
 5
              Representing the Plaintiffs
 6

 7
           MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
 8         By:  Sharon M. O'Donnell, Esquire
           100 Corporate Center Drive
 9         Suite 201
           Camp Hill, PA  17011
10
              Representing the Defendants
11

12
       ALSO PRESENT:
13
       Dr. Tracy Shank
14

15

16   ─────────────────────────────────────────────

17      STIPULATION:  It has been stipulated by and between
     counsel that they waive the sealing of the transcribed
18   testimony by the witness and the filing of the original
     with the Court, and all objections, except as to form,
19   until the time of trial.

20   ─────────────────────────────────────────────

21

22

23

24

25
```

                                                                2

Joint Appendix00200

Case 5:19-cv-01873-MAK   Document 86-2   Filed 01/13/20   Page 57 of 186
Case 5:19-cv-01873-MAK   Document 86-2   Filed 12/05/19   Page 57 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 54 of 181

1
2                              I N D E X

3        WITNESS                 EXAMINED BY              PAGE

4        Stacy Lyons             Mr. Ready                  4

5

6                              EXHIBITS

7

8        NUMBER                  DESCRIPTION

9          1       Letter dated March 20, 2019

10         2       Maria Jones Narrative

11         3       Discipline Referral Form

12         4       E-mail dated March 20, 2019

13         5       E-mail dated March 21, 2019 and April 25,
                   2019
14
           6       Initial Evaluation Form for Jordan Eck
15                 dated 2/22/19, with attachments

16         7       Teacher Input Form, with attachments

17         8       Letter dated March 27, 2019, with
                   attachments
18
           9       E-mail chain dated 3/24/19
19
          10       Discipline Referral Form for Jordan Eck
20
          11       Discipline Referral Form for Jordan Eck
21
          12       Joint Report of Rule 26(f) Conference
22
          13       Letter dated May 9, 2019
23
          14       Prior Written Notice for Initial
24                 Evaluation and Request for Consent Form
                   for Vincent Ferrizzi
25
          15       Newsies Cast Members List                        3

Joint Appendix00201

| NUMBER | DESCRIPTION |
|--------|-------------|
| 16 | Memorandum dated March 21, 2019 |
| 17 | Section 220, Student Expression/Distribution and Posting of Materials |
| 18 | Section 233, Suspension and Expulsion |
| 19 | Section 248, Unlawful Harassment |
| 20 | Section 252, Bullying and Cyber Bullying |
| 21 | May 19, 2019 Required Information |
| 22 | E-mail dated March 19, 2019 |
| 23 | E-mail dated March 20, 2019 |
| 24 | E-mail dated March 20, 2019 |
| 25 | E-mail dated March 21, 2019 with handwritten notes |
| 26 | E-mail chain starting March 25, 2019 |
| 27 | E-mail chain starting April 2, 2019 |
| 28 | E-mail dated April 24, 2019 |
| 29 | E-mail dated April 24, 2019 |
| 30 | OVSD Code of Conduct |
| 31 | Text messages |

4

Joint Appendix00202

**Page 5**

```
1              P R O C E E D I N G S
2                  STACY LYONS
3   was called as a witness and, having been first duly sworn
4   by the Reporter-Notary Public, was examined and testified
5   as follows:
6   BY MR. READY:
7        Q.    Good morning.
8        A.    Good morning.
9        Q.    My name is Joel Ready, and I think, as
10  you're aware, I represent the Plaintiffs in this case
11  against the School District and yourself.
12       A.    Yes.  Correct.
13       Q.    So if I refer to the Plaintiffs
14  throughout this deposition, you'll know I'm referring to
15  Jordan Eck, Haley Hartline and Vinny Ferrizzi; correct?
16       A.    Correct.
17       Q.    I've put a binder in front of you and
18  Counsel, as well, and I'd ask you to look behind Tab 4,
19  which is where we'll start today.  And I will provide one
20  to the Court Reporter, as well, 'cause it's just simpler.
21  I'm going to ask you to take a look at Exhibit 4.
22       A.    (Witness complies.)
23       Q.    Do you recognize this document?
24       A.    Yes, I do.
25       Q.    Did you send this e-mail?
```

**Page 6**

```
1        A.    I did.
2        Q.    Who did you send this e-mail to?
3        A.    A small handful of parents.
4        Q.    I'm going to kind of walk you through
5   this e-mail.  In here it says in that first line -- could
6   you read that second sentence for us?
7        A.    What do you mean, I have spent?
8        Q.    Correct.
9        A.    I've spent the last two months shielding
10  the kids from some very horrible stuff happening behind
11  the scenes with a student.
12            MS. O'DONNELL:  Just so that we're -- it
13  starts, I need your help, I've spent the last two months
14  shielding, that's where you want her to start?
15            MR. READY:  Yes.
16            THE WITNESS:  I've spent the last two months
17  shielding the kids from some very horrible stuff happening
18  behind the scenes with a student and his mother.
19  BY MR. READY:
20       Q.    What were some of the very horrible stuff
21  that was happening behind the scenes?
22       A.    At this point, when this was written in
23  March, I had been being confronted often about doing
24  additional shows because a particular student in his
25  understudy role wanted the opportunity to add an
```

**Page 7**

```
1   additional show so that he could perform.
2        Q.    That show, that was an understudy show.
3   Is that right?
4        A.    He was looking for an understudy show.
5        Q.    So the show that he wanted to add was a
6   show that would allow the students in understudies to
7   perform?
8        A.    Correct.  And we had about three or four
9   students that were actually understudies.  We did not
10  have understudies for every student.
11       Q.    You had done some understudy shows in the
12  past.  Is that right?
13       A.    I only did one show with an understudy
14  show, and that was because of the type of show it was.
15  It was based on seven different stories with two people
16  on stage at a time, a couple of the scenes had three, so
17  it was very, very easy to allow more children to have the
18  experience of learning the script, getting the blocking
19  down.
20            So we offered that as an opportunity because
21  we were basically able to double almost every child in it,
22  and that allowed more people to participate.
23       Q.    And that was the prior semester; correct?
24       A.    That was in the fall.  Correct.
25       Q.    So what other very horrible stuff was
```

**Page 8**

```
1   happening?
2        A.    There had been a lot of reports of
3   bullying amongst students, things like that.  And at this
4   point, it was -- I was just directing students to the
5   Administration and Dr. Shank on anything that they would
6   hear or see.
7        Q.    What sort of bullying was taking place?
8        A.    Just continual talk about people do not
9   deserve the parts they got.
10       Q.    I'd like you to read the next sentence
11  starting with unfortunately.
12       A.    You would like me to; is that correct?
13       Q.    Yes.
14       A.    Unfortunately, this situation has
15  escalated to the point that this student posted something
16  against another student and police were called in.
17       Q.    This reference to a student posting
18  something against another student, what is that in
19  reference to?
20       A.    So that is in reference to a Snapchat or
21  Instagram -- I'm not sure which one it was -- in which
22  Jordan and Haley Hartline had posted.  Jordan asked me
23  actually after the Board meeting when he came to speak
24  with me, he brought that situation up.  He said that they
25  were just trying to be funny.  And I said I'm -- this is
```

Joint Appendix00203

1  what I'm being told, I said.  And he said, I'll show it
2  to you.  And I said, I don't want to see it, this is not
3  my place, that's something for you and the parents to
4  worry about.
5       Q.  So at the time that you sent this e-mail,
6  you had not seen the video?
7       A.  I had not visually seen it.
8       Q.  So what were you basing this statement
9  that he had posted something against another student on?
10      A.  So that was based on a student's mother
11  contacting me and saying what had just occurred.  And
12  then also, when I was at the school, two students telling
13  me that they saw it.
14      Q.  What student's mother told you this?
15      A.  Jared Mazeika, M-A-Z-E-I-K-A.
16      Q.  Who are the students who told you they
17  had seen it?
18      A.  Conner Alexander and at that point in
19  time it was -- I think it was Olivia, Olivia Wagner.
20      Q.  These students told you that it had been
21  posted against another student?
22      A.  They saw the video, and they took it as
23  rather threatening, as well.  And that's where it was
24  like you need to talk to Administration.
25      Q.  I'm going to show you this video.  I'll

9

1       A.  Okay.
2       Q.  That way we can let her take things down.
3  Probably both of us will occasionally have to slow down.
4  Those people who are naturally fast talkers can make it
5  hard for the Court Reporter.  She's a fast typer, but
6  I'll just ask you to try to moderate your speed as we go.
7       A.  Okay.
8       Q.  If at any point I ask you a question and
9  you don't understand the question, you can feel free to
10  let me know that you want more clarification.  Okay?
11      A.  Okay.
12      Q.  And other than that, if you need to take
13  a break, that's perfectly fine, just let us know.  I'll
14  just ask that you finish the question we're on at the
15  time.  Okay?
16      A.  Okay.
17      Q.  I'm going to show you this video that was
18  posted to Snapchat and ask you to watch it.
19      A.  Before you push that button, what is the
20  purpose of me watching the video?
21           MS. O'DONNELL:  You're not in any position
22  to ask a question.  You just answer.
23           THE WITNESS:  Okay.
24           MS. O'DONNELL:  I do the objecting, and I've
25  already put an objection on the record.

11

1  turn this around so Counsel can see it, as well.
2           MS. O'DONNELL:  Is this the Jordan and
3  Haley --
4           MR. READY:  This is the fruit video.
5           MS. O'DONNELL:  The fruit video.  And why
6  are you showing -- I'm going to object because she said she
7  never saw it before.
8           THE WITNESS:  Yeah, and I don't know --
9           MS. O'DONNELL:  He didn't give her any
10 instructions, so she doesn't know.
11          MR. READY:  Sure, we can back up and do a
12 few instructions.
13          MS. O'DONNELL:  Maybe we should.
14 BY MR. READY:
15      Q.  Have you ever had your deposition taken
16 before?
17      A.  No, I have not.
18      Q.  So you can scratch this off your bucket
19 list after today.
20      A.  Not on my bucket list.
21      Q.  Understood.  As we do this, of course,
22 Ms. Dilks will be taking everything down that we say.  So
23 I'll ask you to let one person talk at a time.  If I'm
24 asking a question, let me finish.  I'll try to let you
25 finish your answers, as well, before I jump in.

10

1           (Video played.)
2  BY MR. READY:
3       Q.  Now that you've seen this video, do you
4  agree with your previous statement that it was a
5  threatening video?
6           MS. O'DONNELL:  Object to the form of the
7  question.  Calls for speculation.
8  BY MR. READY:
9       Q.  You can answer.  Do you agree that this
10 is a threatening video still?
11          MS. O'DONNELL:  Still same objection.
12 You're asking for her personal opinion.
13 BY MR. READY:
14      Q.  You can answer subject to that objection.
15      A.  I don't have anything to say.
16      Q.  You don't have anything to say.  You've
17 seen the video just now?
18      A.  Just now I saw the video.
19      Q.  Do you believe that that video
20 constituted a threat against anyone else?
21          MS. O'DONNELL:  Object to the form.  You can
22 answer.
23          THE WITNESS:  I don't know.
24 BY MR. READY:
25      Q.  Is there something in there that you

12

Joint Appendix00204

1 think sounded menacing?
2      MS. O'DONNELL: Object to the form. You can
3 answer.
4      THE WITNESS: I don't know.
5 BY MR. READY:
6      Q.   You don't know whether anything in there
7 sounded menacing. Why is that? Is there something in
8 there that was ambiguous?
9      A.   Being the first time I've seen that, I
10 don't know what it's about.
11      Q.   When you had this video reported to you
12 that this was a threat against another student -- first
13 of all, who was supposed to have been threatened by this
14 video?
15      A.   It would have been Jared Mazeika, one of
16 their students.
17      Q.   Did you ask any of the people who
18 reported this to you to show you the video?
19      A.   No, I did not.
20      Q.   Why not?
21      A.   Because I asked them to report it to Dr.
22 Shank and Mr. Becker.
23      Q.   So your testimony is, as you sit here
24 today, you can't recognize whether there's a threat in
25 that video or not?

13

1      A.   I was told there was a threat.
2      Q.   Having seen it now, do you think there
3 was a threat?
4      MS. O'DONNELL: Object to the form. You can
5 answer.
6      THE WITNESS: I don't know.
7 BY MR. READY:
8      Q.   What information would you need to know
9 whether it was a threat or not?
10      A.   I guess I would need to consider context
11 at the time, and that was a long time ago.
12      Q.   What sort of things in the context play
13 into whether this video was a threat or not?
14      A.   Either the timing of the video itself,
15 maybe activities that were going on before the video that
16 I would not be aware of between the students or even
17 after the video.
18      Q.   So I take it from what you're saying --
19 and you tell me if I'm phrasing it correctly -- that this
20 video on its face doesn't constitute a threat, but maybe
21 with other circumstances it did?
22      MS. O'DONNELL: Object to the form of the
23 question. You can answer.
24      THE WITNESS: Based on the fruits that were
25 chosen, they are -- the one student is deathly allergic to

14

1 those particular fruits. So is it coincidence? Maybe.
2 BY MR. READY:
3      Q.   So Jared is allergic to the fruits in the
4 video?
5      A.   Those three specifically.
6      Q.   When did you become aware of Jared's
7 allergy?
8      A.   When his mother called and said that
9 this just happened and he's very upset, and she said
10 these are the three that he is allergic to.
11      Q.   You didn't know that Jared was allergic
12 to them?
13      A.   No.
14      Q.   You know the Mazeika family fairly well;
15 correct?
16      A.   They've been part of the program and
17 volunteering their time on weekends to build sets and
18 things like that for the last three and a half years.
19      Q.   You've spent some time outside of that,
20 as well, with them, correct; gone to dinner occasionally
21 or seen them in social functions?
22      A.   Not at social functions, but like at
23 dinner when we go out with many of the parents that help
24 out.
25      Q.   So during all that time you've also

15

1 directed Jared for four years in drama; correct?
2      A.   Correct.
3      Q.   So during that time you had never become
4 aware that Jordan was allergic to any of these fruits?
5      MS. O'DONNELL: Object to the form. You
6 said Jordan.
7 BY MR. READY:
8      Q.   I'm sorry. Thank you. You've never
9 become aware that Jared was allergic to any of these
10 fruits?
11      A.   No.
12      Q.   So you said here in your statement that
13 the police were called in, in this e-mail.
14      A.   Correct.
15      Q.   Did you call the police?
16      A.   I did not.
17      Q.   Who did?
18      A.   Mrs. Mazeika.
19      Q.   And did you speak with any Police
20 Officers in this matter?
21      A.   I did not.
22      Q.   Do you know what the police investigated
23 in this matter?
24      A.   Not totally, no.
25      Q.   Other than that she called the police,

16

| | |
|---|---|
| | |

1   are you aware of anything further in regards to --
2       A.   I just know that they --
3       Q.   In regards to the police, do you anything
4   other than that she called them?
5       A.   She called them and they came to the
6   school.
7       Q.   You're aware that they came to the
8   school. Is that right?
9       A.   Correct.
10       Q.   And whom did you learn that from?
11       A.   Mrs. Mazeika and Dr. Shank.
12       Q.   What did they tell you about that?
13       A.   That they came and did a report.
14       Q.   They filed a Police Report?
15       A.   Correct.
16       Q.   Did you speak to Jordan about any of
17   this?
18       A.   The only conversation I had with him
19   regarding the video was when he brought it up after the
20   Board meeting when he came to talk to me.
21       Q.   And you said you referred all of this to
22   Administration. I take it you didn't attempt at this
23   point to do any mediation between Jordan and Jared. Is
24   that correct?
25       A.   I did not.

17

1       Q.   You didn't call them in and say, let's
2   watch this video and discuss it?
3       A.   No.
4       Q.   Why not?
5       A.   One, because I'm not a co-curricular
6   person. I'm not a full-time teacher here. I do this and
7   I have 47 other students that are there to have rehearsal
8   and to not having me take time out of their time to get
9   ready for a show dealing with that, and it became Dr.
10   Shank and Mr. Becker to handle.
11       Q.   What did you think that the parents were
12   going to think by this statement that it had escalated, a
13   student had posted something against another student and
14   police were called in?
15       A.   To be aware that we have students
16   behaving in a manner that is not correct, and we need to
17   make sure that we're handling the situation, obviously,
18   through the school. The school is handling it.
19       I think that was ultimately -- as I said, it
20   had just gotten to that point, and it never should have.
21       Q.   You were aware that Jordan had felt
22   bullied by some of the things Jared had said, as well;
23   correct?
24       A.   No. I am not aware of that.
25       Q.   Were you aware that Haley had said that

18

1   she had a binder thrown at her by Jared at one point?
2       A.   I am aware of that situation, yes, but
3   it was not thrown at her. It was thrown on a desk, from
4   what I was told.
5       Q.   Who told you that?
6       A.   Jared Mazeika.
7       Q.   So you confronted Jared about this
8   claim --
9       A.   I asked him what happened. Yes.
10       MS. O'DONNELL: You have to wait until he's
11   finished completely with his question before you begin to
12   answer.
13   BY MR. READY:
14       Q.   I know this goes against normal
15   conversational tone. Depositions are difficult. But
16   we'll try to finish each statement as we go. Haley told
17   you that Jared had thrown a binder at her; correct?
18       A.   She texted me. Yes.
19       Q.   And then you spoke with Jared about it?
20       A.   Yes.
21       Q.   Why did you speak with Jared about it?
22       A.   Because I wanted to understand both
23   sides of the story.
24       Q.   Why did you not do that with this video?
25       A.   The video I was not aware of until the

19

1   Board meeting timeframe. And again, from my
2   understanding, there was no video. It was something on
3   Snapchat, so it would disappear.
4       Q.   So on March 20th, 2019, you learned about
5   the video for the first time?
6       A.   Yes.
7       Q.   And you sent this e-mail -- it says you
8   sent it at 12:17 a.m. Does that sound correct?
9       A.   Yes, it is.
10       Q.   So when roughly did you learn -- if I'm
11   not mistaken, that's right after midnight, correct, that
12   you sent this e-mail.
13       A.   Correct. It's after midnight because a
14   lot of the work that I do once I leave the school at 10,
15   11 o'clock at night, I then have to do other work in the
16   evening.
17       Q.   So when did you learn about the Snapchat
18   video?
19       A.   I can't tell you exact time.
20       Q.   Would it have been earlier in the evening
21   on the 19th?
22       A.   Possibly.
23       Q.   And during that time you were with Jordan
24   at rehearsal; correct?
25       A.   I don't recall that we were together at

20

Case 5:19-cv-01873-MAK   Document 48-2   Filed 01/13/20   Page 63 of 186

1  the time.
2      Q.   You did not seek to contact him to get
3  his side of the story on this video?
4      A.   No, because it was something between the
5  parents.
6      Q.   I'm going to draw your attention to,
7  again, this statement the police were called in.  Why
8  were you telling all of the parents that you were
9  e-mailing this fact?
10      MS. O'DONNELL:  Object to the form.  She
11  said there were five people.
12  BY MR. READY:
13      Q.   I'm sorry, I may have missed that.  You
14  said you sent this to five people?
15      A.   I sent it to a handful of people.
16      Q.   A handful of people.
17      A.   Correct.
18      Q.   Do you know how many?
19      A.   Not off the top of my head, no, but it
20  was about a handful, so five or six.
21      Q.   Five or six.  Okay.  Who do you remember
22  sending it to?
23      A.   It would have gone to Mrs. Wagner, the
24  Conrads -- again, I'd have to go back and look.
25      Q.   Why were you telling these parents the

21

1  police were called in?
2      A.   'Cause it was where the situation had
3  escalated.  In my mind, we had hit pretty high up on the
4  escalation realm.
5      Q.   You mentioned in the next sentence, This
6  mother and her son want me fired and in the mother's
7  words -- and you're referring to Tara Eck.  Is that
8  right?
9      A.   Correct.
10      Q.   And in Mrs. Eck's words, she --
11      A.   But her name is not listed there.  But,
12  yes, that is who I'm referring to.
13      Q.   And I'll use your words, in the mother's
14  words, quote, she is going to destroy me, end quote.
15  When did Mrs. Eck say that to you?
16      A.   Mrs. Eck told Dr. Shank that.
17      Q.   Do you know when?
18      A.   That was on that Monday or Tuesday of
19  that week.
20      Q.   What was this in the context of?
21      A.   In a meeting that they had with Mrs. Eck
22  here.  I was not part of that conversation.
23      Q.   Here being the high school?
24      A.   Correct.
25      Q.   You said all of this escalation and Mrs.

22

1  Eck wanting to get you fired -- unnamed Mrs. Eck wanting
2  to get you fired -- all of this because her son was not
3  cast as Jack.  Who tried out for Jack?
4      A.   I'd have to go back and look at my
5  notes.  It's from a year ago, but there were several
6  people that tried out for Jack.
7      Q.   It was just Jordan and Jared; correct?
8      A.   At the end, the two that were up against
9  each other in the end -- we go through regular auditions
10  and then we do call-backs, and the call-backs are
11  typically a slimmed down list of people.
12      Q.   You mentioned earlier when we discussed
13  the very horrible stuff happening behind the scenes, you
14  mentioned that a lot of it was bullying because of this
15  role of Jack, because of who got the role; correct?
16      A.   It was more then that.  There were other
17  people that were also bullying other people in different
18  parts.
19      Q.   Who?
20      A.   Haley Richard was bullying Grace, who
21  had been given the part of Catherine that she wanted.  So
22  it went beyond even what Eck or Haley or Vinny were
23  doing.  It wasn't just to Jared.  It was to others.
24      Q.   You said that all of this escalation
25  happened because Jordan was not cast as Jack.  Is that an

23

1  accurate statement?
2      A.   A student was not cast as Jack, yes,
3  that's what I wrote.
4      Q.   Is that why all of this escalation
5  happened?
6      A.   I have no other reason why any of this
7  escalation wouldn't have happened.  I ended a fall play
8  with students writing me beautiful letters on how
9  wonderful it's been.  These three, in particular, saying
10  thank you for believing in me, thank you for being the
11  best mom, thank you for an awesome show and a wonderful
12  experience.
13      And how I can go from November 10th, getting
14  those letters from those three to all of a sudden after
15  three and a half years of working with these kids very, very
16  closely and giving them lots of great opportunities in which
17  they have acknowledged, to all of a sudden turn around and
18  -- it was a tough environment for not only myself, but the
19  other students to have kids that were having a difficult
20  time accepting them, the part that they did get.
21      Q.   Let's go back into November and December
22  of 2018.  There were some complaints at that time, I
23  guess, about the audition schedule.  Is that right?
24      A.   Not that I'm aware of.
25      Q.   I believe you said not that I'm aware of?

24

Joint Appendix00207

1    A.    Not that I'm aware of, no.

2    Q.    Did anyone approach you in December or
3 January about concerns about the audition schedule or the
4 late nights that things were being released or anything
5 like that?

6    A.    No.

7    Q.    Were there any other concerns brought to
8 your attention about your management of the school play?

9    A.    No.

10    Q.    No concerns brought about rehearsal
11 times?

12    A.    No.

13    Q.    So as of the time that you sent this
14 e-mail, you believed that all of the escalation was
15 simply because one student did not get the role he
16 wanted?

17    A.    I would say yes.

18    Q.    You mentioned that you had been working
19 closely with Dr. Shank and the Administration since
20 January. What had you been working closely about?

21    A.    I was letting them know the
22 conversations that were either happening or things that
23 were happening at rehearsal that I was uncomfortable in
24 myself being able to deal with on my own.

25    Q.    What sort of things were you bringing to

25

1 their attention?

2    A.    For example, Jordan Eck in a rehearsal
3 -- we were doing blocking for a particular scene with all
4 of the Newsies; and as I was blocking, I would have Jared
5 Mazeika stand in his spot, Vinny was supposed to stand
6 next to him, Vinny would step over and come over to the
7 left of him or the right of him and not be next to him
8 and Jordan would come, he would not stand next to him
9 either and would actually sit on the floor and would then
10 continue to miss his lines to the point that the other
11 students started saying his lines for him. I had to ask
12 him why, what he was doing. And he said, well, I'm just
13 tired.

14          So it became a situation that I was feeling
15 very uncomfortable, that I was being very disrespected. The
16 entire cast was being disrespected all because they didn't
17 want to play their part.

18    Q.    And they told you that, that's why they
19 were doing it?

20    A.    They did not say why they were doing it.
21 It was their actions that was making me feel that way.

22    Q.    You mentioned that the parents at issue
23 in this situation had made friends with Mrs. Zackon on
24 the school Board. Is that right?

25    A.    That's correct.

26

1    Q.    And you said it's helping to fuel the
2 fire. What fire is this a reference to?

3    A.    Having a School Board member who is
4 behind the scenes working with a parent and actively
5 going against an Administration and a Co-Curricular
6 person, they were fueling the fire.

7    Q.    You sent this to a group of parents who,
8 I take it, were fairly involved in the school show?

9    A.    Yes.

10    Q.    There's no doubt that any of them would
11 have misunderstood who you were referring to in this
12 e-mail, is there?

13    A.    I don't know.

14    Q.    Did you believe they would know who you
15 were referring to?

16    A.    No. Not necessarily, no.

17    Q.    You didn't think that the parents who
18 received this would know immediately that you were
19 referring to Jordan and Tara?

20    A.    No, I don't believe that.

21    Q.    Some of these parents had attended
22 rehearsals. Is that right?

23    A.    They had.

24    Q.    And they had been involved with the play?

25    A.    They're typically on the weekends when

27

1 the kids are not there.

2    Q.    All of these parents, of course, had
3 students in the play; correct?

4    A.    Yes.

5    Q.    So presumably if there was a problem that
6 was escalating all because of Jordan and Jared, the
7 parents all would have kind of known that back story.

8    A.    No, they would not.

9    Q.    Why not?

10    A.    Because I don't share that kind of
11 information. Much like I said in here, I've been keeping
12 things away from people because that's not something for
13 the kids to be involved in or parents to be involved in.

14          It takes away from the experience as to why
15 these kids are here and while the parents want to volunteer
16 their time, they should not be aware of these kinds of
17 things.

18    Q.    So you believe that the parents were
19 totally unaware of this situation between Jordan and
20 Jared?

21    A.    Yes, they were.

22    Q.    And you believe that they would not
23 perceive this reference to Jordan and his mother?

24    A.    I don't believe so.

25    Q.    It's no secret that Mrs. Eck and Mrs.

28

Joint Appendix00208

1 Zackon are friends; right?
2     A.   I know that now. I didn't know that
3 until this stuff started.
4     Q.   When was that?
5     A.   March time frame with the School Board
6 meeting, so it would have been prior to that.
7     Q.   You say at the end of this, We are in
8 jeopardy of losing this program. What does that mean?
9     A.   What it means in the realm of high
10 school and where they choose to put their dollars, having
11 this kind of activity going on where we have parents or
12 students causing a lot of issues, when you have a School
13 Board member and maybe two that don't really truly
14 appreciate music education type programs, like we have
15 here with the theatre program, they're very easy to cut.
16     Q.   So had you had conversations with Dr.
17 Shank or School Board members about this program being
18 cut?
19     A.   No.
20     Q.   Had anybody mentioned to you that they
21 believed that it should be cut or would be cut?
22     A.   No.
23     Q.   Had you had any conversations that the
24 future of the program was in jeopardy at this time?
25     A.   I felt it was.
<center>29</center>

1     Q.   But you hadn't heard that from anybody
2 else?
3     A.   No.
4     Q.   Did you have any conversations with
5 School Board members in advance of this meeting?
6     A.   No.
7     Q.   Did you have any conversations with them
8 after the meeting?
9     A.   No.
10     Q.   You didn't go to the meeting; correct?
11     A.   No. I had a rehearsal to run.
12     Q.   You believed that the program was in
13 jeopardy, but you didn't go to speak up about it?
14     A.   I had a rehearsal to run with these
15 kids. I didn't know what that meeting was going to be
16 about. I just knew that they were going to speak to the
17 School Board. That's all I knew.
18     I had 47 children that needed a rehearsal,
19 and we have a show to do in two and a half weeks. I needed
20 to put my time into the kids.
21     Q.   Did you contact any of the School Board
22 members at any point to express your concern about the
23 future of the program?
24     A.   No.
25     Q.   I'm going to ask you to take a look at
<center>30</center>

1 what has been marked as Exhibit 15 in your binder.
2     A.   (Witness complies.)
3     Q.   What is this document?
4     A.   This was a request that Dr. Shank had
5 asked me to do, which was just here's all of the
6 different parents that have been involved in the program.
7     Q.   When was this requested?
8     A.   This would have been requested when the
9 first lawsuit came out.
10     Q.   There's a column here that says Support
11 Program, and there's a yes, no, basically down the whole
12 list for each student and their parents.
13     A.   Yep.
14     Q.   What is that in reference to?
15     A.   That's just in reference to -- for -- to
16 help our -- the lawyers on this side understand. And one
17 of the requests was talking about when you think of the
18 parents and the kids and things like that, are there some
19 that are fully in support of what Oley does in its
20 program here and the opportunities it provides, and are
21 there some that at this point would be saying no, they
22 think it's not worthwhile.
23     Q.   What made you think that some of these
24 students thought it wasn't worthwhile?
25     A.   Well, three of them did a lawsuit.
<center>31</center>

1     Q.   You believe that means they didn't think
2 the program was worthwhile?
3     A.   Yes, I do.
4     Q.   What about the others, Grace Bertin, Lily
5 Glick, why were they not in support of the program here?
6     A.   Grace Bertin, the last week of the show
7 had -- definitely seemed to be siding, from what I was
8 hearing from students, that she was turning, I guess you
9 can say, on the show itself.
10     Q.   How was she turning on the show itself?
11     A.   Started treating other students a little
12 less respectful and talking more about Haley and Jordan
13 and what they've been through.
14     Q.   So you say talking about what they've
15 been through or talking about them, you mean speaking
16 favorably of them. Is that correct?
17     A.   Correct.
18     Q.   Speaking of their point of view
19 favorably?
20     A.   Correct. Yes.
21     Q.   And that made her not a supporter of the
22 program?
23     A.   Questionable at that point in time. She
24 was a Senior. She was graduating anyway, so....
25     Q.   You listed her here as a no, so you
<center>32</center>

Joint Appendix00209

1 believed that she didn't support the program because she
2 supported Jordan and Haley in their thoughts?
3     A.    If the lawyers wanted to contact these
4 people, this was the basic opinion on where they would
5 probably get somebody that probably wouldn't want to talk
6 to you.
7     Q.    What about Lily Glick?
8     A.    Jordan Eck worked for the Glick family.
9     Q.    So you believed that she would be against
10 the program?
11     A.    Possibly.
12     Q.    I want to refer back to Exhibit 4 for a
13 moment. We just stepped away from that, but I notice a
14 theme here. It says here in the final paragraph of
15 Exhibit 4, I'm reaching out to ask any and all parents
16 that believe in this program and students that love it to
17 please show up to the Board meeting to show your support.
18     Did you believe that Jordan, Haley and Vinny
19 did not love the program or that their parents did not
20 believe in it?
21     A.    I would say they did not believe in it.
22     Q.    Why is that?
23     A.    Because they weren't getting what they
24 wanted out of it.
25     Q.    So they went to the School Board meeting
                                    33

1 and they expressed a lot of concerns, I guess, about when
2 rehearsals started and a number of other things. I think
3 you're aware. You believe that those things made them
4 opponents, not just of your leadership personally, but of
5 the program as a whole?
6     A.    Yes, I do.
7     Q.    What is the division between your
8 leadership and the program as a whole?
9     A.    The program was built on my leadership.
10 It wouldn't exist the way it does today without my
11 leadership.
12     Q.    So you understand that opposition to your
13 leadership is, per se, it's necessarily opposition to the
14 program?
15     A.    In my mind, yes, it is.
16     Q.    Mr. Becker in an e-mail said that he had
17 multiple phone calls with several parents, including Mrs.
18 Bertin, about show times -- excuse me, rehearsal times,
19 them starting on time, how late they would go, that they
20 were still going late deep into the rehearsal process.
21 Did Mr. Becker communicate any of those parental concerns
22 to you at any time?
23     A.    No, he did not.
24     Q.    You never had conversations with Mr.
25 Becker about any concerns maybe that he had generally
                                    34

1 about the program?
2     A.    No.
3     Q.    Did you ever have conversations with Dr.
4 Shank about either parental concerns or her concerns
5 about the program and the way you were running it?
6     A.    No. She had no concerns, and the only
7 parental concerns was anything that she would mention
8 about -- with Jordan, Vinny or Haley.
9     Q.    At some point Dr. Shank told you that
10 Tara Eck was planning to attend the School Board meeting.
11     A.    Yes.
12     Q.    When was that?
13     A.    I believe it was that Monday or Tuesday
14 before.
15     Q.    So if memory serves, the School Board
16 meeting was a Wednesday. So it would have been a day or
17 two before that you were told?
18     A.    Yes.
19     Q.    And why did she tell you that?
20     A.    Because she wanted me to be aware that
21 these students were coming to speak out against me.
22     Q.    And what did she tell you to do about
23 that?
24     A.    She said to reach out to any parents
25 that want to come to the School Board meeting and hear
                                    35

1 what they have to say.
2     Q.    Did you run this e-mail by Mr. Becker or
3 Dr. Shank?
4     A.    No.
5     Q.    Did either of them help you with the
6 wording on it?
7     A.    No.
8     Q.    So after the School Board meeting, these
9 students returned to the auditorium for rehearsal;
10 correct?
11     A.    Correct.
12     Q.    Rehearsal had been going on during the
13 School Board meeting, as I understand it?
14     A.    Yes. Correct.
15     Q.    You excused students who wanted to go
16 speak at the School Board meeting?
17     A.    So I had received texts and messages
18 from a handful of students that said we just heard about
19 this School Board meeting, we would like to attend. I
20 told them they needed to come to rehearsal because I
21 always check everyone in at each rehearsal.
22     Everyone came to the auditorium. I checked
23 everyone in. And we had five people missing, two of which
24 were out sick and the other three were the three in your
25 lawsuit.
                                    36

Joint Appendix00210

1        I let them know that I was aware, because
2  some had come to me, that that School Board meeting was
3  happening, that I would excuse them because I don't have a
4  right to hold them from something if they want to also go
5  and listen, I said, but I have a rehearsal to run. Those of
6  you that would like to be excused, you may be excused.
7  Those of you that are here to rehearse, we're going to
8  rehearse and I asked them to get on stage.
9        Q.   And you expected students to contact you.
10  I mean, that was the purpose of the e-mail; correct?
11        A.   No. I didn't expect any student to
12  contact me.
13        Q.   You didn't expect students to contact you
14  for the purpose of going to the Board meeting?
15        A.   No, I did not.
16        Q.   I want to point back to the last
17  paragraph here, I'm reaching out to ask any and all
18  parents that believe in this program and students that
19  love it to please show up to the Board meeting and show
20  your support.
21        A.   This was not sent to any students.
22        Q.   So you believed this would have no effect
23  on students --
24        A.   No, I don't.
25        Q.   -- attending the Board meeting?

37

1        A.   No, I do not.
2        Q.   Why did you mention the students to show
3  up to the Board meeting then?
4        MS. O'DONNELL: Objection to form. It
5  doesn't say that. Students that love it is the way it
6  reads.
7  BY MR. READY:
8        Q.   I'll rephrase. Why did you ask -- and
9  I'll use your words -- I'm reaching out to ask students
10  that love it -- referring to the program -- to please
11  show up to the Board meeting to show your support?
12        MS. O'DONNELL: Object to the form. It
13  reads any and all parents that believe in this program and
14  students that love it.
15        THE WITNESS: The reference of students is
16  in being supportive of their student loving the program.
17  BY MR. READY
18        Q.   This doesn't say that. So is that what
19  you were trying to say?
20        A.   That's what I was saying.
21        Q.   When you read this, though, you can see
22  how this is clearly a call for parents and students that
23  love it to please show up to the Board meeting; correct?
24        A.   That would be your interpretation, not
25  mine.

38

1        Q.   So you don't believe that the parents
2  reading this e-mail would take this as an invitation to
3  bring their students to the Board meeting?
4        A.   That's not what I implied.
5        Q.   You don't believe that's what they
6  received or that's not what you were trying to say?
7        A.   That's not what I was saying.
8        Q.   You do see, though, reading this now how
9  that clearly could be misunderstood?
10        MS. O'DONNELL: Object to the form.
11        THE WITNESS: That's how you are reading it.
12  It is not how I wrote it.
13  BY MR. READY:
14        Q.   So let me ask a different question. As
15  you read it here today, do you understand how someone
16  could understand it that way?
17        A.   I'm still reading it the way I wrote it
18  and no.
19        Q.   So you do not believe this was read by
20  the parents as an invitation to bring their students to
21  the Board meeting?
22        A.   No, I do not believe that.
23        Q.   This was an invitation, you believe, to
24  only the parents that would not leak to students in any
25  way?

39

1        MS. O'DONNELL: Object to the form. Leak to
2  students, but whatever, you can answer.
3        THE WITNESS: I cannot control what a parent
4  does with their students.
5  BY MR. READY:
6        Q.   You were not trying to incite them, you
7  say, sitting here today --
8        A.   Absolutely not.
9        Q.   -- to bring their students to the Board
10  meeting?
11        A.   No.
12        Q.   You believe this e-mail would only bring
13  parents to the Board meeting and the students that love
14  it would not come to the Board meeting?
15        A.   Correct, 'cause we had rehearsal.
16        Q.   So students contacted you. Did you at
17  that point realize that your e-mail had been
18  misunderstood?
19        A.   No.
20        Q.   So students contacted you saying they
21  wanted to go speak at the Board meeting?
22        A.   They heard about the Board meeting at
23  school and wanted to attend.
24        Q.   Some of these students were the students
25  of parents you had sent these e-mails to; right?

40

Joint Appendix00211

| | |
|---|---|
| 1    A.   I don't have any clue. I'd have to go | 1   typically. |
| 2   back and look. | 2    Q.   And there are plenty of things, I'm sure, |
| 3    Q.   Who contacted you, which students? | 3   that you've been approached with over the years that's a |
| 4    A.   I don't know off the top of my head. | 4   conflict that you've said that's not a sufficient reason |
| 5    Q.   You don't recall, as you sit here today, | 5   to miss rehearsal? |
| 6   which students contacted you about missing rehearsal? | 6    A.   It's either a conflict or they just |
| 7    A.   Not off the top of my head. | 7   don't show up. |
| 8    Q.   And you believe that they didn't get it | 8    Q.   But there are times that you've told |
| 9   from their parents or this e-mail, but they got it from | 9   students that something was not important enough for them |
| 10   school somewhere? | 10   to miss rehearsal? |
| 11    A.   Yes. | 11     MS. O'DONNELL: Object to the form. |
| 12    Q.   Where would they have gotten it at | 12     MR. READY: What'S wrong with the form? |
| 13   school? | 13     MS. O'DONNELL: You're misstating all of her |
| 14    A.   Talking to other students, talking | 14   testimony. |
| 15   amongst themselves. I don't know. | 15     MR. READY: I'm not misstating her testimony |
| 16    Q.   Did you ask any of them? | 16   at all. I'm asking over the years if she has ever told |
| 17    A.   No. | 17   students that they couldn't miss rehearsal for something. |
| 18    Q.   You didn't think that maybe this e-mail | 18     MS. O'DONNELL: That question you can |
| 19   had been misunderstood? | 19   answer. |
| 20    A.   No. | 20     THE WITNESS: Tech week and the week of the |
| 21    Q.   So you excused students to go speak in | 21   show are mandatory. They need to be there. |
| 22   favor of the program and in favor of you at the School | 22   BY MR. READY: |
| 23   Board meeting? | 23    Q.   That wasn't this week; correct? |
| 24    A.   It was not for in favor of the program | 24    A.   No. |
| 25   or in favor of me. And it has never ever been about me. | 25    Q.   So outside of those mandatory times, |
| <div align="center">41</div> | <div align="center">43</div> |
| 1   They had asked if they could go and listen. I can't stop | 1   you've never told a student they couldn't miss rehearsal |
| 2   them from doing that, but I had a rehearsal to run, so I | 2   because of another obligation? |
| 3   said if you would like to go down, you may, but we have a | 3    A.   No, I have not. |
| 4   rehearsal to run. | 4    Q.   Students who came back to rehearsal, you |
| 5    Q.   So you believe that -- and I'm just using | 5   gathered everyone together -- |
| 6   your phrase -- their right to listen. Is that what you | 6    A.   I did not gather everyone together. I'm |
| 7   said? They have a right to attend the School Board | 7   sorry. |
| 8   meeting? | 8    Q.   On the evening of March 20th, after the |
| 9    A.   Just as much as those three had a right | 9   Board meeting when students returned to the auditorium, |
| 10   to say what they wanted to say at that meeting. | 10   you gathered the students together to have a |
| 11    Q.   So you believe they had a right to attend | 11   conversation. |
| 12   the School Board meeting, the students? | 12    A.   No, I did not. |
| 13    A.   If they choose to. | 13    Q.   Did the students gather then to have a |
| 14    Q.   And that trumps their obligation to be at | 14   conversation? |
| 15   rehearsal? | 15    A.   Yes, they did. |
| 16    A.   I wouldn't say it trumped it. | 16    Q.   Describe how that happens. |
| 17    Q.   What would you say? | 17    A.   The students came back in the room. A |
| 18    A.   I can't control them. I can't say, you | 18   couple of them were crying. I gave them a hug. And I |
| 19   have to sit here or be here. | 19   asked them if they were okay. And they said yes, and |
| 20    Q.   Sure; but you don't usually grant reasons | 20   then they asked if they could speak to the rest of the |
| 21   to not be at rehearsal for just anything; right? You | 21   cast. And I said that is fine, you guys can go up on the |
| 22   don't just say, okay, you're not going to be here, that's | 22   stage and do that. And I excused myself over in the pit |
| 23   fine. You normally demand an excuse, right, to decide if | 23   area. |
| 24   it's valid? | 24    Q.   Who was crying? |
| 25    A.   I just ask what the conflict is, | 25    A.   Rachael Shaner. |
| <div align="center">42</div> | <div align="center">44</div> |

1    Q.   Is that it?
2    A.   Yes.
3    Q.   Did she tell you why she was crying?
4    A.   She was crying because for her, for the
5  first time in her life, she stood up in a meeting when
6  someone said something and spoke up and said that they
7  were telling a lie.  And this child is someone that is
8  very demure and sweet and would never be confrontational
9  in any way, shape or form.  And a student had gotten up
10  and said something very, very bad.  And it really
11  bothered her and troubled her enough that she actually
12  spoke up.
13         So it was more of a couldn't believe what
14  she just did.  This one was honestly proud of herself that
15  she finally stood up for something.  I didn't ask specifics.
16  I just gave her a hug.
17    Q.   Were there students that you felt it was
18  kind of a trying experience to speak publicly like that
19  or speak in front of the School Board?
20    A.   With a School Board I'm sure it is with
21  some kids.  Other kids not so much.
22    Q.   During this meeting you locked the doors.
23    A.   The front door of the top was locked.
24  The side door was not.
25    Q.   Why was the front door at the top locked?

45

1    MS. O'DONNELL:  Object to the form of the
2  question.  Your sarcasm is not appreciated.
3    MR. READY:  Your objection is noted.
4  BY MR. READY:
5    Q.   Is that what we thought?  I'm trying to
6  understand what we thought Jordan was going to do based
7  on this video?
8    MS. O'DONNELL:  Who's we, Counsel?  Who's
9  we?
10  BY MR. READY:
11    Q.   Sure.  What did you and Mrs. Mazeika
12  think was going to happen to Jared as a result of Jordan
13  posting this?
14    A.   I didn't think anything, and I'm not
15  going to speak for Mrs. Mazeika.  She just was concerned
16  and asked if I would not mind locking that front door.
17    Q.   Do you ordinarily lock doors during
18  practice?
19    A.   The back door is always locked, and the
20  one other door is locked, and then two are not.
21    Q.   The front doors are not locked normally;
22  correct?
23    A.   Only one of them.
24    Q.   But you locked both of them this time?
25    A.   No, only one.  The one is always locked.

47

1    A.   I had a parent that had asked that they
2  please lock that door there because my back is always
3  towards the back, and it would make them feel more
4  comfortable for their student if there wasn't an easy
5  access during the meeting.
6    Q.   During the School Board meeting?
7    A.   Yes.
8    Q.   Why?
9    A.   Because of the safety for their child.
10    Q.   And this is -- who was this that asked
11  you?
12    A.   The Mazeika family.
13    Q.   They were concerned for Jared's safety?
14    A.   Yes.  And others.
15    Q.   And other students?
16    A.   Yes.
17    Q.   And why were they concerned about that?
18    A.   They were -- at this point, for them, it
19  had escalated that they were concerned for the safety of
20  their son.
21    Q.   And that's because of this video that was
22  posted?
23    A.   Yes.
24    Q.   What did we think Jordan was going to do?
25  Was he going to come in with fruit?

46

1    Q.   So you locked the second door.  One is
2  normally locked, the second one is not.
3    A.   Correct.
4    Q.   You locked the second one this time?
5    A.   In the front of the auditorium, yes.
6    Q.   Did you speak with Dr. Shank or Mr.
7  Becker about concerns about student safety at this
8  rehearsal?
9    A.   No.
10    Q.   Why did you believe that the School Board
11  meeting was a uniquely dangerous time for the students?
12    A.   I didn't say that.
13    Q.   You told me that you were asked to have
14  it locked during the rehearsal that was during the School
15  Board meeting.
16    A.   Correct.
17    Q.   And that was because you were concerned?
18    A.   I had a parent who was concerned.
19    Q.   And this was because the School Board
20  meeting was going on?
21    A.   Yes.  Correct.
22    Q.   What was it about that time that you
23  believed was unsafe for the students?
24    A.   I was trying to be kind to a parent.
25    Q.   You did not communicate any of this to

48

Joint Appendix00213

Case 5:19-cv-01873-MAK Document 84-2 Filed 01/13/20 Page 70 of 186

| | | | | |
|---|---|---|---|---|

**Page 49**

1    Dr. Shank or Mr. Becker?

2       A.    No.

3       Q.    You did not ask for security of any kind?

4       A.    Not at that point.

5       Q.    Who were they afraid was going to come in

6    and harm Jared or another student?

7       A.    I can't say. You'd have to ask them.

8       Q.    During this meeting in which that door

9    was locked after the School Board meeting, you required

10    escorts for students to go to and from the bathroom. Is

11    that right?

12       A.    No. The door was open.

13       Q.    You let them go to and from the bathroom

14    without --

15       A.    Yes.

16       Q.    -- without a parent escort?

17       A.    Yes. Correct.

18       Q.    During that conversation you and Mrs.

19    Hartenstine participated in some of the conversation that

20    the students were debriefing from the School Board

21    meeting?

22       A.    No, we did not.

23       Q.    Were you present for that conversation?

24       A.    I was in a different area of the

25    auditorium.

                   49

**Page 50**

1       Q.    Could you hear from where you were

2    standing?

3       A.    No, I could not.

4       Q.    Did Ms. Hartenstine participate in that

5    conversation?

6       A.    Absolutely not.

7       Q.    She stood with you?

8       A.    She was over in another area talking to

9    a parent.

10       Q.    So she was not, to your knowledge,

11    participating in that conversation?

12       A.    Correct.

13       Q.    Were you aware or did anyone report to

14    you that during that conversation several students said

15    that Jordan and Haley were mental?

16       A.    No, I'm not aware of that.

17       Q.    After this School Board meeting and after

18    these conversations, all the students were in rehearsal

19    at this point?

20       A.    Well, rehearsal was really done at that

21    point.

22       Q.    At that point, Jordan approached you to

23    converse with you in the hallway. Is that right?

24       A.    After Vinny had already asked to speak

25    with me in the hallway, yes.

                   50

**Page 51**

1       Q.    So Vinny asked first?

2       A.    Vinny asked first. He was the first one

3    that came down. He joined the kids on the stage. As

4    they were talking and having their conversation, Vinny

5    was present. And then the other two came in. And then

6    they were all just on the stage, dancing around because

7    we had a song playing, 'cause they wanted to do one of

8    their songs before they left. And then Jordan asked to

9    speak with me. I said, well, that would be fine, but

10    Vinny had asked to speak with me first.

11       Q.    So you spoke with Vinny privately in the

12    hallway?

13       A.    I spoke with Vinny with Mrs. Hartenstine

14    present.

15       Q.    Did you ask Mrs. Hartenstine to join, or

16    did she ask --

17       A.    I have been told by Administration that

18    I should always have someone else present.

19       Q.    Who in Administration told you that?

20       A.    Dr. Shank.

21       Q.    And specifically when talking with these

22    students?

23       A.    Yes.

24       Q.    Not when talking with other students

25    necessarily?

                   51

**Page 52**

1       A.    It's just in good nature to try to

2    always have someone else there.

3       Q.    So when any student approaches you, you

4    don't speak with them privately?

5       A.    At that time, no.

6       Q.    I'm sorry, what do you mean at that time?

7       A.    While this was going on, no.

8       Q.    You implemented a policy that you always

9    wanted someone else to be there?

10       A.    We liked someone to be there. Yes.

11       Q.    So you asked Ms. Hartenstine to join the

12    two of you?

13       A.    Yes.

14       Q.    And I understand Maria Jones also joined

15    you?

16       A.    She came down from the hallway when

17    Jordan and Haley came back into the auditorium. I texted

18    Jared Ott, who's on our facilities, and did ask that I

19    have another adult present.

20       Q.    And he selected Maria then?

21       A.    And he saw her first and said, hey, Mrs.

22    Lyons would like another adult down there, and Maria came

23    down.

24       Q.    Maria is -- what was her position in the

25    school?

                   52

Joint Appendix00214

| | |
|---|---|
| 1    A.   She's an Admin to Dr. Shank and other | 1   Hartenstine why she was being so quiet and didn't she |
| 2  things. I don't know her total title. | 2   have something to say. |
| 3    Q.   Ms. Hartenstine, her position, she's a | 3        Q.   So no, he didn't physically do anything |
| 4  teacher? | 4   to get in anyone's face? |
| 5    A.   Yes, she is. | 5        A.   No. |
| 6    Q.   And she teaches 5th grade. Is that | 6        Q.   He didn't clench his fists or move in |
| 7  right? | 7   anger toward anyone? |
| 8    A.   Yes. | 8        A.   Not that I recall. I'm sure there's a |
| 9    Q.   She also helps with the play all through | 9   video that you could probably watch and see if he did or |
| 10  the year? | 10   not. |
| 11    A.   Yes. | 11        Q.   Do you remember him lunging at anyone? |
| 12    Q.   After you finished with your conversation | 12        A.   Him, no. |
| 13  with Vinny, you called Jordan out to talk to you? | 13        Q.   Was there any point in which you felt |
| 14    A.   Correct. | 14   that he had physically crossed the line such that you |
| 15    Q.   And would you describe that conversation? | 15   felt a need to correct him? |
| 16    A.   He just talked about that he really just | 16        A.   Not physically, but verbally he did. |
| 17  wanted to hope that we can all move forward and wanted to | 17        Q.   So during that verbal -- we'll go to that |
| 18  talk a little bit about trying to start on time. And I | 18   -- you mentioned that he said to Ms. Hartenstine, you're |
| 19  let Jordan know that *I would love if we would start on* | 19   *being quiet, don't you have anything to say. Is that* |
| 20  *time,* that that requires students coming in early to help | 20   what you found offensive? |
| 21  me clear off the entire stage because the Music | 21        A.   At first it's a little offensive to have |
| 22  Department does not do that, and that we actually need | 22   a high schooler calling out a teacher. It was more |
| 23  the students also showing up on time 'cause I can't run a | 23   sounding like it was a dad talking to his child in his, |
| 24  rehearsal when people are not on time. | 24   you know, verbal sound. And Abby responded saying that |
| 25        And he agreed that he would work with the | 25   she was just listening. And from there he continued to |
| 53 | 55 |
| 1  kids as -- in his role of Drama Club President to try to get | 1   talk to her about a story that she had told the students |
| 2  the kids to make sure that they are there and ready to go. | 2   back in January about when she didn't get the part that |
| 3    Q.   During this conversation did Jordan | 3   she had hoped to have, and how another student was being |
| 4  appear angry? | 4   bullied and people were talking about the other student, |
| 5    A.   I wouldn't say he was angry. He was | 5   saying that she should have gotten the part instead. |
| 6  forthright, maybe would be a word to use. | 6        And she said that at first it hurt not to |
| 7    Q.   How was he forthright? | 7   get the part, but it became more of her worry was that her |
| 8    A.   *It wasn't a calm conversation or a nice* | 8   friend was being treated so poorly, so she moved on. She |
| 9  *conversation.* It was much more of a I really need this | 9   accepted the part. She did get a great part. And she just |
| 10  to happen type of thing. | 10   wanted to make sure her friend was okay and to have a good |
| 11    Q.   He was not calm? | 11   show. And he said that he didn't believe her. |
| 12    A.   I wouldn't say he was the calm Jordan | 12        And at one point I said, Jordan, are you |
| 13  that I would know previous in my three and a half years | 13   saying that Ms. Hartenstine is lying? And he said, well, I |
| 14  prior to that working with Jordan. | 14   just don't believe her. |
| 15    Q.   What about his physical mannerisms made | 15        Q.   So he said he didn't believe her. Is |
| 16  you believe he was not calm? | 16   that the phrasing he used? Do you remember -- |
| 17        MS. O'DONNELL:  Object to the form. Was | 17        A.   Yeah. I remember him saying he did not |
| 18  there any physical mannerisms. | 18   believe her. |
| 19  BY MR. READY: | 19        Q.   And you said, you're saying that she's |
| 20    Q.   Sure. Was there any physical mannerism | 20   lying? |
| 21  that he expressed that made you think he wasn't calm? | 21        A.   I asked him, are you saying that Ms. |
| 22    A.   Not that I can call out exactly. | 22   Hartenstine is lying, and he said, I do not believe her. |
| 23    Q.   Was there any point in which he got in | 23        Q.   Did Jordan threaten violence against you |
| 24  anyone's face during this conversation? | 24   or anyone else in the circle at any time? |
| 25    A.   He did end up verbally asking Ms. | 25        A.   No. |
| 54 | 56 |

Joint Appendix00215

1     Q.    What did you say to him regarding his
2   statement that he didn't believe her?  Did you correct
3   that?
4     A.    I don't recall exact words after that.
5   He has a right not to believe her if he doesn't want to.
6     Q.    Did you report this conversation at that
7   time to Mr. Becker or Dr. Shank and request discipline of
8   Jordan Eck?
9     A.    I did not.  I did following, when Jordan
10  -- we finished our conversation, we agreed that both of
11  us would make sure we get the kids on time into
12  rehearsals, and that we need to move forward and have a
13  great show.
14          He removed himself from the hallway, and
15  Abby walked toward my office and started bawling and was
16  physically shaking at that point in time.  I then, as Dr.
17  Shank -- at that time Dr. Shank and Mr. Becker were coming
18  down, and I asked them to please talk to Abby because she's
19  very upset with the -- I don't know what you want to call it
20  -- a conversation she just had with Jordan.
21    Q.    What was she upset about?
22    A.    She felt that she was threatened and
23  disrespected by this young man calling her a liar.
24    Q.    Did she say why she felt threatened?
25    A.    His demeanor to her was extremely strong

                                                    57

1   and authoritative.
2     Q.    His demeanor, specifically his physical
3   demeanor?
4     A.    Both vocal and, I would say, physical if
5   Abby were to describe it, but you'd have to ask her.
6     Q.    Would you describe it as physically
7   threatening?
8     A.    More vocally threatening.
9     Q.    So it wasn't anything that he did
10  physically that made you think that he was threatening
11  her?
12    A.    It was vocal.
13    Q.    I would like to turn your attention to
14  Exhibit 12 in your binder.
15    A.    (Witness complies.)
16    Q.    This document is a joint report filed by
17  your Counsel on behalf of you and the other Defendants.
18  I'll direct your attention to Page 4 of 7.  Page numbers
19  are at the top.
20          MS. O'DONNELL:  I'm going to object because
21  I put this together.  These aren't her words.
22  BY MR. READY:
23    Q.    Okay.  That's fine.  So your Counsel is
24  representing that, I think, you haven't seen this
25  document before.  Is that correct?

                                                    58

1           A.    I'm not familiar with this document.
2   No.
3     Q.    I'd like to go down to the last paragraph
4   on Page 4.  The first sentence there says:  Letting go of
5   emotions became impossible and not long afterwards
6   Plaintiff Eck became insubordinate and aggressive toward
7   one of his teachers.
8           Do you agree with that statement, that he
9   became aggressive toward one of his teachers?
10    A.    Verbally aggressive, yes, I would say
11  that.
12    Q.    So did you ever see him become physically
13  aggressive toward anyone?
14          MS. O'DONNELL:  It doesn't say that, though,
15  does it?
16          MR. READY:  I'm going to ask you not to
17  coach the witness.
18          MS. O'DONNELL:  I'm not.  I'm coaching you.
19  It doesn't say that --
20          MR. READY:  And I don't need your coaching.
21          MS. O'DONNELL:  Okay.  Well, maybe you do
22  because now you're starting to put words in my mouth on my
23  paper and asking my witness to testify against what I've
24  written in a joint case management report.  So that's
25  inappropriate.

                                                    59

1           MR. READY:  Okay.  I will agree to disagree.
2   BY MR. READY:
3     Q.    And I will ask you, did you ever witness
4   Jordan Eck become physically aggressive towards one of
5   his teachers?
6     A.    No.
7     Q.    In what ways, if any, was Jordan
8   insubordinate in the hallway that night?
9     A.    You don't talk to an adult, a teacher, a
10  respected Assistant Director that you've known for three
11  and a half years in that way and accuse them of lying.
12    Q.    So you objected to his tone of voice,
13  which you determined to be aggressive?
14    A.    I found it to be aggressive.  Yes.
15    Q.    And you objected to him saying he did not
16  believe something that she said to him during that
17  conversation or previously?
18    A.    Correct.
19    Q.    That, in your mind, is insubordination?
20    A.    It could be seen that way, yes, in my
21  mind.
22    Q.    Was there any other active
23  insubordination that you believe he committed in the
24  hallway that night?
25    A.    No.

                                                    60

1    Q.    You had no conversation with Dr. Shank
2  that night or the next day about suspending Jordan Eck?
3    A.    No.
4    Q.    You're aware that Jordan Eck was
5  suspended for a Tier 3 offense?
6    A.    I didn't know the tier. I just knew he
7  was suspended.
8    Q.    When did you learn about his suspension?
9    A.    It would have been the following day.
10   Q.    At that point, did you give any thought
11 to how your e-mail from March 20th would have affected
12 people's perceptions about that suspension?
13   A.    No.
14   Q.    Did you at any time think about
15 retracting your e-mail of March 20th?
16   A.    No.
17   Q.    Did you speak with Dr. Shank about
18 addressing the students the following day in the
19 auditorium?
20   A.    She said that they had a meeting with
21 all of the students in which they were going to let them
22 know that Jordan was no longer going to be in the show.
23 My understanding, at that meeting then they had one other
24 student decide to quit the show.
25   Q.    Did Dr. Shank talk to you about any other

61

1  purposes for that announcement?
2    A.    No.
3    Q.    Did you ask her to say anything at the
4  meeting to address the students?
5    A.    I found out after the meeting. I did
6  not know there was a meeting until after.
7    Q.    I'm going to ask you to turn to
8  Exhibit 16 in your binder.
9    A.    (Witness complies.)
10   Q.    Do you recognize this document?
11   A.    Yes.
12   Q.    When did you receive -- first of all,
13 what is this?
14   A.    This is a letter from Dr. Shank and
15 their expectations for the Production Team.
16   Q.    It's addressed to you; correct?
17   A.    To me, but expectations for the entire
18 team.
19   Q.    Addressed to you for management of the
20 Production Staff. Is that correct?
21   A.    Yes.
22   Q.    When did you receive this memo?
23   A.    I have no idea.
24   Q.    The date here says March 21st, 2019,
25 which would have been the day after the School Board

62

1  meeting. Does that sound correct?
2    A.    Well, that's what it says. I don't know
3  that I got it on that day.
4    Q.    Do you recall when you got it?
5    A.    I do not.
6    Q.    I'm going to just point your attention to
7  the first sentence of this memo: As a follow-up to our
8  conversations regarding the concerns expressed by several
9  students and parents/guardians throughout the Spring,
10 2019 musical rehearsal season, I will be summarizing the
11 expectations in this memo. The Production Team is hereby
12 directed to follow or implement the subsequent
13 expectations.
14         Did I read that correctly?
15   A.    You read the words. Yes.
16   Q.    So this seems to say or it does say that
17 this is a follow-up on conversations Dr. Shank had had
18 with you. Do you recall those conversations?
19   A.    Only conversations that I've ever had
20 with Dr. Shank were around the activities with Jordan and
21 Haley and Vinny.
22   Q.    So you had not had conversations about --
23 I'm just looking down this list -- things like making
24 sure that constructive criticism is offered?
25   A.    No. No.

63

1    Q.    You didn't have conversations with Dr.
2  Shank about rehearsals beginning and ending on time?
3    A.    No.
4    Q.    You didn't have conversations about how
5  communications must be copied to Mr. Becker and Dr.
6  Shank?
7    A.    No.
8    Q.    Did you have any conversations that, as
9  No. 6 says, you must allow parents and guardians to
10 attend practices as requested?
11   A.    No, and they've always been open.
12   Q.    As you review this, you do not believe
13 that you had any of these conversations with Dr. Shank
14 before March 21st, 2019?
15   A.    No. These look like they are in
16 response to the March 20th Board meeting.
17   Q.    And again, you don't recall when you
18 received it?
19   A.    No.
20   Q.    I want to direct your attention to the
21 second page, No. 11. I'll read it aloud.
22        MS. O'DONNELL: Wait, wait, wait. Oh, okay.
23 BY MR. READY:
24   Q.    Yeah, sure. Applications for the Drama
25 Club scholarship will be provided to the Superintendent

64

Joint Appendix00217

1 and Administration for their review and selection of the
2 successful candidates.
3 What is this Drama Club scholarship?
4 A. So when I first came in to lead the
5 program, I worked on a sponsorship program to get
6 businesses and community leaders to donate dollars to a
7 fund so that we could start to actually have performing
8 arts scholarships for children here in the Oley Valley.
9 Q. When did that begin?
10 A. That began after my first year, so back
11 in 2015.
12 Q. How much is the scholarship?
13 A. It has varied over time as we've raised
14 more money, but we're to the point that we were getting
15 towards a thousand dollars.
16 Q. And what are the criteria for the
17 scholarship?
18 A. Academic standing, so you need to be 3.0
19 and above. You also have to be, obviously, a member of
20 the Drama Club at that time. And you needed to do an
21 essay. And decide which one -- we had a non-performing
22 scholarship for those kids that are not going to go into
23 theatre, dance or acting as a career, and those kids that
24 want to -- you know, participated in the program, but are
25 going off into another field.

65

1 So we had a little less money for folks that
2 just wanted to still apply and be recognized for their time
3 in the club. And they were also teacher references.
4 Q. There were two scholarships then given
5 out each year?
6 A. Yes.
7 Q. And did you provide these applications
8 this year to Dr. Shank?
9 A. Yes.
10 Q. Who was the successful candidate
11 selected?
12 A. No idea.
13 Q. You were not involved after providing the
14 applications?
15 A. No, I just gave them -- handed them
16 over.
17 Q. Also criteria is that they have to be a
18 Senior. Is that correct?
19 A. Yes. Correct.
20 Q. Did you give any input on these
21 applications?
22 A. No.
23 Q. Who applied?
24 A. Jared Mazeika and Jordan Eck.
25 Q. Did anyone else apply?

66

1 A. No.
2 Q. And you mentioned, I guess, it sounded
3 like one of them is essentially -- and you tell me if I'm
4 summarizing this correctly -- one is a performing
5 scholarship and one is a non-performing scholarship.
6 A. So their college, university or after
7 high school plans is they are either going to pursue a
8 degree in musical theater, dance, vocal, anything to do
9 with performing arts. And the other one is for someone
10 that they are pursuing a different field of study.
11 Q. Did Jordan and Jared both apply for both
12 of these, one of these?
13 A. The first one.
14 Q. The --
15 A. Performing arts.
16 Q. They're pursuing a degree in performing
17 arts?
18 A. Correct.
19 Q. At the end of this memo it says -- the
20 second sentence of that last paragraph: It is important
21 for all parties to maintain an open, collaborative and
22 cooperative communication whereby the student's social,
23 emotional needs are addressed.
24 Did you have any conversations with Dr.
25 Shank before or after this memo about that sentence?

67

1 A. No.
2 Q. Many of these concerns were brought up at
3 the School Board meeting. Is that correct?
4 A. I guess. I was not there. There were
5 no meeting Minutes, so I have no idea.
6 Q. So you don't know?
7 A. No.
8 Q. Fair enough. Did you implement these
9 corrections?
10 A. Yes.
11 Q. When did you begin implementation of
12 these corrections?
13 A. When we started rehearsal the following
14 week.
15 Q. Okay. So --
16 A. So it would have been -- sorry -- I
17 would have received it at some point in time before that
18 following week's rehearsal.
19 Q. Did you meet with the -- first of all,
20 who is the Musical Production Team? Is that students, as
21 well?
22 A. No.
23 Q. Just staff?
24 A. It's myself, Ms. Hartenstine, Ms. Lynch,
25 who is our Choral Director, and then also Joshua

68

1  Schaeffer, who is our choreographer. So there's four of
2  us.
3       Q.  Did you meet with them about this memo?
4       A.  No.
5       Q.  Did you meet with them about the
6  expectations or concerns in this memo?
7       A.  We had conversations, but I did not go
8  through the memo.
9       Q.  At the end of the play, the cast has an
10  after party?
11      A.  Yes.
12      Q.  Do you recall the night of the after
13  party?
14      A.  Yes.
15      Q.  As I understand, it went until about 4 in
16  the morning. Does that sound correct?
17      A.  I don't think it was that late. No.
18      Q.  When did it go to?
19      A.  They traditionally go till about 3.
20      Q.  Is that about when this one went, do you
21  think?
22      A.  I think. Yeah.
23      Q.  If I refer to that night, that's a fair
24  summary including those early hours in the morning;
25  correct?

69

1       A.  That's fine.
2       Q.  During that party I understand you gave
3  out something called happy papers?
4       A.  The kids all do happy papers, and then
5  they go in their bag, and then we hand them their bag.
6       Q.  So you hand them a bag that has their
7  happy papers and something else?
8       A.  It has a program in it, it has their
9  happy papers, it has any of the candy grams that they
10  would have received for people that bought them candy
11  grams, and then flowers.
12      Q.  Happy papers, I understand, is a bit of a
13  tradition that goes back here at the school. Is that
14  right?
15      A.  Yes.
16      Q.  And describe the happy papers.
17      A.  It's something the students do in which
18  they -- each student has their name on a particular piece
19  of paper and all of the other students can come and write
20  about how much they enjoyed working with that person in
21  the show as a friend, et cetera.
22      Q.  Does that predate your time here at the
23  program?
24      A.  It started earlier, yeah, when I was a
25  volunteer.

70

1       Q.  As you hand these out to students, you
2  also give personal words of encouragement. Is that
3  right?
4       A.  Typically.
5       Q.  Is that based on your experience with the
6  student?
7       A.  Yes.
8       Q.  Based on your observations of them as an
9  actor, as a person?
10      A.  As an actor.
11      Q.  Do you also give negative feedback?
12      A.  No.
13      Q.  When giving Vinny his happy papers, you
14  told him that you'd never forgive him for what he said at
15  the School Board meeting.
16      A.  What I said is I thanked Vinny for
17  sticking with Newsies and that he did an amazing job.
18  And I called out the other parts that he had played
19  previously and how he had been absolutely great to work
20  with, but I do want him to know that the words that he
21  said I can't forgive him for 'cause they were extremely
22  hurtful. But that I also realize that he is a high
23  school student on his way off into the world, and over
24  time we sometimes look back at our past and we hopefully
25  look at it as a time that we learned and grow, and that's

71

1  what I said.
2       Q.  What words that he had said at the School
3  Board meeting did you find hurtful?
4       A.  He said that I was abusive.
5       Q.  Who told you that?
6       A.  My son and my husband, who were there.
7       Q.  You said this in front of all the
8  students; correct?
9       A.  Not all of them were there. No.
10      Q.  Who wasn't there?
11      A.  I couldn't tell you. They just weren't
12  all in that vicinity at that time. Some of them had
13  already left already.
14      Q.  So this was at the after party. Do you
15  remember about when it happened?
16      A.  No.
17      Q.  Towards the beginning, towards the end?
18      A.  Maybe towards the end. I really -- I
19  could not recall exactly.
20      Q.  We mentioned that it ended at 3, roughly.
21  Do you remember when it began?
22      A.  Probably didn't get started until about
23  11:30, 12 o'clock because we have to clean things up and
24  get things set.
25      Q.  Did you have any negative feedback for

72

Joint Appendix00219

1 any other of the students?
2    A.    No.
3    Q.    During the after party the students also
4 have the chance to make some speeches; correct?
5    A.    The Seniors like to do that.
6    Q.    And that's permitted, I guess?
7    A.    Yeah.
8    Q.    Did you witness Jared Mazeika's speech?
9    A.    I only heard the beginning of his speech
10 and then got distracted by other activities that were
11 going on between Vinny and his girlfriend.
12    Q.    And what was that?
13    A.    Vinny had gotten up out of his chair and
14 went over and started texting things into his phone. And
15 his girlfriend saw that he did that and started bawling
16 and ran out of the auditorium, so I was dealing with
17 other things at that point.
18    Q.    She started bawling because he was
19 texting?
20    A.    Yes.
21    Q.    Did you speak with her about it?
22    A.    I just told her I'm sorry that she's
23 feeling this way.
24    Q.    Feeling what way?
25    A.    That she was crying.

73

1    Q.    And so her crying, you believed, was
2 because he was texting?
3    A.    Yes.
4    Q.    Did she tell you that's why?
5    A.    No.
6    Q.    Did you ask her why she was crying?
7    A.    No. I didn't get into specifics.
8    Q.    During Jared's speech when Vinny got up
9 to get his phone, Jared stopped his speech. Do you
10 recall that?
11    A.    No. Yeah, I don't recall that.
12    Q.    You don't recall it?
13    A.    No.
14    Q.    And during that time, after Vinny came
15 back and sat back down, Jared said, Bitches will be
16 bitches. Do you recall that?
17    A.    I do not recall that.
18    Q.    Were you there at that time?
19    A.    Again, I did not hear that.
20    Q.    So I just want to understand. Is that
21 because you were distracted, or it's your testimony that
22 you believe he didn't say that?
23    A.    I was distracted.
24    Q.    Did anyone report that statement to you?
25    A.    No.

74

1    Q.    Were you aware that that's why Cassidy
2 Kauffman was crying?
3    A.    No.
4    Q.    He also said during that speech that if
5 anybody came for you, Mrs. Lyons, that they would have to
6 deal with him. Do you recall that statement?
7    A.    No. No, I do not recall that.
8    Q.    Did anybody report that statement to you?
9    A.    No.
10    Q.    I'm going to turn your attention to
11 Exhibit 29.
12    A.    (Witness complies.)
13    Q.    I'm going to ask you to look at what's
14 labeled No. 2, and this is an e-mail from Dr. Shank in
15 response to an e-mail from Ms. Bertin. This is Grace's
16 mother, I believe. No. 2, at the end, this appears to be
17 Dr. Shank's response to why this speech I just referenced
18 was permitted. Dr. Shank says: You are correct, it
19 should have been stopped. As it was explained to me,
20 Senior students have the option of saying what they want
21 during Senior speeches with no adult intervention when
22 inappropriate things have been said. This practice needs
23 to be changed.
24    Hearing that those statements were made, do
25 you agree with Dr. Shank's assessment?

75

1    A.    I have never seen this e-mail, and I
2 don't know anything around this at all.
3    Q.    Do you agree that the practice of Seniors
4 being given the opportunity to say what they want should
5 be changed?
6    A.    If they were saying negative things,
7 yes, it would be changed.
8    Q.    Did Dr. Shank have any conversation with
9 you before or after this e-mail about that speech?
10    A.    She asked me if Jared had said anything,
11 and I told her I was not aware.
12    Q.    Did she have any conversation with you
13 about limiting Senior speeches or anything of that sort?
14    A.    No.
15    Q.    No. Okay. And I take it you didn't
16 speak with any of the students there about these comments
17 since you didn't hear them; correct?
18    A.    No, I did not.
19    Q.    The following day you have a mandatory
20 clean-up time. Is that correct?
21    A.    So it is considered mandatory with a
22 little bit of a caveat to that. It is a Sunday, and we
23 do obviously have some folks that when it comes to
24 Sundays, they do not want to do that, that's their family
25 time. So if they have church or they have a family

76

Joint Appendix00220

1   gathering, they are excused from it.
2           The reason we make it mandatory is we really
3   want kids to understand that it's not just showing up on
4   stage and then leaving; it really is about understanding
5   what goes into creating a show, building that show, and then
6   we have to take it all down. And it is a very -- a lot of
7   work to take everything down.
8           It took us a week to put it up, and I have X
9   amount of hours to get it all down and clean it like we were
10  never there. It has to be perfectly clean.
11      Q.   How many hours, roughly, does it take?
12      A.   So depending on the set, it can go
13  anywhere from four to six hours.
14      Q.   And this starts at 10 in the morning?
15      A.   Yes.
16      Q.   At about 10:15 you asked Vinny to join
17  you in the auditorium. Do you recall that?
18      A.   That is not correct.
19      Q.   Okay.
20      A.   That is not correct.
21      Q.   When did you ask him to —
22      A.   So I got to the school, many of the kids
23  were showing up at 10 o'clock. I had two students that
24  were very, very upset because the day prior, between the
25  2 o'clock show and the 7 o'clock show, Vinny was telling

77

1   them that there's a big lawsuit coming and the bitch is
2   going down. So I contacted Dr. Shank and Mr. Becker and
3   said, I have a situation.
4           They also had told me that he was planning
5   on coming late and leaving early because he didn't want to
6   participate.
7       Q.   Who told you that?
8       A.   Two students.
9       Q.   What two students?
10      A.   Conor Alexander and Stacia Musser.
11      Q.   Did you and Dr. Shank have a conversation
12  about this?
13      A.   Yes, we did. And I also told the
14  students that they need to make sure on Monday they
15  should really go talk to their Counselor or anything like
16  that because they were troubled by what they heard.
17          I said that to Dr. Shank and Mr. Becker, is
18  that I'm uncomfortable with this child showing up if that's
19  what he's saying. He doesn't need to be here, it's not
20  mandatory, it's a Sunday, this is a co-curricular activity,
21  this is not school driven, you don't get a grade for this,
22  and that I was feeling extremely uncomfortable for him being
23  there.
24      Q.   Why were you feeling uncomfortable?
25      A.   Because that was a threat.

78

1       Q.   Did you believe that that was a threat of
2   physical violence?
3       A.   I have seen Vinny be physical before, so
4   I would say both.
5       Q.   When have you seen Vinny be physical?
6       A.   He -- either when he talks about some of
7   his teachers, he will get very angry and rip up papers.
8   I have had him throw a chair across the auditorium.
9       Q.   When did that happen?
10      A.   It was last year.
11      Q.   That was during a rehearsal, I take it?
12      A.   Yes.
13      Q.   And what was the context of that?
14      A.   He was mad at a teacher.
15      Q.   Did he say which teacher?
16      A.   I don't recall who it was.
17      Q.   What did he say about it?
18      A.   He was just mad.
19      Q.   But he said I'm mad about a teacher?
20      A.   He was just mad. Yeah.
21      Q.   He said he was mad about a teacher?
22      A.   Yes.
23      Q.   And he didn't say who?
24      A.   I don't recall the teacher's name.
25      Q.   So you told Dr. Shank that you were

79

1   concerned, I guess, about safety then?
2       A.   Yes. I was concerned not only for my
3   own safety, but the kids, as well, especially when I have
4   kids that are nervous about another student coming after
5   saying those things.
6       Q.   So the two students who brought this
7   concern to you, you were concerned about their mental
8   well-being. Is that right?
9       A.   It's not easy to hear someone saying
10  that they're gonna be doing what they said.
11      Q.   So you told Vinny that some words were
12  spoken?
13      A.   So when Vinny showed up, he showed up an
14  hour late. He walked into the auditorium. I asked my
15  husband and a couple other parents just to walk behind
16  me. They did not need to be next to me in any way, shape
17  or form. They could stand over there because I needed to
18  have a conversation with Vinny. And I brought him out of
19  the environment, and I brought him to the front of the
20  school so we were not around other students.
21      Q.   When did you learn of what Vinny had
22  said?
23      A.   In the morning.
24      Q.   That morning?
25      A.   That morning.

80

Joint Appendix00221

| | | |
|---|---|---|
| 1 | Q. | So the students came to you at what time? |
| 2 | A. | When they got there at 10. |
| 3 | Q. | 10 o'clock and they told you these |
| 4 | things? | |
| 5 | A. | Um-hum. |
| 6 | Q. | So you told Vinny at that time when you |
| 7 | pulled him into the auditorium -- you said this was about | |
| 8 | 11 he showed up? | |
| 9 | A. | He showed up about 11:30. |
| 10 | Q. | About 11:30. |
| 11 | A. | 11:30. |
| 12 | Q. | And you told him that he had said some |
| 13 | things? | |
| 14 | A. | I said that there were a couple of |
| 15 | students that have come to me with some information that | |
| 16 | you were sharing yesterday that's extremely concerning, | |
| 17 | and they're very uncomfortable and I'm extremely | |
| 18 | uncomfortable, so I'm going to have to ask you to | |
| 19 | leave -- I said that I talked to Dr. Shank, and she said | |
| 20 | that I should ask you to leave once you arrive. | |
| 21 | Q. | Did you tell him what he had allegedly |
| 22 | said? | |
| 23 | A. | Not word-for-word. |
| 24 | Q. | Did you give him the gist of it? |
| 25 | A. | Gist of it, that he was talking about a |

81

| | | |
|---|---|---|
| 1 | lawsuit between the two shows yesterday. | |
| 2 | Q. | You mentioned it was your husband and did |
| 3 | you say two other parents? | |
| 4 | A. | Two other parents. |
| 5 | Q. | Who were those parents? |
| 6 | A. | Mike Ulsh and I think Jerry Stoudt. |
| 7 | Q. | Did your husband and these two have |
| 8 | clearances? | |
| 9 | A. | Yes. |
| 10 | Q. | And they followed Vinny out to his car, |
| 11 | is that right, they walked him out? | |
| 12 | A. | They just stood outside by the door. My |
| 13 | husband did not go out to the car until after two of the | |
| 14 | other students that had had their things in Vinny's car | |
| 15 | from the night before, they went and got their things out | |
| 16 | of the vehicle. And Vinny's girlfriend was still there, | |
| 17 | and I asked my husband to please ask Cassidy, is she | |
| 18 | going to go with Vinny or was she going to stay for the | |
| 19 | rest of strike. | |
| 20 | Q. | And I take it in telling Vinny that he |
| 21 | needed to leave, he also was not welcome to come back | |
| 22 | that day at some future time? | |
| 23 | A. | Correct. |
| 24 | Q. | In fact, as soon as he spoke about you at |
| 25 | the School Board meeting, you said you were keeping a | |

82

| | | |
|---|---|---|
| 1 | close eye on him. Isn't that right? | |
| 2 | A. | When? |
| 3 | Q. | Let's go to Exhibit 9. I'll direct your |
| 4 | attention to Page 2, chain of e-mails. | |
| 5 | A. | I have nothing in 9. |
| 6 | Q. | Well, that's not helpful, is it? |
| 7 | | MS. O'DONNELL: You can use my 9. |
| 8 | BY MR. READY: | |
| 9 | Q. | I apologize. On Page 2, this is in a |
| 10 | chain of e-mails between you, Mr. Becker and Dr. Shank. | |
| 11 | I'm reading from the second paragraph on that page: I | |
| 12 | think Abby and Chris would agree that based on some of | |
| 13 | the behavior we saw from Vinny Ferrizzi, we may have a | |
| 14 | mole in our midst. | |
| 15 | | Do you remember writing those words? |
| 16 | A. | Yes. That is in reference to I |
| 17 | scheduled a tour of the Reading Eagle newspaper and to | |
| 18 | get to their history museum that they have there. Being | |
| 19 | Newsies in the musical was all about the young children | |
| 20 | and some of the strikes that went on. So we went to the | |
| 21 | Reading Eagle to learn about, you know, how were they | |
| 22 | affected back in the late 1800's. | |
| 23 | | And while we were having a conversation, |
| 24 | Chris Becker was telling me about where he came from and a | |
| 25 | little bit of his history. All of the other kids were | |

83

| | | |
|---|---|---|
| 1 | totally around the other corner, hanging out in an area as | |
| 2 | we were waiting for buses to come back and pick us up. And | |
| 3 | Vinny got up from all of those people and walked over and | |
| 4 | made sure that he walked right by us, walked over here and | |
| 5 | then came back again. | |
| 6 | | There was absolutely no reason for him to be |
| 7 | there. And I had heard from other students that he had told | |
| 8 | them that he is taking notes. | |
| 9 | Q. | What students told you that? |
| 10 | A. | I would have to think about it a little |
| 11 | further. I can't say off the top of my head. It's been | |
| 12 | a long time. | |
| 13 | Q. | How many students told you that he was |
| 14 | taking notes? | |
| 15 | A. | One or two. |
| 16 | Q. | You don't remember who they were? |
| 17 | A. | Not off the top of my head, no. |
| 18 | Q. | But you found them credible? |
| 19 | A. | Yeah. |
| 20 | Q. | So Vinny walked past you and then came |
| 21 | back, and I guess heard part of Mr. Becker speaking about | |
| 22 | his background? | |
| 23 | A. | Yes. Yes. |
| 24 | Q. | And that's what made you decide that he |
| 25 | was a mole? | |

84

Joint Appendix00222

| | | |
|---|---|---|
| 1 | A. | Yeah. |
| 2 | Q. | It says on the next paragraph or -- I'm |
| 3 | sorry -- the end of that same paragraph: I will continue | |
| 4 | to keep a close eye on this behavior. | |
| 5 | | How did you keep a close eye on this? |
| 6 | A. | And that was because Mr. Becker wanted |
| 7 | me to report to him if there seems to be any activity | |
| 8 | from Vinny as far as being either negative within the | |
| 9 | cast or doing things or I hear anything more from other | |
| 10 | students; I should let him know. | |
| 11 | Q. | So if he had negative commentary about |
| 12 | the play or your direction -- | |
| 13 | A. | Correct. |
| 14 | Q. | -- he wanted to hear about it? |
| 15 | A. | Yes. Correct. |
| 16 | Q. | And you kept a close eye on what he said |
| 17 | and did as a result? | |
| 18 | A. | Yes. |
| 19 | Q. | Were there any other students that you |
| 20 | were keeping a close eye on from this time forward? | |
| 21 | A. | No. |
| 22 | Q. | If I understood your testimony earlier, |
| 23 | you said that the three Plaintiffs in this case, Jordan, | |
| 24 | Vinny and Haley, never approached you about concerns | |
| 25 | about how you were running the play other than the | |

85

| | | |
|---|---|---|
| 1 | casting dispute? | |
| 2 | A. | Yeah. I've never had them come to me on |
| 3 | anything. | |
| 4 | Q. | Did you have any meetings with your staff |
| 5 | about how to handle the students' free speech rights? | |
| 6 | A. | No. |
| 7 | Q. | Do you have any concern that your actions |
| 8 | in this matter or the actions of any of your staff were | |
| 9 | violating their free speech rights? | |
| 10 | A. | No. |
| 11 | Q. | At some point you reported Jordan for not |
| 12 | letting Haley eat. Do you recall this? | |
| 13 | A. | I did not report it. It was from |
| 14 | another person that had contacted me that had some | |
| 15 | concerns. And as an employee of the school, I am a | |
| 16 | mandated reporter and I had to get that information to | |
| 17 | the proper people. | |
| 18 | Q. | Who contacted you? |
| 19 | A. | It was Alexa. |
| 20 | Q. | I'm sorry. Who's Alexa? |
| 21 | A. | Alexa was a graduate. She was actually |
| 22 | one of Haley Hartline's very good friends at one time. | |
| 23 | Q. | And she reported to you that she had |
| 24 | heard or seen something? | |
| 25 | A. | She has been seeing a lot of things, |

86

| | | |
|---|---|---|
| 1 | that she's not eating, seems very depressed all the time, | |
| 2 | was very, very concerned for some activities that were | |
| 3 | going on, and that was just between her and she just | |
| 4 | wanted to tell somebody. | |
| 5 | Q. | Did she connect any of that to Jordan? |
| 6 | A. | Yes. |
| 7 | Q. | What did she say Jordan was doing or not |
| 8 | doing? | |
| 9 | A. | She just said that every time that they |
| 10 | would want to go do something, Jordan would not allow her | |
| 11 | to do so. | |
| 12 | Q. | That Jordan was interfering with her -- |
| 13 | A. | Yes. |
| 14 | Q. | -- friendship and activities with Haley? |
| 15 | A. | Yes. |
| 16 | Q. | Did she say that Jordan was keeping Haley |
| 17 | from eating? | |
| 18 | A. | I wouldn't say from eating. No. |
| 19 | Q. | You reported to Administration that |
| 20 | Jordan was keeping Haley from eating? | |
| 21 | A. | I don't think I said eating. I said she |
| 22 | was in his basement and that Alexa was concerned because | |
| 23 | she's seeing that she's not eating. | |
| 24 | Q. | What was it then that you reported that |
| 25 | you believed Jordan -- maybe not even that you believed. |

87

| | | |
|---|---|---|
| 1 | Let me rephrase that. What is it you reported that | |
| 2 | Jordan was doing or not doing that was affecting Haley | |
| 3 | negatively? | |
| 4 | A. | There was a concern by this other person |
| 5 | that there may be some type of either verbal or physical | |
| 6 | abuse going on, which is why I reported it. It was not | |
| 7 | my place to get involved in. That's for others to do. | |
| 8 | Q. | So you reported this to ChildLine? |
| 9 | A. | No, I reported it to Dr. Shank because I |
| 10 | didn't know who I was supposed to report it to. | |
| 11 | Q. | Did Dr. Shank inform you to call |
| 12 | ChildLine? | |
| 13 | A. | No. |
| 14 | Q. | Did you make reports to any other |
| 15 | investigative agency? | |
| 16 | A. | No. |
| 17 | Q. | Did you contact Haley's parents? |
| 18 | A. | No. |
| 19 | Q. | Did you contact Haley? |
| 20 | A. | No. |
| 21 | Q. | Did you contact Jordan? |
| 22 | A. | No. |
| 23 | Q. | Were you involved any further after that |
| 24 | report? | |
| 25 | A. | No. |

88

Joint Appendix00223

**Page 89**

1    Q.   I'd like to ask you a little background
2  information about yourself.  You said you began working
3  here in 2015.  Is that right?
4    A.   As an employee, yes.
5    Q.   You worked here previously or
6  volunteered?
7    A.   I was -- I've been a parent.  Yes, I've
8  had three students come through this school.
9    Q.   What do you do for your full-time job?
10    A.   I am a Senior Manager at the Hershey
11  Company.
12    Q.   You are hired each year by the School
13  Board directly?
14    A.   As co-curricular and extracurricular
15  they do it on a -- every year they rehire everyone.  It's
16  not a long-term contract.
17    Q.   So it's a one-year agreement,
18  essentially?
19    A.   Yes.
20    Q.   And you were hired for the 2018/2019
21  school year by the School Board?
22    A.   Correct.
23    Q.   And you were rehired this year by the
24  School Board for this school year?
25    A.   Yes.

**Page 90**

1    Q.   I see you're doing 12 Angry Men this
2  year?
3    A.   Yes.  It's actually 12 Angry Jurors.
4    Q.   I'm sorry, 12 Angry Jurors.  You said --
5  and I want to make sure I clarify -- you were not
6  involved in the Drama Club scholarship after you passed
7  on the applications this year?
8    A.   Correct.  Right.
9    Q.   Who was eligible for the Drama Club
10  scholarship this year?  Not who applied, but do you know
11  who was eligible?
12    A.   Any graduating Senior.
13    Q.   How many were there?
14    A.   12 or 13.
15    Q.   Do you know how many of them are going on
16  to do something drama-related such that they would be
17  eligible?
18    A.   Well, you have to remember, they don't
19  have to be going on to do it for the other scholarship.
20  So it doesn't matter what they're going to go do.  There
21  was still an application they could have filled out.
22    Q.   How about for the one that is just for
23  those going on to a performing arts degree?  Do you know
24  how many of these 12 graduating Seniors are going on to
25  do theatre?

**Page 91**

1    A.   Two or three, I believe, were theatre.
2  One was music education.  So they would be the other way.
3    Q.   Who were they?
4    A.   So Jared, Jordan, I think Haley wanted
5  to.  I think those are the only ones that I know somewhat
6  of what they were going for when it came to actually
7  going into like musical theatre or something like that.
8    Q.   Looking back on the events in this suit
9  -- that gave rise to the suit, I should say, and
10  specifically looking back to the e-mail that you sent on
11  March 20th, do you regret sending that e-mail?
12    A.   No.
13    MS. O'DONNELL:  Object to the form, but you
14  can answer.
15    MR. READY:  I'm sorry, what was wrong with
16  the form?
17    MS. O'DONNELL:  You're asking her to
18  speculate about the content of an e-mail that she already
19  wrote.
20  BY MR. READY:
21    Q.   I'll make sure that my question is clear.
22  I'm asking you as you sit here today, do you regret
23  having sent that e-mail?
24    A.   No.
25    MS. O'DONNELL:  Objection.  You could

**Page 92**

1  answer.  I've let her answer.
2  BY MR. READY:
3    Q.   And I want to also make sure I
4  understand.  You said you were not involved after the
5  meeting in the hallway with Jordan Eck.  You were not
6  involved in the decision to suspend him?
7    A.   No.  I don't have rights to do any of
8  that.
9    MR. READY:  Okay.
10    MS. O'DONNELL:  I have no follow-up.  Thank
11  you.
12    (Whereupon, the deposition concluded at
13  11:55 o'clock a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Case 5:19-cv-01873-MAK   Document 84-2   Filed 01/13/20   Page 81 of 186

| | |
|---|---|
| 1 | CERTIFICATE |
| 2 | |
| 3 | I, Lori A. Dilks, the officer before whom |
| 4 | the deposition of STACY LYONS was taken, do hereby |
| 5 | certify that STACY LYONS, the witness whose testimony |
| 6 | appears in the foregoing deposition, was duly sworn by me |
| 7 | on November 11, 2019, and that the transcribed deposition |
| 8 | of said witness is a true record of the testimony given |
| 9 | by her; that the proceedings are herein recorded fully |
| 10 | and accurately to the best of my ability; that I am |
| 11 | neither attorney nor counsel for, nor related to any of |
| 12 | the parties to the action in which this deposition was |
| 13 | taken; and, further, that I am not a relative of any |
| 14 | attorney or counsel employed by the parties hereto or |
| 15 | financially interested in this action. |
| 16 | |
| 17 | |
| 18 | Lori Dilks |
| 19 | Lori A. Dilks |
| 20 | |
| 21 | PA Court Reporter |
| | Notary Public in and for the |
| | Commonwealth of Pennsylvania |
| 22 | |
| 23 | My Commission expires |
| | November 29, 2023 |
| 24 | |
| 25 | |

93

Joint Appendix00225

Case 5:19-cv-01873-MAK Document 54 Filed 12/05/19 Page 82 of 186

**1**

1 [1] - 3:9
10 [7] - 1:24, 3:19, 20:14, 77:14, 77:23, 81:2, 81:3
100 [1] - 2:8
10:10 [1] - 1:17
10:15 [1] - 77:16
10th [1] - 24:13
11 [6] - 1:16, 3:20, 20:15, 64:21, 81:8, 93:7
11:30 [4] - 72:23, 81:9, 81:10, 81:11
11:55 [1] - 92:13
12 [8] - 3:21, 58:14, 72:23, 90:1, 90:3, 90:4, 90:14, 90:24
12:17 [1] - 20:8
13 [2] - 3:22, 90:14
14 [1] - 3:23
15 [2] - 3:25, 31:1
16 [2] - 4:1, 62:8
17 [2] - 1:19, 4:2
17011 [1] - 2:9
18 [1] - 4:4
1800's [1] - 83:22
19 [3] - 4:5, 4:7, 4:8
19510 [1] - 2:4
19608 [1] - 1:24
19th [1] - 20:21

**2**

2 [7] - 3:10, 4:14, 75:14, 75:16, 77:25, 83:4, 83:9
2/22/19 [1] - 3:15
20 [5] - 3:9, 3:12, 4:6, 4:9, 4:10
201 [1] - 2:9
2015 [2] - 65:11, 89:3
2018 [1] - 24:22
2018/2019 [1] - 89:20
2019 [22] - 1:16, 3:9, 3:12, 3:13, 3:13, 3:17, 3:22, 4:1, 4:7, 4:8, 4:9, 4:10, 4:11, 4:13, 4:14, 4:15, 4:16, 20:4, 62:24, 63:10, 64:14, 93:7
2023 [1] - 93:23
20th [6] - 20:4, 44:8, 61:11, 61:15, 64:16, 91:11
21 [4] - 3:13, 4:7, 4:1, 4:11
21st [2] - 62:24, 64:14
22 [1] - 4:8
220 [1] - 4:2
23 [1] - 4:9
233 [1] - 4:4
24 [3] - 4:10, 4:15, 4:16
248 [1] - 4:5
25 [3] - 3:13, 4:11, 4:13
252 [1] - 4:6
26 [1] - 4:13
26(f [1] - 3:21
27 [2] - 3:17, 4:14
28 [1] - 4:15
29 [3] - 4:16, 75:11, 93:23

**3**

3 [5] - 2:4, 3:11, 61:5, 69:19, 72:20
3.0 [1] - 65:18
30 [1] - 4:17
31 [1] - 4:18

**4**

4 [9] - 3:4, 3:12, 5:18, 5:21, 33:12, 33:15, 58:18, 59:4, 69:15
47 [2] - 18:7, 30:18

**5**

5 [1] - 3:13
5:19-CV-01873-MAK [1] - 1:4
5th [1] - 53:6

**6**

6 [2] - 3:14, 64:9
610 [1] - 1:25
678-9984 [1] - 1:26

**7**

7 [3] - 3:16, 58:18, 77:25

**8**

8 [1] - 3:17
8500 [1] - 2:3

**9**

9 [5] - 3:18, 3:22, 83:3, 83:5, 83:7

**A**

a.m [3] - 1:17, 20:8, 92:13
Abby [5] - 55:24, 57:15, 57:18, 58:5, 83:12
ability [1] - 93:10
able [2] - 7:21, 25:24
absolutely [4] - 40:8, 50:6, 71:19, 84:6
abuse [1] - 88:6
abusive [1] - 72:4
academic [1] - 65:18
accepted [1] - 56:9
accepting [1] - 24:20
access [1] - 46:5
accurate [1] - 24:1
accurately [1] - 93:10
accuse [1] - 60:11
acknowledged [1] - 24:17
acting [1] - 65:23
action [2] - 93:12, 93:15
actions [3] - 26:21, 86:7, 86:8
active [1] - 60:22
actively [1] - 27:4
activities [5] - 14:15, 63:20, 73:10, 87:2, 87:14
activity [3] - 29:11, 78:20, 85:7
actor [2] - 71:9, 71:10
add [2] - 6:25, 7:5
additional [2] - 6:24, 7:1
address [1] - 62:4
addressed [3] - 62:16, 62:19, 67:23
addressing [1] - 61:18
Admin [1] - 53:1
Administration [9] - 8:5, 9:24, 17:22, 25:19, 27:5, 51:17, 51:19, 65:1, 87:19
adult [4] - 52:19, 52:22, 60:9, 75:21
advance [1] - 30:5
affected [2] - 61:11, 83:22
affecting [1] - 88:2
afraid [1] - 49:5
afterwards [1] - 59:5
agency [1] - 88:15
aggressive [7] - 59:6, 59:9, 59:10, 59:13, 60:4, 60:13, 60:14
ago [2] - 14:11, 23:5
agree [7] - 12:4, 12:9, 59:8, 60:1, 75:25, 76:3, 83:12
agreed [2] - 53:25, 57:10
agreement [1] - 89:17
Alexa [4] - 86:19, 86:20, 86:21, 87:22
Alexander [2] - 9:18, 78:10
allegedly [1] - 81:21
Allentown [1] - 2:3
allergic [6] - 14:25, 15:3, 15:10, 15:11, 16:4, 16:9
allergy [1] - 15:7
allow [4] - 7:6, 7:17, 64:9, 87:10
allowed [1] - 7:22
almost [1] - 7:21
aloud [1] - 64:21
amazing [1] - 71:17
ambiguous [1] - 13:8
amount [1] - 77:9
AND [1] - 1:16
anger [1] - 55:7
Angry [3] - 90:1, 90:3, 90:4
angry [3] - 54:4, 54:5, 79:7
announcement [1] - 62:1
answer [13] - 11:22, 12:9, 12:14, 12:22, 13:3, 14:5, 14:23, 19:12, 40:2, 43:19, 91:14, 92:1
answers [1] - 10:25
anyway [1] - 32:24
apologize [1] - 83:9
appear [1] - 54:4
APPEARANCES [1] - 2:1
application [1] - 90:21
applications [5] - 64:24, 66:7, 66:14, 66:21, 90:7
applied [2] - 66:23, 90:10
apply [3] - 66:2, 66:25, 67:11
appreciate [1] - 29:14
appreciated [1] - 47:2
approach [1] - 25:2
approached [3] - 43:3, 50:22, 85:24
approaches [1] - 52:3
April [4] - 3:13, 4:14, 4:15, 4:16
area [4] - 44:23, 49:24, 50:8, 84:1
arrive [1] - 81:20
arts [5] - 65:8, 67:9, 67:15, 67:17, 90:23
assessment [1] - 75:25
Assistant [1] - 60:10
attachments [3] - 3:15, 3:16, 3:17
attempt [1] - 17:22
attend [8] - 35:10, 36:19, 40:23, 42:7, 42:11, 64:10
attended [1] - 27:21
attending [1] - 37:25
attention [9] - 21:6, 25:8, 26:1, 58:13, 58:18, 63:6, 64:20, 75:10, 83:4
attorney [2] - 93:11, 93:14
audition [2] - 24:23, 25:3
auditions [1] - 23:9
auditorium [12] - 36:9, 36:22, 44:9, 48:5, 49:25, 52:17, 61:19, 73:16, 77:17, 79:8, 80:14, 81:7
authoritative [1] - 58:1
aware [25] - 5:10, 14:16, 15:6, 16:4, 16:9, 17:1, 17:7, 18:15, 18:21, 18:24, 18:25, 19:2, 19:25, 24:24, 24:25, 25:1, 28:16, 34:3, 35:20, 37:1, 50:13, 50:16, 61:4, 75:1, 76:11
awesome [1] - 24:11

**B**

background [2] - 84:22, 89:1
backs [2] - 23:10
bad [1] - 45:10
bag [3] - 70:5, 70:6
based [7] - 7:15, 9:10, 14:24, 47:6, 71:5, 71:8, 83:12
basement [1] - 87:22
basic [1] - 33:4
basing [1] -

9:8
bathroom [2] - 49:10, 49:13
bawling [3] - 57:15, 73:15, 73:18
beautiful [1] - 24:8
became [6] - 18:9, 28:14, 56:7, 59:5, 59:6, 59:9
BECKER [1] - 1:9
Becker [17] - 13:22, 18:10, 34:16, 34:21, 34:25, 36:2, 48:7, 49:1, 57:7, 57:17, 64:5, 78:2, 78:17, 83:10, 83:24, 84:21, 85:6
become [5] - 15:6, 16:3, 16:9, 59:12, 60:4
began [3] - 65:10, 72:21, 89:2
begin [3] - 19:11, 65:9, 68:11
beginning [3] - 64:2, 72:17, 73:9
behalf [1] - 58:17
behaving [1] - 18:16
behavior [2] - 83:13, 85:4
behind [7] - 5:18, 6:10, 6:18, 6:21, 23:13, 27:4, 80:15
BERKS [1] - 1:22
berkscourtreporting@gmail.com [1] - 1:25
Bertin [4] - 32:4, 32:6, 34:18, 75:15
best [2] - 24:11, 93:10
between [11] - 2:16, 14:16, 17:23, 21:4, 28:19, 34:7, 73:11, 77:24, 82:1, 83:10, 87:3
beyond [1] - 23:22
big [1] - 78:1
binder [6] - 5:17, 19:1, 19:17, 31:1, 58:14, 62:8
bit [4] - 53:18, 70:12, 76:22, 83:25
bitch [1] - 78:1
Bitches [1] - 74:15
bitches [1] - 74:16
Blandon [1] - 2:4
blocking [3] - 7:18, 26:3, 26:4
Board [56] - 8:23, 17:20, 20:1, 26:24, 27:3, 29:5, 29:13, 29:17, 30:5, 30:17, 30:21, 33:17, 33:25, 35:10, 35:15, 35:25, 36:8, 36:13, 36:16, 36:19, 37:2, 37:14, 37:19, 37:25, 38:3, 38:11, 38:23, 39:3, 39:21, 40:9, 40:13, 40:14, 40:21, 40:22, 41:23, 42:7, 42:12, 44:9, 45:19, 45:20, 46:6, 48:10, 48:15, 48:19, 49:9, 49:20, 50:17, 62:25, 64:16, 68:3, 71:15, 72:3, 82:25, 89:13, 89:21, 89:24
bothered [1] - 45:11
bought [1] - 70:10
break [1] - 11:13
bring [4] - 39:3, 39:20, 40:9, 40:12
bringing [1] - 25:25
brought [9] - 8:24, 17:19, 25:7, 25:10, 68:2, 80:6, 80:18, 80:19
bucket [2] - 10:18, 10:20
build [1] - 15:17
building [1] - 77:5
built [1] - 34:9
bullied [2] - 18:22, 56:4
Bullying [2] - 4:6
bullying [5] - 8:3, 8:7, 23:14, 23:17, 23:20
buses [1] - 84:2
businesses [1] - 65:6
button [1] - 11:19
BY [28] - 3:3, 5:6, 6:19, 10:14, 12:2, 12:8, 12:13, 12:24, 13:5, 14:7, 15:2, 16:7, 19:13, 21:12, 38:7, 38:17, 39:13, 40:5, 43:22, 47:4, 47:10, 54:19, 58:22, 60:2, 64:23, 83:8, 91:20, 92:2

C

call-backs [2] - 23:10
calm [5] - 54:8, 54:11, 54:12, 54:16, 54:21
Camp [1] - 2:9
candidate [1] - 66:10
candidates [1] - 65:2
candy [2] - 70:9, 70:10
cannot [1] - 40:3
car [3] - 82:10, 82:13, 82:14
career [1] - 65:23
case [3] - 5:10, 59:24, 85:23
Cassidy [2] - 75:1, 82:17
cast [7] - 23:3, 23:25, 24:2, 26:16, 44:21, 69:9, 85:9
Cast [1] - 3:25
casting [1] - 86:1
Catherine [1] - 23:21
causing [1] - 29:12
caveat [1] - 76:22
Center [1] - 2:8
CERTIFICATE [1] - 93:1
Certified [1] - 1:23
certify [1] - 93:5
cetera [1] - 70:21
chain [4] - 4:13, 4:14, 83:4, 83:10
chair [2] - 73:13, 79:8
chance [1] - 73:4
changed [3] - 76:23, 76:5, 76:7
check [1] - 36:21
checked [1] - 36:22
child [5] - 7:21, 45:7, 46:9, 55:23, 78:18
ChildLine [2] - 88:8, 88:12
children [4] - 7:17, 30:18, 65:8, 83:19
choose [2] - 29:10, 42:13
Choral [1] - 68:25
choreographer [1] - 69:1
chosen [1] - 14:25
Chris [2] - 83:12, 83:24
CHRISTOPHER [1] - 1:9
church [1] - 76:25
circle [1] - 56:24
circumstances [1] - 14:21
claim [1] - 19:8
clarification [1] - 11:10
clarify [1] - 90:5
clean [4] - 72:23, 76:20, 77:9, 77:10
clean-up [1] - 76:20
clear [2] - 53:21, 91:21
clearances [1] - 82:8
clearly [2] - 38:22, 39:9
clench [1] - 55:6
close [5] - 83:1, 85:4, 85:5, 85:16, 85:20
closely [3] - 24:16, 25:19, 25:20
Club [6] - 54:1, 64:25, 65:3, 65:20, 90:6, 90:9
club [1] - 66:3
clue [1] - 41:1
Co [1] - 27:5
co [3] - 18:5, 78:20, 89:14
Co-Curricular [1] - 27:5
co-curricular [3] - 18:5, 78:20, 89:14
coach [1] - 59:17
coaching [2] - 59:18, 59:20
Code [1] - 4:17
coincidence [1] - 15:1
COLEMAN [1] - 2:7
collaborative [1] - 67:21
college [1] - 67:6
column [1] - 31:10
comfortable [1] - 46:4
coming [6] - 35:21, 53:20, 57:17, 78:1, 78:5, 80:4
commentary [1] - 85:11
comments [1] - 76:16
Commission [1] - 93:23
committed [1] - 60:23
Commonwealth [1] - 93:21
communicate [2] - 34:21, 48:25
communication [1] - 67:22
communications [1] - 64:5
community [1] - 65:6
Company [1] - 89:11
complaints [1] - 24:22
completely [1] - 19:11
complies [5] - 5:22, 31:2, 58:15, 62:9, 75:12
concern [4] - 30:22, 80:7, 86:7, 88:4
concerned [11] - 46:13, 46:17, 46:19, 47:15, 48:17, 48:18, 60:1, 60:2, 60:7, 87:2, 87:22
concerning [1] - 81:16
concerns [18] - 25:3, 25:7, 25:10, 34:1, 34:21, 34:25, 35:4, 35:6, 35:7, 48:7, 63:8, 68:2, 69:6, 85:24, 86:15
concluded [1] - 92:12
Conduct [1] - 4:17
Conference [1] - 3:21
conflict [3] - 42:25, 43:4, 43:6
confrontational [1] - 45:8
confronted [2] - 6:23, 19:7
connect [1] - 87:5
Conner [1] - 9:18
Conor [1] - 78:10
Conrads [1] - 21:24
Consent [1] - 3:24
consider [1] - 14:10
considered [1] - 76:21
constitute [1] - 14:20
constituted [1] - 12:20
constructive [1] - 63:24
contact [9]

Case 5:19-cv-01873-MAK  Document 48-2  Filed 01/13/20  Page 84 of 186

- 21:2,
30:21,
33:3,
37:9,
37:12,
37:13,
88:17,
88:19,
88:21
contacted
[7] - 40:16,
40:20,
41:3,
41:6,
78:2,
86:14,
86:18
contacting
[1] - 9:11
content [1]
- 91:18
context [4]
- 14:10,
14:12,
22:20,
79:13
continual
[1] - 8:8
continue
[2] - 26:10,
85:3
continued
[1] - 55:25
contract [1]
- 89:16
control [2] -
40:3,
42:18
conversati
on [27] -
17:18,
22:22,
44:11,
44:14,
49:18,
49:19,
49:23,
50:5,
50:11,
50:14,
51:4,
53:12,
53:15,
54:3,
54:8,
54:9,
54:24,
57:6,
57:10,
57:20,
60:17,
61:1,
76:8,
76:12,

78:11,
80:18,
83:23
conversati
onal [1] -
19:15
conversati
ons [19] -
25:22,
29:16,
29:23,
30:4,
30:7,
34:24,
35:3,
50:18,
63:8,
63:17,
63:18,
63:19,
63:22,
64:1,
64:4,
64:8,
64:13,
67:24,
69:7
converse
[1] - 50:23
cooperativ
e [1] -
67:22
copied [1] -
64:5
corner [1] -
84:1
CORNERS
TONE [1] -
2:2
Corporate
[1] - 2:8
Correct [1]
- 32:20
correct [72]
- 5:12,
5:15,
5:16, 6:8,
7:8, 7:23,
7:24,
8:12,
15:15,
15:20,
16:1,
16:2,
16:14,
17:9,
17:15,
17:24,
18:16,
18:23,
19:17,
20:8,
20:11,
20:13,

20:24,
21:17,
22:9,
22:24,
23:7,
23:15,
26:25,
28:3,
30:10,
32:16,
32:17,
36:10,
36:11,
36:14,
37:10,
38:23,
40:15,
43:23,
47:22,
48:3,
48:16,
48:21,
49:17,
50:12,
53:14,
55:15,
57:2,
58:25,
60:18,
62:16,
62:20,
63:1,
66:18,
66:19,
67:18,
68:3,
69:16,
69:25,
72:8,
73:4,
75:18,
76:17,
76:20,
77:18,
77:20,
82:23,
85:13,
85:15,
89:22,
90:8
correction
s [2] -
68:9,
68:12
correctly
[3] - 14:19,
63:14,
67:4
Counsel [5]
- 5:18,
10:1,
47:8,
58:17,
58:23

counsel [3]
- 2:16,
62:24
93:11,
93:14
Counselor
[1] - 78:15
couple [4] -
7:16,
44:18,
80:15,
81:14
course [2] -
10:21,
28:2
COURT [2]
- 1:1, 1:22
Court [5] -
1:23,
2:17,
5:20,
11:5,
93:20
creating [1]
- 77:5
credible [1]
- 84:18
criteria [2] -
65:16,
66:17
criticism
[1] - 63:24
crossed [1]
- 55:14
crying [8] -
44:18,
44:24,
45:3,
45:4,
73:25,
74:1,
74:6, 75:2
Curricular
[1] - 27:5
curricular
[3] - 18:5,
78:20,
89:14
cut [4] -
29:15,
29:18,
29:21
Cyber [1] -
4:6

## D

dad [1] -
55:23
dance [2] -
65:23,
67:8
dancing [1]
- 51:6
dangerous

[1] - 48:11
date [1] -
62:24
DATE [1] -
1:16
dated [13] -
3:9, 3:12,
3:13,
3:15,
3:17,
3:22, 4:1,
4:8, 4:9,
4:10,
4:11,
4:16, 4:16
deal [2] -
25:24,
75:6
dealing [2]
- 18:9,
73:16
deathly [1] -
14:25
debriefing
[1] - 49:20
December
[2] - 24:21,
25:2
decide [4] -
42:23,
61:24,
65:21,
84:24
decision [1]
- 92:6
deep [1] -
34:20
Defendant
s [2] -
2:10,
58:17
defendant
s [1] - 1:13
definitely
[1] - 32:7
degree [3] -
67:8,
67:16,
90:23
demand [1]
- 42:23
DEMANDE
D [1] - 1:7
demeanor
[3] - 57:25,
58:2, 58:3
demure [1]
- 45:8
DENNEHE
Y [1] - 2:7
Departme
nt [1] -
53:22

DEPONEN
T [1] - 1:15
deposition
[7] - 5:14,
10:15,
92:12,
93:4,
93:6,
93:7,
93:12
deposition
s [1] -
19:15
depressed
[1] - 87:1
describe
[5] - 44:16,
53:15,
58:5,
58:6,
70:16
dESCRIPT
ION [1] -
3:8
deserve [1]
- 8:9
desk [1] -
19:3
destroy [1]
- 22:14
determine
d [1] -
60:13
different [6]
- 7:15,
23:17,
31:6,
39:14,
49:24,
67:10
difficult [2]
- 19:15,
24:19
Dilks [5] -
1:23,
10:22,
93:3,
93:18,
93:19
dinner [2] -
15:20,
15:23
direct [3] -
58:18,
64:20,
83:3
directed [2]
- 16:1,
63:12
directing
[1] - 8:4
direction
[1] - 85:12

directly [1]
- 89:13
Director [2]
- 60:10,
68:25
disagree
[1] - 60:1
disappear
[1] - 20:3
discipline
[1] - 57:7
Discipline
[3] - 3:11,
3:19, 3:20
discuss [1]
- 18:2
discussed
[1] - 23:12
dispute [1]
- 86:1
disrespect
ed [3] -
26:15,
26:16,
57:23
distracted
[3] - 73:10,
74:21,
74:23
DISTRICT
[3] - 1:1,
1:1, 1:7
District [2] -
1:9, 5:11
division [1]
- 34:7
document
[6] - 5:23,
31:3,
58:16,
58:25,
59:1,
62:10
dollars [3] -
29:10,
65:6,
65:15
donate [1] -
65:6
done [2] -
7:11,
50:20
door [11] -
45:23,
45:24,
45:25,
46:2,
47:16,
47:19,
47:20,
48:1,
49:8,
49:12,

82:12
doors [3] -
45:22,
47:17,
47:21
double [1] -
7:21
doubt [1] -
27:10
down [19] -
7:19,
10:22,
11:2,
11:3,
23:11,
31:11,
42:3,
51:3,
52:16,
52:22,
52:23,
57:15,
59:3,
63:23,
74:15,
77:6,
77:7,
77:9, 78:2
Dr [42] - 8:5,
13:21,
17:11,
18:9,
22:16,
25:19,
29:16,
31:4,
35:3,
35:9,
38:3,
48:6,
49:1,
51:20,
53:1,
57:7,
57:16,
57:17,
61:1,
61:17,
61:25,
62:14,
63:17,
63:20,
64:1,
64:5,
64:13,
66:8,
67:24,
75:14,
75:17,
75:18,
75:25,
76:8,
78:2,
78:11,

78:17,
79:25,
81:19,
83:10,
88:9,
88:11
Drama [6] -
54:1,
64:24,
65:3,
65:20,
90:6, 90:9
drama [2] -
18:1,
90:16
drama-
related [1]
- 90:16
draw [1] -
21:8
Drive [3] -
1:24, 2:8,
driven [1] -
78:21
duly [2] -
5:3, 93:6
during [24]
- 15:25,
16:3,
20:23,
36:12,
45:22,
46:5,
46:6,
47:17,
48:14,
49:8,
49:18,
50:14,
54:3,
54:24,
55:17,
60:15,
70:2,
73:3,
74:8,
74:14,
75:4,
75:21,
79:11

## E

E-mail [10] -
3:12,
3:13, 4:8,
4:9, 4:10,
4:11,
4:13,
4:14,
4:15, 4:16
e-mail [27] -
5:25, 6:2,
6:5, 9:5,

Joint Appendix00228

16:13,
20:7,
20:12,
25:14,
27:12,
34:16,
36:2,
37:10,
39:2,
40:12,
40:17,
41:9,
41:18,
61:11,
61:15,
75:14,
75:15,
76:1,
76:9,
91:10,
91:11,
91:18,
91:23
e-mailing
[1] - 21:9
e-mails [3] -
40:25,
83:4,
83:10
Eagle [2] -
83:17,
83:21
early [3] -
53:20,
69:24,
78:5
EASTERN
[1] - 1:1
easy [4] -
7:17,
29:15,
46:4, 80:9
eat [1] -
86:12
eating [6] -
87:1,
87:17,
87:18,
87:20,
87:21,
87:23
Eck [22] -
3:14,
3:19,
3:20,
5:15,
22:7,
22:15,
22:16,
22:21,
23:1,
23:22,
26:2,
28:25,

33:8,
35:10,
57:8,
59:6,
60:4,
61:2,
61:4,
66:24,
92:5
ECK [1] -
1:3
Eck's [1] -
22:10
education
[2] - 29:14,
91:2
effect [1] -
37:22
either [10] -
14:14,
25:22,
26:9,
35:4,
36:5,
43:6,
67:7,
79:6,
85:8, 88:5
eligible [3] -
90:9,
90:11,
90:17
emotional
[1] - 67:23
emotions
[1] - 59:5
employed
[1] - 93:14
employee
[3] - 1:12,
86:15,
89:4
encourage
ment [1] -
71:2
end [1] -
22:14,
23:6,
23:9,
29:7,
54:25,
67:19,
69:9,
72:17,
72:18,
75:16,
85:3
ended [2] -
24:7,
72:20
ending [1] -
64:2
enjoyed [1]
- 70:20

entire [3] -
26:16,
53:21,
62:17
environme
nt [2] -
24:18,
80:19
escalated
[4] - 8:15,
18:12,
22:3,
46:19
escalating
[1] - 28:6
escalation
[6] - 22:4,
22:25,
23:24,
24:4,
24:7,
25:14
escort [1] -
49:16
escorts [1]
- 49:10
especially
[1] - 80:3
Esquire [2]
- 2:3, 2:8
essay [1] -
65:21
essentially
[2] - 67:3,
89:18
et [1] -
70:21
Evaluation
[1] - 3:14
Evaluaton
[1] - 3:24
evening [3]
- 20:16,
20:20,
44:8
events [1] -
91:8
exact [2] -
20:19,
57:4
exactly [2] -
54:22,
72:19
examined
[1] - 5:4
EXAMINE
D [1] - 3:3
example [1]
- 26:2
except [1] -
2:17
excuse [3] -
34:18,

37:3,
42:23
excused [3]
- 36:15,
37:6,
41:21,
44:22,
77:1
Exhibit [6] -
5:21,
31:1,
33:12,
33:15,
58:14,
62:8,
75:11,
83:3
EXHIBITS
[1] - 3:6
exist [1] -
34:10
expect [2] -
37:11,
37:13
expectatio
ns [3] -
62:15,
62:17,
63:11,
63:13,
69:6
expected
[1] - 37:9
experienc
e [5] -
7:18,
24:12,
28:14,
45:18,
71:5
expires [1]
- 93:23
explained
[1] - 75:19
express [1]
- 30:22
expressed
[3] - 34:1,
54:21,
63:8
Expressio
n/
Distribution
[1] - 4:3
Expulsion
[1] - 4:4
extracurri
cular [1] -
89:14
extremely
[6] - 57:25,
71:21,
78:22,

81:16,
81:17
eye [6] -
83:1,
85:4,
85:5,
85:16,
85:20

**F**

face [3] -
14:20,
54:24,
55:4
facilities [1]
- 52:18
fact [2] -
21:9,
82:24
fair [2] -
68:8,
69:23
fairly [2] -
15:14,
27:8
fall [2] -
7:24, 24:7
familiar [1]
- 59:1
family [5] -
15:14,
33:8,
46:12,
76:24,
76:25
far [1] -
85:8
fast [2] -
11:4, 11:5
favor [4] -
41:22,
41:24,
41:25
favorably
[2] - 32:16,
32:19
feedback
[2] - 71:11,
72:25
felt [7] -
18:21,
29:25,
45:17,
55:13,
55:15,
57:22,
57:24
Ferrizzi [3]
- 3:24,
6:15,
83:13
FERRIZZI
[1] - 1:4

few [1] -
10:12
field [2] -
65:25,
67:10
filed [2] -
17:14,
58:16
filing [1] -
2:17
filled [1] -
90:21
final [1] -
33:14
finally [1] -
45:15
financially
[1] - 93:15
fine [6] -
11:13,
42:23,
44:21,
51:9,
58:23,
70:1
finish [4] -
10:24,
10:25,
11:14,
19:16
finished [3]
- 19:11,
53:12,
57:10
fire [3] -
27:2, 27:6
fired [3] -
22:6,
23:1, 23:2
FIRM [1] -
2:2
first [21] -
5:3, 6:5,
13:9,
13:12,
20:5,
31:9,
45:5,
51:1,
51:2,
51:10,
52:21,
55:21,
56:6,
59:4,
62:12,
63:7,
65:4,
65:10,
67:13,
68:19
fists [1] -
55:6
five [6] -

21:11,
21:14,
21:20,
21:21,
36:23
floor [1] -
26:9
flowers [1]
- 70:11
folks [2] -
66:1,
76:23
follow [4] -
63:7,
63:12,
63:17,
92:10
follow-up
[3] - 63:7,
63:17,
92:10
followed [1]
- 82:10
following
[5] - 57:9,
61:9,
61:18,
68:18,
76:19
follows [1] -
5:5
FOR [1] -
1:1
foregoing
[1] - 93:6
forgive [2] -
71:14,
71:21
Form [6] -
3:11,
3:14,
3:16,
3:19,
3:20, 3:24
form [20] -
2:17,
12:6,
12:21,
13:2,
14:4,
14:22,
16:5,
21:10,
38:4,
38:12,
39:10,
40:1,
43:11,
43:12,
45:9,
47:1,
54:17,
80:17,

91:13,
91:16
forthright
[2] - 54:6,
54:7
forward [3]
- 53:17,
57:12,
85:20
four [4] -
7:8, 16:1,
69:1,
77:13
Fox [1] -
1:24
frame [1] -
29:5
free [3] -
11:9,
86:5, 86:9
friend [3] -
56:8,
56:10,
70:21
friends [3] -
28:23,
29:1,
88:22
friendship
[1] - 87:14
front [5] -
5:17,
45:19,
45:23,
45:25,
47:16,
47:21,
48:5,
72:7,
80:19
fruit [3] -
10:4,
10:5,
46:25
fruits [6] -
14:24,
15:1,
15:3,
16:4,
16:10
fuel [1] -
27:1
fueling [1] -
27:6
full [2] -
18:6, 89:9
full-time [2]
- 18:6,
89:9
fully [2] -
31:19,
93:9
functions
[2] - 15:21,

15:22
fund [1] -
85:7
funny [1] -
8:25
future [3] -
29:24,
30:23,
82:22

**G**

gather [2] -
44:6,
44:13
gathered
[2] - 44:5,
44:10
gathering
[1] - 77:1
generally
[1] - 34:25
girlfriend
[3] - 73:11,
73:15,
82:16
gist [2] -
81:24,
81:25
given [4] -
23:21,
66:4,
76:4, 93:8
Glen [1] -
1:24
Glick [3] -
32:5,
33:7, 33:8
GOGGIN
[1] - 2:7
gonna [1] -
80:10
Grace [2] -
23:20,
32:4
grace [1] -
32:6
Grace's [1]
- 75:15
grade [2] -
53:6,
78:21
graduate
[1] - 86:21
graduatin
g [3] -
32:24,
90:12,
90:24
grams [2] -
70:9,
70:11
grant [1] -
42:20

great [4] - 24:16, 56:9, 57:13, 71:19
group [1] - 27:7
grow [1] - 71:25
guardians [1] - 64:9
guess [9] - 14:10, 24:23, 32:8, 34:1, 67:2, 68:4, 73:6, 80:1, 84:21
guys [1] - 44:21

**H**

HALEY [1] - 1:3
Haley [23] - 5:15, 8:22, 10:3, 18:25, 19:16, 23:20, 23:22, 32:12, 33:2, 33:18, 35:8, 50:15, 52:17, 63:21, 85:24, 86:12, 86:22, 87:14, 87:16, 87:20, 88:2, 88:19, 91:4
Haley's [1] - 88:17
half [5] - 15:18, 24:15, 30:19, 54:13, 60:11
hallway [8] - 50:23, 50:25, 51:12,

52:16, 57:14, 60:8, 60:24, 92:5
hand [3] - 70:5, 70:6, 71:1
handed [1] - 68:15
handful [5] - 6:3, 21:15, 21:16, 21:20, 36:18
handle [2] - 18:10, 86:5
handling [2] - 18:17, 18:18
handwritten [1] - 4:12
hanging [1] - 84:1
happy [7] - 70:3, 70:4, 70:7, 70:9, 70:12, 70:16, 71:13
Harassment [1] - 4:5
hard [1] - 11:5
harm [1] - 49:6
Hartenstine [11] - 49:19, 50:4, 51:13, 51:15, 52:11, 53:3, 55:1, 55:18, 58:13, 56:22, 68:24
Hartline [2] - 5:15, 8:22
HARTLINE [1] - 1:3
Hartline's [1] - 86:22
head [5] - 21:19, 41:4,

41:7, 84:11, 84:17
hear [8] - 8:6, 35:25, 50:1, 74:19, 76:17, 80:9, 85:9, 85:14
heard [8] - 30:1, 36:18, 40:22, 73:9, 78:16, 84:7, 84:21, 86:24
hearing [2] - 32:8, 75:24
help [5] - 6:13, 15:23, 31:16, 36:5, 53:20
helpful [1] - 83:6
helping [1] - 27:1
helps [1] - 53:9
hereby [2] - 63:11, 93:4
herein [1] - 93:9
hereto [1] - 93:14
herself [1] - 45:14
Hershey [1] - 89:10
High [3] - 1:10, 1:12, 1:18
high [6] - 22:3, 22:23, 29:9, 55:22, 67:7, 71:22
Hill [1] - 2:9
himself [1] - 57:14
hired [2] - 89:12, 89:20
history [2] -

83:18, 83:25
hit [1] - 22:3
hold [1] - 37:4
honestly [1] - 45:14
hope [1] - 53:17
hoped [1] - 56:3
hopefully [1] - 71:24
horrible [5] - 6:10, 6:17, 6:20, 7:25, 23:13
hour [1] - 80:14
hours [4] - 69:24, 77:9, 77:11, 77:13
hug [2] - 44:18, 45:16
hum [1] - 81:5
hurt [1] - 56:6
hurtful [5] - 71:22, 72:3
husband [6] - 72:6, 80:15, 82:2, 82:7, 82:13, 82:17

**I**

idea [1] - 62:23, 66:12, 68:5
immediately [1] - 27:18
implement [2] - 63:12, 68:8
implementation [1] - 68:11
implemented [1] - 52:8
implied [1] - 39:4

important [2] - 43:9, 67:20
impossible [1] - 59:5
IN [1] - 1:1
inappropriate [2] - 59:25, 75:22
incite [1] - 40:6
including [2] - 34:17, 69:24
individually [3] - 1:7, 1:9, 1:11
Inform [1] - 88:11
information [5] - 14:8, 28:11, 81:15, 86:16, 89:2
Information [1] - 4:7
initial [2] - 3:14, 3:23
input [1] - 66:20
Input [1] - 3:16
Instagram [1] - 8:21
instead [1] - 56:5
instructions [2] - 10:10, 10:12
insubordinate [2] - 59:6, 60:8
insubordination [2] - 60:19, 60:23
interested [1] - 93:15
interfering [1] - 87:12
interpretation [1] - 38:24
intervention [1] - 75:21
Investigated [1] - 16:22

investigative [1] - 88:15
invitation [3] - 39:2, 39:20, 39:23
involved [11] - 27:8, 27:24, 28:13, 31:6, 66:13, 88:7, 88:23, 90:6, 92:4, 92:6
issue [1] - 26:22
issues [1] - 29:12
itself [3] - 14:14, 32:9, 32:10

**J**

Jack [6] - 23:3, 23:6, 23:15, 23:25, 24:2
January [3] - 25:3, 25:20, 56:2
Jared [29] - 9:15, 13:15, 15:3, 15:11, 16:1, 16:9, 17:23, 18:22, 19:1, 19:6, 19:7, 19:17, 19:19, 19:21, 23:7, 23:23, 26:4, 28:6, 28:20, 47:12, 49:6, 52:18, 66:24, 67:11, 73:8,

74:9, 74:15, 76:10, 91:4
Jared's [3] - 15:6, 46:13, 74:8
Jefferson [1] - 1:19
jeopardy [3] - 29:8, 29:24, 30:13
Jerry [1] - 82:6
job [2] - 71:17, 89:9
Joel [2] - 2:3, 5:9
join [5] - 51:15, 52:11, 77:16
joined [2] - 51:3, 52:14
Joint [1] - 3:21
joint [2] - 58:16, 59:24
Jones [2] - 3:10, 52:14
JORDAN [1] - 1:3
Jordan [64] - 3:14, 3:19, 3:20, 5:15, 8:22, 10:2, 16:4, 16:6, 17:16, 17:23, 18:21, 20:23, 23:7, 23:25, 26:2, 26:8, 27:19, 28:6, 28:19, 28:23, 32:12, 33:2, 33:8, 33:18, 35:8,

46:24, 47:6, 47:12, 50:15, 50:22, 51:8, 52:17, 53:13, 53:19, 54:3, 54:12, 54:14, 56:12, 58:23, 57:8, 57:9, 57:20, 60:4, 60:7, 61:2, 61:4, 61:22, 63:20, 66:24, 67:11, 85:23, 86:11, 87:5, 87:7, 87:10, 87:12, 87:16, 87:20, 87:25, 88:2, 88:21, 91:4, 92:5
Joshua [1] - 68:25
jump [1] - 10:25
Jurors [2] - 90:3, 90:4
JURY [1] - 1:7

**K**

Kauffman [1] - 75:2
keep [2] - 85:4, 85:5
keeping [5] - 28:11, 82:25, 85:20, 87:16, 87:20
kept [1] - 85:16
kids [24] - 6:10, 6:17, 24:15,

24:19, 28:1, 28:13, 28:15, 30:15, 30:20, 31:18, 45:21, 51:3, 54:1, 54:2, 57:11, 65:22, 65:23, 70:4, 77:3, 77:22, 80:3, 80:4, 83:25
kind [7] - 6:4, 28:7, 28:10, 29:11, 45:18, 48:24, 49:3
kinds [1] - 28:16
knowledge [1] - 50:10
known [2] - 28:7, 60:10

**L**

labeled [1] - 75:14
last [9] - 6:9, 6:13, 6:16, 15:13, 32:6, 37:16, 59:3, 67:20, 79:10
late [7] - 25:4, 34:19, 34:20, 69:17, 78:5, 80:14, 83:22
LAW [1] - 2:2
lawsuit [5] - 31:8, 31:25, 36:25, 78:1, 82:1

lawyers [2] - 31:16, 33:3
lead [1] - 65:4
leaders [1] - 65:6
leadership [5] - 34:4, 34:8, 34:9, 34:11, 34:13
leak [2] - 39:24, 40:1
learn [6] - 17:10, 20:10, 20:17, 61:8, 80:21, 83:21
learned [2] - 20:4, 71:25
learning [1] - 7:18
leave [4] - 20:14, 81:19, 81:20, 82:21
leaving [2] - 77:4, 78:5
left [3] - 26:7, 51:8, 72:13
less [2] - 32:12, 66:1
Letter [3] - 3:9, 3:17, 3:22
letter [1] - 62:14
letters [2] - 24:8, 24:14
letting [3] - 25:21, 59:4, 86:12
liar [1] - 57:23
lie [1] - 45:7
life [1] - 45:5
Lily [2] - 32:4, 33:7
limiting [1] - 76:13

line [2] - 6:5, 55:14
lines [2] - 26:10, 26:11
List [1] - 3:25
list [5] - 10:19, 10:20, 23:11, 31:12, 63:23
listen [3] - 37:5, 42:1, 42:6
listening [1] - 55:25
LLC [1] - 2:2
LOCATION [1] - 1:18
lock [2] - 46:2, 47:17
locked [13] - 45:22, 45:23, 45:25, 47:19, 47:20, 47:21, 47:24, 47:25, 48:1, 48:2, 48:4, 48:14, 49:9
locking [1] - 47:16
long-term [1] - 89:16
look [10] - 5:18, 5:21, 21:24, 23:4, 30:25, 41:2, 54:15, 71:24, 71:25, 75:13
looking [4] - 7:4, 63:23, 91:6, 91:10
Lori [4] -

1:23, 93:3, 93:18, 93:19
losing [1] - 29:8
love [9] - 33:16, 33:19, 37:19, 38:5, 38:10, 38:14, 38:23, 40:13, 53:19
loving [1] - 38:16
lunging [1] - 55:11
lying [4] - 56:13, 56:20, 56:22, 60:11
lynch [1] - 68:24
Lyons [3] - 3:4, 52:22, 75:5
LYONS [5] - 1:11, 1:15, 5:2, 93:4, 93:5

**M**

M-A-Z-E-l-K-A [1] - 9:15
mad [5] - 79:14, 79:18, 79:19, 79:20, 79:21
mail [37] - 3:12, 3:13, 4:8, 4:9, 4:10, 4:11, 4:13, 4:14, 4:15, 4:16, 5:25, 6:2, 6:5, 9:5, 16:13, 20:7, 20:12, 25:14, 27:12, 34:16,

36:2, 37:10, 39:2, 40:12, 40:17, 41:9, 41:18, 61:11, 61:15, 75:14, 75:15, 76:1, 76:9, 91:10, 91:11, 91:18, 91:23
mailing [1] - 21:9
mails [3] - 40:25, 83:4, 83:10
maintain [1] - 67:21
man [1] - 57:23
management [3] - 25:8, 69:24, 62:19
Manager [1] - 89:10
mandated [1] - 86:15
mandatory [6] - 43:21, 43:25, 76:19, 76:21, 77:2, 78:20
manner [1] - 18:16
mannerism [1] - 54:20
manneris ms [2] - 54:15, 54:18
March [20] - 3:9, 3:12, 3:13, 3:17, 4:1, 4:8, 4:9, 4:10, 4:11, 4:13, 6:23, 20:4, 29:5, 44:8,

61:11, 61:15, 62:24, 64:14, 64:16, 91:11
Maria [4] - 52:14, 52:20, 52:22, 62:24
marked [1] - 31:1
Marla [1] - 3:10
MARSHALL [1] - 2:7
Materials [1] - 4:3
matter [4] - 16:20, 16:23, 86:8, 90:20
Mazelka [11] - 9:15, 13:15, 15:14, 16:18, 17:11, 19:6, 26:5, 46:12, 47:11, 47:15, 66:24
Mazelka's [1] - 73:8
mean [5] - 6:7, 29:8, 32:15, 37:10, 52:6
means [2] - 29:9, 32:1
mediation [1] - 17:23
meet [3] - 68:19, 69:3, 69:5
meeting [61] - 8:23, 17:20, 20:1, 22:21, 29:6, 30:5, 30:8, 30:10, 30:15, 33:17, 33:25, 35:10, 35:16,

35:25, 36:8, 36:13, 36:16, 36:19, 37:2, 37:14, 37:19, 37:25, 38:3, 38:11, 38:23, 39:3, 39:21, 40:10, 40:13, 40:14, 40:21, 40:22, 41:23, 42:8, 42:10, 42:12, 44:9, 45:5, 45:22, 46:5, 46:6, 48:11, 48:15, 48:20, 49:8, 49:9, 49:21, 50:17, 61:20, 61:23, 62:4, 62:5, 62:6, 63:1, 64:16, 68:3, 68:5, 71:15, 72:3, 82:25, 92:5
meetings [1] - 86:4
member [3] - 27:3, 29:13, 65:19
members [3] - 29:17, 30:5, 30:22
Members [1] - 3:25
memo [8] - 62:22, 63:7, 63:11,

67:19, 67:25, 69:3, 69:6, 69:8
Memorandum [1] - 4:1
memory [1] - 35:15
Men [1] - 90:1
menacing [2] - 13:1, 13:7
mental [2] - 50:15, 80:7
mention [2] - 35:7, 38:2
mentioned [10] - 22:5, 23:12, 23:14, 25:18, 26:22, 29:20, 55:18, 67:2, 72:20, 82:2
messages [2] - 4:18, 36:17
midnight [2] - 20:11, 20:13
midst [1] - 83:14
Mike [1] - 82:6
mind [5] - 22:3, 34:15, 47:16, 60:19, 60:21
mine [1] - 38:25
Minutes [1] - 68:5
miss [5] - 26:10, 43:5, 43:10, 43:17, 44:1
missed [1] - 21:13
missing [2] - 36:23, 41:6
misstating

[2] - 43:13, 43:15
mistaken [1] - 20:11
misunderstood [4] - 27:11, 39:9, 40:18, 41:19
moderate [1] - 11:6
mole [2] - 83:14, 84:25
mom [1] - 24:11
moment [1] - 33:13
Monday [4] - 1:16, 22:18, 35:13, 78:14
money [2] - 65:14, 66:1
months [3] - 6:9, 6:13, 6:16
morning [8] - 5:7, 5:8, 69:16, 69:24, 77:14, 80:23, 80:24, 80:25
mother [7] - 6:18, 9:10, 9:14, 15:8, 22:6, 28:23, 75:16
mother's [2] - 22:6, 22:13
mouth [1] - 59:22
move [3] - 53:17, 55:6, 57:12
moved [1] - 56:8
MR [38] - 6:6, 6:15, 6:19, 10:4, 10:11, 10:14, 12:2,

12:8, 12:13, 12:24, 13:5, 14:7, 15:2, 16:7, 19:13, 21:12, 38:7, 38:17, 39:13, 40:5, 43:12, 43:15, 43:22, 47:3, 47:4, 47:10, 54:19, 58:22, 59:16, 59:20, 60:1, 60:2, 64:23, 83:8, 91:15, 91:20, 92:2, 92:9
MS [36] - 6:12, 10:2, 10:5, 10:9, 10:13, 11:21, 11:24, 12:6, 12:11, 12:21, 13:2, 14:4, 14:22, 16:5, 19:10, 21:10, 38:4, 38:12, 39:10, 40:1, 43:11, 43:13, 43:18, 47:1, 47:8, 54:17, 58:20, 59:14, 59:18, 59:21, 64:22, 83:7, 91:13,

Case 5:19-cv-01873-MAK Document 86-2 Filed 01/13/20 Page 88 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/05/19 Page 88 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 85 of 181

91:17,
91:25,
92:10
multiple [1]
- 34:17
museum
[1] - 83:18
music [2] -
29:14,
91:2
Music [1] -
53:21
Musical
- 68:20
musical [4]
- 63:10,
67:8,
83:19,
91:7
Musser [1]
- 76:10
must [2] -
64:5, 64:9

**N**

name [4] -
5:9,
22:11,
70:18,
79:24
Narrative
[1] - 3:10
naturally
[1] - 11:4
nature [1] -
52:1
necessaril
y [3] -
27:16,
34:13,
51:25
need [16] -
6:13,
9:24,
11:12,
14:8,
14:10,
18:16,
43:21,
53:22,
54:9,
55:15,
57:12,
59:20,
65:18,
78:14,
78:19,
80:16
needed [6]
- 30:18,
30:19,
36:20,
65:20,

80:17,
82:21
needs [2] -
67:23,
75:22
negative [5]
- 71:11,
72:25,
76:6,
85:8,
85:11
negatively
[1] - 88:3
nervous [1]
- 80:4
never [13] -
10:7,
16:3,
16:8,
16:20,
34:24,
41:25,
44:1,
45:8,
71:14,
76:1,
77:10,
85:24,
86:2
Newsies [4]
- 3:25,
24:4,
71:17,
83:19
newspape
r [1] -
83:17
next [8] -
8:10,
22:5,
26:6,
26:7,
26:8,
61:2,
80:16,
85:2
nice [1] -
54:8
night [7] -
20:15,
60:8,
60:24,
61:2,
69:12,
69:23,
82:15
nights [1] -
25:4
NO [1] - 1:4
non [2] -
65:21,
67:5
non-
performing

[2] - 65:21,
67:5
normal [1] -
19:14
normally
[4] - 42:23,
47:21,
48:2
Notary [2] -
5:4, 93:21
noted [1] -
47:3
notes [4] -
4:12,
23:5,
84:8,
84:14
nothing [1]
- 83:5
Notice [1] -
3:23
notice [1] -
33:13
November
[5] - 1:16,
24:13,
24:21,
93:7,
93:23
number [1]
- 34:2
NUMBER
[1] - 3:8
numbers
[1] - 58:18

**O**

o'clock [7] -
20:15,
72:23,
77:23,
77:25,
81:3,
92:13
O'Donnell
[1] - 2:8
O'
DONNELL
[36] - 6:12,
10:2,
10:5,
10:9,
10:13,
11:21,
11:24,
12:6,
12:11,
12:21,
13:2,
14:4,
14:22,
16:5,
19:10,

21:10,
38:4,
38:12,
39:10,
40:1,
43:11,
43:13,
43:18,
47:1,
47:8,
54:17,
58:20,
59:14,
59:18,
59:21,
64:22,
63:7,
91:13,
91:17,
91:25,
92:10
object [15] -
10:6,
12:6,
12:21,
13:2,
14:4,
14:22,
21:10,
38:12,
39:10,
40:1,
43:11,
47:1,
54:17,
58:20,
91:13
Object [1] -
16:5
objected
[2] - 60:12,
60:15
objecting
[1] - 11:24
objection
[8] - 11:25,
12:11,
12:14,
38:4,
47:3,
91:25
objections
[1] - 2:17
obligation
[2] - 42:14,
44:2
observatio
ns [1] -
71:8
obviously
[3] - 18:17,
65:19,
76:23
occasiona

lly [2] -
11:3,
15:20
occurred
[1] - 9:11
OF [1] - 1:1
offense [1]
- 61:5
offensive
[2] - 55:20,
55:21
offered [2] -
7:20,
63:24
office [1] -
57:15
officer [1] -
93:3
Officers [1]
- 16:20
often [1] -
6:23
OLEY [1] -
1:6
Oley [7] -
1:8, 1:10,
1:12,
1:18,
1:19,
31:19,
65:8
Olivia [2] -
9:19
once [2] -
20:14,
81:20
one [39] -
5:19,
7:13,
8:21,
10:23,
13:15,
14:25,
18:5,
19:1,
25:15,
31:16,
45:14,
47:20,
47:23,
47:25,
48:1,
48:2,
48:4,
51:2,
51:7,
56:12,
59:7,
59:9,
60:4,
61:23,
65:21,
67:3,
67:4,

67:5,
67:9,
67:12,
67:13,
69:20,
84:15,
86:22,
89:17,
90:22,
91:2
one-year
[1] - 89:17
ones [1] -
91:5
open [3] -
49:12,
64:11,
67:21
opinion
[2] - 12:12,
33:4
opponents
[1] - 34:4
opportunit
ies [2] -
24:16,
31:20
opportunit
y [3] -
6:25,
7:20, 76:4
opposition
[2] - 34:12,
34:13
option [1] -
75:20
ordinarily
[1] - 47:17
original [1]
- 2:17
Ott [1] -
52:18
outside [3]
- 15:19,
43:25,
82:12
OVSD [1] -
4:17
own [2] -
25:24,
80:3

**P**

PA [3] - 2:4,
2:9, 93:20
PAGE [1] -
3:3
Page [4] -
58:18,
59:4,
83:4, 83:9
page [3] -
58:18,

64:21,
83:11
paper [2] -
59:23,
70:19
papers [6] -
70:3,
70:4,
70:7,
70:9,
70:12,
70:16,
71:13,
79:7
paragraph
[7] - 33:14,
37:17,
59:3,
67:20,
83:11,
85:2, 85:3
parent [6] -
27:4,
40:3,
46:1,
48:18,
48:24,
49:16,
50:9, 89:7
parental [1]
- 34:21,
35:4, 35:7
parents [39]
- 6:3, 9:3,
15:23,
18:11,
21:5,
21:8,
21:25,
26:22,
27:7,
27:17,
27:21,
28:2,
28:7,
28:13,
28:15,
28:18,
29:11,
31:6,
31:12,
31:18,
33:15,
33:19,
34:17,
35:24,
37:18,
38:13,
38:22,
39:1,
39:20,
39:24,
40:13,
40:25,

41:9,
64:9,
80:15,
82:3,
82:4,
82:5,
88:17
parents/
guardians
[1] - 63:9
part [11] -
15:16,
22:22,
23:21,
24:20,
26:17,
56:2,
56:5,
56:7,
56:9,
84:21
participate
[3] - 7:22,
50:4, 78:6
participate
d [2] -
49:19,
65:24
participati
ng [1] -
50:11
particular
[5] - 6:24,
15:1,
24:9,
26:3,
70:18
parties [3] -
67:21,
93:12,
93:14
parts [5] -
8:9,
23:18,
71:18
party [6] -
69:10,
69:13,
70:2,
72:14,
73:3
passed [1] -
90:6
past [3] -
7:12,
71:24,
84:20
PENNSYL
VANIA [1]
- 1:1
Pennsylva
nia [3] -
1:19,
1:24,

93:21
people [21]
- 7:15,
7:22, 8:8,
11:4,
13:17,
21:11,
21:14,
21:15,
21:16,
23:6,
23:11,
23:17,
28:12,
33:4,
36:23,
53:24,
56:4,
70:10,
84:3,
86:17
people's [1]
- 61:12
per [1] -
34:13
perceive [1]
- 28:23
perception
s [1] -
61:12
perfectly
[2] - 11:13,
77:10
perform [2]
- 7:1, 7:7
performin
g [2] -
65:7,
65:21,
67:4,
67:5,
67:9,
67:15,
67:16,
90:23
permitted
[2] - 73:6,
76:18
person [7] -
10:23,
18:6,
27:6,
70:20,
71:9,
86:14,
88:4
personal
[2] - 12:12,
71:2
personally
[1] - 34:4
phone [3] -
34:17,
73:14,

Case 5:19-cv-01873-MAK Document 86-2 Filed 01/13/20 Page 89 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/05/19 Page 89 of 186
Case 5:19-cv-01873-MAK Document 48-2 Filed 12/03/19 Page 86 of 181

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 74:9 | 43:2 | posting [2] | 32:22, | **Q** | 19:13, | d [1] - 66:2 | 40:15, | 86:13, |
| phrase [1] - | point [31] - | - 8:17, | 33:1, | | 21:12, | record [2] - | 41:6, | 88:10, |
| 42:6 | 6:22, 8:4, | 47:13 | 33:10, | questiona | 38:7, | 11:25, | 42:2, | 88:24 |
| phrasing | 8:15, | practice [3] | 33:16, | ble [1] - | 38:17, | 93:8 | 42:4, | Report [2] - |
| [2] - 14:19, | 9:18, | - 47:18, | 33:19, | 32:23 | 39:13, | recorded | 42:15, | 3:21, |
| 56:16 | 11:8, | 75:22, | 34:5, | quiet [2] - | 40:5, | [1] - 93:9 | 42:21, | 17:14 |
| physical [9] | 17:23, | 76:3 | 34:8, | 55:1, | 43:12, | refer [3] - | 43:5, | reported |
| - 54:15, | 18:20, | practices | 34:9, | 55:19 | 43:15, | 5:13, | 43:10, | [10] - |
| 54:18, | 19:4, | [1] - 84:10 | 34:14, | quit [1] - | 43:22, | 33:12, | 43:17, | 13:11, |
| 54:20, | 26:10, | predate [1] | 35:1, | 61:24 | 47:3, | 69:23 | 44:1, | 13:18, |
| 58:2, | 30:22, | - 70:22 | 35:5, | quote [2] - | 47:4, | reference | 44:4, | 86:11, |
| 58:4, | 31:21, | present [5] | 37:18, | 22:14 | 47:10, | [9] - 8:17, | 48:8, | 86:23, |
| 79:2, | 32:18, | - 49:23, | 38:10, | | 54:19, | 8:19, | 48:14, | 87:19, |
| 79:3, | 32:23, | 51:5, | 38:13, | **R** | 58:22, | 8:20, | 50:18, | 87:24, |
| 79:5, 88:5 | 35:9, | 51:14, | 38:16, | | 59:16, | 27:2, | 50:20, | 88:1, |
| physically | 37:16, | 51:18, | 41:22, | Rachael [1] | 59:20, | 28:23, | 53:24, | 88:6, |
| [8] - 55:3, | 40:17, | 52:19 | 41:24, | - 44:25 | 60:1, | 31:14, | 63:10, | 88:8, 88:9 |
| 55:14, | 46:18, | President | 65:5, | raised [1] - | 60:2, | 31:15, | 68:13, | Reporter |
| 55:16, | 49:4, | [1] - 54:1 | 65:24, | 65:13 | 64:23, | 38:15, | 68:18, | [5] - 1:23, |
| 57:16, | 50:19, | presumabl | 70:8, | ran [1] - | 83:8, | 83:16 | 79:11 | 5:4, 5:20, |
| 58:6, | 50:21, | y [1] - 28:5 | 70:23 | 73:16 | 91:15, | referenced | rehearsals | 11:5, |
| 58:10, | 50:22, | pretty [1] - | programs | rather [1] - | 91:20, | [1] - 75:17 | [4] - 27:22, | 93:20 |
| 59:12, | 54:23, | 22:3 | [1] - 29:14 | 9:23 | 92:2, 92:9 | references | 34:2, | reporter [1] |
| 60:4 | 55:13, | previous | proper [1] - | reach [1] - | ready [2] - | [1] - 66:3 | 57:12, | - 86:16 |
| pick [1] - | 56:12, | [2] - 12:4, | 86:17 | 35:24 | 18:9, 54:2 | Referral [3] | 64:2 | Reporter- |
| 84:2 | 57:16, | 54:13 | proud [1] - | reaching | Ready [3] - | - 3:11, | rehearse | Notary [1] |
| place [1] - | 61:10, | previously | 45:14 | [3] - 33:15, | 2:3, 3:4, | 3:19, 3:20 | [2] - 37:7, | - 5:4 |
| 70:18 | 63:6, | [3] - 60:17, | provide [2] | 37:17, | 5:9 | referred [1] | 37:8 | REPORTI |
| Pike [1] - | 65:14, | 71:19, | - 5:19, | 36:9 | realize [2] - | - 17:21 | rehire [1] - | NG [1] - |
| 2:3 | 68:17, | 89:5 | 66:7 | read [8] - | 40:17, | referring | 89:15 | 1:22 |
| pit [1] - | 73:17, | Principal | provided | 8:6, 8:10, | 71:22 | [7] - 5:14, | rehired [1] - | reports [2] - |
| 44:22 | 86:11 | [1] - 1:10 | [1] - 64:25 | 38:21, | really [9] - | 22:7, | 89:23 | 8:2, 88:14 |
| place [3] - | Police [2] - | privately [2] | provides | 39:15, | 29:13, | 22:12, | related [2] - | represent |
| 8:7, 9:3, | 16:19, | - 51:11, | [1] - 31:20 | 39:19, | 45:10, | 27:11, | 90:16, | [1] - 5:10 |
| 88:7 | 17:14 | 52:4 | providing | 63:14, | 50:20, | 27:15, | 93:11 | representi |
| Plaintiff [1] | police [9] - | problem [1] | [1] - 86:13 | 63:16, | 53:16, | 27:19, | relative [1] - | ng [3] - |
| - 59:6 | 8:16, | - 28:5 | Public [2] - | 64:21 | 54:9, | 38:10 | 93:13 | 2:5, 2:10, |
| Plaintiffs | 16:13, | proceedin | 5:4, 93:21 | Reading [2] | 72:18, | regarding | released [1] | 58:24 |
| [5] - 1:4, | 16:15, | gs [1] - | publicly [1] | - 83:17, | 77:2, | [9] - 17:19, | - 25:4 | Request [1] |
| 2:5, 5:10, | 16:22, | 93:9 | - 45:18 | 83:21 | 77:4, | 57:1, 63:8 | remember | - 3:24 |
| 5:13, | 16:25, | process [1] | pulled [1] - | reading [1] | 78:15 | regards [2] | [9] - 21:21, | request [2] - |
| 85:23 | 17:3, | - 34:20 | 81:7 | - 39:2, | realm [2] - | - 17:1, | 55:11, | - 31:4, |
| planning | 8:14, | Productio | purpose [3] | 39:8, | 22:4, 29:9 | 17:3 | 56:16, | 57:7 |
| [2] - 35:10, | 21:7, 22:1 | n [4] - | - 11:20, | 39:11, | reason [4] - | regret [2] - | 56:17, | requested |
| 78:4 | policy [1] - | 62:15, | 37:10, | 39:17, | 24:5, | 91:11, | 72:15, | [3] - 31:7, |
| plans [1] - | 52:8 | 62:20, | 37:14 | 63:11 | 43:4, | 91:22 | 72:21, | 31:8, |
| 67:7 | poorly [1] - | 63:11, | purposes | reads [2] - | 77:2, 84:6 | regular [1] - | 83:15, | 64:10 |
| play [10] - | 56:8 | 68:20 | [1] - 62:1 | 38:6, | reasons [1] | 23:9 | 84:16, | requests |
| 14:12, | position [3] | Program | pursue [1] - | 38:13 | - 42:20 | rehearsal | 90:18 | [1] - 31:17 |
| 24:7, | - 11:21, | [1] - 31:11 | 67:7 | READY [38] | receive [2] - | [35] - 18:7, | removed | required [1] |
| 25:8, | 52:24, | program | pursuing | - 5:6, | 62:12, | 20:24, | [1] - 57:14 | - 49:9 |
| 26:17, | 53:3 | [33] - | [2] - 67:10, | 6:15, | 62:22 | 25:10, | rephrase | Required |
| 27:24, | possibly [1] | 15:16, | 67:16 | 6:19, | received [8] | 25:23, | [2] - 38:8, | [1] - 4:7 |
| 28:3, | - 20:22, | 29:8, | push [1] - | 10:4, | - 27:18, | 26:2, | 88:1 | requires [1] |
| 53:9, | 33:11 | 29:15, | 11:19 | 10:11, | 36:17, | 30:11, | report [12] - | - 53:20 |
| 69:9, | posted [7] - | 29:17, | put [7] - | 10:14, | 39:6, | 30:14, | 13:21, | respected |
| 85:12, | 8:15, | 29:24, | 5:17, | 12:2, | 64:18, | 30:18, | 17:13, | [1] - 60:10 |
| 85:25 | 8:22, 9:9, | 30:12, | 11:25, | 12:8, | 68:17, | 34:18, | 50:13, | respectful |
| played [2] - | 9:21, | 30:23, | 29:10, | 12:13, | 70:10 | 34:20, | 57:6, | [1] - 32:12 |
| 12:1, | 11:18, | 31:6, | 30:20, | 12:24, | recognize | 36:9, | 58:16, | responded |
| 71:18 | 18:13, | 31:20, | 58:21, | 13:5, | [3] - 5:23, | 36:12, | 59:24, | [1] - 55:24 |
| playing [1] - | 46:22 | 32:2, | 59:22, | 14:7, | 13:24, | 36:20, | 74:24, | response |
| 51:7 | Posting [1] | 32:5, | 77:8 | 15:2, | 62:10 | 36:21, | 75:8, | [3] - 64:16, |
| plenty [1] - | - 4:3 | | | 16:7, | recognize | 37:5, | 85:7, | |

75:15, 75:17
rest [2] - 44:20, 82:19
result [2] - 47:12, 85:17
retracting [1] - 61:15
returned [2] - 36:9, 44:9
review [2] - 64:12, 65:1
Richard [1] - 23:20
rights [3] - 86:5, 86:9, 82:7
rip [1] - 79:7
rise [1] - 91:9
role [5] - 6:25, 23:15, 25:15, 54:1
room [1] - 44:17
roughly [3] - 20:10, 72:20, 77:11
Rule [1] - 3:21
run [7] - 30:11, 30:14, 36:2, 37:5, 42:2, 42:4, 53:23
running [2] - 35:5, 85:25

**S**

safety [6] - 46:9, 46:13, 48:19, 48:7, 80:1, 80:3
sarcasm [1] - 47:2
sat [1] - 74:15
saw [7] - 9:13,

9:22, 10:7, 12:18, 52:21, 73:15, 83:13
scene [1] - 26:3
scenes [6] - 6:11, 6:18, 6:21, 7:16, 23:13, 27:4
Schaeffer [1] - 69:1
schedule [2] - 24:23, 25:3
scheduled [1] - 83:17
scholarship [10] - 64:25, 65:3, 65:12, 65:17, 65:22, 67:5, 90:6, 90:10, 90:19
scholarships [2] - 65:8, 66:4
school [23] - 9:12, 17:6, 17:8, 18:18, 20:14, 22:23, 25:8, 26:24, 27:8, 29:10, 40:23, 41:10, 41:13, 52:25, 67:7, 70:13, 71:23, 77:22, 78:21, 80:20, 86:15, 89:8, 89:21, 89:24
SCHOOL [1] - 1:6
School [41]

- 1:8, 1:10, 1:12, 1:18, 5:11, 27:3, 29:5, 29:12, 29:17, 30:5, 30:17, 30:21, 33:25, 35:10, 35:15, 35:25, 36:8, 36:13, 36:16, 36:19, 37:2, 41:22, 42:7, 42:12, 45:19, 45:20, 46:6, 48:10, 48:14, 48:19, 49:9, 49:20, 50:17, 62:25, 68:3, 71:15, 72:2, 82:25, 89:12, 89:21, 89:24
schooler [1] - 55:22
scratch [1] - 10:18
script [1] - 7:18
se [1] - 34:13
sealing [1] - 2:16
season [1] - 63:10
second [7] - 6:6, 48:1, 48:2, 48:4, 64:21, 67:20, 83:11
secret [1] - 28:25
Section [4]

- 4:2, 4:4, 4:5, 4:6
security [1] - 49:3
see [8] - 8:6, 9:2, 10:1, 38:21, 39:8, 55:9, 59:12, 90:1
seeing [2] - 86:25, 87:23
seek [1] - 21:2
selected [2] - 52:20, 66:11
selection [1] - 65:1
semester [1] - 7:23
send [2] - 5:26, 6:2
sending [2] - 21:22, 91:11
Senior [7] - 32:24, 66:18, 76:20, 75:21, 76:13, 89:10, 90:12
Seniors [3] - 73:5, 76:3, 90:24
sent [12] - 9:5, 20:7, 20:8, 20:12, 21:14, 21:15, 25:13, 27:7, 37:21, 40:25, 91:10, 91:23
sentence [7] - 6:6, 8:10, 22:5, 59:4, 63:7, 67:20, 67:25
serves [1] - 35:15
SERVICE

[1] - 1:22
set [2] - 72:24, 77:12
sets [1] - 15:17
seven [1] - 7:15
several [4] - 23:5, 34:17, 50:14, 63:8
shaking [1] - 57:16
Shaner [1] - 44:25
Shank [4] - 8:5, 13:22, 17:11, 18:10, 22:16, 25:19, 29:17, 31:4, 35:4, 35:9, 36:3, 48:6, 49:1, 51:20, 53:1, 57:7, 57:17, 61:1, 61:17, 61:25, 62:14, 63:17, 63:20, 64:2, 64:6, 64:13, 66:8, 67:25, 75:14, 75:18, 76:8, 78:2, 78:11, 78:17, 79:25, 81:19, 83:10, 88:9, 88:11
SHANK [1] - 1:7
Shank's [1] - 75:17, 75:25
shape [2] - 45:9,

80:16
share [1] - 28:10
sharing [1] - 81:16
Sharon [1] - 2:8
shielding [3] - 6:9, 6:14, 6:17
show [40] - 7:1, 7:2, 7:4, 7:5, 7:6, 7:13, 7:14, 9:1, 9:25, 11:17, 13:18, 18:9, 24:11, 27:8, 30:19, 32:6, 32:9, 32:10, 33:17, 34:18, 37:19, 38:2, 38:11, 38:23, 43:7, 43:21, 56:11, 57:13, 61:22, 61:24, 70:21, 77:5, 77:25
showed [4] - 80:13, 81:8, 81:9
showing [5] - 10:6, 53:23, 77:3, 77:23, 78:18
shows [3] - 6:24, 7:11, 82:1
sick [1] - 36:24
side [3] - 21:3, 31:16, 45:24
sides [1] - 19:23
siding [1] - 32:7
simpler [1] - 5:20

simply [1] - 25:15
Sinking [1] - 1:24
sit [5] - 13:23, 26:9, 41:5, 42:19, 91:22
sitting [1] - 40:7
situation [8] - 8:14, 8:24, 18:17, 19:2, 22:2, 26:14, 26:23, 28:19, 78:3
six [3] - 21:20, 21:21, 77:13
slimmed [1] - 23:11
slow [1] - 11:3
small [1] - 6:3
Snapchat [4] - 8:20, 11:18, 20:3, 20:17
so... [1] - 32:24
social [1] - 15:21, 15:22, 58:2, 67:22
someone [9] - 39:15, 45:6, 45:7, 51:19, 52:2, 52:9, 52:10, 67:9, 80:9
sometimes [1] - 71:24
somewhat [1] - 91:5
somewhere [1] - 41:10
son [4] - 22:6, 23:2,

46:20, 72:6
song [1] - 51:7
songs [1] - 51:8
soon [1] - 82:24
sorry [19] - 16:8, 21:13, 44:7, 52:6, 68:16, 73:22, 85:3, 86:20, 90:4, 91:15
sort [4] - 8:7, 14:12, 25:25, 76:13
sound [4] - 20:8, 55:24, 63:1, 69:18
sounded [3] - 13:1, 13:7, 67:2
sounding [1] - 55:23
speaking [3] - 32:15, 32:18, 84:21
specifically [4] - 15:5, 51:21, 58:2, 91:10
specifics [2] - 45:15, 74:7
speculate [1] - 91:18
speculation [1] - 12:7
speech [9] - 73:8, 73:9, 74:8, 74:9, 75:4, 75:17, 76:9, 86:5, 86:9
speeches [3] - 73:4, 75:21, 76:13

speed [1] - 11:6
spent [5] - 6:7, 6:9, 6:13, 6:16, 15:19
spoken [1] - 80:12
sponsorship [1] - 65:5
spot [1] - 26:5
Spring [2] - 1:24, 63:9
STACEY [1] - 1:11
Stacia [1] - 78:10
Stacy [1] - 3:4
STACY [4] - 1:15, 5:2, 93:4, 93:5
staff [3] - 68:23, 88:4, 86:8
Staff [1] - 62:20
stage [7] - 7:16, 37:8, 44:22, 51:3, 51:6, 53:21, 77:4
stand [4] - 26:5, 26:8, 80:17
standing [2] - 50:2, 65:18
start [8] - 5:19, 6:14, 53:18, 53:19, 65:7
started [11] - 26:11, 29:3, 32:11, 34:2, 57:15, 68:13, 70:24, 72:22, 73:14, 73:15, 73:18

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| starting [5] - 4:13, 4:14, 8:11, 34:19, 59:22 | Stoudt [1] - 82:6 | 32:11, 33:16, 35:21, 36:9, 36:15, 36:18, 37:9, | 76:16, 77:23, 78:8, 78:9, 78:14, 80:6, 80:20, | 33:1, 33:17, 37:20, 38:11 **supported** [1] - 33:2 | **Team** [3] - 62:15, 63:11, 68:20 **team** [1] - | 32:14, 64:11 **thoughts** [1] - 33:2 **thousand** | 14:14 **tired** [1] - 26:13 **title** [1] - 53:2 | d [2] - 2:16, 93:7 **treated** [1] - 56:8 **treating** [1] |
| **starts** [2] - 6:13, 77:14 | **Street** [1] - 1:19 **strike** [1] - 82:19 **strikes** [1] - | 37:13, 37:18, 37:21, 37:23, | 81:1, 81:15, 82:14, 84:7, | **supporter** [1] - 32:21 **supportive** [1] - 38:16 | 62:18 **tech** [1] - 43:20 **term** [1] - 89:16 | [1] - 65:15 **threat** [10] - 12:20, 13:12, 13:24, | **today** [8] - 5:19, 10:19, 13:24, 34:10, | - 32:11 **TRIAL** [1] - 1:7 **trial** [1] - 2:18 |
| **statement** [12] - 9:8, 12:4, 16:12, 18:12, | 83:20 **strong** [1] - 57:25 **Student** [1] - 4:12 | 38:2, 38:5, 38:9, 38:14, | 84:9, 84:13, 85:10, 85:19, | **supposed** [3] - 13:13, 26:5, 88:10 | **testified** [1] - 5:4 **testify** [1] - 59:23 | 14:1, 14:3, 14:9, 14:13, | 39:15, 40:7, 41:5, 91:22 | **tried** [2] - 23:3, 23:6 **troubled** [2] - 45:11, 78:16 |
| 19:16, 21:7, 24:1, 57:2, | **student** [32] - 6:11, 6:18, 6:24, 7:10, | 38:15, 38:22, 39:3, 39:20, | 89:8 **students'** [1] - 88:5 **study** [1] - | **suspend** [1] - 92:6 **suspende** d [2] - | **testimony** [8] - 2:17, 13:23, 43:14, 43:15, | 14:20, 78:25, 79:1 **threaten** [1] - | **together** [5] - 20:25, 44:6, 44:6, 44:10, | **true** [1] - 93:8 **truly** [1] - 29:13 **trumped** [1] |
| 59:8, 74:24, 75:6, 76:8 | 8:15, 8:16, 8:17, 8:18, 9:9, | 39:24, 40:2, 40:4, | 67:10 **stuff** [6] - 6:10, | 61:5, 61:7 **suspendin** g [1] - 51:2 | 74:21, 85:22, 93:5, 93:8 | - 56:23 **threatened** [3] - 13:13, | 58:21 **tone** [2] - 19:15, | - 42:16 **trumps** [1] - 42:14 |
| **statement** s [1] - 75:24 **STATES** [1] - 1:1 | 9:21, 13:12, 14:25, 18:13, 24:2, | 40:9, 40:13, 40:16, 40:20, | 6:17, 6:20, 7:25, 23:13, | **Suspensio** n [1] - 4:4 **suspensio** | **Text** [1] - 4:18 **texted** [2] - | 57:22, 57:24 **threatenin** | 60:12 **took** [2] - 9:22, 77:8 | **try** [9] - 10:24, 11:6, |
| **stay** [1] - 82:18 **step** [1] - 26:6 | 25:15, 31:12, 37:11, 38:16, | 40:24, 41:3, 41:6, 41:14, | 61:12 **subject** [1] - 12:14 | n [2] - 61:8, 61:12 **sweet** [1] - | 19:18, 52:17 **texting** [3] - 73:14, | g [6] - 9:23, 12:5, 12:10, 58:7, | **top** [6] - 21:19, 41:4, 41:7, | 19:16, 52:1, 54:1 **trying** [9] - 8:25, |
| **stepped** [1] - 33:13 **sticking** [1] - 71:17 | 44:1, 45:9, 46:4, 48:7, | 41:21, 42:12, 43:9, 43:17, | **subseque** nt [1] - 63:12 | 45:8 **sworn** [2] - 5:3, 93:6 | 73:19, 74:2 **texts** [1] - | 58:8, 58:10 **three** [17] - 7:8, 7:16, | 45:23, 45:25, 58:19, | 38:19, 39:6, 40:6, 45:18, |
| **still** [7] - 12:10, 12:11, 34:20, | 49:6, 52:3, 56:3, 66:4, | 44:4, 44:9, 44:10, 44:13, | **successfu** l [2] - 65:2, 66:10 | **T** | 36:17 **thanked** [1] - 71:16 | 16:5, 15:10, 15:18, 24:9, | 84:11, 84:17 **total** [1] - 53:2 | 47:5, 48:24, 53:18 |
| 39:17, 66:2, 82:16, 90:21 | 61:24, 70:18, 71:6, 71:23, | 44:17, 45:17, 46:15, 48:11, | **sudden** [2] - 24:14, 24:17 | **Tab** [1] - 5:18 **talkers** [1] - | **THE** [33] - 1:1, 1:1, 6:16, | 24:14, 24:15, 31:25, 36:24, | **totally** [3] - 16:24, 28:19, | **Tuesday** [2] - 22:18, 35:13 |
| **stipulated** [1] - 2:16 **STIPULATI** ON [1] - | 80:4 **student's** [3] - 9:10, 9:14, | 48:23, 49:10, 49:20, 50:14, | **sufficient** [1] - 43:4 **suit** [2] - | 11:4 **talks** [1] - 79:6 **Tara** [8] - | 10:6, 11:23, 12:23, 13:4, | 42:9, 54:13, 60:10, 85:23, | 84:1 **tough** [1] - 24:18 **tour** [1] - | **turn** [5] - 10:1, 24:17, 58:13, |
| 2:18 **stood** [4] - 45:5, 45:15, | 67:22 **students** [99] - 7:6, | 50:16, 51:22, 51:24, 53:20, | 91:8, 91:9 **Suite** [2] - 2:4, 2:9 | 22:7, 27:19, 35:10 **Teacher** [1] | 14:6, 14:24, 38:15, 39:11, | 89:8, 91:1 **throughou** t [2] - 5:14, | 83:17 **toward** [5] - 55:7, | 62:7, 75:10 **turning** [2] - 32:6, |
| 50:7, 82:12 **stop** [1] - 42:1 | 7:9, 8:3, 8:4, 9:12, 9:16, | 53:23, 56:1, 61:18, 61:21, | **summarizi** ng [2] - 63:10, | - 3:16 **teacher** [9] - 18:6, | 40:3, 43:20 **theater** [1] - | 63:9 **throw** [1] - 79:8 | 57:15, 59:6, 59:8, 59:13 | 32:10 **two** [26] - 6:9, 6:13, |
| **stopped** [2] - 74:9, 75:19 | 9:20, 13:16, 14:16, 18:7, | 62:4, 63:9, 68:20, 70:17, | 67:4 **summary** [1] - 69:24 | 53:4, 55:22, 60:9, 66:3, | 67:8 **theatre** [5] - 29:15, | **thrown** [4] - 19:1, 19:3, | **towards** [6] - 46:3, 60:4, | 6:16, 7:15, 9:12, 23:8, |
| **stories** [1] - 7:15 **story** [4] - 19:23, | 18:15, 24:8, 24:19, 26:11, | 70:19, 71:1, 72:8, 73:1, | **Sunday** [2] - 76:22, 78:20 | 79:14, 79:15, 79:19, 79:21 | 65:23, 90:25, 91:1, 91:7 | 19:17 **theme** [1] - 33:14 | 65:16, 72:17, 72:18 **TRACY** [1] - | 29:13, 30:19, 35:17, 36:23, |
| 21:3, 28:7, 56:1 | 28:3, 29:12, 31:24, 32:8, | 73:3, 75:20, | **Sundays** [1] - 76:24 **Superinte** ndent [2] - 1:8, 64:25 **Support** [1] - 31:10 **support** [6] - 31:19, 32:5, | **teacher's** [1] - 79:24 **teachers** [4] - 59:7, 59:9, 60:5, 79:7 **teaches** [1] - 53:6 | **theme** [1] - 33:14 **themselve** s [1] - 41:16 **they've** [4] - 15:16, 32:13, | **Tier** [1] - 61:5 **tier** [1] - 61:6 **TIME** [1] - 1:16 **timeframe** [1] - 20:1 **timing** [1] - | 1:7 **tradition** [1] - 70:13 **traditionall** y [1] - 69:19 **transcribe** | 47:20, 51:5, 52:12, 66:4, 77:23, |

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 92 of 186

78:8,
78:9,
80:6,
82:1,
82:3,
82:4,
82:7,
82:13,
84:15,
91:1
**type** [4] -
7:14,
29:14,
54:10,
88:5
**typer** [1] -
11:5
**typically** [4]
- 23:11,
27:25,
43:1, 71:4

**U**

**Ulsh** [1] -
82:6
**ultimately**
[1] - 18:19
**um-hum** [1]
- 81:5
**unaware** [1]
- 28:19
**uncomfort
able** [7] -
25:23,
26:15,
78:18,
78:22,
78:24,
81:17,
81:18
**understoo
d** [2] -
10:21,
85:22
**understud
ies** [3] -
7:6, 7:9,
7:10
**understud
y** [6] -
6:25, 7:2,
7:4, 7:11,
7:13
**unfortunat
ely** [2] -
8:11, 8:14
**uniquely** [1]
- 48:11
**UNITED** [1]
- 1:1
**university**
[1] - 67:6
**Unlawful**

[1] - 4:5
**unnamed**
[1] - 23:1
**unsafe** [1] -
48:23
**up** [39] -
8:24,
10:11,
17:19,
22:3,
23:8,
30:13,
33:17,
37:19,
38:3,
38:11,
38:23,
43:7,
44:21,
45:5,
45:6,
45:9,
45:12,
45:15,
53:23,
54:25,
63:7,
63:17,
68:2,
72:23,
73:13,
74:8,
76:20,
77:3,
77:8,
77:23,
78:18,
79:7,
80:13,
81:8,
81:9,
84:2,
84:3,
92:10
**upset** [4] -
15:9,
57:19,
57:21,
77:24

**V**

**valid** [1] -
42:24
**VALLEY** [1]
- 1:6
**Valley** [5] -
1:8, 1:10,
1:12,
1:18, 65:8
**varied** [1] -
65:13
**vehicle** [1] -
82:16

**verbal** [3] -
55:17,
55:24,
88:5
**verbally** [3]
- 54:25,
55:16,
59:10
**vicinity** [1] -
72:12
**video** [36] -
9:6, 9:22,
9:25,
10:4,
10:5,
11:17,
11:20,
12:1,
12:3,
12:5,
12:10,
12:17,
12:18,
12:19,
13:11,
13:14,
13:18,
13:25,
14:13,
14:14,
14:15,
14:17,
14:20,
15:4,
17:19,
18:2,
19:24,
19:25,
20:2,
20:5,
20:18,
21:3,
46:21,
47:7, 55:9
**view** [1] -
32:18
**Vincent** [1]
- 3:24
**VINCENT**
[1] - 1:3
**Vinny** [38] -
5:15,
23:22,
26:5,
26:6,
33:18,
35:8,
50:24,
51:1,
51:2,
51:4,
51:10,
51:11,
51:13,

53:13,
63:21,
71:13,
71:16,
73:11,
73:13,
74:8,
74:14,
77:16,
77:25,
79:3,
79:5,
80:11,
80:13,
80:18,
80:21,
81:6,
82:10,
82:18,
82:20,
83:13,
84:3,
84:20,
85:8,
85:24
**Vinny's** [2]
- 82:14,
82:16
**violating** [1]
- 86:9
**violence** [2]
- 56:23,
79:2
**visually** [1]
- 9:7
**vocal** [3] -
58:4,
58:12,
67:8
**vocally** [1] -
58:8
**voice** [1] -
60:12
**volunteer**
[2] - 28:15,
70:25
**volunteere
d** [1] - 89:6
**volunteeri
ng** [1] -
15:17
**vs** [1] - 1:5

**W**

**Wagner** [2]
- 9:19,
21:23
**wait** [4] -
19:10,
64:22
**waiting** [1] -
84:2
**waive** [1] -

2:16
**walk** [2] -
6:4, 80:15
**walked** [1] -
57:15,
80:14,
82:11,
84:3,
84:4,
84:20
**WARNER**
[1] - 2:7
**watch** [3] -
11:18,
18:2, 55:9
**watching**
[1] - 11:20
**ways** [1] -
60:7
**Wednesda
y** [1] -
35:16
**week** [7] -
22:19,
32:6,
43:20,
43:23,
58:14,
77:8
**week's** [1] -
68:18
**weekends**
[2] - 15:17,
27:25
**weeks** [1] -
30:19
**welcome**
[1] - 82:21
**well-being**
[1] - 80:8
**whereby** [1]
- 67:22
**whole** [3] -
31:11,
34:5, 34:8
**Witness** [4]
- 5:22,
31:2,
58:15,
75:12
**witness** [5]
- 2:17,
5:3,
59:17,
59:23,
60:3,
82:9,
73:8,
93:5, 93:8
**WITNESS**
[12] - 3:3,
8:16,
10:8,

11:23,
12:23,
13:4,
14:6,
14:24,
38:15,
39:11,
40:3,
43:20
**wonderful**
[2] - 24:9,
24:11
**word** [3] -
54:6,
81:23
**word-for-
word** [1] -
81:23
**wording** [1]
- 36:6
**words** [14] -
22:7,
22:10,
22:13,
22:14,
36:9,
57:4,
58:21,
59:22,
63:15,
71:2,
71:20,
72:2,
80:11,
83:15
**world** [1] -
71:23
**worry** [2] -
9:4, 56:7
**worthwhil
e** [3] -
31:22,
31:24,
32:2
**write** [1] -
70:19
**writing** [2] -
24:8,
83:15
**Written** [1] -
3:23
**written** [2] -
6:22,
59:24
**wrote** [4] -
24:3,
39:12,
39:17,
91:19

**Y**

**year** [15] -
23:5,

53:10,
55:10,
66:5,
66:8,
79:10,
89:12,
89:15,
89:17,
89:21,
89:23,
89:24,
90:2,
90:7,
90:10
**years** [7] -
15:18,
16:1,
24:15,
43:3,
43:16,
54:13,
60:11
**yesterday**
[2] - 81:18,
82:1
**young** [2] -
57:23,
83:19
**yourself** [2]
- 5:11,
89:2

**Z**

**Zackon** [2]
- 26:23,
29:1

Joint Appendix00236

1        IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3    JORDAN ECK, HALEY
     HARTLINE and VINCENT
     FERRIZZI,
4              Plaintiffs       NO. 5:19-CV-01873-MAK

5        vs.

6    OLEY VALLEY SCHOOL
     DISTRICT; TRACY SHANK,
7    individually and as        JURY TRIAL OF 12
     Superintendent of the      DEMANDED
8    Oley Valley School
     District; CHRISTOPHER M.
9    BECKER, individually and
     as Principal of Oley
10   Valley High School; and
     STACEY LYONS,
11   individually and as an
     employee of Oley Valley
12   High School,
               Defendants
13

14

15            DEPONENT:  DR. TRACY SHANK

16

         DATE AND TIME:  Thursday, November 14, 2019
17                        at 10:15 a.m.

18

         LOCATION:  Oley Valley High School
19                   17 Jefferson Street
                     Oley, Pennsylvania
20

21

22

         BERKS COURT REPORTING SERVICE
23            By:  Lori A. Dilks
            Certified Court Reporter
24             10 Fox Glen Drive
     Sinking Spring, Pennsylvania 19608
25            (610) 678-9984
         berkscourtreporting@gmail.com

                                                        1

0111a

Joint Appendix00237

1    APPEARANCES:

2

3        CORNERSTONE LAW FIRM, LLC
         By:  Joel A. Ready, Esquire
         8500 Allentown Pike
4        Suite 3
         Blandon, PA 19510
5
             Representing the Plaintiffs
6

7

8        MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
         By:  Sharon M. O'Donnell, Esquire
         100 Corporate Center Drive
9        Suite 201
         Camp Hill, PA  17011
10
             Representing the Defendants
11

12

13

14

15

16

17       STIPULATION:  It has been stipulated by and between
    counsel that they waive the sealing of the transcribed
    testimony by the witness and the filing of the original
18  with the Court, and all objections, except as to form,
    until the time of trial.
19

20

21

22

23

24

25

                                                        **2**

```
1                        I N D E X

2
        WITNESS                 EXAMINED BY              PAGE
3
        Dr. Tracy Shank         Mr. Ready                  5
4                               Ms. O'Donnell            122
                                Mr. Ready                126
5

6                              EXHIBITS

7
        NUMBER                    DESCRIPTION
8
           1        Letter dated March 20, 2019
9
           2        Maria Jones Narrative
10
           3        Discipline Referral Form
11
           4        E-mail dated March 20, 2019
12
           5        E-mail dated March 21, 2019 and April 25,
13                  2019

14         6        Initial Evaluation Form for Jordan Eck
                    dated 2/22/19, with attachments
15
           7        Teacher Input Form, with attachments
16
           8        Letter dated March 27, 2019, with
17                  attachments

18         9        E-mail chain dated 3/24/19

19         10       Discipline Referral Form for Jordan Eck

20         11       Discipline Referral Form for Jordan Eck

21         12       Joint Report of Rule 26(f) Conference

22         13       Letter dated May 9, 2019

23         14       Prior Written Notice for Initial
                    Evaluation and Request for Consent Form
24                  for Vincent Ferrizzi

25         15       Newsies Cast Members List
```

3

0113a

Joint Appendix00239

| | NUMBER | DESCRIPTION |
|---|---|---|
| 1 | | |
| 2 | 16 | Memorandum dated March 21, 2019 |
| 3 | 17 | Section 220, Student Expression/Distribution and Posting of Materials |
| 4 | | |
| 5 | | |
| | 18 | Section 233, Suspension and Expulsion |
| 6 | 19 | Section 248, Unlawful Harassment |
| 7 | | |
| | 20 | Section 252, Bullying and Cyber Bullying |
| 8 | | |
| 9 | 21 | May 19, 2019 Required Information |
| 10 | 22 | E-mail dated March 19, 2019 |
| 11 | 23 | E-mail dated March 20, 2019 |
| | 24 | E-mail dated March 20, 2019 |
| 12 | | |
| 13 | 25 | E-mail dated March 21, 2019 with handwritten notes |
| 14 | 26 | E-mail chain starting March 25, 2019 |
| 15 | 27 | E-mail chain starting April 2, 2019 |
| 16 | 28 | E-mail dated April 24, 2019 |
| 17 | 29 | E-mail dated April 24, 2019 |
| 18 | 30 | OVSD Code of Conduct |
| 19 | 31 | Text messages |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

4

D114a

Joint Appendix00240

Case 5:19-cv-01873-MAK Document 46-1 Filed 11/25/19 Page 118 of 218

```
 1              PROCEEDINGS
 2        DR. TRACY SHANK
 3    was called as a witness and, having been first duly
 4    sworn by the Reporter-Notary Public, was examined and
 5    testified as follows:
 6    BY MR. READY:
 7        Q.   Good morning, Dr. Shank.
 8        A.   Good morning.
 9        Q.   I'm Joel Ready, and I think you're aware
10    I represent the Plaintiffs in this case.
11        A.   Correct.
12        Q.   Have you had your deposition taken
13    before?
14        A.   Yes.
15        Q.   And you were sitting in on Mr. Becker's
16    deposition the other day, as well?
17        A.   Correct.
18        Q.   So you know basic ground rules that we'll
19    try not to interrupt each other as much as possible, and
20    that I'll ask you to make verbal responses so that Lori
21    can take those down.
22        A.   Correct. Just so you understand, if
23    there is a health/safety emergency, whether we're in the
24    middle of a question or not, I have to leave.
25        Q.   I do understand that and we'll respect
                                                5
 1    that, certainly.
 2        A.   Thank you.
 3        Q.   We know you've had quite a wild morning
 4    this morning dealing with an active shooter drill that
 5    was planned and then a fire drill that was not planned.
 6        A.   Correct.
 7        Q.   Are you still okay to proceed today?
 8        A.   Oh, yes, most definitely.
 9        Q.   I'll start off with just a couple of
10    questions. Tell me about your professional background
11    and how you got into education.
12        A.   I started -- I graduated from Lebanon
13    Valley College in 1989 with a dual Bachelor's degree in
14    music education and psychology. My Master's degree is
15    from Temple University in educational leadership and
16    policy studies. My doctoral degree is in 2001 from
17    Immaculata University in educational leadership and
18    policy studies.
19              I began teaching in 1989. I taught for
20    nine years. I was a 6 through 12 band director and
21    also a theatre director. I worked in our high school
22    theatre, as well. And then I went into Administration
23    in 1998 where I was an Assistant High School Principal,
24    an Assistant Middle School Principal, Assistant
25    Superintendent, and I've been a Superintendent
                                                6
```

```
 1    already since about 2005.
 2              And then I came to Oley Valley in 2010
 3    where I was an Assistant Superintendent for Curriculum
 4    Instruction and then became Acting Superintendent in
 5    2011 and officially Superintendent in 2012.
 6        Q.   And I think our stenographer is going to
 7    ask us to slow down. She's already told me this morning,
 8    so it's not just you. She told me from my performance
 9    the other day I needed to slow down, so we'll both try to
10    do that, if that's all right, but thank you.
11              Your date of hire with the Oley Valley
12    School District, if I understand, was in 2012?
13        A.   '10.
14        Q.   I'm sorry. 2010.
15        A.   It originally was 2010. Formally as
16    Superintendent was 2012.
17        Q.   I see. Thank you for that clarification.
18    And there is a work-related e-mail account with the Oley
19    Valley School District that you use. I don't actually --
20    I believe it's tshank@ovsd.pa.org.
21        A.   Correct.
22        Q.   Is that an inbox that you use
23    exclusively?
24        A.   Sometimes my secretaries will use that --
25        Q.   Okay.
                                                7
 1        A.   -- and check my e-mail if I'm not in the
 2    District. We have proxy access.
 3        Q.   Okay, understood. So they check your
 4    e-mails from time to time?
 5        A.   Um-hum. Yes.
 6        Q.   And are you aware, as regards to e-mails,
 7    that your Counsel provided to us, it appears those
 8    e-mails came from you. Do you know if any of those came
 9    from someone other than you?
10        A.   To my knowledge, without knowing
11    specifically which ones you're referring to, I believe
12    they were all mine.
13        Q.   As we go through these today, if you see
14    one that you did not write will you let us know?
15        A.   Correct.
16        Q.   So as part of your training and your
17    education, I understand you've probably taken some
18    courses on school law and student discipline. Is that
19    right?
20        A.   Correct.
21        Q.   Could you describe your training in
22    respect to student discipline.
23        A.   I've had conferences. I have had classes
24    in both my Master's -- undergraduate, my Master's and my
25    Doctoral program. I have taken courses with the
                                                8
```

Joint Appendix00241

Case 5:19-cv-01873-MAK   Document 46-1   Filed 12/25/19   Page 119 of 218

**Page 9**

1  Pennsylvania School Boards Association
2  I have attended conferences or webinars
3  under Perry Zirkel up at Lehigh University. I have
4  studied special education law. I do a lot of reading
5  in case law. I have been to seminars through our
6  Association, Superintendents Association, Principal
7  Association and Pupil Services Association, all
8  regarding student rights, responsibilities, student
9  discipline, IDA, basically everything that falls under
10  my jurisdiction.
11       Q.  What is IDA?
12       A.  Individual Disability Education Act; that
13  is a Federal law governing special education.
14       Q.  As part of your job here as
15  Superintendent, you set policies for the Oley Valley
16  School District.
17       A.  No. The Board sets policy.
18       Q.  In regards to student discipline, is that
19  also the case?
20       A.  Yes. Our Board policies on student
21  discipline are approved by the School Board. Mrs. Zackon
22  is Chair of the Policy Committee.
23       Q.  And do you have input with that committee
24  as far as what they set as policies?
25       A.  I draft the policies in accordance with

**Page 11**

2       A.  Correct.
3       Q.  And do you advise them on those policies?
4       A.  Through the Solicitor and myself, yes.
5       Q.  Can you discuss how you balance the
6  student's free expression rights against other concerns
7  such as order in the classroom.
8       A.  There's a line between what we
9  tentatively would call —
10            COURT REPORTER: Excuse me —
11            THE WITNESS: I'm sorry. I don't know
12  who I'm supposed to talk to, you or him.
13            COURT REPORTER: If you can just slow
14  down.
15            THE WITNESS: Sorry. I'm used to
16  Stenographer's keeping up in my other depositions. So
17  can you repeat the question?
18  BY MR. READY:
19       Q.  Yeah, sure.
20       A.  Thanks.
21       Q.  How do you balance a student's free
22  expression rights against other concerns such as keeping
23  order in the school environment?
24       A.  We encourage student expression. We have
25  a lot of civil — what we refer to a lot of times as

**Page 10**

1  Pennsylvania School Boards Association regulations and
2  their Council. And then I provide the drafts to the
3  Policy Committee for the Board for discussion and review,
4  and then subsequently put them on the Board Agenda, as
5  directed, for Board approval.
6       Q.  And then you are an ex officio member of
7  the Oley Valley School District School Board. Is that
8  right?
9       A.  I'm a non-voting member. It's a team of
10  ten, if you've heard that.
11       Q.  Explain that a little bit.
12       A.  There's nine members of the Board that
13  control the overall operation of the School District.
14  The Solicitor is a non-voting member, the Board Secretary
15  is kind of a non-voting member and the Superintendent.
16  That means that in my contract I have all rights to every
17  meeting or committee meeting or discussion in executive
18  session.
19            Anything that has to do with my
20  personnel or my evaluation, of course, I'm not there,
21  but I have all rights to information and dialogue and
22  discussion.
23       Q.  So as part of your position then as a
24  part of the team of ten with the School Board, you do
25  interact with them on the policies they set on student

**Page 12**

1  civil discourse. We want students to learn when it's
2  developmentally appropriate. If you're dealing with an
3  elementary student versus a high school student, of
4  course, that's gonna look differently.
5            But we encourage them to seek and
6  express their opinions and their views whether it's a
7  political discussion, current events in social studies,
8  or a discussion over an author or a text in English.
9            The line becomes more gray when the
10  student would be causing a disruption or is not backing
11  their comments with fact or is getting agitated or
12  accusatory or threatening. It's basically — is it a
13  more mature and civil discourse, or is it more
14  targeted; threatening, personal and not issue driven.
15       Q.  Are there meaningful differences between
16  whether a student speaks privately to a teacher or in
17  front of a class?
18       A.  It depends on the topic. Sometimes if a
19  student is having an issue with a teacher, we would
20  recommend that they or they and their parents meet with
21  that teacher in a classroom privately because it's not
22  for other students to hear.
23            Because in today's world, between
24  social media and student interactions and the fact that
25  today's students struggle more with social interactions

**[Page 13]**

1  and communication skills -- especially because they're current
2  used to living behind their screens, that that be done
3  in a teaching environment and not in front of a
4  classroom.
5      A lot of the discussion that we
6  encourage in a classroom is more about the concept of
7  whatever the class is or the nature of the discussion
8  from an educational standpoint.
9      Q.   If a student is asked a direct question
10  by a teacher and believes that the answer to that
11  question is something the teacher will not find
12  palatable, what do you believe a student should do about
13  that situation?
14      A.   I think the student -- it depends what
15  age we're talking about. Are we talking about a high
16  school student, a middle school student, elementary
17  student?
18      Q.   Sure. Let's start with a middle school
19  student.
20      A.   Middle school students, depending on the
21  -- a 6th grader or an 8th grader still isn't going to
22  look differently in today's world, but if they're not
23  comfortable asking it then they need to respectfully and
24  politely respond to the teacher that I'm not comfortable
25  answering at that time. If they're not comfortable

**[Page 14]**

1  answering the question at this time, then they need to
2  say that to the teacher, I'm not comfortable answering
3  that at this time; or if they would like to talk about it
4  later or with my principal and just respond politely,
5  professionally and calmly to that teacher.
6      If they are able to answer the question
7  and then that dialogue is coming across polite,
8  professional, mature and not agitated, aggressive or
9  intimidating in any way -- if you're dealing with an
10  older student -- sometimes 8th graders think they're
11  Seniors and they have all the answers, and they have
12  not yet matured enough to know how to have those
13  conversations -- then that becomes a teachable moment
14  in that classroom. So it's a matter of what age group,
15  what topic you're talking about.
16      For example, we deal with it a lot when
17  it comes to the Presidential election because there
18  are -- as you know, in politics today there are many
19  sides to that issue, and we've actually encouraged our
20  students to have that civil discourse and those
21  discussions in classrooms -- middle school and high
22  school, in particular, just because of the age group --
23  but also to encourage them to seek their rights and to
24  have that expression and be able to have the agree to
25  disagree and walk away and know that that's okay.

**[Page 15]**

1  cannot continue to go at it from the angle that I am
2  the only one who's ever right. There's always multiple
3  sides of an issue and we, as an educational system,
4  need to encourage our students to understand that and
5  mature in the understanding that we need to respect the
6  rights and the statements of others.
7      Q.   So in regards to a middle school student
8  or in regards to a high school student in the same
9  scenario, a teacher asks them a question that they think
10  the answer will not be pleasing or palatable to the
11  teacher, how do you think they should respond, or how is
12  it different from the answer you gave for a middle
13  schooler?
14      A.   I think the only difference in the answer
15  between a middle school student and a high school student
16  is the expectation for a high school student, especially
17  a Junior or a Senior in AP U.S. History or current
18  events.
19      The other course that comes up a lot
20  here at the high school is the Holocaust, and
21  discussions about that is that they need to -- they're
22  expected, as a more mature student and as a 17- or
23  18-year-old, that they are able to articulate
24  themselves much more clearly and directly, calmly and

**[Page 16]**

1  professionally, and not get as emotional or as agitated
2  or loud or acting out as much as you would expect a
3  middle school student because they've not yet mastered
4  their emotions as we would expect a Junior or Senior to
5  have.
6      Q.   So there's a difference then in the
7  expectations between a 12th grader and a middle schooler?
8      A.   We are a developmental institution.
9  There's a difference between a 6th grader and a 7th
10  grader in maturity.
11      When you work with teenagers, there can
12  even be developmental differences within an age group.
13  You can have immature 17-year-olds and you can have
14  very mature 17-year-olds.
15      Every individual is unique and
16  different, and we respect those differences. But we
17  also have to teach the differences, and we have to
18  teach students how to work with each other
19  cooperatively and respect each other's opinions as
20  students, as well as students to adults and adults to
21  students. That's what education is all about,
22  teaching.
23      Q.   Do you agree or disagree with the
24  following statement:  A 12th grade student may form and
25  express a personal opinion on the abilities of a teacher?

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 100 of 186

**Page 17**

1      A.   They have every right that —
2      Q.   Do you agree or disagree with this
3 statement: A 12th grade student may form a personal
4 opinion on the credibility or veracity of a teacher?
5      A.   They have — everyone has — is entitled
6 to an opinion.
7      Q.   And you believe they can all express that
8 opinion. Is that right?
9      A.   Correct.
10      Q.   Are there any differences in your
11 expectations of the students' interactions with teachers
12 and their interactions with their co-curricular leaders
13 such as coaches, Drama Club leaders or band leaders or
14 whoever else?
15      A.   The question is very vague. Can you
16 redefine it, please?
17      MS. O'DONNELL: I was almost going to
18 put an objection in there, but I thought maybe there
19 was something I missed and she didn't.
20 BY MR. READY:
21      Q.   Sure, I'll be happy to. Is there a —
22 you expect a certain level of respect for all of your
23 teachers from the students. Is that right?
24      A.   Students should respect teachers.
25 Teachers should respect students. It doesn't matter

**17**

**Page 18**

1 whether you're the coach who is not a teacher or you're a
2 coach that is a teacher.
3      Q.   And so you expect students to interact in
4 regards to their teachers in the same way they interact
5 in regards to their co-curricular leaders?
6      A.   The expectation is that we are
7 professional and we are mature in our communications as
8 employees, regardless of class of employees.
9      So a custodian is expected to act
10 professionally just as a teacher would be or an
11 Administrator would be.
12      Q.   And you expect that if a custodian or a
13 teacher or a coach on the football field gives a student
14 instruction, you see those all on the same plane for that
15 student to respond to. Is that right?
16      A.   The student should be responding to what
17 the adult — that is in direct supervision of the adult
18 in the building, they should be responding to that.
19      If they have an issue with that, then
20 they should take that to their parents, who would talk
21 to an Administrator or they bring it to — depending on
22 the developmental level of the child, they would bring
23 that directly to the Administrator.
24      Like a high school student would seek
25 out me, they would seek out the Principal, the

**18**

**Page 19**

1 Assistant Principal, someone, to ask them if they
2 didn't feel that the directive they were given was
3 proper. Unless it was unethical, immoral or illegal,
4 then the child should refuse to do that regardless of
5 the level.
6      But, yes, they should be responding
7 respectfully and politely and maturely to an advisor, a
8 coach or a teacher. A teacher does have more authority
9 as a certificated individual, and it is a different
10 class of employee than a support staff advisor or a
11 coach, who is a non-teacher.
12      Q.   Does that give them more authority over
13 the students?
14      A.   It depends on the situation.
15      Q.   What would be a situation that would be
16 an example of how a teacher might have more authority
17 than a co-curricular leader?
18      A.   A teacher in a classroom is bound by our
19 professional Code of Ethics. An advisor, a coach that is
20 a non-teacher, although they are introduced to that, are
21 not bound by the same mandated reporting.
22      So if you are — as an attorney, for
23 instance, you are caught on a DUI, I don't have to
24 report you to anybody.
25      (Brief interruption.)

**19**

**Page 20**

1      (Whereupon, the Reporter read back the
2 referred-to testimony.)
3      THE WITNESS: So if you were an
4 attorney, I don't have to do anything with that. So if
5 you are an advisor, other than reporting to the Board,
6 I don't have to do anything with that.
7      If you're a professional staff member I
8 have the Code of Ethics, but I have to report to the
9 State Department because you're a certificated
10 individual. So there are lines that are different that
11 holds teachers to a higher level of accountability than
12 you would an advisor.
13      What we expect as a system, an
14 educational system, from our employees is the same;
15 that we expect them to be mature and professional and
16 positive with our students, and we are all teachers,
17 regardless of your class of employee.
18 BY MR. READY:
19      Q.   You've already mentioned or we discussed
20 at the very beginning the nature of dealing with threats
21 in the school system. You've done a drill this morning.
22      When a threat is directly reported to
23 you by a student or by anyone that a certain student is
24 threatening others, what is the process for dealing
25 with that?

**20**

Joint Appendix00244

**Page 21**

1      A.   What type of threat —

2      Q.   Let's say a — I believe it to be a

3 threat of bodily harm.

4      A.   We would pull the student who allegedly

5 made the threat for bodily harm into an area. We would

6 interview that person, the Administration, whether it's

7 me or here at the high school or the high school

8 Administration if it's a high school student.

9      Just for trying to narrow the focus,

10 I'll just use that it was a high school student. And

11 then we would seek to interview and do statements,

12 written statements from the students who allegedly were

13 the target of the threat.

14      Depending on whether that threat was

15 credible or not credible, whether it was — in today's

16 world students, because of social media and movies and

17 video gaming, they tend to use words that there isn't

18 intent. So without intent, then it could be

19 disciplinary, it could be a referral to the Student

20 Assistance Team, it could be counseling services.

21      If it is a credible threat, we notify

22 the police, we file a report, not necessarily a charge.

23 We would, of course, notify the parents, bring the

24 parents in, and we'd have a meeting.

25      And then if it's a special education

**Page 22**

1 child, then there's extra steps that we have to take

2 with that, as well.

3      Q.   In that process you mentioned determining

4 if the threat is credible. If the threat is credible,

5 how do you determine if a threat is credible?

6      A.   Through the investigative process. You

7 interview the witnesses. You look at video if there is

8 video. We do not have audio. We only have video in our

9 hallways and large group areas.

10      You talk to any adults that may be in

11 the vicinity. You get written statements from

12 students. You look into, was there prior issues with

13 that particular student, is this a pattern, is it not?

14 Was there a catalyst that incited the student to say

15 whatever the threat was? Did somebody infuriate him or

16 her that words just came out of their mouth which, in

17 today's children, is more second nature then it was,

18 say, ten years ago, which is the influence of, you

19 know, the video gaming and the epidemic and some of the

20 other pieces that we're dealing with in schools today.

21      It's really a full investigative

22 process. It takes a lot of time and a lot of

23 interviews, and then a lot of discussion about — with

24 the Counselors, the Administrators, the School

25 Psychologists.

**Page 23**

1 Assessment Team that we run on a threat depending on

2 what the threat is and the nature of the threat.

3      Q.   The ultimate decision of whether

4 something should be referred for discipline, whether it's

5 a threat or academic related or something else, does that

6 lie with you in the Oley Valley School District?

7      A.   If it's not cut and dry — like if we saw

8 you throw food in the cafeteria and it's on video,

9 buildings do that.

10      If it's anything that is larger than

11 that, we are a very small administrative team so we

12 talk all the time. So I consult with my Administrators

13 on an hourly basis sometimes regarding cases that they

14 have.

15      My job, in particular, depending on the

16 Administrator and their level of experience, is to work

17 through to make sure we're not missing any angles; have

18 you thought about this, have you thought about this,

19 what about this, have you talked to this person, have

20 you talked to that person, to make sure that we've

21 looked at it from all sides.

22      But I, as a commissioned officer in the

23 State of Pennsylvania, I am ultimately responsible for

24 the day-to-day operations of the School District, so

**Page 24**

1 the ultimate responsibility or the buck stops at my

2 desk, so to speak, on all decisions.

3      Q.   When you say you're a commissioned

4 officer, what do you mean by that phrase?

5      A.   I am sworn in by a Judge or a — mine was

6 a Judge. My swearing in was by a Judge at the

7 Courthouse, but there is an oath that we must take to

8 uphold.

9      Q.   So I want to show you a document. I

10 believe you have your binder there in front of you.

11      I'm going to turn your attention to

12 Exhibit 17 and, for your reference, it's behind Tab 17.

13 Do you recognize this document?

14      A.   It's Policy 220, Student Expression.

15      Q.   And have you ever seen this document

16 before?

17      A.   Yes.

18      Q.   And you've read it and are familiar with

19 this document then?

20      A.   Yes.

21      Q.   What training do you or does the School

22 District, as an entity, provide in regards to this

23 document to teachers and Administrators?

24      A.   It's one of the policies that are

25 reviewed. We send out a list of policies to staff every

**Page 25**

1 year that they go over now and over it. In the
2 Teacher's Handbook, which is reviewed annually. It's
3 also in a condensed version in the Student Handbook.
4     Q.   And do you go over it at any meetings?
5 Is there -- I don't know what you call them -- but a work
6 day that you go over policies with teachers at the
7 beginning of a school year or during the school year?
8     A.   At the opening of the school year at our
9 opening -- building level faculty meetings they go
10 through the Student Handbook -- the Teacher Handbook as
11 well as the Student Handbook.
12     Q.   And in those meetings, how much time is
13 spent on this policy in training?
14     A.   That would be a building decision 'cause
15 they go over some policies; they review them.  Teachers
16 are responsible -- it's part of their professional
17 responsibility to review policy and know policy.
18     Q.   So you leave that, I suppose, the
19 training of it, to the building leaders.  Is that
20 correct?
21     A.   Correct.
22     Q.   And who are -- just to be clear, who are
23 the building leaders?
24     A.   The building -- head of the buildings are
25 the Principals.

**Page 26**

1     Q.   Understood.  Who hired Stacy Lyons as
2 Director of the Drama Department?
3     A.   The Board hires.
4     Q.   Did you have involvement in interviewing
5 her?
6     A.   No.
7     Q.   Did you know her before she worked here?
8     A.   She was employed in 2015/16 school year,
9 was hired by Dr. Michael Stauffer, who was the Principal
10 of the high school at that time.
11     I only knew Mrs. Lyons as the mother of
12 Ian Lyons, who was a -- at that time a middle school
13 bass player.  I did not know her theatre background,
14 and there were no records of her ever being employed
15 prior to that in the Oley Valley School District.
16     Q.   You, yourself -- I think you mentioned
17 that you have a background in music and theatre, as well;
18 correct?
19     A.   Correct.
20     Q.   Have you stayed involved with the theatre
21 department here as a result of your background?
22     A.   Yes.
23     Q.   And the decision to hire assistants, such
24 as Mrs. Hartenstine, that lies with Mrs. Lyons?
25     A.   It lies with the building Administration.

**Page 27**

1     A.   Correct.
2     Q.   I just want to clarify -- I think we've
3 got this -- but Mrs. Lyons is not a teacher; she is a
4 co-curricular leader?
5     A.   Yeah, she's extracurricular.  Theatre is
6 an extracurricular position.  She is not a teacher and
7 she's not employed in any other capacity except the Fall
8 play director and the musical director.
9     Q.   Okay.  I want to turn your attention to
10 the events of March 21st, 2019.  This is the day after
11 the School Board meeting at issue in this case.
12     A.   Okay.
13     Q.   There was a meeting in the auditorium
14 with the school show students.  Do you recall that
15 meeting?
16     A.   Yes.
17     Q.   Do you know when you decided to call that
18 meeting?
19     A.   I was instructed by the School Board on
20 Wednesday night to -- the previous evening to meet with
21 the cast and crew to reiterate the fact that they had
22 heard what the students had stated and parents had stated
23 at the Board meeting; that the students needed to know
24 that they were heard, they were listened to, but that my

**Page 28**

1 instruction was that I would be providing continued
2 oversight, because I had oversight of the theatre since I
3 started the investigation into the concerns being
4 expressed in the Ecks in February of 2019, and that I was
5 to meet with the cast and crew to set the expectations
6 for what the rehearsals were to be conducted as; that if
7 the drama and the gossiping did not stop I had authority
8 from the Board, seven of the nine Board of Directors, to
9 cancel the show.
10     And if anyone was going to continue to
11 be disruptive, then I had authority in which to remove
12 them from the show.  Then I talked to the students
13 about being positive, about working together, coming
14 together.
15     They were three weeks -- roughly three
16 weeks out from the opening of the show and that it was
17 a very difficult show, and they could pull it off, but
18 they needed to put all of their personal -- when they
19 walk into the auditorium, much like when we go to work,
20 you have to leave your personal opinions at the door,
21 so to speak, and focus on the job at hand, getting the
22 show ready, making it the best it could be.
23     We believed in them.  My door is always
24 open, told them where my office was here at the high
25 school, and that if they had any concerns or questions

1  that they needed to come -- they could come see me, and
2  we would talk about that.
3      Q.   So that was all discussed, I guess, at
4  the Board meeting on Wednesday night, March the 20th, in
5  an Executive session, I suppose?
6      A.   Correct.
7      Q.   So this was a session that was closed to
8  the public, and they instructed you to deal with the
9  students who were a disruption?
10         MS. O'DONNELL:  Object to the form.
11         MR. READY:  I'm sorry?
12         MS. O'DONNELL:  That was not what she
13  was directed to do.
14         THE WITNESS:  I was directed to meet
15  with the cast and the crew that were present at the
16  meeting and then to inform them that I would be
17  addressing the issues.
18         I was now their go-to for questions,
19  concerns; that I set my expectations for the show; that
20  they needed to -- as a theatre person I understand that
21  rumors happen, that we don't have to get along, but we
22  need to act together, put it aside, move forward; that
23  they were heard by the Board; that I would be looking
24  into the concerns that were expressed, but I needed
25  them to focus on the show, making it the best it could
                                                    29

1  be, come together; that we believed in them, we were
2  behind them, but also that if there were continued
3  disruptions that I did have the authority to cancel the
4  show.
5  BY MR. READY:
6      Q.   Okay.  What sort of disruptions was the
7  Board concerned about?
8      A.   Continually undermining and gossip.
9  There was a movement among some students to, as teenagers
10  do -- I don't know what your experience working with
11  teenagers are, but sometimes they get in their little
12  groups of friends and then the two groups of friends tend
13  to fight each other or start rumors about each
14  other, and then we have to mediate the sessions.  And
15  then we call them frenemies, so we're friends today but
16  we're not tomorrow, and then we're friends the next day
17  because they're teenagers and that's what young people
18  do.
19         And part of an educational system is to
20  teach those social skills that they need in order to
21  survive when they get into the real world 'cause I'm
22  sure, in your place of business, if you chose to do
23  that with your colleagues it wouldn't go over very
24  well.
25         So it's a life lesson that we are
                                                    30

1  oriented to teach, as well.  Sometimes it's easier
2  than others, and when you're dealing with a cast of 70
3  people, cast, crew and pit, it does -- that's a lot of
4  personalities and everything from 9th graders to
5  Seniors who are -- have their own opinions, and they're
6  very much entitled to it, so we have to teach them how
7  to express those in a positive way.
8      Q.   Did the Board, in that discussion, speak
9  with you about your authority to suspend students?  Did
10  that come up in that discussion?
11      A.   No.  I'm granted the ability to suspend
12  students by School Code.
13      Q.   I'd like to ask you to look at Exhibit 4.
14  And I'll represent to you this is an e-mail that was sent
15  by Mrs. Lyons on March the 20th, right after midnight on
16  March the 20th so early in the day.
17         Have you seen this e-mail before?
18      A.   The first time I saw this e-mail is when
19  you sent it to me in your notice that you were Counsel.
20      Q.   Would that have been our letter to the
21  School Board?
22      A.   It was something that came in after you
23  represented the Ecks, and it was attached in that
24  document that you submitted.  I had not seen it till that
25  point.
                                                    31

1      Q.   And you've had an opportunity to read it
2  since that time?
3      A.   Yes.
4      Q.   There are a couple of statements in here
5  that I want to ask you about.  It mentions in the
6  beginning of the second paragraph, I have been working
7  closely with Dr. Shank and the Administration since
8  January.
9         In what ways were you working closely
10  with Mrs. Lyons since January?
11      A.   After Mrs. Eck told Mr. Becker on or
12  about January 3rd, 2019, that she was very upset that her
13  student, Jordan, did not get the lead in the musical, and
14  she was very mad at Mrs. Lyons, and she wanted an apology
15  for her son for not getting the lead in the musical, then
16  Mr. Becker came to me about the concerns that were being
17  expressed about rehearsal times and getting out late and
18  some of the other casting decisions that were made.
19         So I met with Mrs. Lyons and talked to
20  Mrs. Lynch, who was the vocal pit director for the
21  show, to talk to them; do we have the rubrics, do you
22  have the spreadsheets for auditions and casting --
23  'cause that happened over Christmas break, so I was not
24  present in the building when that happened -- to make
25  sure that all the procedures for casting were done
                                                    32

**33**

1 according — you know, fairly, objectively, which they
2 were.
3      So I started doing my oversight and as
4 that continued on — and actually ended up with me in
5 February, early February of 2019 — then I started
6 doing oversight of the theatre myself with visiting
7 rehearsals, talking regularly with Mrs. Lyons, helping
8 — trying to help her to communicate more clearly with
9 students and their expectations and working with Mrs.
10 Lynch, who was doing vocals at that time, to balance
11 the discord between Jared and Jordan over who got the
12 lead in the musical.
13      And then I had met with Mrs. Eck, and
14 then I met with Jordan, and then I met with the
15 Mazaikas, and then trying to mediate this whole
16 situation to get them to understand casting decisions
17 were not made by one individual; they were made by
18 several individuals.
19      And this is what the advisor -- it's
20 just like playing time — I don't know if you were an
21 athlete, but it was like playing time in field hockey
22 right now, not everybody is going to start, not
23 everybody is going to have equal playing time at the
24 high school level.
25      And sometimes we don't always

**34**

1 understand why we didn't get the lead, but there are
2 reasons for that, and it wasn't a single person's
3 decision, and it wasn't based on one isolated moment in
4 time. So there were multiple discussions from that
5 point.
6      I was visiting rehearsals. I was
7 talking to Mrs. Lyons. I was in communication with her
8 on — some days on a daily basis, sometimes a weekly
9 basis depending on where they were and how much
10 snowstorms we had and how much we were in session.
11      And also making sure that things like
12 -- I'm here a lot, so in the evenings when I'm leaving
13 at 9:30, 10 o'clock at night, I should not see students
14 on campus for a rehearsal. So they need to get out
15 earlier because the young people have homework, they
16 need rest, and they have to be in school the next day.
17      So I was making sure that we were
18 adhering to what my expectations were for theatre
19 rehearsals. And the schedule that was set was the same
20 schedule that we have utilized over the last three
21 years that Mrs. Lyons has been doing the shows here at
22 the high school. There was a Director previous to
23 that.
24      But I was also concerned about not
25 making rehearsals late. And, as you may know, students

**35**

1 are — on a junior license can't drive after certain
2 times at night, and I don't like them driving in the
3 wintertime, you know, when it's dark out because they
4 all think they're invincible so — behind the wheel of
5 a car, but they need to be home, you know, by 9:30.
6    Q.  So I take it then some of the rehearsals
7 were going too long for that first couple months of the
8 spring show rehearsals?
9    A.  I thought they were going — for the
10 first couple weeks of January, when they were getting
11 started and we were still making adjustments between the
12 athletes getting to practice and the athletic schedules
13 for winter sports and the work schedules and FFA
14 schedules, it takes a little while to get -- when you're
15 dealing with that many students, to get all their
16 schedules and start and end times -- because you report
17 to rehearsal based on when your character or when your
18 dance rehearsal is.
19      So kids are coming and going at all
20 different times, depending on what act or what scenes
21 they're working on. So choreography could be happening
22 in a lobby, where you could be on stage working on
23 Scene 2.
24      So there are different people running
25 different pieces, so students come and go at all

**36**

1 different times.
2      It's not like an athletic rehearsal —
3 like you heard on the announcements — where you show
4 up at 5 o'clock and it's over at 7:30. Musical
5 rehearsals are established differently.
6    Q.  So you did then discuss with Mrs. Lyons
7 that you felt that the rehearsal times needed to end
8 sooner?
9    A.  Yes.
10    Q.  The third paragraph of this e-mail she
11 says that: Dr. Shank let me know today that this
12 parent — that she had referred to earlier — is planning
13 on attending the School Board meeting tomorrow night at 7
14 p.m. in the high school library.
15      Do you recall that conversation with
16 Mrs. Lyons?
17    A.  Yes. I was informed by a secretary, who
18 heard it from Mrs. Eck, that they were coming to the
19 Board meeting.
20      And for me — it is customary for me to
21 let a teacher, an Administrator or an advisor or coach
22 know if people are coming to the Board meeting to speak
23 either positively or negatively — or, in this case, I
24 had no idea what it was going to be — just as I have a
25 responsibility to inform the Board that a parent may be

Case 5:19-cv-01873-MAK Document 46-1 Filed 10/25/19 Page 126 of 318

**Page 37**

1 coming to talk about an issue in a classroom and
2 whether they show up or not — sometimes they do,
3 sometimes they don't — but it is a communication that
4 is part of my general practice.
5     Q. Were you aware that Mrs. Lyons was going
6 to rally some parents to come to the School Board?
7     A. No, I was not.
8     Q. You've already said you hadn't seen this
9 e-mail until we provided it to you, so I take it you
10 didn't approve of the content of this e-mail?
11     A. No, I did not.
12     Q. I want to back up to the first paragraph
13 here. She mentions in the — I think it's the third
14 sentence, actually: Unfortunately, the situation has
15 escalated to the point that this student posted something
16 against another student and the police were called in.
17     Were you aware of the circumstances of
18 this claim about a police report?
19     A. I knew from the Guidance Counselor and
20 Mr. Becker that there was a Snapchat video that was
21 posted outside of school about fruit that Jared was
22 allergic to, that all the students knew that he was
23 allergic to the fruit that was chosen in the video.
24     I had not seen the video. Mrs. Eck had
25 offered to show it to me on her personal cell phone,

**Page 38**

1 which I declined because I don't look at people's cell
2 phones, personal cell phones, but I had not seen it.
3     I know there was a concern from Mrs.
4 Mazeika about her student — her child's safety because
5 of other issues that had been going on outside of
6 school.
7     And we are — our practice here in the
8 District has been if we know that a parent is going to
9 call the police about an issue, we do give them a
10 heads-up as a customary professionalism to let them
11 know that Parent A may be calling about this.
12     Sometimes they do follow through,
13 sometimes they don't, but it's our working relationship
14 with the police — just as you saw this morning with
15 the fire alarm, the fire company shows up in their
16 pickup truck just to assist us whenever needed. That's
17 part of — one of the positives of being in a small
18 community.
19     So we would do that just as an FYI. We
20 did not file charges. We didn't have anything to do
21 with that other than, hey, this phone call may be
22 coming your way, it may not be.
23     Q. Do you know who told Mrs. Lyons that the
24 police had been called in regards to this incident?
25     A. No, I do not.

**Page 39**

1     Q. You didn't tell her that?
2     A. No, I didn't tell her that.
3     Q. I take it that's not something that would
4 typically be passed on to a co-curricular leader.
5     A. No. That we would consider our
6 confidential information.
7     Q. Do you agree it should not have been
8 shared with other parents in the drama program?
9     A. That information — I don't know who this
10 e-mail went to, so I don't know if it went to one person
11 or 75 people. I can't answer that question.
12     I don't know her motives. You would
13 have to speak to her about that.
14     Q. But do you agree that it was not
15 appropriate to share this information with one or 75
16 people who were not the Eck or Mazeika families?
17     A. It's not mine to judge.
18     Q. So you agree that it's confidential
19 information that shouldn't be shared with —
20     A. Administratively, it's confidential
21 information we do not share. What you would choose to do
22 with it, that's you.
23     Q. So if this information leaks one way or
24 another, then you wouldn't have a concern about a teacher
25 or co-curricular leader then further disseminating that

**Page 40**

1 information, as long as the Administration was no longer
2 involved in the leaking?
3     A. Not necessarily.
4     Q. So why — you say it's not yours to
5 judge; but, I mean, if it's confidential information then
6 —
7     A. Our police reports, we don't go and
8 broadcast them over the PA system. So I don't know who,
9 whether Mrs. — I don't know from this e-mail whether
10 Mrs. Mazeika, who then called the police, told Mrs. Lyons
11 and what that conversation may or may not have looked
12 like, whether she heard it on the grapevine, whether she
13 was at Dunkin' Donuts and heard it there.
14     I can't judge a situation without
15 further information, and your questions are not giving
16 me information in order to answer your question.
17     Q. Okay.
18     A. Does that make sense?
19     Q. Yeah. For a moment I'm going to step
20 aside from how she learned it. You would agree that she
21 shouldn't pass on information that she knew or should
22 have known was confidential?
23     A. I don't know the reason why she chose to
24 pass it on. I don't know — like you're asking me to
25 assume facts that may or may not be accurate.

**41**

1  So maybe, hypothetically speaking, Mrs.
2  Mazeika may have said, Mrs. Lyons, will you share this
3  with the cast and crew?  I don't know if that happened.
4  I don't know what that conversation -- I don't know
5  where she got the information.
6          I would need more detailed, factual
7  information before I can answer the question.
8      Q.   Let's assume that Mrs. Mazeika did share
9  it.  Is that okay for her to then to pass on to parents
10 who are involved in the school show?
11     A.   If Mrs. Mazeika authorized the fact that
12 she called in the police, which Mrs. Mazeika did, and
13 says that to Mrs. Lyons, I want you to communicate this,
14 then Mrs. Lyons would communicate that because the parent
15 requested to share her personal information about the
16 video.
17         But I don't know if that's factual or
18 not, so you're asking me to make an assumption based on
19 -- it could be accurate or inaccurate information.
20     Q.   Okay.
21     A.   I don't know what that would have looked
22 like.
23     Q.   So you're saying, though, it's okay for
24 her to pass on this confidential information if a parent
25 asks her to do so?

**42**

1      A.   It would be no different than passing on
2  medical information about a child.
3          Like we have a student with cancer
4  right now.  We cannot release that information until
5  the parent gave us authorization in which to release
6  that to the faculty.
7      Q.   So that's a good example.  Let's assume
8  that it's a parent not of that student but another parent
9  who says, I have learned that, you know, Student A has
10 cancer; my student, Student B, wants everyone to know.
11 You would agree that shouldn't get passed on to other
12 parents in the school; right?
13     A.   Without that parent -- without the
14 particular parent of that particular student's
15 authorization, that's -- to me that would -- I would not
16 -- if somebody asked me that question, I would not
17 authorize the release of that information until you, as
18 the parent, says it's okay to talk about my child to
19 other people's children.
20         Do you follow me?
21     Q.   Yes.  So, in other words, in this
22 instance we have a claim that Jordan was threatening
23 toward Jared in some way, that he posted a video against
24 him online, and now it gets passed on without Mrs. or Mr.
25 Eck or Jordan's approval or knowledge.

**43**

1      Q.   You would agree that that is an
2  improper release of confidential information?
3          MS. O'DONNELL:  I'm going to object
4  because --
5          THE WITNESS:  There's no names.
6          MS. O'DONNELL:  -- right, there are no
7  names.
8          THE WITNESS:  There's no names in this.
9  So if you don't even -- if you're a parent of a
10 freshman -- and I'm just saying, you know, an
11 example -- if you're a parent of a freshman and you
12 don't know anything about this alleged Snapchat video
13 and you got this e-mail, you wouldn't have any clue if
14 that was Jared or Jordan.
15 BY MR. READY:
16     Q.   Okay.  However, this e-mail does go on to
17 say that this is all because one student was not cast as
18 Jack, which, as you said, was something that most of the
19 cast was aware of.
20     A.   But there are also many students who
21 tried out for Jack that were not cast as Jack.
22     Q.   So you don't believe, based on this
23 e-mail, that it was clear who was being referred to?
24     A.   I can't answer that because I know who it
25 referred to because I have been dealing with this case

**44**

1  since January of 2019.  I can't say what a freshman
2  parent is going to say, who doesn't have the information
3  that I already have.
4          So you're asking me to try and make a
5  hypothesis on something that I can't answer because I
6  have too much information.
7      Q.   Okay, that's fine.  I want to make sure I
8  understand.  You don't have a problem with the release of
9  this information in this e-mail as a, per se, matter,
10 without knowing more.  You're not concerned about the
11 release of a claim that the police were called in on a
12 student for posting a video against another student?
13     A.   That's factual.  That's a factual
14 statement.  Just as it's factual in here that a parent is
15 friends with Mrs. Zackon, who is a School Board member,
16 who was helping to fuel the fire.  That is a factual
17 statement.  Mrs. Zackon was fueling the fire.
18     Q.   Well, of course, that's -- that she's
19 helping to fuel the fire is a statement of opinion, but I
20 think I understand what you're saying.
21     A.   That's fact.  That's not opinion.  She
22 was fueling the fire.  I can tell you that 'cause I deal
23 with the Board.
24     Q.   Sure.  Tell me what you mean by that
25 then.

Case 5:19-cv-01873-MAK   Document 48-1   Filed 11/25/19   Page 128 of 218

**45**

1  A.  Well, because it was made very clear
2  between Jordan and Vinny that Dr. Markley, a Board
3  member, and Mrs. Zackon, a Board member, were behind
4  working with them in March against Mrs. Lyons. That all
5  came out.
6  Q.  When you say working against Mrs. Lyons,
7  could you explain what you mean?
8  A.  Because Mrs. Zackon is friends with Mrs.
9  Eck. And Mrs. Zackon believes that Jordan should have
10  gotten the lead. So, therefore, she sided with Mrs. Eck
11  against Mrs. Lyons.
12  Dr. Markley, who is a former High
13  School Principal, had an issue with Mrs. Lyons's older
14  daughter, Sydney, who's now in theatre on Broadway in
15  New York, and claims that she was a Director at a time
16  that she wasn't even a Director. She was not an
17  employee of the School District prior to the '15/16
18  school year.
19  So he's referring to Mrs. Bortz, the
20  previous Director, in his communications in a public
21  meeting, speaking that it's Mrs. Lyons and it's not.
22  And then he worked as the High School
23  Principal with the older Eck brother and sister, who I
24  don't know because they graduated before I came, and
25  also with the older brother or sister -- I don't know

**46**

1  them -- of Vinny Ferrizzi.
2  So he knows the families from his
3  15-year tenure as High School Principal, so there's a
4  personal connection with two of your clients. So they
5  were working and talking to them because Mrs. Zackon
6  had said in a public meeting that she had been talking
7  with Mrs. Eck.
8  And then the e-mail that you produced
9  to me is like, okay, here it's confirmed again, my
10  suspicion of where some of the undercurrent and why I
11  started losing control of what I was mediating on a
12  day-to-day basis and getting the young men to come
13  together to understand all people are important.
14  All roles are important, nobody
15  functions in a show independently, there are multiple
16  leads, there are multiple reasons in casting. And
17  getting all of this started to settle down again and
18  mediating between Jordan and Jared, and then it would
19  spike, and then it would start to calm down again, only
20  to find out that the whole thing about coming to the
21  Board meeting on the 20th -- or whatever day it was,
22  21st, I can't even remember anymore -- was set up
23  because the Ecks were led to believe that night that
24  the Board was gonna fire Mrs. Lyons.
25  So the Board went into Executive

**47**

1  session -- I'm probably crossing lines right now,
2  but --
3  MS. O'DONNELL:  You're under oath.
4  THE WITNESS:  The Board went in
5  Executive Session to discuss what the students and the
6  parents had said, positive and negative, because
7  everybody is entitled to their opinion. They went in
8  to talk about some of the pieces.
9  I got grilled about what I was doing to
10  supervise. I laid out everything that I had been
11  doing. I laid out all of my supervisory -- my
12  communications, my directives, all of that stuff, which
13  was then summarized after that meeting to Mrs. Lyons;
14  that all of those conversations went on in Executive
15  session.
16  Meanwhile, Mrs. Eck and -- I don't
17  remember the other parents that waited in the
18  hallway -- waiting for a decision from the Board to say
19  why isn't she getting fired; we were told by two Board
20  members she was getting fired. But they had no
21  intention of firing her.
22  The advisor position for a musical is a
23  one-year appointment. So every year we post, every
24  year -- if you want to apply next year, it'll be posted
25  in May, you're more than welcome to join us to do the

**48**

1  theatre -- or come in and you can do some civics
2  lessons for us. But to do those pieces, you know --
3  and I had said to Mrs. Eck, if you have someone else
4  that wants to do it, have them apply.
5  We don't usually get many people 'cause
6  for 3, $4,000 you're gonna give up months and nights
7  and weekends of your life. It's like coaching. You
8  can't find people to do it anymore.
9  But part of that -- all of that came
10  out of that discussion. So we thought -- and the Board
11  was pretty clear that we heard you that night, we will
12  take it under advisement.
13  We went into Executive session. I laid
14  out what I had been doing, all the oversight, all the
15  supervision, all of the dialogue, all of the pieces,
16  trying to get it settled.
17  And then they went out of Executive
18  session. The parents were still in the hallway. They
19  were like why is she not -- what's their action? We
20  don't take action after Executive Session when our
21  meetings are -- our Execs are at the end of the meeting
22  'cause we adjourn the meeting and then go into
23  Executive Session, so there can't be action without
24  reconvening, as you're probably aware.
25  So then that was -- my marching orders,

Joint Appendix00251

1  so to speak, were very clear, and that's what I ended
2  up putting in play the next day with the cast.
3  BY MR. READY:
4      Q.    I want to turn your attention now to what
5  is marked as Exhibit -- I'm sorry. I want to follow up
6  on one other thing you said. You said, I don't look at
7  personal cell phones.
8      A.    I don't.
9      Q.    Can you explain that?
10     A.    When you start looking at what's on
11  somebody's personal cell phone in your capacity as an
12  Administrator, you start to cross lines.
13         Like if you have pictures of your
14  children in your phone, that's one thing. But if
15  you're trying to show me something on your personal
16  cell phone that -- I don't know whether it was
17  doctored, whether it was shopped, photo-shopped or
18  whatever the latest, greatest technology is -- I would
19  rather hear it from Mrs. Lyons or from someone who
20  actually sent it.
21         We have access, of course, to
22  everybody's e-mail, proxy access. We can look at
23  anything anytime. I would rather take it from the
24  source than through this parent to this parent to this
25  parent.

49

1      Q.    So the video that was at issue, the fruit
2  video as we're referring to it, you didn't watch it at
3  any time, did you?
4      A.    Not until you showed it on Monday.
5      Q.    In the deposition of Mr. Becker?
6      A.    Correct.
7      Q.    You've seen that video now. I don't
8  think I need to show it to you again.
9      A.    Correct.
10     Q.    Do you agree that that video does not
11  contain a threat against any third party?
12     A.    That video, when I saw that on Monday,
13  demonstrated how immature Jordan is.
14         If you look at the sequence of events
15  between Jared and Jordan through the course of the
16  January through March time frame and the fact that
17  Jared's -- Jordan's mother was at the dance studio,
18  Allegedly, Jared had claimed that Mrs. Eck was at the
19  dance studio waiting for him to come out, and Jordan
20  was not at a dance practice that night; that he was
21  fearful because of some of the issues that had been
22  going on between the boys outside of school.
23         People knew that he's allergic to the
24  fruit that was chosen in the video. I could understand
25  why a parent would be fearful for their child when you

50

1  put the sequence of events together.
2         If you're looking at the video in
3  isolation, it's very immature for a Senior. And I
4  think it's inappropriate to post something like that
5  because the kids need to realize that whatever's on
6  social media never goes away.
7      Q.    What is inappropriate about it?
8      A.    It's just immature for a Senior.
9      Q.    It's --
10     A.    It doesn't reflect well on his academic
11  intellect or his ability. It was very childish.
12     Q.    Some people say that about puns
13  generally, but I assume you really mean specifically that
14  you believed -- well, I don't want to say why.
15         You're saying it's inappropriate, it
16  doesn't reflect on his intellect. I mean, is it the
17  puns? Is it just the flirty nature of it? What is it
18  that you felt was inappropriate?
19     A.    I just thought that for someone who is as
20  intelligent as he is -- and he is a nice, young man and
21  he had such a bright future.
22         And someone who is going into the
23  theatre, having known -- been in a theatre background,
24  my brother played off Broadway, I have known a lot of
25  people in the theatre -- if they saw that, it would not

51

1  reflect on who his character truly is.
2      Q.    Do you perceive it as a threat against
3  Jared Mazeika?
4      A.    It's not for me to judge. I'm not the
5  parent. My child is not allergic to those particular
6  fruits. My child was not at a dance studio when another
7  parent showed up, without her student being at the
8  rehearsal.
9         Some of the other issues that the two
10  young men had had over the course of the time -- I'm
11  not in Mrs. Mazeika's shoes in order to make the
12  judgment of whether that's -- my son is being
13  threatened by that or not.
14     Q.    Did you ever speak with Jordan about this
15  video or about the concerns that Ms. Mazeika had about
16  Jordan and Jared?
17     A.    Can you rephrase that?
18     Q.    Sure. After Jared -- let me back up.
19  When did you first learn about the fruit video?
20     A.    From Mr. Becker.
21     Q.    And about when was that?
22     A.    I think they called -- met with Ms.
23  Borovik that morning. And Mrs. Eck or Mrs. Mazeika came
24  in -- I don't remember the whole sequence of events, but
25  I think it was later that same afternoon he gave me an

52

**Page 53**

1 update on what had happened in the morning.
2    Q.   This was the day before the Board meeting
3 on the 19th?
4    A.   I'd have to check but maybe on or about.
5    Q.   And did you at that time seek to speak
6 with Jordan Eck?
7    A.   No.
8    Q.   Why not?
9    A.   Because I, for one, was getting ready for
10 a Board meeting, and I had other responsibilities that I
11 needed to adhere to, as well.
12        I did -- had given a directive that no
13 one was to meet with Jordan, Jared or Haley alone or
14 their parents. There needs to be at least two
15 Administrators or a Counselor and Administrator present
16 in all discussions.
17        I did not see -- Mr. Becker had handled
18 it and Mrs. Borovik had handled it, and I didn't see
19 any need for me to follow up on what they had done.
20    Q.   Now, I'll turn your attention to
21 Exhibit 16.
22        MS. O'DONNELL: 16?
23        MR. READY: 16, yes.
24 BY MR. READY:
25    Q.   This appears to be a memo that you

**Page 55**

1    Q.   Was there anything in this memo -- and I
2 believe it's 11 points -- was there anything in this memo
3 that you had not already previously discussed with Mrs.
4 Lyons orally, I should say?
5    A.   I had not talked about communications
6 being copied to Administration. That was something that
7 came out of the e-mail that you just referenced.
8    Q.   And that's No. 2?
9    A.   Yes.
10    Q.   Okay.
11    A.   So I wanted to make sure that we were
12 copied on communications so that if something were sent
13 that was questionable, I at least would have eyes on it.
14 So that came out of that -- that one.
15        (Witness viewed document.)
16        And No. 11, that the applications for
17 the Drama Club scholarship provided to the
18 Administration, that was not previously discussed at
19 that point.
20        And the only reason I included that is
21 because of the concerns raised by Jared and Jordan and
22 other Seniors; that when the applications of the
23 probably 12, 14 Seniors that we had last year came in
24 that they would be evaluated by more than just one
25 individual.

**Page 54**

1 drafted and sent to Mrs. Lyons the day after the School
2 Board meeting.
3    A.   It was drafted the day after the School
4 Board meeting. It was sent to Mrs. Lyons after approval
5 by our Solicitor on or about March 28th, 2019.
6    Q.   And it says here at the first paragraph:
7 As a follow-up to our conversations regarding the
8 concerns expressed by several students and
9 parents/guardians throughout the Spring 2019 musical
10 rehearsal season, I will be summarizing the expectations
11 in this memo.
12        This references previous conversations,
13 and I think you may have already described those. Is
14 that what you were discussing earlier?
15    A.   Correct. What I wanted to do was to
16 summarize my conversations with her from -- beginning in
17 January, as I stated earlier, up through and including
18 March 21st so that there would be very clear expectations
19 articulated so that there wasn't any question as to what
20 I meant in my communications.
21        They had been verbal to that point, a
22 few e-mails here and there, but most of it was
23 conversations before or after musical rehearsals. But
24 I wanted to make it very clear what my expectations
25 were.

**Page 56**

1    Q.   And you've had the opportunity just now
2 to read through all 11 points. So as you recall, No. 2
3 and No. 11 are the only ones that you had not previously
4 discussed -- the only two you had not previously
5 discussed with Mrs. Lyons orally?
6    A.   To the best of my memory, yes.
7    Q.   The applications for the Drama Club
8 scholarship, did you receive those?
9    A.   I received them in late May.
10    Q.   And who applied for the Drama Club
11 scholarship?
12    A.   There were two students.
13    Q.   And who were they?
14    A.   Jared and Jordan.
15    Q.   And who received the scholarship?
16    A.   No one.
17    Q.   Why is that?
18    A.   Because both essays, as we read them,
19 were not well written. Their reference letters were not
20 directed to the scholarship. They were the general
21 reference letters that they used for the college
22 application process.
23        Both students' essays were equally,
24 shall I say, poorly written. So -- and there was one
25 scholarship for two people. And, given the events of

Case 5:19-cv-01873-MAK   Document 64   Filed 01/03/20   Page 110 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 107 of 181
Case 5:19-cv-01873-MAK   Document 46-1   Filed 11/25/19   Page 131 of 218

**Page 57**

1 January through April of 2019, it was decided that
2 neither student would be awarded the one scholarship.
3 And it was not the only scholarship we
4 did not give last year. So there were other Senior
5 scholarships that were not awarded.
6 Q. What other Senior scholarships weren't
7 awarded?
8 A. I'd have to check the list, but I can
9 think of two that, off the top of my head, we did not
10 have students either apply for or qualify for. But I
11 would have to get the list from the high school 'cause
12 that was May and --
13 Q. Sure.
14 A. -- and we give a ton of scholarships.
15 Q. How many do you give?
16 A. We have probably close to a hundred
17 thousand in scholarships about every year.
18 Q. I'm sorry to interrupt. Out of the Oley
19 Valley School District?
20 A. Yeah, and our local community support.
21 Our big ones are through the Foundation, which are 2500
22 to $3,000. But there are some smaller ones, like the
23 Reifsnyder, sometimes the Mark Oswald. I don't think we
24 gave the Channing Mauger scholarship last year to a
25 Senior 'cause they didn't meet the requirements.

**Page 58**

1 So we don't give them all every year.
2 Q. I'm correct in saying that Jordan and
3 Jared both met the requirements for this scholarship;
4 correct?
5 A. To my knowledge, they were in Drama Club,
6 they wrote the essays, they provided the letter of
7 references.
8 Q. Would this be the only scholarship from
9 last year that wasn't awarded, not because of lack of
10 application or qualification, but because of extenuating
11 circumstances?
12 A. I can tell you that there were students
13 who did not receive scholarships, who may have submitted
14 applications for other scholarships that, based on their
15 Senior year, whether it be discipline, academic
16 achievement, may have met the requirements for community
17 service but were not awarded the scholarships.
18 Q. Do you know how many years the Drama Club
19 scholarship has been awarded?
20 A. At best, maybe two, three at max. It's a
21 newer scholarship.
22 Q. Since the first year it was given, has
23 there ever been another year where it was not awarded?
24 A. To my knowledge, it has only been two,
25 three years, so I would say they haven't been around long

**Page 59**

1 enough to not be given a second time.
2 But I can tell you that if there is
3 nobody that applies this year and nobody qualifies, the
4 same procedure would be followed because I have stated
5 that the Administration will review application
6 scholarships this year, as well. That's become our new
7 protocol.
8 Q. Okay.
9 A. And it is consistent with all of our
10 scholarships. So if you want to offer a Cornerstone Law
11 Firm scholarship, it comes to us, Guidance presents it to
12 the Administration, the Administration has final say on
13 the essays that you would want to present to support it.
14 Q. And do you know the total of the
15 scholarship that's awarded for the Drama Club?
16 A. No, I do not.
17 Q. You attended the -- I think you've
18 already said this -- the Oley Valley School Board meeting
19 on March 20th.
20 A. I'm required to be there.
21 Q. I know that there were a number of
22 students who spoke at the meeting, not just our three
23 Plaintiffs, but other students as well. Is that right?
24 A. Positive and negative.
25 Q. Were there any students who were unruly

**Page 60**

1 or disruptive?
2 A. Vinny.
3 Q. How was he unruly or disruptive?
4 A. He overacted his speech, which is Vinny,
5 if you -- as you have met him -- very passionate young
6 man but immature.
7 But he sat down at one point and
8 another student came up to speak or a parent -- I don't
9 remember off the top of my head which it was -- who
10 didn't say things that he agreed with, and he got up
11 and was yelling some things, and then his father
12 actually got up and removed him from the room. I
13 believe it was his father.
14 Q. Do you remember what he -- this was
15 during someone else's speech, you're saying?
16 A. Yes. He got up and interrupted, and then
17 they -- whoever, his father maybe, I think it was,
18 actually escorted him from the room.
19 Q. Do you remember what he was yelling?
20 A. No.
21 Q. What about Jordan or Haley? Were they
22 disruptive?
23 A. In their speech to the Board?
24 Q. At any time.
25 A. During the meeting?

**Page 61**

1   Q.   Yes.

2   A.   No. The Board let them speak as long --

3   usually we have a five-minute limit. We didn't hold to

4   that. We gave them every opportunity to speak.

5        When Vinny stood up and interrupted

6   someone else -- but the Board did not or the Solicitor,

7   who's present, who really kind of runs, you know,

8   public comment, did not -- we did not have to address

9   him from the Board's side. His parent -- I believe it

10   was his dad; I could be wrong on that -- but got up and

11   removed him because he knew he -- the outburst was not

12   appropriate.

13        But outside of that it was a very civil

14   night. Everybody spoke their piece, every -- positive,

15   negative, the students and the parents that were

16   present.

17        In my opinion, having done this for a

18   very long time, it was more -- the more civil public

19   comments of discord, positive and negative, that I have

20   sat through over the years. I've been, you know, in

21   the central office for almost 20 -- I've been an

22   Administrator for almost 22 years now.

23        I have seen them where the audience

24   turns on each other or people interrupt on a regular

25   basis or language. The Board meeting was in no way

**Page 62**

1   like that.

2        And the Board gave them the courtesy to

3   actually extend their time. Public comment ran from

4   about 7:15 to about 8:40 that night. Usually we don't

5   go more than 20 minutes in public comment, and then

6   they shut it down 'cause that's what policy states.

7        But they afforded them every

8   opportunity to say -- and even some of them got up a

9   second time if there was something that they forgot and

10   the Board allowed them to do that, as well, to try and

11   open up the dialogue as much as we could.

12   Q.   Do you remember who got up and spoke a

13   second time?

14   A.   I don't remember offhand 'cause there

15   were so many people in the audience and speaking or

16   reading a letter on behalf of someone who couldn't be

17   there.

18   Q.   Do you remember -- maybe you don't -- do

19   you remember how many students spoke that night, roughly?

20   A.   No.

21   Q.   Did Jordan, Haley or Vinny speak a second

22   time?

23   A.   I don't remember.

24   Q.   So later that evening I understand you

25   became aware of a discussion that had happened between

**Page 63**

1   Jordan, Mrs. Lyons, Maria Jones and Ms. Hartenstine in

2   the hallway after rehearsal.

3   A.   Well, there were two discussions I became

4   aware of. One was with Vinny in that group -- I don't

5   know if Mrs. Jones was present or not -- and then a

6   second one by Jordan.

7   Q.   So the conversation with Jordan, when did

8   you first -- who first approached you about that

9   conversation that happened?

10   A.   I was coming out of Executive Session,

11   trying to go back to my office to go home when Mrs. Jones

12   came and got me and asked me -- and stated that Mrs.

13   Hartenstine wanted to speak to me, that she was very

14   upset about the way Jordan had treated her and spoke to

15   her, and that she felt threatened and intimidated.

16        And I'm like, okay, I'll be right

17   there. So I dropped my items in my office, went down

18   to the auditorium to find out what had happened and,

19   basically, at that point started running an

20   investigation into the fact that Jordan's behavior

21   after the Board meeting -- 'cause I can tell you that

22   he spoke very well during the Board meeting.

23        But after the Board meeting he wanted

24   to have a conversation after Vinny spoke to Mrs. Lyons

25   and that it did not go well.

**Page 64**

1   Q.   Let me back up. Do you know what time,

2   roughly, you got out of Executive Session that night?

3   A.   Not off the top of my head, no.

4   Q.   Your office is -- this is all --

5   everything that we're discussing happened in this

6   building that we're in right now. Is that right?

7   A.   Administrative offices are in the high

8   school.

9   Q.   So we're here in the high school, and so

10   the path -- the walk from the library where the School

11   Board meeting was held to your office, how far is that,

12   roughly?

13   A.   One hallway.

14   Q.   And then from there to the auditorium is?

15   A.   Down one -- maybe 20 yards, 30 yards.

16   Q.   These are all within five minutes of each

17   other. Is that fair?

18   A.   Three minutes between classes. You can

19   get from here to the auditorium in less than three

20   minutes.

21   Q.   So you came out of Executive Session.

22   You were told -- and I'm sorry -- by whom?

23   A.   Mrs. Jones came.

24   Q.   Mrs. Jones. And she said there had been

25   a confrontation. Is that what she said, or how did you

0129a

**Page 65**

1  put it?
2      A.   That there had been -- that Mrs.
3  Hartenstine was very upset, that wanted to speak to me,
4  that she was threatened and intimidated by Jordan, and
5  she wanted to talk to me right away.
6      Q.   And you went and spoke with Mrs.
7  Hartenstine at that time?
8      A.   I spoke to everybody who was present or
9  near that discussion that occurred in the hallway between
10  the individuals that you had mentioned earlier.
11      I also spoke to the custodian, who was
12  originally present. And then both -- the custodian
13  walked away when it started to get heated because he
14  did not feel it was appropriate for him to stay in that
15  environment.
16      Q.   Who is the custodian?
17      A.   Jared Ott.
18      Q.   And --
19      A.   You will see him on the video.
20      Q.   Okay. And who else did you speak to that
21  was present? Ms. Hartenstine, Ms. Jones, Mrs. Lyons; is
22  that right?
23      A.   Correct.
24      Q.   And then did you speak to anyone else?
25      A.   I didn't speak with Jordan until the next

**Page 66**

1  day because he had left for the evening.
2      Q.   How long did your conversation with Ms.
3  Hartenstine go?
4      A.   Oh, I think it was probably -- between
5  interviewing all of them and getting all the facts on
6  that evening, I think I didn't leave here till probably
7  12:30, quarter of 1.
8      Q.   And do you recall -- Ms. Hartenstine told
9  you that she had been -- that she felt threatened?
10      A.   Correct.
11      Q.   Did she say why?
12      A.   Because Jordan would not stop coming at
13  her. I don't remember the exact words that she used at
14  this point, but she felt that she was verbally accosted
15  because he kept trying to insinuate that she was a liar,
16  and that she should be comforting him because he didn't
17  get the lead and because that he -- he wants an apology,
18      And she -- I guess there was -- I was
19  not here when Mrs. Hartenstine was in high school, so
20  this is her version of my investigation in talking with
21  her; that I guess when she was in theatre in high
22  school there was a student who she thought she would
23  get the lead and the other student got it, much similar
24  situation, and those two were friends and how they
25  worked through their friendship.

**Page 67**

1  And then Jordan kept coming at her,
2  well, weren't you needed to be comforted, weren't you
3  upset, weren't you disappointed? And he would not
4  stop.
5      And then he was agitated and getting
6  more verbally aggressive at her that she felt that she
7  was intimidated, that she was being threatened, that
8  she had never been treated by a student like that
9  before as a professional staff member and that -- and
10  she was actually in tears during the conversation with
11  Jordan because he would just not stop coming at her,
12  trying to get her to admit to something that she kept
13  saying that's not accurate.
14      Q.   So was it your understanding at that time
15  then that she felt physically threatened by Jordan?
16      MS. O'DONNELL: Object to the form.
17  She didn't say physically. No one said physically.
18      THE WITNESS: I didn't say physically.
19  BY MR. READY:
20      Q.   And I didn't say that you did. Was it
21  your understanding at that time that she felt physically
22  threatened by Jordan?
23      A.   She was verbally, not physically.
24      Q.   So it wasn't your understanding of your
25  conversation with Ms. Hartenstine that -- it wasn't your

**Page 68**

1  understanding that she felt like she was in some sort of
2  imminent physical threat from Jordan?
3      A.   No. She was intimidated. She felt
4  verbally threatened by him. He would not stop coming at
5  her.
6      He was angry. He was agitated, by his
7  own admission when I sat with him the next day. Arms
8  crossed, hands -- fists clenched, shifting weight, eye
9  rolls, head rolls, like all the nonverbals that you can
10  tell when someone is agitated and upset and angry.
11      So that, combined with his words to
12  her, that's where she felt threatened and intimidated.
13  And she believed that he was calling her a liar, and
14  that she should side with him against Mrs. Lyons, and
15  he needed an apology and that whole conversation.
16      And she was actually in tears during
17  the conversation with Jordan.
18      Q.   I'm going to direct your attention to
19  Exhibit 1, and I believe you've seen this before. This
20  appears to be Ms. Hartenstine's letter to you that
21  evening, March 20th, 2019.
22      A.   Correct.
23      Q.   You asked her to write this; correct?
24      A.   Any time that we do statements and
25  investigation, yes, I want it in writing so that I don't

1  misinterpret. And that's why, like in the last
2  paragraph, the lack of respect that Jordan has shown
3  towards me, as a dedicated teacher, will not be tolerated
4  any longer.
5           It did come out in conversation with
6  Mrs. Hartenstine that Jordan had been not -- his
7  difficulty controlling his emotions and getting
8  agitated or angry at different points up to this point
9  in the musical but this evening, as she put into
10  writing, is that he wanted -- the nature of the
11  conversation and how she felt that she was not treated
12  -- she was threatened and disrespected.
13           Q.   This, I take it, was -- this interaction
14  was sort of the trigger for the discipline of Jordan Eck.
15  Is that right?
16           A.   He crossed the line that night.
17           Q.   Okay.
18           A.   You can have a conversation and you can
19  agree to disagree, just as Vinny did that evening. He
20  met with Mrs. Lyons and Mrs. Hartenstine prior to this
21  conversation with Jordan, and that was a very -- they
22  agreed to disagree, and then Vinny thanked her and then
23  very calmly, you know, went home for the evening. They
24  could agree to disagree, walked away, did not cross the
25  line.

                              69

1           When Jordan chose to get agitated and
2  angry and his nonverbals, as well as coming at -- that
3  the teacher felt disrespected and threatened over not
4  getting the part and he couldn't believe it, that she
5  wouldn't be upset when she didn't get the part when she
6  was in high school and needed to be comforted and kept
7  coming at her, he crossed the line between a civil
8  discourse in conversation and disrespecting a
9  professional staff member.
10           Q.   When you say coming at her, what --
11           A.   Verbally. Not physically, verbally.
12           Q.   So he kept asking her questions, I guess.
13  Is that right?
14           A.   Over and over again and getting more
15  agitated. And it probably went on a whole lot longer
16  than it should have.
17           Like a student -- if a student says to
18  you that, you know, I want to go to the office and you
19  say, please wait until you've finished your test, and
20  then they ask you again and they ask you again, and
21  they're getting louder and more agitated verbally, then
22  they're gonna cross the line.
23           As a professional, they need to do what
24  you asked them to do and please stop. He did not stop.
25  He kept going and going and going to the point where he

                              70

1  had her in tears.
2           Q.   I'm going to show you a video that I
3  think you've seen. This is the surveillance footage --
4           A.   That's correct.
5           Q.   -- in the hallway that night. You've
6  seen this; correct?
7           A.   Yes.
8           Q.   Let me first ask, when was the first time
9  you watched this footage?
10           A.   Probably within a couple days of the
11  actual event.
12           Q.   That would have been after Jordan had
13  been suspended; correct?
14           A.   Right, because it was verbal. We don't
15  have audio on our cameras. There was no physical threat
16  or physical altercation.
17           Q.   So as I point to this video I'll ask you
18  -- maybe you can tell us -- is there a point in this
19  video where his physical conduct would be an example of
20  what you're talking about.
21           A.   When you put his verbal words -- he did
22  not like approach her in proximity or any of those
23  things.
24           When you put the verbal aggressiveness
25  and the non-stopping of his communication with his

                              71

1  nonverbal behaviors of clenched fist, folded arms,
2  shifting weight, leaning back on the wall, the eye
3  rolls, you put all of those into an immature
4  17-year-old, that part is part of his communication.
5           He did not like come at her. He did
6  not go up and put -- you know, stand two inches from
7  her.
8           MS. O'DONNELL:   Lunge, I believe, would
9  be the word.
10           THE WITNESS:   He did not lunge at her,
11  none of those pieces. It was his verbal behavior,
12  compiled with somebody's nonverbal behavior. Because,
13  just as you know, somebody's nonverbal behavior is a
14  reflection of what's coming out of their mouth a lot of
15  times. So if somebody is getting agitated and angry,
16  their nonverbals will reflect that.
17           He shifts his weight a lot, which a lot
18  of people do when they get angry, but he did not lunge
19  at her, he did not walk towards her. He didn't do any
20  of those other pieces.
21           This was his choice of words, his
22  choice of the fact that he did not stop and actually
23  had a teacher in tears because he was relentless in his
24  communication, to the point where he says that she
25  felt threatened and disrespected.

                              0131a      72

**73**

1 And it was confirmed by Maria Jones,
2 who witnessed it, and Stacy Lyons, who I talked to last
3 because I was actually giving her less credibility into
4 the perception of it.
5          But when you have the Board Secretary,
6 who doesn't know anything about anything, what had been
7 going on, was a very perceptual and intelligent person
8 who is reading it, that the nonverbals and that — and
9 that he crossed the line.
10          So everything did confirm.  And I think
11 if you watch the video, you can see that his arms do
12 cross, he is clenching his fists.
13          MR. READY:  What I'm going to do here
14 because I realize we don't — give me one second.
15          (Short pause.)
16          MR. READY:  I'm going to play this
17 video and it's on, roughly, triple speed, and I want to
18 see if we can point out the examples of the body
19 language that you are referring to.
20          (Video played.)
21 BY MR. READY:
22      Q.   So I see him shifting his weight here,
23 and we are at roughly a minute 40.  Is that what you're
24 referring to in terms of his actions?
25      A.   When you deal with teenagers, you learn

**74**

1 to read their nonverbals.
2          You know, you can watch the video all
3 you want and if you're not used to dealing with
4 teenagers and how they get emotional because of their
5 immaturity, you could perceive that very differently
6 than we do as professional educators.
7      Q.   Okay.  So —
8      A.   Right there his arms are clenched.  His
9 arms of folded.
10      Q.   I'm going to pause the video for a
11 moment.  This is at 3:39.  And I'm going to keep playing.
12 Go ahead.
13          (Video played.)
14          So his arms are folded, that's what
15 you're referring to there?
16      A.   And you can see that he's — his arms are
17 — he talks a lot with his hands, shifting his weight.
18          (Video played.)
19      Q.   Now, we are at roughly — at about five
20 there, about five minutes in.  I see Mrs. Lyons also
21 shifting her weight.  Do you think that that's different?
22      A.   I think Mrs. Lyons is shifting her weight
23 because she's standing in the same position.  She's not
24 like — now he's leaning against the wall.
25          Mrs. Hartenstine — anytime you're

**75**

1 standing on terrazzo floors, you're gonna shift your
2 weight because they're hard to be standing on,
3 especially at whatever time of night this was.
4      Q.   And this is after rehearsal, of course,
5 so I'm sure they're all physically tired.
6      A.   They're tired.  Correct.
7      Q.   And I see, if I'm not mistaken, Ms.
8 Hartenstine is wearing some kind of like dance shoes or
9 ballet slippers.
10      A.   I don't know.
11      Q.   Can you tell?
12      A.   What the camera doesn't show is the
13 verbal.
14      Q.   Sure.  Just for the reference of anybody
15 reading a transcript, from the left to right we have Mrs.
16 Lyons with her back to us.  Then we have Jordan facing
17 us.  I think he's the only one whose face we can really
18 see.  Then we have Ms. Hartenstine.  And to her right,
19 also faced away from the camera, barely visible is Ms.
20 Jones.  Is that correct?
21      A.   Correct.
22      Q.   Are there other examples here of the
23 physical behavior that you're referring to?
24      A.   That's posture right there on nonverbals.
25      Q.   And I'm going to pause that.  That's at

**76**

1 8:20.
2      A.   That's what known as a defensive.
3      Q.   Can you explain that a little bit?
4      A.   Usually a nonverbal communication, when
5 somebody's arms are crossed and they're in a wide stance
6 like that, they're usually trying to calm themselves down
7 from getting angry.
8          And then at some points — I don't know
9 if you could see it without blowing it up, but you'll
10 see the clenched fists, as well.
11          When a student starts to get into that
12 stance, then we usually go into a de-escalation mode
13 educationally.
14      Q.   What does that mean, de-escalation mode?
15      A.   That means normally that he's trying to
16 like — you'll see Mrs. Lyons actually start to pull —
17 like hold her hands down in front of her.  You start
18 talking in a more slow pattern, you lower your voice
19 rate, you try to de-escalate the student to make sure
20 that they don't get more verbally aggressive.  We call it
21 de-escalation.
22      Q.   You said we call that de-escalation mode.
23 Essentially what you're saying is — I mean, it's pretty
24 typical of what most people would do in that situation.
25 Is that right?

Joint Appendix00258

Case 5:19-cv-01873-MAK   Document 46-1   Filed 11/25/19   Page 136 of 218

A.   We would hope.

Q.   We would hope.  Maybe not everyone; right?

A.   Not everyone.  Correct.

Q.   I'm going to play it again.

(Video played.)

Q.   You've seen this whole video.  What you've just pointed out, is that typical of the things you observed throughout?

A.   With the folded arms, his weight, the hands in the pockets and the shifting, yeah.

Q.   In other words, I'll spare you the trouble of watching the rest of this.  What we just saw is what you saw in this video that gave you concern?

A.   When I saw the video, it just confirmed the fact that you could tell that you have a 17-year-old student who is starting to get agitated because this went on way too long.

In my professional opinion, Mrs. Lyons and Mrs. Hartenstine should not have entertained him for this long.  They should have stopped the meeting and asked him to reconvene it at another time when it was much calmer heads.

Q.   I take it it's the crossing the arms, it's the – that's what caused you to – you think means

77

they should have called off the meeting at that point?

A.   When a student starts verbally coming at a teacher and repeatedly asking the same questions and don't use – like she says in her statement, you know, just couldn't believe that she wasn't upset and confronted him [sic] about it, that she feels that she's getting to the point where she's disrespected, we should – educationally, we recommend that we stop the meeting and reconvene with parents in another – when calmer heads prevail.

This went on for, in my professional opinion after watching the video, running the investigation – and I had that conversation that you do not entertain a student who is emotional, who is upset, who – that you let it go on for this long.  You've got to rephrase or redirect them to let's meet tomorrow when we've had, what I call, the 24-hour rule just to calm down and reset ourselves.

Whether it's adults or whether it's students – I have the same thing in parent meetings.  If you're in an IEP meeting and it becomes heated, a lot of times we will reconvene an hour later or sometimes the next day so that people have a chance to, in essence, breathe.

Q.   So if this meeting had been called off

78

maybe ten minutes in, that might have changed the suspension of Jordan Eck?

MS. O'DONNELL:  I'm going to object to the form because this video is about 10 minutes.

MR. READY:  The video is about 24 minutes.

MS. O'DONNELL:  The entire video is 24 minutes?

MR. READY:  And I'll allow you to see it.  Just to be clear, we were watching this on triple speed, which is why it's only been a few minutes since we began, but this video is about 24 minutes.

BY MR. READY:

Q.   I'm just trying to understand.  If they had called off this meeting earlier –

A.   When he started coming at Mrs. Hartenstine verbally – not physically, verbally – and she started getting upset, they should have canceled – ended the meeting right there and said to Jordan, please go home and we can talk about this tomorrow; we'll have Dr. Shank, Mr. Becker, your parents – let's sit down and have a discussion about what your concerns are.

It would not have escalated to the point where a teacher would have felt threatened and disrespected because it would have been done in – like

79

Vinny's, his was done in like two minutes.  They parted, they disagreed, they agreed to disagree, Vinny said thank you, he went home for the evening.

This one, as you stated, it went on much longer than it should.  They tried to give Jordan every opportunity to understand and hear what they were telling him.  He was not having it; he was not hearing it.  He kept coming back at them and coming back at them.  At that point, as an educator, you would end the conversation.

Mrs. Lyons is an advisor.  She's not trained in the same way we are.  And Mrs. Hartenstine was already visibly upset and didn't know what to do because you're the Assistant, you're not the Director.

And when you're like an Assistant Principal versus a Principal, you're waiting and then didn't know what to do and she got upset.  But she was threatened – she felt very threatened and disrespected, which we do hold students very accountable for that.

Q.   So this conversation – and I'll stop the video at this point.  It looks like we're at the end.  This conversation – this conversation presented a confusing situation to handle for Ms. Hartenstine because of her emotional state?

D133a   80

Joint Appendix00259

**Page 81**

1    A.    That he pushed her to the point where she
2  got emotional — I've worked with Mrs. Hartenstine for
3  years, both as a long-term sub — I hired Mrs.
4  Hartenstine as a teacher in the School District. I've
5  been in her classroom. I have seen that it takes a lot
6  to get her rattled and upset.
7         When you deal with 23 5th graders every
8  day or 5th graders, ten-year olds, I have not seen —
9  in all my years of working with Mrs. Hartenstine, even
10  as the color guard advisor for the marching band over
11  the years, I have never seen a student get to her as
12  much as he did that evening.
13    Q.    I'm going to direct our attention to
14  Exhibit 2. I'm not sure if that's what we were just
15  looking at or not.
16         But Exhibit 2, this is Bates stamped
17  OVSD 75. This was provided to us by your Counsel in
18  discovery. It is a — and I should say it's 75 and
19  76 — it is a two-page letter written by Marie Jones to
20  you. Do you recognize this document.
21    A.    This was Maria Jones' statement regarding
22  what she witnessed in the hallway.
23    Q.    You reviewed this that night or the
24  following morning, perhaps?
25    A.    I interviewed Mrs. Jones that night where

**Page 82**

1  she told me what she witnessed in the conversation. And
2  then, as I normally do, I asked her to follow it up; I
3  need you to put it in writing for me.
4    Q.    Is there anything omitted from this
5  statement that she had told you that night that was
6  material to your determination of Jordan's discipline?
7  You can certainly take the time to read it.
8    A.    (Witness reviewed document.)
9         What was the question?
10    Q.    Is there anything that was not in this
11  written statement, now that you've read it, that you
12  relied on that night or the next morning in determining
13  Jordan Eck's discipline?
14    A.    From Mrs. Jones, Mrs. Jones' statement
15  did align with what Mrs. Lyons had told me, as well as
16  what Mrs. Hartenstine had told me. The disrespect, the
17  threatening nature, the anger, the clenched fists, all of
18  those pieces were confirmed by Mrs. Jones, who had next
19  to no information on the back story of what had been
20  going on for the last three months.
21    Q.    So to be specific, there's nothing else
22  that Mrs. Jones told you that night orally that's not in
23  this written statement that's material?
24    A.    Not that I remember.
25    Q.    And I'll ask you the same question about

**Page 83**

1  Exhibit 1.  This is Ms. Hartenstine's statement to you,
2  which you may have already read it. If you want a minute
3  to read it, you certainly can.
4    A.    (Witness reviewed document.)
5         (Short recess was taken.)
6  BY MR. READY:
7    Q.    So the question that I was asking is —
8  you've had a chance to review Exhibit 1 — is there
9  anything else that Ms. Hartenstine told you that night
10  that's not reflected in this document that was material
11  to your determination of Jordan's discipline?
12    A.    My investigation showed that I had a
13  student and I needed to, you know, talk to the student
14  the next day to get his side of the story, as well,
15  'cause he had already left for the evening — that went
16  on for, as you stated, 20 minutes, continually the same
17  questions, intimidating, disrespecting a teacher, who
18  then felt threatened to the point where she's in tears in
19  front of a student in the hallway, witnessed by someone
20  who had no knowledge or information, who confirmed it
21  with Mrs. Lyons, that everybody heard and said the same
22  things, that he had not stopped.
23         If he had done what Vinny had done in
24  Vinny's conversation with Mrs. Lyons, asked the
25  questions — Vinny was upset, too, or angry or whatever

**Page 84**

1  you want to call it — but very calmly said, as to
2  whatever it was they talked about, which I don't know
3  the knowledge of that conversation — but then they
4  agreed to disagree, he walked away, two, three minutes,
5  went home for the evening.
6         If Jordan had done the same thing that
7  evening, asked whatever it was he needed to ask, asked
8  Ms. Hartenstine — which, I believe, according to her,
9  was about the lead in the play — that when she didn't
10  get the lead that she thought she should have been
11  entitled to, just as he didn't get the lead that he
12  thought he was entitled to, and she said to him, no, I
13  was upset, but then I did my role. If he had said
14  thank you, we can agree to disagree, have a good night
15  and left, there would be no discipline.
16         The fact that he continued to go on to
17  the point where he had a professional staff member in
18  tears and did not stop, so he crossed the line between
19  having an agree to disagree civil conversation to one
20  where he is agitated and angry towards a staff member
21  and continually went on and on and on.
22    Q.    At the end of this second paragraph she
23  says: Mrs. Lyons asked Jordan if he was accusing me of
24  lying. He vocalized that he still did not believe me,
25  making me feel like he was calling me a liar about a

0134a

**Page 85**

1  situation he knows nothing about that happened ten years
2  ago; I felt threatened and disrespected, what should
3  Jordan have done in this situation when asked this direct
4  question by Ms. Lyons about the veracity of Ms.
5  Hartenstine's story?
6      A.   The question is -- she asked him a direct
7  question, are you calling her a liar, and then he says he
8  still does not believe me. Well, is that, yes, you're
9  calling her a liar or, no, you're not?
10      He, also, according to the statement --
11  he did not say I don't believe you because I feel this
12  way or because here are the facts to support why I
13  don't believe what you're saying.
14      But when you have a teacher at this
15  point who is upset, who is in tears, who's trying to
16  say, yes, I was upset and this is how I handled it,
17  like a life lesson and trying to educate -- because she
18  is a teacher -- that we all have disappointments in our
19  lives, we all think that we should get parts or jobs or
20  solos or whatever that we thought we should have gotten
21  that we didn't, it's how we respond to that situation
22  that is critical.
23      And at some point you just gotta accept
24  the fact that there are people who make decisions, and
25  we can agree to disagree with them, but they have their

**Page 86**

1  rationale.
2      And the production team of individuals
3  made the decision to cast this show in December of 2018
4  where he was in a support role, not necessarily the
5  lead role that he thought he was entitled to as a
6  Senior in the Drama Department.
7      And he could not get his head around
8  the fact that I didn't get the lead at my Senior show
9  and I'm majoring in theatre, and he couldn't figure out
10  why and people owed him an apology, which goes back to
11  January of 2019 with Mrs. Ecks' conversation.
12      Q.   So what he should have done then, when he
13  was asked if he was accusing Ms. Hartenstine of lying, is
14  what?
15      He should have refused to answer?
16  Should he have said, you know, let's continue this
17  conversation tomorrow when everyone is calmed down?
18  What do you believe he should have done?
19      A.   Professionally, I don't think he should
20  have even taken this conversation to the point where you
21  have a teacher in tears and, as a 17-year-old Senior,
22  continue to ask the same question and try and tell her
23  how she should feel.
24      As a young adult, he should be having
25  empathy and understanding that people are going to

**Page 87**

1  perceive and do things differently than maybe I
2  believe, and have an understanding that people can come
3  to a situation and agree to disagree and respect her
4  decision and respect her answer.
5      He may think -- in his mind he may
6  think she was lying. She tried to be honest and up
7  front about this is how I dealt with it, this is what I
8  did when I was in this situation, but he wasn't hearing
9  anything except his own opinion and his own thoughts.
10      Q.   So sticking to that opinion and those
11  thoughts and refusing to change his mind is what
12  ultimately was his mistake here?
13      A.   No. His mistake was he continued to go
14  at the teacher on the same issues over and over and over
15  again in an agitated, angry state in which she felt
16  threatened and disrespected to a professional staff
17  member for, as you said, 20 minutes; the student did not
18  stop.
19      Where his mistake was, when he started
20  getting angry or upset, he should have been able to
21  self-regulate himself as a Senior in high school, to
22  know that I'm getting upset, I'm getting angry, let's
23  just reconvene -- like Vinny did. Vinny was like,
24  let's talk about this later.
25      Q.   If that's true of a Senior in high

**Page 88**

1  school, isn't that also true of Ms. Hartenstine? At some
2  point she should have said, you know what, I'm upset, I'm
3  angry, I'm in tears, let's have this conversation
4  tomorrow?
5      A.   Right. But if you watch the video, it
6  took him almost 15 minutes to get her to the point where
7  she's in -- crying. I mean, she's trying to empathize
8  with him and get him to understand this is how I dealt
9  with it, this is how -- to try to teach him that tomorrow
10  can be a new day. He would not stop.
11      Q.   But essentially what you're saying is
12  they wouldn't stop, but no one stopped this conversation.
13      So why is it that Jordan is more
14  responsible for knowing the point at which this
15  conversation should stop than the adults in the room?
16      A.   'Cause this was Jordan's requested
17  conversation, so they're trying to give him the benefit
18  of the doubt and answer his questions and be responsive,
19  let him speak his mind, do all the stuff to get him to
20  understand, to empathize with him, to try and see a
21  different point of view so that he can focus on the role
22  that he was given, and not necessarily the one he thought
23  he was entitled to, but he would not -- he would not
24  give.
25      And if you've worked with Jordan at

Case 5:19-cv-01873-MAK Document 46-1 Filed 11/25/19 Page 139 of 218

**89**

1   all, as I have, he gets to a point where he just
2   doesn't stop. Like there is a -- he has an issue with
3   self-regulation.
4           So -- which is one of the reasons why
5   they kept trying to re-issue or re-discuss or
6   re-communicate this is where we're at and this is my
7   answer, and he couldn't respect the fact that Mrs.
8   Hartenstine is telling him this is how I dealt with it,
9   this is how I felt, this is what I did.
10          And it was like he wouldn't take what
11   she's saying and listen to it. He was listening to
12   respond and not listening to understand. Does that
13   make sense to you?
14      Q.   Sure, I understand what you're saying.
15   Yeah.
16          Let me turn to Exhibit 2. There's a
17   couple comments here I just want to call your attention
18   to.
19          I'm looking at Page 2 of this document.
20   And, actually, let me go straight to the last sentence:
21   In my daily interactions with students, I have not seen
22   this level of anger and lack of awareness of others'
23   feelings.
24          You interact with a lot of students, as
25   does Ms. Jones. Based on your review of this

**90**

1   situation, do you agree with that statement?
2          MS. O'DONNELL: Object to the form. Do
3   you agree that she wrote it? Do you agree that she
4   felt that way?
5   BY MR. READY:
6      Q.   Sure. I'll rephrase. Do you agree that
7   you have not seen -- that you have not seen this level of
8   anger and lack of awareness of other's feelings in
9   students on a day-to-day basis?
10     A.   Maria has or I have?
11     Q.   You.
12     A.   Oh, I've seen lots -- I've seen it in a
13   5th grader I'm dealing with right now. I've seen -- I
14   deal with students all the time literally from
15   5-year-olds to 18-year-olds. I deal with adults all the
16   time.
17     Q.   Ms. Jones says here that she has never
18   seen this level of anger and lack of awareness of others'
19   feelings.
20          So I guess I'm wondering -- and, of
21   course, you probably have more contact with students
22   than Ms. Jones.
23     A.   Yes, I do.
24     Q.   You personally, though, you wouldn't
25   agree that you've not seen this level of anger or lack of

**91**

1   awareness of others' feelings in students?
2     A.   In my 31 years of experience, I've seen
3   people act like Jordan did, I've seen people act like
4   Vinny did, very maturely and calmly, and I've seen
5   students who have gotten, due to -- I've seen students
6   who have had emotional disturbance diagnoses who have
7   been -- acted out more than Jordan did that night. I
8   have seen in 31 years the gamut.
9     Q.   You've seen worse than this?
10     A.   Yes.
11     Q.   I'm going to turn your attention now to
12   Exhibit 30. I'm going to ask you to look at this in
13   conjunction with Exhibit 10, which I will represent to
14   you Exhibit 10 is just the suspension notice for Jordan.
15     A.   (Witness complies.)
16     Q.   I'll give you a moment to find those.
17     A.   Oh, the referrals?
18     Q.   Correct.
19     A.   Okay.
20     Q.   So the referral for discipline -- and I
21   believe in the conversation, also, you told Jordan that
22   this was a Level 3 suspension.
23     A.   It could be 2, 3 or 4. Level 2, 3 or 4's
24   are all suspendable levels. I don't live -- in my world,
25   I live on the behavior. I don't live by levels. Like I

**92**

1   don't memorize that this is a Level 3 or a Level 4. I
2   know Levels 2's, 3's and 4's are all suspendable
3   offenses.
4     Q.   You're aware that Jordan was given a
5   Level 3 suspension for this, though; correct?
6     A.   Yeah. But it still -- it could have been
7   a Level 2, and it still would have been a suspension.
8     Q.   So I want to look at the Code of Conduct
9   here, and I'll turn to -- I'll turn to what is Page 3 of
10   this document. OVSD 850 is the Bates stamp. And the
11   page before that and this page lists the Level 3
12   offenses.
13          And so I won't belabor the point. Do
14   you see his offense in this Level 3 list, as we look at
15   it now.
16     A.   And Level 2 is also a suspendable-level
17   offense, so you could have it in Level 2, you could have
18   in a Level 3. He did threaten a teacher verbally, as the
19   teacher put in to her statement. He was disrespectful.
20     Q.   And the --
21     A.   And this list is --
22     Q.   The threat to the teacher was what?
23     A.   It was verbal, and we just went over all
24   that in Mrs. Hartenstine's statement.
25     Q.   There's nothing else to add in regards to

1  the content of the threat that he made to her?

2     A.   These levels are examples. They're not

3  all-encompassing lists.

4       So if you're trying to pinpoint

5  something in a particular list, you could have

6  something listed in Level 2 that can be, due to the

7  actions of the student, be in Level 3.

8       So when you're looking at it, you're

9  looking at a disruption. You're looking at,

10  considering — it could be — to use the kid word today

11  of bullying of a teacher 'cause he didn't stop, he kept

12  repeatedly going at it with the same questions.

13       You're looking at insubordination

14  because he wasn't like calming down. She was trying to

15  calm him down, and he wouldn't.

16       You're looking at — there's multiple

17  places, and this list does not have every infraction

18  that is going to be listed because there's no list

19  under the sun that's going to list every possible

20  instance that a student could have, and that's why 2's,

21  3's and 4's are all suspendable-level offenses.

22       So Mr. Becker put it as a Level 3

23  'cause I said — when I met with Mrs. Eck and Jordan I

24  said it could be — what level offense it is. I'm

25  like, yeah, it could be two levels — Level 2, Level 3,

93

1  but this is what it is, and this is a three-day out

2  because you disrespected a teacher and that she felt

3  threatened.

4       And he agreed that — his statement was

5  something to the effect of that, I understand how she

6  could feel that way; I was angry, I was upset.

7       And I said to him — I said to him then

8  why didn't you just go home and talk to them later?

9  And that's when he said, well, Dr. Markley said we

10  should come to rehearsal and talk about it.

11       So then — and I said, do you

12  understand that when you're already angry and upset how

13  that communication style is different, tone of voice,

14  perception, body language? I demonstrated, clenched

15  fists, folded arms. He's like, yes, I can understand

16  that.

17       It's the same way when I said, you

18  know, because of your behavior and the ongoing issues I

19  have to remove you from the show. And his quote to me

20  was, that's for the best, so he knew.

21       And we also knew that morning he had

22  already secured counsel, so we knew where this was

23  going at like 7:30, 8 o'clock that morning because Mrs.

24  Eck had already communicated that they were seeking

25  counsel, which is why I agreed — 'cause normally on a

94

1  three-day suspension we don't have to have a parent

2  present.

3       And, according to policy, in the first

4  three days the informal hearing doesn't kick in until

5  after day three. So I said to bring Mrs. Eck in, I'm

6  good with this; she can hear everything I have to say.

7       And I talked him through how he could

8  have responded differently, how perception is a lot of

9  times reality with people because you see a situation

10  and I see a situation, and we can see the same thing

11  and think of it two different ways. It has to do with

12  prerequisite knowledge that we bring to the event.

13       And then he admitted that he did. And

14  he's like, I think this is for the best. And then he

15  went into a whole discussion about all these people

16  that were going to quit the show and all of his friends

17  are gonna quit, and what was I going to do about that.

18       I said, that's my problem, that's why I

19  sit in the chair, that's why I am ultimately

20  responsible. Because if they quit the show, then I

21  either have to recast the show, or I have to cancel the

22  show. I said, but that is my job.

23       We are three weeks out from the show —

24  this was not the weekend before the show as one of the

25  documents portrayed — and that that's my problem if

95

1  they did, and I will give you them opportunity.

2       I explained to him that I would be

3  meeting with the cast because his girlfriend, Haley,

4  already knew that he was removed from the show before

5  the cast meeting, which is why she was so agitated and

6  making noises and pounding her book bag on the ground

7  and tapping her foot very loudly when I was trying to

8  speak —

9     Q.   We —

10     A.   May I finish?

11     Q.   Yeah, we'll get to that in just a second.

12     A.   Can I finish my thought — finish what

13  I'm saying, please?

14     Q.   Let me —

15       MS. O'DONNELL: Let her finish, Joel.

16       MR. READY: I'm going to object. I

17  understand. It's non-responsive.

18       I understand what you're saying. We

19  will come back to that, and I will give you a chance to

20  talk about that.

21       MS. O'DONNELL: No, no. Just let her

22  finish. You can —

23       THE WITNESS: I'm still talking about

24  my conversation with Jordan. So I explained to him and

25  meanwhile — and he admitted to what he had done. He

96

**97**

1 admitted that perceptually he was angry. He admitted
2 that he was raising his voice.
3     I never said that he lunged or came at
4 her. Jordan is very good — he's a good actor, and he
5 embellishes things as actors do.
6     But he admitted that day — I had the
7 statement from Mrs. Hartenstine laying on Mr. Becker's
8 desk in front of him. And Mr. Becker was sitting
9 behind his desk, we were sitting in front of his desk.
10 Mrs. Eck was on the — closest to the door, Jordan was
11 in the middle, and I was on the other side of Jordan.
12     I said, it's right here if you want to
13 read the statement. And he was like, no, that's okay,
14 I know what I did; I can understand why she would be
15 upset.
16 BY MR. READY:
17    Q.   It's your testimony here today that you
18 showed him — offered to show him —
19    A.   I offered to show him.
20    Q.   — that you offered to show him the
21 statement of Ms. Hartenstine and that he declined and
22 said I know what I did?
23    A.   Yes. He's not going to tell you that
24 because it doesn't support the narrative, but it was
25 laying on Mr. Becker's desk right in front of him. He

**98**

1 had an opportunity to explain why he behaved the way he
2 did. His answer to me was, I was angry, I was upset they
3 didn't fire her.
4     And that's when the whole thing in
5 leaving the auditorium that night, the night before,
6 that it was from — and the investigated [sic] shows
7 that this — the investigation — when I was doing the
8 investigation on Wednesday that — when they left the
9 Board meeting that night, the public comment — because
10 when public comment is closed — I don't know if you do
11 Board Meetings or not but most of the public leaves
12 after public comment. They don't always stay for the
13 Board meeting because they're really kinda boring.
14     But then the Board said to them that
15 they — when they — when I said earlier they will take
16 it under advisement, they will take — they heard what
17 people said, they will discuss it, and then they left,
18 then they — the parents stayed in the hallway and they
19 — the kids went back to rehearsal.
20     And then Jordan was already still angry
21 and upset. So — and after the conversation with Mrs.
22 Lyons, Ms. Hartenstine and Ms. Jones on the way out, he
23 was stating — and I don't remember to who, off the top
24 of my head — but the fact that this is not over;
25 they're going to get more people.

**99**

1    Q.   You overheard this?
2    A.   I was not there. I was in Executive
3 Session.
4    Q.   Who did you hear this from?
5    A.   It was in the investigation that I talked
6 — as I just stated, with Mrs. Lyons, Mrs. Jones and Mrs.
7 Hartenstine.
8     MS. O'DONNELL: It's in Exhibit 2.
9     THE WITNESS: And it's Exhibit 2.
10 BY MR. READY:
11    Q.   Okay.
12    A.   So — and then — so I had talked to him
13 about anger and calming down and how you should have
14 conducted — with Jordan the next day — how we could do
15 it different. We talked about perception.
16     I actually stood up at one point and
17 demonstrated if I stood there with folded arms and
18 clenched fists and shifting my weight, how would you
19 feel? He said, I can understand.
20     The statement from Mrs. Hartenstine was
21 laying on Mr. Becker's desk directly in front of Mr.
22 Eck — in front of Jordan. And I said, it's right
23 there, do you want to read it? And he's like, no,
24 that's okay.
25    Q.   I want to turn your attention to Exhibit

**100**

1 25.
2    A.   (Witness complies.)
3    Q.   This is an e-mail from you to Mr. Becker.
4    A.   Correct.
5    Q.   And you said — this was sent, it looks
6 like, March 21st, 7:37 in the morning.
7    A.   Um-hum.
8    Q.   That's correct?
9    A.   Correct.
10    Q.   And you said this will be a three-out. I
11 assume that means a three-day suspension?
12    A.   Correct.
13    Q.   And he will be out of the show?
14    A.   Correct.
15    Q.   So that decision had been made that
16 morning before you had a chance to meet with Jordan;
17 correct?
18    A.   I — at this point in time, I was
19 mentoring Mr. Becker as a new High School Principal. I
20 was calling discipline decisions on multiple students,
21 not just this student.
22     Going into the meeting with Jordan,
23 based on the infraction, on the intimidation and
24 disrespect of a teacher, is generally a three-day out.
25     Because Mr. Becker comes from a

0138a   **100**

**101**
```
1  different school district and we take a very strong
2  stance on disrespect to a teacher, our procedure here
3  is a three-day. So I don't know if he knew that or
4  didn't know that, so I was being clear in my
5  communication.
6          If Jordan had — and one of the things
7  that happened in the meeting with Jordan, even though
8  it was a three-day out, because he was honest and calm
9  and mature in the meeting with him and his mother and
10 Mr. Becker, is why I made the decision not to remove
11 him from Honor Society or fully remove him from Drama
12 Club.
13         Now, hence, he wasn't ever removed as
14 President because Mr. Becker did not do the — a
15 re-election or Drama Club meeting, so he really
16 actually retained that title even though I said he
17 would be removed as President and still in Drama Club,
18 which means he was able to wear the colors of the
19 Theatre Department for graduation. There's like a cord
20 that they wear with their cap and gown.
21         And he stayed in Honor Society because
22 of the way he did handle himself and the fact that he
23 owned his behavior and his anger and the fact that he
24 didn't stop.
25         So I was able to lessen the consequence
```

**103**
```
1  coming into the auditorium, I heard Mr. Becker say
2  something — 'cause I asked him, are all the students
3  here? And I said, how many do we have? And he said,
4  like 50 and Haley said, no, 49 because Jordan had already
5  left; he wouldn't at the meeting.
6          And then she — they all — I had
7  everybody get seated, and then I began to talk about
8  how much we respected their voice at the meeting last
9  night and rehearsals and the expectations.
10         Haley's sitting off to the — on the
11 end seat on the left, on the center section of the
12 auditorium, tapping her foot, banging her book bag,
13 rolling her eyes. So I did what's called teacher wait
14 time where you remain quiet and you wait for kids to
15 settle down, and then she would settle down.
16         Then I would go to speak again, and
17 then she was disruptive again and tapping and banging
18 her book and rolling her eyes and restless and shifting
19 stuff and slamming stuff. And then I would look at
20 her, which is — we call it the teacher look; I'm sure
21 you remember that from school — and then she wouldn't
22 stop, and eventually I said, do you want to leave? And
23 she's like, yes.
24         So she gets up, slams her stuff, yells
25 I quit and goes slamming out, threw her book bag
```

**102**
```
1  because on a suspension you're generally removed from
2  National Honor Society. It's one of the rules.
3          But as Superintendent, I do have
4  override rights for that. And because of this
5  situation and trying to balance all sides of it and his
6  communication and understanding in that meeting, I was
7  able to pull back some of the other pieces that would
8  have been in play.
9      Q.   I want to go with you to a discussion
10 about the meeting that happened in the auditorium with
11 the school show team.
12     A.   Okay.
13     Q.   You called that meeting and had them all
14 come down?
15     A.   Correct, as I was instructed to do, yes.
16     Q.   And you announced to them at that time
17 that Jordan had been suspended?
18     A.   No.
19     Q.   You did not?
20     A.   I did not. Haley did.
21     Q.   Haley had told other students?
22     A.   Haley had told other students because if
23 Jordan was not in school, then Haley wouldn't be in
24 school. And Haley wanted to be with Jordan 'cause mom
25 took — Mrs. Eck took Jordan home because, as I was
```

**104**
```
1  against the door on the lower end of the auditorium
2  that the door flew back, slammed against the concrete
3  wall. Kids started to cry because she made such a
4  disruption, and I looked at Mr. Becker, and I said you
5  will deal with that before you leave.
6          And then I went on talking about we
7  need to be positive, and we need to come together, and
8  the show needs to go on and having theatre and the
9  gossip stops and kinda resetting expectations.
10     Q.   Before Haley quit, you said if anybody
11 doesn't like what we've laid out here, you can quit.
12     A.   You can quit, please let Mrs. Lyons know,
13 talk to your parents, you have 48 hours, don't — you
14 know, it will not reflect negatively.
15         I understand, having been in theatre.
16 They know I'm theatre, they know I'm music. I'm very
17 active in theatre and music — or was very active in
18 theatre and music here.
19         And then — so that I hadn't put that
20 out because that was one of the things. If you don't
21 want to participate in the show — there are kids that
22 didn't like Newsies. It's a very different show. I
23 don't know if you know that. That show is not a
24 classic, you know, Fidler on the Roof or a Brigadoon
25 that were kind of the '40s level big shows. So it was
```

**Page 105**

1　very different.
2　　　Q.　At that point, when you said if you have
3　a problem you can quit, you also then at that point,
4　based on Haley's actions of putting books or moving
5　things around, you said you look like you're ready to
6　leave. Do you recall that?
7　　　A.　No, I do not.
8　　　Q.　You don't recall saying to her, you look
9　like you're ready to leave so you can go now?
10　　　A.　No, I didn't.
11　　　Q.　When you said to —
12　　　A.　I just said — I did say to her, like
13　when she was banging her stuff, I looked at her and I'm
14　like, do you want to leave? And she's like, yes, and
15　that's when she got up and made this huge scene on the
16　way out. That's what I said.
17　　　　　I didn't say you look like you want to
18　leave. I just said, do you want to leave? Because it
19　was very obvious, and she's on her phone — and I would
20　assume texting Jordan — that she was trying to get out
21　of the meeting.
22　　　　　And with the disruption that she was
23　causing during the times I was trying to speak to the
24　cast, I finally looked and her, after trying to
25　redirect two or three times, I'm like do you just want

**Page 106**

1　to go, like do you want to leave? And she's like, yes,
2　and then she yelled and went out the door. That's what
3　I said.
4　　　Q.　When you spoke to Mr. Becker and told him
5　to deal with that, you also told him to suspend Haley?
6　　　A.　For one day because he asked me, what do
7　you want me to do? I said, well, that was a disruption
8　while the Superintendent is speaking; that's a one-day
9　suspension.
10　　　Q.　Was this after the students had dispersed
11　after the meeting?
12　　　A.　They probably were walking out. I don't
13　remember. We were standing in the pit. He and I stepped
14　back.
15　　　　　The kids were — some of them were
16　crying, trying to get themselves together. Because
17　when she left in her anger, then that kinda put some of
18　our other students over the edge or over the top 'cause
19　they were still — you know, kids in the room that are
20　Jordan fans or Jared fans, so you're still trying to
21　bring them together to leave their differences at the
22　door, to come together, put a show together, you know,
23　the whole adage the show must go on.
24　　　　　But once she left, it was so disruptive
25　that that kind of — I had to re-focus them all again

**Page 107**

1　to finish what I had to say as far as expectations for
2　rehearsal and academics and here's your communication,
3　and if you have questions, concerns, you come see me;
4　you'll see me around, open rehearsals, your parents are
5　welcome, all the stuff that, you know, I needed to
6　articulate to the students to let them know that they
7　were heard, they were understood, and that I was on top
8　of it, and I would be, you know, addressing things.
9　　　Q.　You also told a student not to make any
10　other negative statements about the show or Mrs. Lyons.
11　　　A.　They were not supposed to be gossiping.
12　I didn't say the negative statements. My thing was that
13　you can't be starting rumors or gossiping. If they had
14　negative things to say — they were also told if they had
15　concerns or questions, they were to come directly to me.
16　　　Q.　I want to fast forward to the night after
17　the school show at the after-party. You're aware at this
18　point of the statements that Jared made at the after-
19　party; correct?
20　　　A.　As I am today?
21　　　Q.　Yeah, as you sit here today you're aware.
22　　　A.　As I sit here today, yes. I didn't at
23　the time, but —
24　　　Q.　When did you learn about them?
25　　　A.　Probably from Grace Bertin's mom.

**Page 108**

1　　　Q.　And you heard that he used inappropriate
2　language and, also, that he said anybody who has a
3　problem with Mrs. Lyons will have to deal with me or that
4　I'll come after them?
5　　　A.　That's what Ms. Bertin had said.
6　　　Q.　Did you investigate those comments at
7　all?
8　　　A.　I went back to Mrs. Lyons to answer the
9　questions that Mrs. Bertin had sent me, and I had talked
10　to Mrs. Becker — Mr. Becker, and I talked to a few
11　students and — about what went on, what didn't go on,
12　and there was conflicting information on that.
13　　　Q.　Did you talk to Jared?
14　　　A.　No, I did not.
15　　　Q.　Did you speak — did Mrs. Lyons — had
16　she witnessed those statements?
17　　　A.　I don't recall.
18　　　Q.　I'm going to give you a document. I
19　don't believe this was in our binders, so give me just a
20　moment.
21　　　　　I received this from Counsel and may
22　have received it previously, but I'll give you copies
23　of these. I'm going to make this Exhibit 31. We
24　didn't have this in the original binder, so I'll add it
25　now for Exhibit 31.

0140a

1  Do you recognize these text messages
2  (indicating)?
3      A.     (No response.)
4      Q.     I'm sorry, let me be more clear. There
5  are two pages here. These were provided by your Counsel.
6  The second page of text messages is what I'm referring
7  to. Do you recognize these (indicating)?
8      A.     The first page I don't. I don't know
9  what that is. The second page, yes. This was the text
10  message that I received at 10:21 on Sunday, the 14th.
11      Q.     And I assume this is the only
12  communication that you received from Mrs. Lyons or anyone
13  about the — that led to your decision about Vinny to be
14  removed?
15      A.     To send him home?
16      Q.     Correct.
17      A.     Yeah, because it was obvious to me from
18  Mrs. Lyons' text that we were gonna have an issue.
19          And the fact that I was not at the set
20  strike between Mrs. Lyons and whatever parents and
21  Vinny that actually — when I said in my text, if he
22  shows just send him home, was as much to protect Vinny
23  than having an issue with Mrs. Lyons because the show
24  was over. Vinny did extremely well in the show. He's
25  a good actor.

109

1      Q.     Do you remember this e-mail?
2      A.     Yes.
3      Q.     Why did you not agree to meet at any
4  point with Mrs. Hartline?
5      A.     Well, it wasn't that I didn't agree at
6  any time. I was not meeting with her in her heated
7  state. Mrs. Hartline is not a resident of the District.
8  She lives in Muhlenberg School District.
9          Her primary custodial parent is her
10  father, whose address was Main Street. 'Cause if a
11  student's living in Muhlenberg, obviously, they're not
12  our student.
13          So if she's living with her mother,
14  who, according to Mrs. Eck, was not a fit mother, then
15  I would meet with her. But if a parent is hot, then
16  she needs to calm down before we have a meeting with
17  all parties because it would not help at that
18  particular time, on 4/2/2019.
19      Q.     And you never did meet with Ms. Hartline,
20  did you?
21      A.     No, 'cause after Haley chose to quit the
22  show, there was no other issue with Ms. Hartline.
23      Q.     Did you ever meet with Haley about any of
24  the disciplinary action taken against her?
25      A.     No. My interactions with Haley for most

111

1  And that he, based on what — and I had
2  not known at that point what happened the night
3  before — that to send the kid home. Having done
4  theatre, he's probably exhausted. They were up all
5  night doing the cast party, celebrating as they should,
6  just go home and rest.
7      Q.     So there was no other conversation with
8  Mrs. Lyons other than what's contained here; correct?
9      A.     Correct.
10      Q.     About that?
11      A.     Right.
12      Q.     You did not at any point meet with Vinny
13  about the decision, did you?
14      A.     No.
15      Q.     I'm going to ask you to look at
16  Exhibit 27, which is in your binder.
17          This is an e-mail chain between you and
18  Mr. Becker. I'll point you down to the bottom of the
19  page.
20          At the very bottom, actually, of this
21  first page — this appears to be an e-mail from you —
22  it says: I understand a meeting will not be helpful.
23  And this is in response to a request from Haley
24  Hartline's mom to meet.
25      A.     Correct.

110

1  of the show was basically when she came into my office to
2  get snacks.
3      Q.     There was an incident in which Jordan was
4  reported for not letting Haley eat. Are you familiar
5  with this?
6      A.     There was an allegation from Alexis Henry
7  at Kutztown that was transmitted verbally to Mrs. Lyons,
8  who then called me about the concern. I met with Jordan,
9  with Mrs. Cambria, Director of Student Services, to just
10  see what is up.
11          It was one of those meetings where I
12  had to look into it, but I had reason to believe there
13  was nothing to it.
14      Q.     Mrs. Lyons said she did not report that
15  to ChildLine. Did you?
16      A.     No, because there was nothing there to
17  report. That would have been inappropriate for me to
18  report it to ChildLine.
19          It was Alexis Henry, who was a college
20  student, talking to a student and it got lost in
21  translation so it was vague, but there was no evidence
22  to that.
23      Q.     I want to turn to Exhibit 29. There are
24  several paragraphs here. I'm going to look at what's
25  labeled No. 2. And down at the bottom of this it says

112

**113**

1  that Mrs. Lyons, during Jared's speech -- actually, let
2  me back up.
3  　　　　The second sentence here: His
4  15-minute speech included phrases like -- excuse my
5  language -- bitches be bitches and don't mess with
6  Lyons; she will take you down.
7  　　　　And down -- further down it says that
8  Mrs. Lyons -- she -- stood behind him nodding her head
9  in agreement with his toxic and inappropriate remarks.
10  You went on to say that this speech should have been
11  stopped.
12  　　A.　Correct, because I -- if that did occur
13  as the way it was -- and Mrs. Lyons explained to me when
14  I took Mrs. Bertin's questions -- this was done in an
15  e-mail -- and told Mrs. Lyons and Mr. Becker that I need
16  responses to these concerns expressed by a stud- -- by a
17  parent, that I want responses in writing, which is my
18  normal protocol, especially when you're gathering
19  information from several parties because you don't want
20  to get it mixed up or lost in translation; that there was
21  an inconsistency on where Mrs. Lyons was at this time
22  between who said what.
23  　　　　But what I was telling Ms. Bertin at
24  this time was basically if any of this -- what she said
25  happened, it isn't correct and the adults should stop

**114**

1  it.
2  　　　　I have hence, since this time, also
3  addressed with Mrs. Lyons for this year's show, since
4  the Board did approve her 8/1 in September to do this
5  '19/20 musical and the fall play, that any kind of
6  Senior speeches needed to be more supervised for
7  content, language, that this was appropriate --
8  inappropriate.
9  　　　　And that's why Mrs. -- I guess Mrs.
10  Lyons for the last three years has given an opportunity
11  at the cast party, after the final show of the musical,
12  for the Seniors to talk to the underclassman.
13  　　　　But what she describes here and having
14  worked with Mrs. Bertin over the years -- her daughter
15  was a Senior last year -- to know that I have not found
16  that what she said to -- to not be credible, and had I
17  known it earlier or known like the day after or been
18  able to confirm it, the show would go on; it would have
19  been dealt with.
20  　　　　But I do not tolerate language, nor do
21  I tolerate disrespect, that it should have been
22  stopped.
23  　　　　But I could not -- I had information to
24  show that either Mrs. Lyons was within proximity, then
25  there was other information that said that she was off

**115**

1  stage and didn't hear it.
2  　　　　I couldn't confirm it to take any
3  formal disciplinary action on it, but I did not talk to
4  Jared.
5  　　Q.　I understand, of course, you're a
6  Defendant in this lawsuit, but what do you want from the
7  outcome of this lawsuit?
8  　　　　MS. O'DONNELL: Objection to the form.
9  　　　　MR. READY: What do you want at the
10  outcome of this lawsuit, that's the form you object to?
11  　　　　MS. O'DONNELL: Yeah. What do you
12  want? She wants not to be a Defendant.
13  BY MR. READY:
14  　　Q.　Is that a fair summary?
15  　　A.　I'm just -- I'm doing my job to the best
16  of my ability. I assume whoever the Judge is in this
17  case will decide that.
18  　　Q.　Did you have conversations with Mrs.
19  Lyons at any time about how to balance students -- these
20  three students or any student's free speech rights versus
21  the other concerns about their behavior?
22  　　A.　Can you clarify your question?
23  　　Q.　Yeah, sure. Did you ever supervise or
24  train Mrs. Lyons about how to balance the first amendment
25  rights of the students to disagree with a teacher versus

**116**

1  the concerns that you've expressed that led to their
2  suspension?
3  　　A.　I had conversations with Mrs. Lyons
4  throughout, as I stated, from January to April about what
5  I called the three P's. She needs to be polite, she
6  needs to be professional, and she needs to be positive.
7  　　　　She needs to let them speak their mind
8  and not take it personally, as any professional; that
9  students are students and they are immature, and they
10  don't have the worldly experiences that you do when
11  you're out of college and work in the real world, and
12  that we need to help educate them on the proper way to
13  communicate.
14  　　　　But I also talked to her about there
15  are lines that you don't cross with a student. They
16  can't be disruptive, they can't be disorderly, they
17  can't use language, they can't, you know, intimidate,
18  threaten or disrespect, but they need to learn how --
19  and Seniors in high school, for the most part, have
20  learned those skills.
21  　　Q.　I may have one or two other questions.
22  I'm just going take a quick look.
23  　　　　But let me just ask you, is there
24  anything that I have asked you about that you wanted to
25  add anything additionally to your answer or thought you

1    didn't get the chance to fully explain yourself?
2       A.   I think that the biggest piece of this
3    goes back to the fact that Jordan did not get the lead in
4    the musical that he felt he was entitled to. He was
5    looking from Jan- -- from his mom's own -- mother's own
6    admission and his mother's -- through January through his
7    removal in March of the show, which he stated was for the
8    best, that he did not understand or would not accept that
9    he wasn't the lead.
10       And at one point he also was trying to
11    intimidate Jared to get him to quit so he thought he
12    would be the lead in the musical. There are at least
13    two documented incidences where Jared had met with
14    people, Guidance and myself, about quitting the show
15    and just giving Jordan what he wants. He hence, as you
16    know, did not end up quitting the show.
17       You're dealing with high school
18    teenagers, who are 17 years old, who think that high
19    school is the end all, be all, as we all did when we
20    were in high school. You know, you don't see life past
21    it till you get out and you reflect back.
22       I think the other piece that you didn't
23    address today is the fact that it was Mrs. Eck who
24    actually gave us information about Jordan's mental
25    health and anger issues in February of 2019 that led to

<div align="center">117</div>

1    the issuance of, under Child Find -- I'm not sure if
2    you're familiar with Child Find or IDEA -- that if we
3    get any information that leads us to believe that a
4    student has a learning disability or emotional
5    disability or autism or intellectual disability, that
6    we are required under Federal law to issue a notice of
7    an educational placement or recommendation for testing,
8    which we did on the students based on Mrs. Eck telling
9    us about Jordan's anger issues at home and -- which
10    happened in February of 2019.
11       And then after some of the other
12    explosions with Haley and her emotional stabili- --
13    instability and, as it was stated by Haley's mother to
14    Mrs. Cambria, that that's why we issued them because,
15    in today's world, even after a student graduates, then
16    we come -- that urge of coming back against the public
17    school system for failure to identify and offering
18    compensatory education, those conversations were
19    documented -- they were in the over 1100 documents that
20    you received -- that there were reasons for why we took
21    the actions that we did.
22       I think that there's a lot to this case
23    that has to deal with teenagers being teenagers and
24    understand -- not understanding life beyond high
25    school; that we don't always get what we want in life,

<div align="center">118</div>

1    and we're not entitled to anything.
2       And I think it's very difficult for
3    Jordan, who has had several leads in the musicals as an
4    underclassman, to understand why he didn't get the lead
5    that was cast by a production team, not by one
6    individual.
7       And what was interesting to me, as we
8    went through this process, is that up until January,
9    2019 Jordan and Mrs. Lyons got along very well. There
10    were no complaints.
11       There were some complaints over the
12    years about rehearsals running late, especially coming
13    into the week of the show because they're trying to
14    practice as much as they can.
15       Jordan would go around calling Mrs.
16    Lyons mom. He would reach out, hang out in the
17    theatre. They were helping.
18       Mrs. Lyons was going to take the
19    Senior students to Disney to -- there's a theatre
20    program that they have at Disney World -- in the fall
21    which, hence, didn't happen because the music trip to
22    Disney is this year -- and to help them build their
23    resumes.
24       But she was helping articulate him to
25    community theatres and working with him in other

<div align="center">119</div>

1    places. And it wasn't until the time he didn't get the
2    lead in the musical then, all of a sudden, did he have
3    all these issues.
4       So if he had all these issues and he's
5    been in the musical -- he's been in the theatre program
6    for three and a half years, where were the concerns?
7    And I could never get an answer for that.
8       Q.   You mentioned that he tried to intimidate
9    Jared -- I think those were the words that you used --
10    out of the school's lead or into withdrawing.
11       A.   To quitting. Correct.
12       Q.   What did he do to intimidate him? Do you
13    know?
14       A.   It was the division of friends. And as I
15    said, with teenagers they -- you know, kids are kids and
16    they're gonna take sides with their friends.
17       And then the friend groups -- in
18    today's world, you know, they do a lot of social media
19    and outside of school stuff that has nothing to do with
20    us; that Jared thought that if -- they could all be
21    friends again if he just quit the musical.
22       He didn't understand that once you
23    open, what I call Pandora's box, and you start to have
24    issues with relationships and you're not -- the kids
25    aren't mature enough to work through those, you can't

<div align="center">0143a   120</div>

1    put the Genie back in the bottle, that they couldn't
2    make it all better until they were willing to sit down
3    and put the past in the past.
4              But most immature 17-year-olds are not
5    developmentally at a capability to be able to do that.
6    There are a lot of adults that can't do that.
7              And that Jordan kept after him about,
8    you know, let me do one show, let me do an understudy,
9    let me do this, and just kept going after -- like I
10   need a chance to be the lead, I need a chance to be the
11   lead.
12             And Jared got to the point, when I met
13   with -- as I stated earlier, when I met with him and
14   his mother, that Jared was like maybe I should just
15   quit and then he can have what he wants because they
16   were friends at one point.
17             And then a casting decision, made by a
18   production team of people and not an individual, then
19   broke up a friendship that had been for years. And
20   then that friendship can't -- has not been able -- I
21   don't know where they are today, but at least coming
22   through April of that last year was not gonna be in a
23   repairable place.
24        Q.   Were you aware before the fruit video
25   incident -- I realize you have a lot of students that you

121

1    deal with.
2        A.   Um-hum.
3        Q.   In fact, how many students are in the
4    School District, roughly?
5        A.   District-wide, we were about 1637 last
6    year.
7        Q.   So a lot of students. Were you aware
8    that Jared was allergic to fruit before this incident?
9        A.   That wouldn't be knowledge that I would
10   have.
11             MR. READY: I have no further questions
12   at this time.
13   BY MS. O'DONNELL:
14        Q.   I would like you to take a look at
15   Exhibit No. 4 -- 24, I'm sorry -- 24.
16        A.   Which one?
17        Q.   24.
18        A.   (Witness complies.)
19        Q.   And take a look at it quickly to refresh
20   your recollection.
21        A.   (Witness reviewed document.)
22        Q.   And indicate what the purpose of this
23   e-mail was.
24        A.   This was an e-mail from me to the Board
25   at 11:39 on the night of -- I think it's the Board

122

1    meeting.
2              When I got -- Maria came to -- Maria
3    Jones came to get me to go to the auditorium and the --
4    after the meeting to speak with the Directors, I walked
5    into the aftermath of a negative situation, and that he
6    was -- this is kind of my summary to what happened that
7    night.
8              He accused her of lying, which we spoke
9    about earlier, because Mrs. Hartenstine was not
10   speaking up. And then the statement that this is not
11   over, getting more people to come forward. When I
12   walked in, the teacher was visibly upset and crying and
13   did admit to me that she was feeling threatened.
14             Because I knew that I had, as I stated
15   earlier and is in documentation, Mrs. Zackon's
16   involvement with Mrs. Eck, I was trying very hard to be
17   responsive to the Board's request for information as to
18   what was happening. Our Drama Department is very
19   strong here and very much supported by the community;
20   that there were a lot of rumors and gossip and things
21   going on throughout the small town that we all live and
22   work in -- or work in, I don't live here, but -- so
23   that they were aware at night so that the communication
24   didn't get out in front of me.
25        Q.   In the second full paragraph it says:

123

1    Students are angry with him for his actions when he
2    returned to the auditorium after he left the Board
3    meeting. What does that mean?
4        A.   Well, he was -- as I stated earlier, when
5    he spoke at the Board meeting, he spoke very well. When
6    he went back to the auditorium, through the
7    investigation, he went in front of the cast, thanked them
8    for supporting him. And it was all about him and his
9    role in the musical and his leadership in the Drama Club
10   and thank you for supporting me against Mrs. Lyons and --
11   before the rehearsal, I guess, got back under way.
12             And the kids were upset because the
13   others that came back from the Board meeting must have
14   just folded right into rehearsal, and they did whatever
15   they were doing at rehearsal that night, which I don't
16   know what that is.
17             And according to Jordan's words, as I
18   stated earlier, that this is not over. And then I do
19   state that because -- you know, that I will take care
20   of it because of what -- the rest of it that came out
21   through the investigation of the treatment of a
22   professional staff member.
23        Q.   When you say, but I will take care of it,
24   you said, but I will end his role in it. Do you see
25   that?

0144a

124

Joint Appendix00270

**[Page 125]**

1  A.   Correct.

2  Q.   And you said that, even knowing that, at

3  least two of the Board members were very supportive of

4  Jordan. Did you think that was going to be an issue?

5  A.   I know it was going to be an issue with

6  the two Board members who think that he should have

7  gotten the lead in the musical just because of who he is

8  and what his aspirations were beyond high school. But

9  they were not present when it was casted, and I still —

10  and they did not understand, and I don't know if they

11  understand to this point, that that show was cast by a

12  group of individuals, not by an individual person.

13  Q.   Well — but you said you would end his

14  role in it. Did you have the authority to end his role

15  in the —

16  A.   Yes. I was granted authority to do what

17  I needed to do to make sure that the show either went on,

18  it didn't go on; if people were disruptive or not, doing

19  what they need to do in rehearsal or disruptive to the

20  rest of the 70 some people, then I had the authority in

21  which to remove students from it, just as we would an

22  athletic team.

23  If somebody is not showing up to

24  rehearsals — or to practices or not performing and not

25  doing what they need to do, they're removed from the

125

**[Page 126]**

1  athletic team. This extracurricular activity is the

2  same way. It is a privilege, not a right.

3  MS. O'DONNELL: Those are all the

4  questions I have.

5  BY MR. READY:

6  Q.   Two quick questions. Did you send this

7  e-mail here in Exhibit 24 to anyone other than the Board?

8  A.   No. That's what All — that's my group

9  list for the Board, is All.

10  Q.   Sure. Second, you mentioned students

11  were angry with him. Which students?

12  A.   Just cast students.

13  Q.   Which cast students or where did you hear

14  that? Did a student approach you, or was it just

15  something that a teacher told you, perhaps?

16  A.   No. I think it was students that were in

17  the auditorium, but I can't remember who. But I can tell

18  you it wasn't Jared, it wasn't Jordan, it wasn't Haley,

19  it wasn't Vinny.

20  I would imagine it was like Connor

21  Alexander. There are some other students that I worked

22  closely with because of other educational need, not

23  behavioral. There's a lot of high school students that

24  I work closely with for other reasons.

25  They were just frustrated with the

126

**[Page 127]**

1  gossip and the anger and the continual disruption that

2  is being caused.

3  MR. READY: Thank you for your time.

4  MS. O'DONNELL: Okay, thanks very much.

5  (Whereupon, the deposition concluded at

6  12:45 o'clock p.m.)

127

**[Page 128]**

1  CERTIFICATE

2

3  I, Lori A. Dilks, the officer before whom

4  the deposition of DR. TRACY SHANK was taken, do hereby

5  certify that DR. TRACY SHANK, the witness whose

6  testimony appears in the foregoing deposition, was duly

7  sworn by me on November 14, 2019, and that the

8  transcribed deposition of said witness is a true record

9  of the testimony given by her; that the proceedings are

10  herein recorded fully and accurately to the best of my

11  ability; that I am neither attorney nor counsel for,

12  nor related to any of the parties to the action in

13  which this deposition was taken; and, further, that I

14  am not a relative of any attorney or counsel employed

15  by the parties hereto or financially interested in this

16  action.

17

18  _____Lori Dilks_____

19  Lori A. Dilks

20

21  PA Court Reporter

Notary Public in and for the Commonwealth of Pennsylvania

22

23  My Commission expires

November 29, 2023

24

25                                    0145a

128

Wednesday, March 20, 2019

Dr. Shank,

At approximately 10:00pm on Wednesday, March 20, 2019, Jordan Euk asked to speak privately with Mrs. Stacy Lyons at the conclusion of rehearsal. She asked that I along with Mrs. Maria Jones be there as a witness to the conversation. Jordan did not object to myself or Mrs. Jones being present during the conversation.

The majority of the conversation was between Mrs. Lyons and Jordan. At one point, Jordan looked at me and said "Well you're awfully quiet, don't you have anything to say ..." in which I replied "I am just listening." He proceeded to question my own feelings about a similar situation when I was in high school back in 2009 that I openly shared with all of the cast back in January about when I auditioned for the leading role and did not get the part. He told me that he "just couldn't believe that I wasn't upset and wanted to be comforted about not getting the leading part that I auditioned for" in which I responded, "Yes, I was upset, but I made peace with the decision, made sure my friend that I was up against was okay after very hurtful things were said about her, moved on, and had a great show." Mrs. Lyons asked Jordan if he was accusing me of lying. He vocalized that he still did not believe me, making me feel like he was calling me a liar about a situation he knows nothing about that happened 10 years ago. I felt threatened and disrespected.

The lack of respect that Jordan has shown towards me as a dedicated teacher, assistant director, and volunteer to this program and district will not be tolerated any longer.

Respectfully,

Abagaie Hartenstine

5th Grade Mathematics Teacher
Assistant Director, OVHS Drama Department
Band Majorette Director, OVHS Marching Lynx



EXHIBIT

OVSD 000000074

0179a

Following the board meeting, I was in the main hallway outside the library waiting to clean up the board room and put away laptops once executive session was finished. A custodian called me over to him and said Mrs. Lyons had requested another adult be present in the auditorium. I told him I would go and see if any assistance was needed. When I got there, students were leaving the auditorium and Mrs. Lyons, Ms. Hartenstein, and Jordan Eck and Vinny Ferlazi were walking up the steps into the back of the music hallway. When I asked if I could be of any assistance, Jordan walked away and Vinny spoke to Mrs. Lyons and Ms. Hartenstein. I offered to stay to provide a neutral party, as Vinny was visibly upset. Mrs. Lyons said I should stay. Vinny spoke to Mrs. Lyons stating that he was upset with things and was not sure what he wanted to say, and wanted to say he knew she worked hard, but maybe didn't know how to talk to students since she was not a teacher. He said he was hurt when she "called him out" in front of other students. Mrs. Lyons acknowledged his feelings and asked if any teachers ever corrected a student in front of their peers. He said no. Vinny seemed conflicted in what he was thinking and trying to say, and seemed unsure of what he wanted to see changed in the drama program. Vinny ended up thanking Mrs. Lyons for listening to him and left.

Mrs. Lyons went to the steps to see if Jordan wanted to speak with her and Ms. Hartenstine. Jordan did come into the hallway and again I offered to stay as a neutral party. Jordan appeared angry. Both Mrs. Lyons and Jordan initially appeared tense. Jordan told Mrs. Lyons he was disappointed in decisions she had made and things she had said. Mrs. Lyons acknowledged Jordan's feelings and his right to have those feelings. Mrs. Lyons stated she was disappointed in actions Jordan and some other drama club students have made. Mrs. Lyons spoke to Jordan about how people can disagree over things, but can to move forward together toward a common goal. She spoke to him about how two people can perceive the same information in a different way. Mrs. Lyons appeared less tense. Jordan appeared tense and angry, with clenched fists and head shaking whenever something was said that he did not agree with, Jordan repeatedly said he wanted things to change, but could not say specifically what, other than rehearsals were not starting on time. Mrs. Lyons said that sometimes students cannot get to the rehearsals at the scheduled start time, but that it would be a goal for all students and staff to start rehearsals on time. Jordan again brought up that he was not speaking out because he was not given the lead role in the play. Mrs. Lyons said that seemed to be the time when the problems started. Jordan accused Ms. Hartenstine of lying or making up a story that she had told the cast about a time when she had not gotten the lead part but her best friend had, rumors were circulating about why her friend had gotten the part, and Ms. Hartenstine reached out to her friend because she cared about her and supported her. Jordan said "Who would do that? Why would you not want to be comforted if you didn't get the part? Who would not want to be comforted?" It was evident Jordan could only think of himself at this time and not other parties. Ms. Hartenstine was visibly upset and tearful that Jordan accused her of making this up. Mrs. Lyons asked Jordan if he did not see how he had made Ms. Hartenstine upset with his accusations, but Jordan did not seem to care about how his words and actions made other people feel. He said at one point to Mrs. Lyons, "I was going to hang you out to dry, I really was," and "I'm not saying that they have to fire you but," Jordan said he was not sure how to move forward and Mrs. Lyons suggested being calm, coming to rehearsals with a calm attitude, greeting the other students and apologizing to them, reaching a hand out to them and asking them to work together with him. Jordan said he had a lot of homework to do and nodded at us and left.



EXHIBIT

OVSD 000000075

When I went down the hallway to the doors outside the auditorium, Jordan, his parents, Vinny Ferrizzi, Rafael Forsyth, and Haley Hartline were standing there. They asked me if they would find out the results of the executive session. I told them no action would be taken this evening. They asked if action would be taken, when would it be taken? I told them action items would go on a board agenda and the next board meeting was on April 10th, and that board and committee meetings are open to the public and the schedules are posted online, or they can call my extension to ask about meeting dates/times. Vinny Ferrizzi then asked me if Mrs. Zackon was in the school building at any time during the school day. I told him that board members are like other members of the public and community and if they wanted to come to any of the schools, they would need to schedule that with the building principal. Vinny said he would contact Mrs. Zackon outside of school. I asked him if he knew how to contact her and he nodded. I told them all board members names and addresses are public information and he nodded. Jordan turned to me and said "I'm going to get more people. We'll get more people. This isn't over." Jordan appeared angry, staring at me when he said this.

I am a support staff member and not an educator, but I was concerned with the anger and lack of empathy I observed in Jordan. Whenever something was said that he did not agree with, there was head shaking and clenching of fists. He appeared that if he did not get what he wanted, he would not be satisfied, no matter what accommodations or resources could be offered. In my daily interactions with students, I have not seen this level of anger and lack of awareness of other's feelings.

Maria H. Jones

OVSD 000000078

|  | No. 220 |
|---|---|
| SECTION: | PUPILS |
| TITLE: | STUDENT EXPRESSION/ DISTRIBUTION AND POSTING OF MATERIALS |
| ADOPTED: | November 17, 1999 |
| REVISED: | October 11, 2006 May 18, 2016 |

# OLEY VALLEY SCHOOL DISTRICT

## 220. STUDENT EXPRESSION/DISTRIBUTION AND POSTING OF MATERIALS

**1. Purpose**
Title 22
Sec. 12.9

The right of public school students to freedom of speech is guaranteed by the Constitution of the United States and the constitution of the Commonwealth. The Board respects the right of students to express themselves in word or symbol and to distribute and post materials in areas designated for posting as a part of that expression. The Board also recognizes that exercise of that right must be limited by the district's responsibility to maintain an orderly school environment and to protect the rights of all members of the school community.

This policy addresses student expression in general and distribution and posting of materials that are not part of district-sponsored activities. Materials sought to be distributed or posted as part of the curricular or extracurricular programs of the district shall be regulated as part of the school district's educational program.

**2. Definitions**

**Distribution** - students handing non-school materials to others on school property or during school-sponsored events; placing upon desks, on or in lockers; or engaging in any other manner of delivery of non-school materials to others while on school property or during school functions. When email, text messaging or other technological delivery is used as a means to distributing or accessing non-school materials via use of school equipment or while on school property or at school functions, it shall be governed by this policy. Off-campus or after hours distribution, including technological distribution, that does or is likely to materially or substantially interfere with the educational process, including school activities, school work, or discipline and order on school property or at school functions; threatens serious harm to the school or community; encourages unlawful activity; or interferes with another's rights is also covered by this policy.

**Expression** - verbal, written or symbolic representation or communication.

**Non-school Materials** - any printed or written materials meant for posting or general distribution to others that are not prepared as part of the curricular or extracurricular program of the district, including but not limited to fliers, invitations, announcements, pamphlets, posters, Internet bulletin boards, personal web sites and the like.


EXHIBIT

OVSD 000000801

A 000000208

Joint Appendix00275

Case 5:19-cv-01873-MAK   Document 48-2   Filed 01/13/20   Page 132 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 129 of 181
Case 5:19-cv-01873-MAK   Document 41-2   Filed 11/25/19   Page 212 of 223

### 220. STUDENT EXPRESSION/DISTRIBUTION AND POSTING OF MATERIALS - Pg. 2

Posting - publicly displaying non school materials on school property or at a school-sponsored events, including but not limited to affixing such materials to walls, doors, bulletin boards, easels, the outside of lockers; on district-sponsored or student websites; through district-owned technology and the like.

**3. Authority**
**Title 22**
**Sec. 12.9**

Students have the right to express themselves unless such expression is likely to or does materially or substantially interfere with the educational process, including school activities, school work, or discipline and order on school property or at school functions, threatens serious harm to the school or community, encourages unlawful activity, or interferes with another's rights.

**SC 511**
**Title 22**
**Sec. 12.2, 12.9**

Student expression that occurs on school property or at school-sponsored events is fully governed by this policy. In addition, off campus or after hours expression is governed by this policy if the student expression involved constitutes unprotected expression as stated in this policy and provided the off-campus or after hours expression does or is likely to materially or substantially interfere with the educational process, including school activities, school work, or discipline and order on school property or at school functions; threatens serious harm to the school or community, encourages unlawful activity, or interferes with another's rights.

**SC 510**
**Title 22**
**Sec. 12.9**

The Board shall require that distribution and posting of non-school materials occur only at the places and during the times set forth in written administrative regulations. Such regulations or procedures shall be written to permit the orderly operation of schools, while recognizing the rights of students to engage in protected expression.

*Unprotected Student Expression*

The Board reserves the right to designate and prohibit manifestation of student expression that are not protected by the right of free expression because they violate the rights of others or where such expression is likely to or does materially or substantially interfere with school activities, school work, or discipline and order on school property or at school functions including but not limited to:

1. Libel of any specific person or persons.

2. Advocating the use or advertising the availability of any substance or material that may reasonably be believed to constitute a direct and serious danger to the health or welfare of students.

**Title 22**
**Sec. 12.2**

3. Using obscene, lewd, vulgar or profane language - whether verbal, written or symbolic.

4. Inciting violence; advocating use of force; or encouraging violation of federal, state, or municipal law, Board policy or district rules or regulations.

Page 2 of 5

OVSD 000000802

A 000000209

Joint Appendix00276

220. STUDENT EXPRESSION/DISTRIBUTION AND POSTING OF MATERIALS - Pg. 3

5.  Are likely to or do materially or substantially interfere with the educational process, including school activities, school work, or discipline and order on school property or at school functions, threaten serious harm to the school or community, encourage unlawful activity, or interfere with another's rights.

6.  Violating written school district administrative regulations or procedures on time, place and manner for posting and distribution of otherwise protected expression.

Spontaneous student expression which is otherwise protected speech is not prohibited by this section.

Discipline For Engaging In Unprotected Expression.

The Board reserves the right to prohibit the posting or distribution of non-school materials containing unprotected expression and to prohibit students from engaging in other unprotected student expression, as well as to stop unprotected student expression when it occurs. The Board reserves the right to discipline students for engaging in unprotected expression. Where such expression occurs off campus and away from school functions, an understanding between unprotected expression and a substantial and material disruption of the school program must be established.

Distribution Of Non-School Materials

**4.  Delegation of Responsibility**

**Title 22**
**Sec. 12.9**

The Board requires that students who wish to distribute or post non-school materials on school property shall submit them one (1) day in advance of planned distribution or posting to the building principal or designee, who shall forward a copy to the Superintendent.

If the non-school materials contain unprotected expression as stated in this policy, the building principal or designee shall notify the students that they may not post or distribute the materials because the materials constitute a violation of Board policy.

If notice is not given during the period between submission and the time for the planned distribution or posting, students may proceed with the planned distribution or posting, provided they comply with written administrative regulations or procedures on time, place and manner of posting or distribution of non-school materials.

Students who post or distribute non-school materials in compliance with this provision may still be ordered to cease such distribution if the materials are later found to be unprotected expression under this policy.

Students who distribute printed materials shall be responsible for clearing any liter

*Page 3 of 5*

OVSD 000000803

A 000000210

Joint Appendix00277

220. STUDENT EXPRESSION/DISTRIBUTION AND POSTING OF MATERIALS - Pg. 4

that results from their activity and shall schedule the event so that they do not miss instructional time themselves.

Posting Of Non-School Materials

If a school building has an area where individuals are allowed to post non-school materials, students may post such items as well, if the materials do not constitute unprotected expression and the items are submitted for prior review in the same manner as if the students were going to distribute them.

Such materials shall be officially dated, and the district may remove the materials within ten (10) days of posting or other reasonable time as stated in the administrative regulation or procedures relating to posting.

Review Of Student Expression

School officials shall not censor or restrict non-school materials or other student expression for the sole reason that it is critical of the school or its administration, or because the views espoused are unpopular or may make people uncomfortable.

Student-initiated religious expression is permissible and shall not be prohibited except as to time, place and manner of distribution, or if the expression involved violates some other part of this policy, e.g. because it is independently determined to be unprotected expression under the standards and definitions of this policy.

The review for unprotected expression shall be reasonable and not calculated to delay distribution.

Appeal of the reviewer's decision may be made to the Superintendent and then to the Board, in accordance with Board policy and district regulations or procedures.

The Superintendent shall assist the building principal in determining the designation of the places and times non-school materials may be distributed in each school building. Such designations may take into account maintenance of the flow of student traffic throughout the school and shall limit distribution of non-school materials to non-instructional times.

Disciplinary action may be determined by the administrators for students who distribute or post non-school materials in violation of this policy and district regulations or procedures, or who continue the manifestation of unprotected expression after a person in authority orders that they desist. Disciplinary actions shall be included in the disciplinary Code of Student Conduct.

The Board policy and any administrative regulations or procedures written to implement this policy shall be referenced in student handbooks so that

Page 4 of 5

DVSD 000000804

A 000000211

220. STUDENT EXPRESSION/DISTRIBUTION AND POSTING OF MATERIALS - Pg. 5

| | students can access them for further information. |
|---|---|
| | References: |
| | School Code – 24 P.S. Sec. 510, 511 |
| | State Board of Education Regulations – 22 PA Code Sec. 12.2, 12.9 |

OVSD D00000805

A 000000212

No. 233

SECTION:    PUPILS

TITLE:      SUSPENSION AND EXPULSION

ADOPTED:    November 17, 1999

# OLEY VALLEY
# SCHOOL DISTRICT

REVISED:    July 14, 2004
            May 18, 2016

| 96+ | 233. SUSPENSION AND EXPULSION |
|---|---|
| 1. Purpose | The Board recognizes that exclusion from the educational program of the schools, whether by suspension or expulsion, is the most severe sanction that can be imposed on a student and one that cannot be imposed without due process. The Board shall define and publish the types of offenses that would lead to exclusion from school. Exclusions affecting students with disabilities shall be governed by applicable state and federal law and regulations.<br><br>The Board may, after a proper hearing, suspend a student for such time as it deems necessary or may permanently expel a student. |
| 2. Guidelines | Exclusion From School – Suspension |
| 3. Delegation of Responsibility | The principal or person in charge of the school may suspend any student for disobedience or misconduct for a period of one (1) to ten (10) consecutive days and shall immediately notify the suspension to the parent/guardian and the Superintendent in writing when the student is suspended. |
| SC 1318<br>Title 22<br>Sec. 12.6 | No student may be suspended without notice of the reasons for which s/he is suspended and an opportunity to be heard on his/her own behalf before the school official who holds the authority to reinstate the student. Prior notice is not required where it is clear that the health, safety, or welfare of the school population is threatened. Suspensions may not run consecutively beyond the ten-school-day time period. |
| Title 22<br>Sec. 12.7 | When the suspension exceeds three (3) school days, the student and parent/guardian shall be given the opportunity for an informal hearing with the designated school official. Such hearing shall take place as soon as possible after the suspension, and the district shall offer to hold it within the first five (5) days of the suspension. |
| SC 1318<br>Title 22<br>Sec. 12.6, 12.8 | Informal hearings under this provision shall be conducted by the designated school official(s).<br><br>Purpose of Informal Hearing |

Page 1 of 5



EXHIBIT

OVSD 000000806

0188a

Case 5:19-cv-01873-MAK   Document 48-2   Filed 01/05/20   Page 137 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 01/05/20   Page 137 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 134 of 181

Case 5:19-cv-01873-MAK   Document 46-1   Filed 11/25/19   Page 194 of 218

233. SUSPENSION AND EXPULSION - Pg. 2

|  | The purpose of the informal hearing is to permit the student to explain the circumstances surrounding the event leading to the suspension, to show why the student should not be suspended, and to discuss ways to avoid future offenses. |
|---|---|
|  | **Due Process Requirements for Informal Hearing** |
|  | 1. The student and parent/guardian shall be given written notice of the reasons for the suspension. |
|  | 2. The student and the parent/guardian shall receive sufficient notice of the time and place of the informal hearing. |
|  | 3. The student may question any witnesses present at the informal hearing. |
|  | 4. The student may speak and produce witnesses who may speak at the informal hearing. |
| 2 Pa. C.S.A. Sec. 101 et seq | 5. The school district shall offer to hold the informal hearing within five (5) days of the suspension. Delay of such hearing shall not delay the student's return to school. |
| Title 22 Sec. 12.6, 12.8 | **Exclusion From Class - In-School Suspension** |
|  | No student may receive an in-school suspension without notice of the reasons for which s/he is suspended and an opportunity to be heard prior to the time the suspension becomes effective. The parent/guardian shall be informed of the suspension action by the school. |
| 2 Pa. C.S.A. Sec. 101 | Should the in-school suspension exceed ten (10) consecutive school days, the student and parent/guardian shall be offered an informal hearing with the building principal. Such hearing shall take place prior to the eleventh day of the in-school suspension. The procedure shall be the same as the procedure for informal hearings held in connection with out-of-school suspensions. |
|  | The district shall provide for the student's education during the period of in-school suspension. |
|  | **Expulsion** |
|  | Expulsion is exclusion from school by the Board for a period exceeding ten (10) consecutive school days. The Board may permanently expel from the district rolls |

OVSD 000000807

0189a

Joint Appendix00281

Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 138 of 186
Case 5:19-cv-01873-MAK   Document 46-1   Filed 11/25/19   Page 198 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 135 of 181

Case 5:19-cv-01873-MAK   Document 46-1   Filed 11/25/19   Page 195 of 218

233. SUSPENSION AND EXPULSION - Pg. 3

any student whose misconduct and disobedience warrants this sanction. No student shall be expelled without an opportunity for a formal hearing before a duly authorized committee of the Board, and upon action taken by the Board after the hearing.

**Expulsion Hearings**

A formal hearing shall be required in all expulsion actions.

The formal hearing shall observe the due process requirements of:

1. Notification of the charges in writing by certified mail to the student's parent/guardian.

2. At least three (3) days' notice of the time and place of the hearing, which shall include a copy of this policy, hearing procedures, and notice of the right to representation by legal counsel. A student may request the rescheduling of the hearing when s/he demonstrates good cause for an extension.

3. The hearing shall be private unless the student or parent/guardian requests a public hearing.

4. Representation by counsel at the parent's/guardian's expense and parent/guardian may attend the hearing.

5. Disclosure of the names of witnesses against the student and copies of written statements or affidavits.

6. The right to request such witnesses against the student appear in person and answer questions or be cross-examined.

7. The right to testify and present witnesses on the student's behalf.

8. A written or audio record shall be kept of the hearing and a copy made available to the student at the student's expense, or at no charge if the student is indigent.

9. The hearing shall be held within fifteen (15) school days of the notice of charges, unless a delay is mutually agreed to by both parties or is delayed by:

a. The need for laboratory reports from law enforcement agencies.
b. Evaluations or other court or administrative proceedings are pending due to a student's invoking his/her rights under the Individuals with Disabilities Education Act (IDEA).
c. Delay is necessary due to the condition or best interests of the victim in cases of juvenile or criminal court involving sexual assault or serious bodily injury.

Page 3 of 5

0VSD 000000808

0190a

Case 5:19-cv-01873-MAK   Document 85-2   Filed 01/03/20   Page 139 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 136 of 181

Case 5:19-cv-01873-MAK   Document 46-1   Filed 11/25/19   Page 196 of 218

233. SUSPENSION AND EXPULSION - Pg. 4

10. Notice of a right to appeal the results of the hearing shall be provided to the student with the expulsion decision.

Adjudication

A written adjudication shall be issued after the Board has acted to expel a student. The adjudication may include additional conditions or sanctions.

Attendance/School Work During Suspension and Prior to Expulsion

Students serving an out-of-school suspension must make up missed exams and work, and shall be permitted to complete assignments pursuant to established guidelines.

Students who are facing an expulsion hearing must be placed in their normal classes if the formal hearing is not held within the ten-day suspension.

If it is not possible to hold the formal hearing within the first ten (10) school days, the school district may exclude such a student from class for up to five (5) additional – fifteen (15) total – school days if, after an informal hearing, it is determined that the student's presence in his/her normal class would constitute a threat to the health, safety, and welfare of others.

Any further exclusion prior to a formal hearing may be only by mutual agreement. Such students shall be given alternative education, which may include home study.

Students may not participate in any school activities during the period of suspension. Further, students are not permitted on any school property at any time during the period of suspension, except to confer with the administrator, or to pick up or deliver work assignments at a time designated by the administrator. Students may lose school privileges in addition to the suspension depending upon the severity of the offense.

Attendance/School Work After Expulsion

Students who are under seventeen (17) years of age are still subject to compulsory school attendance even though expelled and shall be provided an education.

The parent/guardian has the initial responsibility of providing the required education and shall, within thirty (30) days, submit evidence to the school that the required education is being provided or that they are unable to do so. If the parent/guardian is unable to provide for the required education, the school district shall, within ten (10) school days of receipt of the parent's/guardian's notification, make provision for the student's education.

OVSD 000000809

0191a

Joint Appendix00283

233. SUSPENSION AND EXPULSION - Pg. 5

The Board may provide an educational program to the student immediately upon expulsion and may waive the thirty 30-day period, at its discretion.

Students With Disabilities

A student with a disability shall be provided educational services as required by state and federal laws and regulations and Board polices.

The Superintendent or designee shall develop administrative regulations to implement this policy which include:

1. Publication of a Code of Student Conduct, in accordance with Board policy on student discipline.
2. Procedures that ensure due process when a student is being deprived of the right to attend school.
3. Regulations regarding student records which require that records of disciplinary suspension be maintained in accordance with Board policy on student records.
4. The name of a student who has been disciplined shall not become part of the agenda or minutes of a public meeting, nor part of any public record of the Board. Such students may be designated by code.
5. Any student who has been expelled may apply for readmission to school upon such conditions as may be imposed by the Board.

Transfer Students

Any student requesting permission to transfer from another school while serving an unfinished suspension and/or expulsion imposed by that school entity must appear, with a parent/guardian, at a formal hearing before the Board, or committee thereof, to determine the legitimacy of the imposed suspension or expulsion. The Board reserves the right to continue or modify the existing suspension or expulsion and impose conditions for a student's admission to district-operated schools or programs.

Page 5 of 5

OVSD 000000810

0192a

Joint Appendix00284

5. Comply with all local, state and federal laws,
6. Exercise proper care when using all facilities and equipment.
7. Attend school daily and be on time for all classes and other school functions,
8. Make up work and assessments when absent from school.
9. Pursue satisfactorily to complete the courses of study prescribed by Commonwealth and Oley Valley School District authorities.
 . Report accurately in student media.
 11. Not use obscene language in student media or on school premises.

## OVHS CODE OF CONDUCT

### CODE OF CONDUCT
The public schools have a compelling responsibility to develop reasonable rules and regulations regarding student conduct. The schools have an institutional responsibility to provide a safe and healthy environment for students. The climate of the school must provide for the protection of the rights of students to receive an education. Recent reports have validated this need and emphasized the absolute necessity for reasonable rules and regulations that govern student conduct. There can be no excellence in education without an orderly instructional environment. Teachers must be able to teach and students must be able to learn in an environment that is free from undue disruption. This Student Code of Conduct is intended to be a clear and understandable message of the critical nature of this mission.

### OFF SITE OR AFTER HOURS CONDUCT
In some circumstances, off-site or after-hours conduct may subject students to school discipline. Whether school discipline will be imposed depends on whether the misconduct causes disruption or it is reasonably foreseeable that disruption may result. The actual or foreseeable disruption may be to school work or to the school community, by using school property or equipment or by involving school activities or interactions in the planning, organizing or advertising of the misconduct, including but not limited to conduct utilizing various forms of technology.
All facilities (including parking lots) used for school events are covered by school policy. Examples include, but are not limited to: athletic fields and parking lots as well as other facilities/parking areas for such events as the prom and graduation, concerts, fun nights, etc.

### OVHS STUDENT CODE OF CONDUCT
This Code of Student Conduct outlines the rules and regulations that are designed to maintain a standard of conduct in the schools of the District. This publication is intended to accomplish the following purposes:

1. It meets the legal requirements of Section 12.3(c) of Title 22 of the Pennsylvania Code, which requires that the District adopt a code of student conduct and distribute copies to both students and parents. It also meets the requirements of Act 26 of 1995 as it relates to possession of weapons and the Safe Schools Initiative. To comply with this provision, this Student Code of Conduct will be included in a condensed format in student and parent handbooks and will also be available on the school's website.
2. It establishes a rational standard of behavior that is expected of students in achieving the objective of providing a safe environment for the pursuit of knowledge.
3. It helps prepare students for life in a democratic society where adopted laws govern and maintain a measure of protection and security for citizens within the framework of freedom.

The Code includes many of the strategies used to maintain a safe and disciplined environment. It also has a strong focus on a cooperative effort among students, parents and school personnel and helps to define the essential role of each participant in the process. The maintenance of a positive learning climate in the schools of the District is dependent upon the provision of a controlled environment free from undue interference or disruption. To accomplish this objective, four critical elements must exist:

1. The Board of School Directors and Administration must determine the rules and regulations that apply to student conduct, the penalties for violations and the rights and responsibilities of individuals within the system.
2. School personnel must be familiar with the structure of the system and work diligently to insist upon proper behavior and guide students toward self-discipline.
3. Students must be aware of rules and regulations and be willing to assume responsibility for their behavior.
4. Parents must be familiar with the rules and regulations and be willing to support the school in the attempt to provide a productive climate for learning.

This Code of Student Conduct is intended to provide a base for the interaction and cooperation of these critical elements. Disciplinary options are examples and should not be interpreted as an all-inclusive sequential list.

**Level 1 – Action(s)**, which interfere with orderly operation of the classroom or school. Seriousness of the violation may require initiation of discipline at a higher level as deemed appropriate by the Administration. Disciplinary Options are examples of alternatives and should not be interpreted as an all-inclusive sequential list.
Infraction(s):
- Abusive language
- Destructive behavior
- Cheating and/or plagiarism
- Classroom disturbance
- Disrespectful speech or action
- Failure to follow established procedures
- Failure to submit required note
- Littering
- Unauthorized use of electronic device

0208s
OVSD  000000848

- Repeated tardiness to school/class
- Violation of acceptable use policy
- Writing in books or on desk
- Dress code violation

Disciplinary Option(s):
- Behavior contract
- Parent contact
- Conference
- Teacher detention
- Detention
- Loss of classroom privileges
- Verbal reprimand
- Loss of network privileges

Procedure(s):
- Staff member may assign teacher detention and/or contact the parent/guardian
- Student may be referred for disciplinary action
- A conference may be required if necessary
- Documentation will be maintained for future reference

Level 2 – Actions whose frequency or seriousness disrupt the orderly operation of the classroom or school. Seriousness of the violation may require initiation of discipline at a higher level as deemed appropriate by the Administration. Disciplinary Options are examples of alternatives and should not be interpreted as an all-inclusive sequential list.

Infraction(s):
- Continuation of unmodified Level 1 misbehavior
- Cyber bullying
- Cutting class, study hall, activity period
- Cutting school and/or cutting more than one class
- Disruptive behavior at special functions, athletic contests or co-curricular/extra-curricular activities
- Disruptive behavior on school property, the properties bordering the school, on the school bus, or at a bus stop.
- Failure to identify oneself correctly.
- Fighting
- Harassment/bullying of other persons
- Horseplay or pushing (no harm intended or inflicted)
- In an unauthorized area
- Inappropriate use of electronic devices
- Insubordination
- Lying
- Theft (minor – under $200)
- Vandalism (minor)

Disciplinary Option(s):
- Any appropriate option from Level 1
- Referral to outside agency
- Change daily schedule
- Parental conference
- Detention
- Saturday detention
- Social probation (No participation in extracurricular/co-curricular activities)
- Suspension

Procedure(s):
- Student may be referred for disciplinary action.
- Documentation will be maintained for future reference.
- The administrator may conference with the student, teacher, and witnesses.
- Every attempt will be made to contact the parent/guardian regarding the infraction and the discipline rendered.
- In cases of suspected injury, every attempt will be made to assist the student with proper medical treatment by certified medical professionals and parents/guardians will be contacted.

Level 3 – includes offenses against persons or property or offenses whose consequences may endanger the health, safety, or welfare of self or others in the school. Level 3 offenses may result in the notification of law enforcement agencies (PA Code Section 1317). Seriousness of the violation may require initiation of discipline at a higher level as deemed appropriate by the Administration. Disciplinary Options are examples of alternatives and should not be interpreted as an all-inclusive sequential list.

Infraction(s):
- Continuation of unmodified Level 2 misbehavior
- Hazing
- Obscene and/or threatening calls or messages
- Possession of fireworks, smoke bombs, etc.

0209a
OVSD 000000849

- Smoking and/or violation of tobacco policy
- Student to student assault/battery or physical attack (no injury incurred – intent to harm)
- Tampering with fire extinguisher or other emergency equipment
- Petty theft (Over $200)
- Sexual misconduct of any nature
- Threatening another student (verbal, written, or inciting)
- Vandalism (major)
- Gambling

Discipline Option(s):
- Any appropriate disciplinary option from proceeding groups
- Suspension
- Possible expulsion
- Referral to law enforcement agency and/or district justice

Procedure(s):
- Student may be referred for disciplinary action.
- Documentation will be maintained for future reference.
- The administrator may conference with the student, teacher, and witnesses.
- Every attempt will be made to contact the parent/guardian regarding the infraction and the discipline rendered.
- In cases of suspected injury, every attempt will be made to assist the student with proper medical treatment by certified medical professionals and parents/guardians will be contacted.
- Restitution of property and/or cost of damages
- Referral to law enforcement agencies and/or district magistrate.

**Level 4** - includes acts resulting in violence to another's person or property or posing a direct threat to the safety of others in the school. Level 4 infractions are very serious and may require administrative action which may result in immediate removal of the student from school and/or subsequent action by the Board of School Directors. Level 4 discipline infractions may be reported to law enforcement officials. Seriousness of the violation may require initiation of discipline at an even higher level as deemed appropriate by the Administration. Disciplinary Options are examples of alternatives and should not be interpreted as an all-inclusive sequential list.

Infraction(s):
- Continuation of unmodified Group Three behaviors
- Arson
- Assault/battery
- Bomb threats
- Calling in false alarms
- Disorderly conduct
- Extortion
- Furnishing/selling/possession/under the influence of a controlled substance
- Intimidation: Ethnic, Racial
- Hate Crimes
- Malicious Harassment
- Physical attack on a staff member
- Possession/use/transfer of weapons (P.S.C.13-1317.2)
- Reckless Endangering
- Robbery
- Sexual Harassment
- Sexual Offenses
- Student to student assault/battery or physical attack (injury incurred)
- Terroristic Threats
- Threatening school officials/faculty/staff
- Theft/possession/sale of stolen property
- Unlawful demonstrations
- Use of fireworks, smoke bombs, etc.
- Other criminal acts committed at school or school-related events

Disciplinary Option(s):
- An appropriate disciplinary response from proceeding groups
- Expulsion by the Board of School Directors
- Appropriate placement of student at an alternative school

Procedures:
- Student may be referred for disciplinary action.
- Documentation will be maintained for future reference.
- The administrator may conference with the student, teacher, and witnesses.
- Every attempt will be made to contact the parent/guardian regarding the infraction and the discipline rendered.
- In cases of suspected injury, every attempt will be made to assist the student with proper medical treatment by certified medical professionals and parents/guardians will be contacted.
- Restitution of property and/or cost of damages

0210e
OVSD 000000850

Joint Appendix00287

- Referral to law enforcement agencies and/or district magistrate.
- Complete statements by student and staff witnesses or those reporting offense shall be given to administrator.
- A complete and accurate written report submitted to the Superintendent within 48 hours of the incident.
- If appropriate, the Superintendent shall recommend further action to the Board of School Directors.

## REMOVAL OF PRIVILEGES

Students may have school privileges revoked for violating the OVHS Code of Conduct. These privileges include but are not limited to extracurricular (athletic and non-athletic), school sponsored activities, graduation, baccalaureate, school social events, including dances, prom, and/or positions of leadership in clubs and other school organizations.

## TEACHER DETENTION

Teachers may assign students to after school detention as an alternative to administrative detentions. Assigning teachers will monitor students in his/her classroom until no later than 2:50 PM. The teacher assigning the detention must give one-day notice to the student, the parent/guardian, and administration.

## DETENTION

In certain cases, a student may be required to remain after the conclusion of the normal school day for infractions of school regulations. Detention is held from 2:45 PM until 3:45 PM under the supervision of a staff member. Students will not be admitted late. Students may also serve their detentions during any regularly scheduled detention prior to the actual assigned day. Time in detention is to be spent working constructively.

- If homework is complete, students may read appropriate material that must meet the approval of the instructor.
- There shall be no talking, use of electronic devices, eating, sleeping, or disrupting others during detention.
- Students shall sit where the supervisor places them without question.
- Dismissal from detention may result in additional discipline.
- Only in the case of an emergency or with administrative permission shall a student be allowed to leave assigned detention early.

Students who fail to serve their assigned administrative detention shall be assigned a Saturday detention.

## SATURDAY DETENTION

A student may be required to attend a Saturday detention for infractions of the disciplinary code. On the day(s) a student is assigned a Saturday detention, he or she is to report to the High School lobby by 8:50 AM. Detention will be held from 9:00 AM to 11:30 AM.

1. Students are permitted to work on scheduled related assignments.
2. Students who violate the rules for Saturday detention shall be removed immediately and their parents or guardians shall be contacted. These students shall be assigned three (3) days of suspension beginning immediately upon the next regularly scheduled school day.
3. Failure to attend Saturday detention shall result in a parent conference with the high school administration and immediate suspension. If a student does not attend the assigned Saturday detention, they will be assigned one (1) day of suspension. Students will not be eligible for participation in any extra-curricular activity until the day after the suspension has been served.
4. Absence from Saturday detention due to illness or family emergency must be documented and previously approved by the administration. A doctor's note is required for absences due to illness. Students with excused notes shall be assigned to the next scheduled Saturday detention.

## SUSPENSION

Students who are suspended shall be required to complete course work assigned to them during their suspension. The teachers shall provide assignments, but it is the student's responsibility to make arrangements to complete these assignments. Arrangements to pick up the assignments are to be made by contacting the guidance office. Assigned work must be completed by the time the student returns to school unless another deadline is specified on the assignment. Students will be given 1 day per day of OSS to makeup any tests/quizzes that occurred during the period the student was suspended.

Students who are serving a suspension will not participate in co-curricular or extracurricular activities. Any Oley Valley student suspended at the BCTC may also be placed on suspension from Oley Valley High School.

## EXCLUSIONS FROM SCHOOL

Suspension - Suspension is a severe administrative disciplinary action that is taken only when: (1) milder forms of disciplinary action have been ineffective in correcting the students behavior, (2) the student commits a violation found within the Level II, III, IV classification or (3) the student represents an immediate danger to him/herself or to the school community. During the period of the suspension, the student:
1. Must stay at home during regular school hours. Students may not go to work or run errands.
2. Students must be supervised by an adult during the term of the suspension.
Suspension is exclusion from school for a period of 1 to 10 consecutive school days; suspensions will be assigned by the Administration. No student shall be suspended until the student has been informed of the reasons for the suspension and given an opportunity to respond. An attempt will be made to notify parents of the student on the day suspension is imposed. The parents will also be notified in writing with a copy forwarded to the Superintendent's office.

- Informal Hearing - When the suspension exceeds three (3) school days, the student and the parents will be given the opportunity for an informal hearing before the building administrator. The hearing shall be offered to be held within the first five (5) days of the suspension. The purpose of this informal hearing is to enable the student and the parent to meet with the appropriate school official to explain the circumstances surrounding the event for which the student is being suspended or to show why the student should not be suspended. The informal hearing is intended to bring forth all relevant information regarding the event for which the student may be suspended and to encourage the student's parents to meet with the administrator to discuss ways to avoid future offenses.

0211g
OVSD 000000851

**Due Process Requirements** - The following due process requirements are to be observed in regard to the informal hearing:

1. Notification of the reasons for the suspension shall be given in writing to parents or guardians and the student.

2. Sufficient notice of the time and place of the informal hearing shall be given. The informal hearing will take place within the first five (5) days of the suspension.

3. A student has the right to question any witness present at the hearing.

A student has the right to speak and produce witnesses on his/her own behalf.

**Effects of Suspension** – The following Effects of Suspension apply:

1. **Assessments and School Work:** Students shall have the responsibility to make up assessments and work missed during the period of the suspension and shall be permitted to complete these assignments within guidelines established by the School Administration.

2. **School Activities:** Students may not participate in any school activities during the period of suspension. Students are not permitted on any school property at any time during the period of suspension, except to confer with the administration or to pick up or deliver work assignments at a time designated by the administrator.

3. **Loss of Privileges:** Students could lose school privileges following the suspension depending upon the severity of the offense. The type and length of lost privileges is to be determined by Administration.

**Expulsion** - is exclusion from school imposed by the Board of School Directors for a period exceeding ten school days and may be permanent expulsion from the school rolls. All expulsions require either an Agreement and Waiver of Hearing and an Agreement for Expulsion signed by the student, parents(s) and School Board or a prior formal hearing before a committee of the Board of School Directors or a duly authorized committee of the board or a qualified hearing examiner appointed by the board. When the hearing is conducted by a committee of the board or a hearing examiner, a majority vote of the entire school board is required to expel a student. The formal hearing will be scheduled during the first ten days of the suspension. If it is impossible to schedule a hearing during this ten day period, the student may be returned to school pending the hearing. Students who are less than 17 years of age are subject to the Compulsory School Attendance Laws even though expelled. The initial responsibility for providing the education rests with the students parent or guardian through placement in another school or through tutoring or through an alternate educational program approved by the District. If the parents or guardians are unable to provide the required education, they must within thirty days submit to the District superintendent written evidence outlining the attempts which have been made and the reasons for non-compliance. If thirty days pass without the District receiving satisfactory evidence that the required education is being provided, the District will contact the parent. If these efforts are not productive, the District has the option to provide some alternate educational program or take action in accordance with Chapter 63 of The Juvenile Act (42 PA. C.S. 6301-6308).

**Formal Hearing** - The following due process procedures are to be observed with regard to the formal hearing:

1. Notification of the charges shall be sent to the student's parents or guardian by certified mail or courier delivery.

2. Notice of the time and place of the hearing must be given;

3. The hearing shall be held in private unless the student or parent requests a public hearing.

4. The student has the right to be represented by counsel.

The student has the right to be presented with the names of witnesses against the student and copies of the statements and affidavits of those witnesses.

6. The student has the right to request that any such witnesses appear in person and answer questions or be cross-examined.

7. The student has the right to testify and present witnesses on his or her own behalf.

8. A record must be kept of the hearing, either by a stenographer or by tape recorder. The student is entitled, at his or her own expense, to a copy of the transcript.

9. The proceeding shall be held within 15 school days of the notification of the charges, unless mutually agreed to by both parties. Hearings may be delayed for any of the reasons set forth in 22 PA. Code 12.8(b)(9).

Where the student disagrees with the results of the hearing, recourse is available in the appropriate court of the Commonwealth. Notice of a right to appeal the results of a hearing shall be provided to the student with the expulsion decision.

The Board of School Directors has defined the types of offenses that could lead to exclusion from school. These offenses may take the form of suspension or expulsion and include but are not limited to the following:

1. Insubordination or defying school authorities;

2. Destruction or willful defacing of school property;

3. Hazardous or unauthorized use of vehicles;

4. Use, possession or distribution of dangerous drugs or drug-related paraphernalia as defined in the Dangerous drugs, Device and Cosmetics Act;

5. Use, possession or distribution of 'look-alike' drugs defined as a non-controlled substance that has a stimulant or Depressant effect on humans and resembles a controlled substance in appearance;

6. Use, possession or distribution of anabolic steroids as defined in Act 93 of 1989;

7. Use, possession or distribution of alcoholic beverages;

8. Use, possession or distribution weapons or fireworks;

9. Fighting or physical assault;

10. Theft;

11. Gambling;

12. Use of profane language or obscene language or gestures;

13. Disorderly, vicious, illegal or immoral conduct;

14. Persistent or severe harassment, intimidation, extortion or bullying;

15. Participation in or responsibility for causing damage, destruction or vandalism to District property or to the Personal property of District employees, whether on or off school premises;

16. Verbal or physical assault directed toward a District employee, either on or off school premises;

17. Violation of any local, state or federal law, as appropriate;

18. Persistent violation of school rules and regulations or an accumulation of minor offenses;

D212a
OVSD 000000852

19. Excessive unexcused absence or tardiness by a student not subject to compulsory attendance laws;
20. Possession, use or distribution of any weapon as defined by Act 26 of 1995 to include, but not be limited to, any knife, cutting instrument, cutting tool, nunchuk, firearm, shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury;
21. Possession or use of any incendiary devices to include but not limited to lighters or matches;
22. Terrorist Threat/Bomb Threat; and
7. Possession, use or distribution of any replica or 'look-alike' weapon as defined in School Board Policy.

## CONTACTING LAW ENFORCEMENT AGENCIES

The Board of School Directors has established a policy with regard to contact with law enforcement agencies involving discipline as a result of activities occurring on school property or at a school event. Some examples of law enforcement contact are as follows: Police assistance will be requested when a person fails to respond to a request to leave the premises, when any person is creating a disturbance and fails to respond to requests to cease and desist or when any action threatens the health, safety or welfare of any person. The police will also be contacted when any person other than police officers are in possession of a dangerous weapon. Police will be contacted for identification of substances and assistance in the investigation of all violations of the Dangerous Drugs, Device and Cosmetics Act (Purdon's Pennsylvania Statutes, 35 P.S. Sections 780-101 through 780-144) or drugs, including those which fall under the "look alike" category. Police may also be contacted for cases of verbal or physical assault or violation of local, state or federal law depending on the seriousness of the incident. Victims of violations of local, state and federal law may choose to file charges under these statutes independent of school disciplinary actions. School personnel are often asked why they do not file charges for some specific student disciplinary incidents. While the school has broad discretion in student discipline matters, the school does not have jurisdiction to file charges in all incidents. The police and/or the District Attorney will make that decision after an incident report is filed by the school.

## SEARCH AND SEIZURE

School officials have the authority to lawfully search students or their belongings, including lockers, automobiles, school owned electronic devices, purses, backpacks, clothing, and other possessions, without a warrant, when in school, on school grounds or when otherwise under school supervision, if there is a reasonable suspicion that the place or thing to be searched contains prohibited contraband, material that would pose a threat to the health, safety and welfare of the school population, or evidence that there has been a violation of the law, Board policy, or school rules. The scope and extent of searches must be reasonable in relation to the nature of the suspected evidence, contraband or dangerous material and to the grounds for suspecting that it may be found in the place or thing being searched.

## STUDENT DEBT/SMALL CLAIMS COURT PROCEDURES

Students are expected to pay all debts in a timely manner.
The Oley Valley School District will make every effort to inform students/parents of debts/obligations. Debts/obligations include but are not limited to textbooks, technology, athletic uniforms, and other district owned supplies and equipment.
In the event that a student has a debt, the student may lose privileges including but not limited to field trips, prom, dances, graduation, field days, assemblies, etc. Additionally, a student with debt/obligations will not receive their diploma until the debt/obligation has been paid. These debt/obligations include any debt/obligation at BCTC.
At the end of each month building administrators will send a list of names, addresses, and debts/obligations owed to the Superintendent's office. The list will be for any student who has a debt/obligation over $25.
The Superintendent's office will forward the information to the school solicitor who will send a "demand for payment letter" to the parents/guardians of students informing them that they have 10 days to pay or litigation will be filed.
The Superintendent's office will notify building administrators when the letters have been mailed which will begin the 10-day window.
After 10 days, the building administrators will complete a "Civil Complaint Form" for each student with a debt/obligation which will result in filing in small claims court. Copies of the filing should be sent to the school solicitor.
For Debts/Obligations Accrued After May 1st:
In addition to the above procedures, if a debt/obligation occurs after May 1st, the district will contact the parents/guardians to inform them of the debt/obligation. Parents/guardians will be given five business days to repay the debt/obligation prior to their name being sent to the Superintendent's Office. The list will be for any student who has a debt/obligation over $25.

## TRANSPORTATION

### SCHOOL BUS
Means a motor vehicle that is designed to carry eleven (11) passengers or more, including the driver, and is used for the transportation of preprimary, primary or secondary school students to or from public, private or parochial schools or events related to such schools or school-related activities.

### SCHOOL VEHICLE
'eans a motor vehicle, except a motorcycle, designed for carrying no more than ten (10) passengers, including the driver, and used for the transportation of preprimary, primary, or secondary school students while registered by or under contract to the school district. The term includes vehicles having chartered, group and party rights under the Pennsylvania Public Utility Commission and used for the transportation of school children.

### TRANSPORTATION

Following the board meeting, I was in the main hallway outside the library waiting to clean up the board room and put away laptops once executive session was finished. A custodian called me over to him and said Mrs. Lyons had requested another adult be present in the auditorium, I told him I would go and see if any assistance was needed. When I got there, students were leaving the auditorium and Mrs. Lyons, Ms. Hartenstein, and Brent Eck and Vinny Ferrizzi were walking up the steps into the back of the music hallway. When I asked if I could be of any assistance, Jordan walked away and Vinny spoke to Mrs. Lyons and Ms. Hartenstein. I offered to stay to provide a neutral party, as Vinny was visibly upset. Mrs. Lyons said I should stay. Vinny spoke to Mrs. Lyons stating that he was upset with things and was not sure what he wanted to say, and wanted to say he knew she worked hard, but maybe didn't know how to talk to students since she was not a teacher. He said he was hurt when she "called him out" in front of other students. Mrs. Lyons acknowledged his feelings and asked if any teachers ever corrected a student in front of their peers. He said no. Vinny seemed conflicted in what he was thinking and trying to say, and seemed unsure of what he wanted to see changed in the drama program. Vinny ended up thanking Mrs. Lyons for listening to him and left.

*Mrs. Lyons went to the steps to see if Jordan wanted to speak with her and Ms. Hartenstine. Jordan did come into the hallway and again offered to stay as a neutral party. Jordan appeared angry. Both Mrs. Lyons and Jordan initially appeared tense. Jordan told Mrs. Lyons he was disappointed in decisions she had made and things he had said. Mrs. Lyons acknowledged Jordan's feelings and his right to have those feelings. Mrs. Lyons stated she was disappointed in actions Jordan and some other drama club students have made. Mrs. Lyons spoke to Jordan about how people can disagree over things, but can to move forward together toward a common goal. She spoke to him about how two people can perceive the same information in a different way. Mrs. Lyons appeared less tense. Jordan appeared tense and angry, with clenched fists and head shaking whenever something was said that he did not agree with. Jordan repeatedly said he wanted things to change, but could not say specifically what, other than rehearsals were not starting on time. Mrs. Lyons said that sometimes students cannot get to the rehearsals at the scheduled start time, but that it would be a goal for all students and staff to start rehearsals on time. Jordan again brought up that he was not speaking out because he was not given the lead role in the play. Mrs. Lyons said that seemed to be the time when the problems started. Jordan accused Ms. Hartenstine of lying or making up a story that she had told the cast about a time when she had not gotten the lead part but her best friend had, rumors were circulating about why her friend had gotten the part, and Ms. Hartenstine reached out to her friend because she cared about her and supported her. Jordan said "Who would do that? Why would you not want to be comforted if you didn't get the part? Who would not want to be comforted?" It was evident Jordan could only think of himself at this time and not other parties. Ms. Hartenstine was visibly upset and tearful that Jordan accused her of making this up. Mrs. Lyons asked Jordan if he did not see how he had made Ms. Hartenstine upset with his accusations, but Jordan did not seem to care about how his words and actions made other people feel. He said at one point to Mrs. Lyons, "I was going to hang you out to dry, I really was," and "I'm not saying that they have to fire you but," Jordan said he was not sure how to move forward and Mrs. Lyons suggested being calm, coming to rehearsals with a calm attitude, greeting the other students and apologizing to them, reaching a hand out to them and asking them to work together with him. Jordan said he had a lot of homework to do and nodded at us and left.*



OVSD 000000075

A 000000202

When I went down the hallway to the doors outside the auditorium, Jordan, his parents, Vinny Ferritzi, Rafael Forsyth, and Haley Martino were standing there. They asked me if they would find out the results of the executive session. I told them no action would be taken this evening. They asked if action would be taken, when would it be taken? I told them action items would go on a board agenda and the next board meeting was on April 30th, and that board and committee meetings are open to the public and the schedules are posted online, or they can call my extension to ask about meeting dates/times. Vinny Ferritzi then asked me if Mrs. Zackon was in the school building at any time during the school day. I told him that board members are like other members of the public and community and if they wanted to come to any of the schools, they would need to schedule that with the building principal. Vinny said he would contact Mrs. Zackon outside of school. I asked him if he knew how to contact her and he nodded. I told them all board members names and addresses are public information and he nodded. Jordan turned to me and said "I'm going to get more people. We'll get more people. This isn't over." Jordan appeared angry, staring at me when he said this.

I am a support staff member and not an educator, but I was concerned with the anger and lack of empathy I observed in Jordan. Whenever something was said that he did not agree with, there was hard shaking and clenching of fists. He appeared that if he did not get what he wanted, he would not be satisfied, no matter what accommodations or resources could be offered. In my daily interactions with students, I have not seen this level of anger and lack of awareness of other's feelings.

Marla H. Jones

OVSD 000000076

A 000000203

## OLEY VALLEY HIGH SCHOOL
### DISCIPLINE REFERRAL FORM

Student Name: Haley Lawther          Grade: ___      Date: 3/21/19

Referring Teacher: _____          Period/Class: _____

Time of Incident: __1130__          Location of Incident: _____

Others Involved: ☐ None ☐ Peers ☐ Staff ☐ Teacher ☐ Substitute ☐ Unknown ☐ Other _____

| Problem Behavior (Completed by Administration) | Possible Motivation (Completed by Admin) | Consequence/Intervention (Completed by Administration) |
|---|---|---|
| ☐ Bus Misconduct | ☐ Avoid adult direction | ☐ Verbal Warning |
| ☐ Cafeteria Misconduct | | |
| ☐ Academic Dishonesty/Cheating | ☐ Incite peer conflict | ☐ Phone Call to Parent/Guardian |
| ☐ Class Misconduct | | |
| ☐ Cut Class | ☐ Avoid task/activity | ☐ Conference with Parent/Guardian |
| ☐ Cut School | | |
| ☐ Failure to Serve Detention | ☐ Unknown | ☐ Lunch Detention |
| ☒ Disrespect/Insubordination | | Date(s) Assigned: _____ |
| ☐ Participating/Inciting a Disturbance | ☐ Obtain adult attention | |
| ☐ Dress Code Violation | | ☐ After School Detention |
| ☐ Forgery | ☐ Obtain items/activities | Date(s) Assigned: _____ |
| ☐ Handbook Violation | | |
| ☐ Inappropriate Object | ☐ Obtain peer attention | ☐ Saturday Detention |
| ☐ Inappropriate Language/Comment/Gesture | | Date(s) Assigned: _____ |
| ☐ Left Class Without Permission | ☐ Other: _____ | |
| ☐ Left School Without Permission | | ☒ Out of School Suspension (OSS) |
| ☐ Late to Class (On 4th late per semester) | | Date(s) Assigned: 3/22 |
| ☐ Late to School (On 4th late per semester) | | |
| ☐ Mobile Device Violation | | ☐ Removal from District Transportation |
| ☐ Abuse of Pass | | Date(s) Assigned: _____ |
| ☐ Public Display of Affection | | |
| ☐ Refusal to Cooperate with School Rule | | ☐ Loss of Privilege(s): _____ |
| ☐ Technology Violation | | |
| ☐ Unsafe Practice | | ☐ Behavior Contract |
| ☐ Assault on Student | | |
| ☐ Assault on Staff | | ☐ Referral to School Counselor |
| ☐ Fight | | |
| ☐ Threat | | ☐ Other: _____ |
| ☐ Theft | | |
| ☐ Bullying | | |
| ☐ Vandalism | | Discipline Code: D5 |
| ☐ Drug/Alcohol Violation | | |
| ☐ Weapon Violation | | |
| ☐ Tobacco Violation | | |

Incident Detail Narrative (Completed by Referring Faculty/Staff Member)

Told the two m+c — yelling "I quit" +

made it two exit

Administrator Signature: _____          Date: 3/21/19

☐ Entered into school LMS          Office Use Only
   ☐ Green (Guidance File)          ☐ Admin
   ☐ Yellow (Guidance File)         ☐ Student
Parent: _____                    ☐ Teacher

REV 7/12/18

EXHIBIT
3

OVSD 000000485

A 000000204

From: Chris Becker
To: Dawn Cambria; Tracy Shank
CC: AnnMarie Borovik
Date: 3/19/2019 3:41 PM
Subject: Meeting Notes...

Meeting Notes:

I was alerted last night around 9 PM by Dr. S to connect with Ann Marie in the morning.

Ann Marie and I connected this morning to review the student incident report.
We went to the scheduled IEP meeting together scheduled at 7:30 am and also was told that Jared's mom
was with Mrs. Snyder. We went to the meeting and said we would have that meeting
at about 7:50 am in my office. Mom was OK with the wait time.

At 7:50 am, Ann Marie, Jared, Jared's mother, and I met to review the incident.
*Safety was the big focus and take away of the meeting. Jared's mom also mentioned that Jared
thought Mrs. Eck was*
in the parking lot at the dance studio last night as he was leaving. The dance studio is located
close to Pricetown Road. We also discussed that last night a meeting occurred with Stacy Lyons
to
*discuss the recent events and a plan moving forward.*

We took the following actions steps during the meeting:
1). Mom will be calling Central Berks police today to keep the incident on file.
2). Jared spoke about his decision to continue with the play (video idea was discussed from
monday evening).
3). Jared also spoke about what his end game is. He mentioned– no siding among friends,
drama, and making the play the best it can be.
4). We also spoke about the process we follow as a school..that we would be talking to Jordan,
etc. Jared understood and knows he has 2 trusted adults in the room to report too if an incident
or drama would occur today or any day in school. The meeting ended after that discussion.

At the conclusion of this meeting– Ann Marie and I called down and met w/ Jordan. We spoke to
Jordan about the following items:
Work release– He needs to report. If for some reason he does not..he needs to come to the
main office to discuss.
We asked him about the recent drama and incidents regarding the play. He mentioned he
wanted to talk to Dr.S and about 6-7 other students were planning to do that today. When we
mentioned Dr. S was not available, we told him to see Deb and a schedule would be reviewed.
He spoke to Ann Marie about a note book situation yesterday that she handled with Haley. He
was also stated 2-3x about wanting Jared to get the help that he needed. He also mentioned
that Jared was seen on a snap chat video showing his middle finger. He mentioned an example
of a dance off that occurred at the MS production this weekend which was the focus of that snap
chat video.



GVSD 000000895

A 000000213

Ann Marie & I around 10:45 am called OFF. SMITH from Central Berks to file the school's incident report with the notes above. We spoke about the incident notes from above. Off. Smith was very thankful that we gave him the heads up. He also was told that the play and specific parts in the play have caused this tension among the students since Winter 2019.

About 1 hour later...a representative of central berks police and Jared's mom came to the progressions office to fill out the incident report from about
11:45–12:30 PM today.

Mrs. Eck called Mr. Becker's phone line around 1:30 PM this afternoon. I will be calling her back with a witness (Ann Marie) later today.

At 2:59 PM– we made that phone call.
Mom asked that whatever is going on– she wants to be present.
She is really upset about him being questioned.
Ann Marie & I both spoke about the review of the notes above from Jordan's office visit today.
Social Media conversation occurred. Mom and Jordan has this talk often.
Jordan was accused of "abuse" by the drama director in the past.
Mom requested again that when he is questioned– a parent needs to be present.
Kids are tired of Stacy. Mom want onto the idea of favoring 1 student over another.
Conversation ended at 3:15 PM.

Mr. Chris Becker
⌐ 'ncipal
ᴗιey Valley High School
610–987–4100 X6003
@OleyValleyHS

OVSD 000000896

A 000000214

From: Tracy Shank
To: All
Date: 3/20/2019 11:39 PM
Subject: FYI @ tonight

I went to the auditorium tonight after the meeting to speak with the Directors only to walk into the aftermath of a negative situation whereby Jordan was speaking to the cast thanking them for supporting him and helping him get things changed. He then verbally accosted the assistant director and accused her of lying and not speaking up and then closed with " this is not over and I will be getting more people to come forward". The teacher was visible upset, crying, and felt threatened by him. The teacher used the words "verbally attacked".

I am obtaining the statements from the teacher and witnessed by Maria and the teacher.

I am going to issue discipline regarding tonights situation and depending on what the rest of the investigation reveals tomorrow Jordan may have just finished his last rehearsal tonight. Students are angry with him for his actions when he returned to the auditorium after he left the Board meeting.

According to Jordan's own words, "this is not over" but I will end his role in it.

We will run the process in the morning.

Thank you for your support and understanding in a very difficult situation.

EXHIBIT 31

OVSD 000000898

A 000000215

cbecker ~ Re: Phone Call 3/25/19                                      3/26/2019  Page 1

From: Chris Becker <cbecker@ovsdpa.org>
To: Tracy Shank
    Stacy Lyons
Date: 3/25/2019 5:37 PM
Subject: Re: Phone Call 3/25/19

My impression is that she is mad at all of us for everyone that has transpired recently.  She will
need some time to calm down.

We can all sit down with her or call in the short term depending on everyone's availability....

Chris Becker
Principal
Oley Valley High School
Sent from my iPhone

> On Mar 25, 2019, at 5:33 PM, Tracy Shank <_TShank@ovsdpa.org_> wrote:
>
> I hope  that the truth will soon come out...
>
>
>>>> Stacy Lyons 03/25/19 17:22 PM >>>
> Let me know if you need anything from me.
>
> Oh – an interesting nugget. So The Repko's claim that I caused their son to quit college 2 years
in.  They were going to pull Sam if I was not fired...
>
> Sam is still attending rehearsals, Mrs Repko emailed me today regarding a raffle basket to cover
the fundraising requirement for Sam and.... on Friday we had our cast and family movie night. Sam
attended WITH his younger brother Aaron. If I'm such an awful person then why are you putting
your youngest son in my care!!!!!
>
> They had a great time and Aaron enjoyed the movie and sitting with Sam, Jared and others.
>
>
>
>>>> Chris Becker 03/25/19 15:43 PM >>>
> Hello:
>
>
> I wanted to alert you that I spoke to HH mother this morning around 7:10 am.
> it was a conversation that was over 10 minutes.  I have been busy throughout the day but felt
the need to email everyone and document my notes.
>
>
> At the beginning of our conversation-
> She was a little bothered about the suspension and wording that I used last week.



OVSD 000000807

A  000000216

Case 5:19-cv-01873-MAK  Document 48-2  Filed 12/03/19  Page 154 of 186
Case 5:19-cv-01873-MAK  Document 48-2  Filed 12/03/19  Page 151 of 181
Case 5:19-cv-01873-MAK  Document 41-2  Filed 11/25/19  Page 220 of 223

cbecker – Re: Phone Call 3/25/19                          3/26/2019  Page 2

> But then the conversation went quickly into asking for a meeting with the two of you....
> Throughout the phone call– Mom and her emotions were calm, loud, and crying.
>
> My notes include:
>
>
> She used the word "staff bullying" about the play, cast meeting last week (looking at her
daughter while speaking), and a recent food conversation with another student and not getting
parent notification.
>
> Talked about the board meeting and how someone said they were affected 2 years after leaving
the HS.
>
>
> She is available anytime to meet but may need to be "calmed down" during our meeting.
Mentioned maybe the students dad would be there and finally be involved?
>
>
> Mentioned a student was one of Mrs. Lyons's is a "Pet weasel"
>
>
> Mentioned her daughter is ill and medicine is not working.
>
>
> Mentioned her daughter's GPA and how she is a good student but was upset about the
attendance letter that was recently sent home (10 day for 18–19 school year)
>
>
> At one point– I talked about moving forward over the last 45–50 days of school– She said this
won't be over because lawyers will be involved.
>
>
> I believe I have everything documented and wanted to keep everyone on the same page.
>
>
> Thank you,
>
>
>
> Mr. Chris Becker
> Principal
> Oley Valley High School
> 610-987-4100 X6003
> @OleyValleyHS
> 

OVSD 000000808

A 000000217

Joint Appendix00298

**From:** Chris Becker
**To:** Dawn Cambria; Tracy Shank
**CC:** AnnMarie Borovik
**ate:** 3/19/2019 3:41 PM
**Subject:** Meeting Notes...

**Meeting Notes:**

I was alerted last night around 9 PM by Dr. S to connect with Ann Marie in the morning.

Ann Marie and I connected this morning to review the student incident report.
We went to the scheduled IEP meeting together scheduled at 7:30 am and also was told that Jared's mom
was with Mrs. Snyder. We went to the meeting and said we would have that meeting
at about 7:50 am in my office. Mom was OK with the wait time.

At 7:50 am..Ann Marie, Jared, Jared's mother, and I met to review the incident.
Safety was the big focus and take away of the meeting. Jared's mom also mentioned that Jared thought Mrs. Eck was
in the parking lot at the dance studio last night as he was leaving. The dance studio is located
close to Pricetown Road. We also discussed that last night a meeting occurred with Stacy Lyons to
discuss the recent events and a plan moving forward.

We took the following actions steps during the meeting:
1). Mom will be calling Central Berks police today to keep the incident on file.
2). Jared spoke about his decision to continue with the play (video idea was discussed from monday evening).
3). Jared also spoke about what his end game is. He mentioned– no siding among friends, drama, and making the play the best it can be.
4). We also spoke about the process we follow as a school..that we would be talking to Jordan, etc. Jared understood and knows he has 2 trusted adults in the room to report too if an incident or drama would occur today or any day in school. The meeting ended after that discussion .

At the conclusion of this meeting– Ann Marie and I called down and met w/ Jordan. We spoke to Jordan about the following items:
Work release– He needs to report. If for some reason he does not..he needs to come to the main office to discuss.
We asked him about the recent drama and incidents regarding the play. He mentioned he wanted to talk to Dr.S and about 6-7 other students were planning to do that today. When we mentioned Dr. S was not available, we told him to see Deb and a schedule would be reviewed.
He spoke to Ann Marie about a note book situation yesterday that she handled with Haley. He was also stated 2-3x about wanting Jared to get the help that he needed. He also mentioned  at Jared was seen on a snap chat video showing his middle finger. He mentioned an example of a dance off that occurred at the MS production this weekend which was the focus of that snap chat video.



OVSD 000000895

cbecker – Re: Phone Call 3/25/19                                    3/26/2019  Page 2

> But then the conversation went quickly into asking for a meeting with the two of you....
> Throughout the phone call– Mom and her emotions were calm, loud, and crying.

>
> My notes include:
>
>
> She used the word "staff bullying" about the play, cast meeting last week (Looking at her
daughter while speaking), and a recent food conversation with another student and not getting
parent notification.
>
> Talked about the board meeting and how someone said they were affected 2 years after leaving
the HS.
>
>
> She is available anytime to meet but may need to be "calmed down" during our meeting.
Mentioned maybe the students dad would be there and finally be involved?
>
>
> Mentioned a student was one of Mrs. Lyons's is a "Pet weasel"
>
>
> Mentioned her daughter is ill and medicine is not working.
>
>
> Mentioned her daughter's GPA and how she is a good student but was upset about the
attendance letter that was recently sent home (10 day for 18–19 school year)
>
>
> At one point– I talked about moving forward over the last 45–50 days of school– She said this
won't be over because lawyers will be involved.
>
>
> I believe I have everything documented and wanted to keep everyone on the same page.
>
>
> Thank you,
>
>
> Mr. Chris Becker
> Principal
> Oley Valley High School
> 610–987–4100 X6003
> @OleyValleyHS
>

OVSD 000000908

| Subject: | Need your help | | Help |
| --- | --- | --- | --- |
| Date: | 2019-03-19 15:32:51 | | |
| | Download | | |
| From: | Stacy Lyons | | |
| To/Cc: | kellyandshawnconred@aol.com | | |

**View Message**     **View Source**

Hi Shawn,

I need your help. I've spent the last 2 months shielding the kids from some very horrible stuff happening behind the scenes with a student and his mother. Unfortunately the situation has escalated to the point that this student posted something against the other student and police were called in. This mother and her son want me fired and in the mothers words "she is going to destroy me" – all of this because her son was not cast as Jack.

I have been working closely with Dr Shank and the administration since January. This parent has made friends with Mrs Zackon on the school board. This is helping to fuel the fire.

Dr Shank let me know today that this parent is planning on attending the school board meeting tomorrow night at 7pm in the HS library.

I am reaching out to ask any and all parents that believe in this program and students that love the program to please show up to show your support. We are in jeopardy of losing this program.

Any questions feel free to call me 610-621-6588

Stacy Lyons
Director
OVHS Drama Department
slyons@ovsdpa.org
610-621-6588 (c)

Joint Appendix00301

| | | |
|---|---|---|
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Christine & Bernie Franckowiak" <christinefrancko.. |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Rob & Erica Witt" <ericaw77@ptd.net> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Kerry Matteoli" <kmatteoli@icloud.com> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Jessica & David Kauffman" <jes0925@comcast.n.. |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Beth Hoch" <sbsahoch@gmail.com> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Mrs. Griffiths" <griffiths71201@gmail.com> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Rachel Kerper" <rachelkerper@gmail.com> |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Brad Teeters" <Brad.teeters@gmail.com> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Cinamon Kopicki" <cinamonkopicki@yahoo.com> |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Jillian Prout" <symj48@aol.com> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Catherine Wagner" <lcjosj@yahoo.com> |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Jere Stoudt" <jerdan0609@yahoo.com> |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Teresa Fegley" <mom80703@aol.com> |
| 3.7K | "Stacy Lyons" <slyons@ovsdpa.org> | "Adam Schanely" <aschanely@gmail.com> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Jennifer Schlegel" <jrschlegel@comcast.net> |
| 3.8K | "Stacy Lyons" <slyons@ovsdpa.org> | "Tracy Donoff" <tracydonoff@gmail.com> |
| 4.0K | "Stacy Lyons" <slyons@ovsdpa.org> | "Juli Bertin" <jsbertin@gmail.com> |
| 4.5K | "Stacy Lyons" <slyons@ovsdpa.org> | kellyandshawnconrad@aol.com |
| 3.6K | "Stacy Lyons" <slyons@ovsdpa.org> | kellyandshawnconrad@aol.com |

**From:** Tracy Shank
**To:** All
**Date:** 3/20/2019 11:39 PM
**Subject:** FYI @ tonight

I went to the auditorium tonight after the meeting to speak with the Directors only to walk into the aftermath of a negative situation whereby Jordan was speaking to the cast thanking them for supporting him and helping him get things changed. He then verbally accosted the assistant director and accused her of lying and not speaking up and then closed with " this is not over and I will be getting more people to come forward". The teacher was visibly upset, crying, and felt threatened by him. The teacher used the words "verbally attacked".

I am obtaining the statements from the teacher and witnessed by Maria and the teacher.

I am going to issue discipline regarding tonights situation and depending on what the rest of the investigation reveals tomorrow Jordan may have just finished his last rehearsal tonight. Students are angry with him for his actions when he returned to the auditorium after he left the Board meeting.

According to Jordan's own words, "this is not over" but I will end his role in it.

We will run the process in the morning.

Thank you for your support and understanding in a very difficult situation.



OVSD 000000898

D1BDa

cbecker – Re: Fwd: Statement                                   3/21/2019  Page 1

**From:** Tracy Shank
**To:** Chris Becker
**:e:** 3/21/2019 7:37 AM
**Subject:** Re: Fwd: Statement

This will be a 3 out and he will be out of the show based on his behavior last night after the board mtg.

>>> Chris Becker 03/21/19 07:34 AM >>>
I printed this and will see Maria this am as well...

Mr. Chris Becker
Principal
Oley Valley High School
610-987-4100 X6003
@OleyValleyHS

> Tracy Shank 3/21/2019 7:27 AM >>>
You need to get a statement from Maria as well. She will be in by 830.
We will run this issue today.



EXHIBIT

OVSD 000000899

0181a

OLEY VALLEY HIGH SCHOOL
DISCIPLINE REFERRAL FORM

Student Name: Jordan Eck                   Grade: 12th   Date: 3/21/19

Referring Teacher: Hackensad                Period/Class: Play Practice

Time of Incident: 930 AM      Location of Incident: Aud

Others Involved: ☐ None ☐ Peers ☐ Staff ☐ Teacher ☐ Substitute ☐ Unknown ☐ Other _____

| Problem Behavior (Completed by Administrator) | Possible Motivation (Completed by Admin) | Consequence/Intervention (Completed by Administrator) |
|---|---|---|
| ☐ Bus Misconduct | ☐ Avoid Adult Direction | ☐ Verbal Warning |
| ☐ Cafeteria Misconduct | | |
| ☐ Academic Dishonesty/Cheating | ☐ Incite peer conflict | ☐ Phone Call to Parent/Guardian |
| ☐ Class Misconduct | | |
| ☐ Cut Class | ☐ Avoid task/activity | ☒ Conference with Parent/Guardian |
| ☐ Cut School | | |
| ☐ Failure to Serve Detention | ☐ Unknown | ☐ Lunch Detention |
| ☐ Disrespect/Insubordination | | Date(s) Assigned: _____ |
| ☐ Participating/Inciting a Disturbance | ☐ Obtain adult attention | ☐ After School Detention |
| ☐ Dress Code Violation | | Date(s) Assigned: _____ |
| ☐ Forgery | ☐ Obtain items/activities | |
| ☐ Handbook Violation | | ☐ Saturday Detention |
| ☐ Inappropriate Object | ☐ Obtain peer attention | Date(s) Assigned: _____ |
| ☐ Inappropriate Language/Comment/Gesture | | |
| ☐ Left Class Without Permission | ☐ Other: _____ | ☒ Out of School Suspension (OSS) |
| ☐ Left School Without Permission | | Date(s) Assigned: 3/22 + 25 + 26 |
| ☐ Late to Class (On 4th late per semester) | | |
| ☐ Late to School (On 4th late per semester) | | ☐ Removal from District Transportation |
| ☐ Mobile Device Violation | | Date(s) Assigned: _____ |
| ☐ Abuse of Pass | AS OF | |
| ☐ Public Display of Affection | Current | ☐ Loss of Privilege(s): _____ |
| ☐ Refusal to Cooperate with School Rule | Investigation | |
| ☐ Technology Violation | | ☐ Behavior Contract |
| ☐ Unsafe Practice | | |
| ☐ Assault on Student | | ☐ Referral to School Counselor |
| ☐ Assault on Staff | | |
| ☐ Fight | | ☒ Other: 3 steps |
| ☐ Threat | | AHS School Sentence |
| ☐ Theft | | |
| ☒ Bullying | | |
| ☒ Vandalism | | Discipline Code: |
| ☐ Drug/Alcohol Violation | | Xout of play |
| ☐ Weapon Violation | | |
| ☐ Tobacco Violation | | |

Incident Detail Narrative (Completed by Referring Faculty/Staff Member)

_____

Administrator Signature _____   Date: 3/21/19

Office Use Only
☐ Entered into eSchool/PLUS   ☐ Original (Student File)   ☐ Guidance
☐ Parent                      ☐ Teacher

REV 7/12/18

**EXHIBIT**

OVSD 000000804

0182a

## OLEY VALLEY HIGH SCHOOL
### DISCIPLINE REFERRAL FORM

Student Name: Jordan Eck                Grade: 10th   Date: 3/21/19

Referring Teacher: Hartenstine / Shank          Period/Class:

Time of Incident: 7:10 pm       Location of Incident: AHD

Others Involved: ☐ None ☐ Peers ☐ Staff ☐ Teacher ☐ Substitute ☐ Unknown ☐ Other _____

| Problem Behavior (Completed by Administration) | Possible Motivation (Completed by Admin.) | Consequences/Action (Completed by Administration) |
|---|---|---|
| ☐ Bus Misconduct | ☐ Avoid adult direction | ☐ Verbal Warning |
| ☐ Cafeteria Misconduct | | |
| ☐ Academic Dishonesty/Cheating | ☐ Incite peer conflict | ☐ Phone Call to Parent/Guardian |
| ☐ Class Misconduct | | |
| ☐ Cut Class | ☐ Avoid inactivity | ☒ Conference with Parent/Guardian |
| ☐ Cut School | | 3/21/19  Dr. _____ |
| ☐ Failure to Serve Detention | ☐ Unknown | ☐ Lunch Detention |
| ☒ Disrespect/Insubordination | | Date(s) Assigned: ___ mr. Becker |
| ☐ Participating/Inciting a Disturbance | ☐ Obtain adult attention | |
| ☐ Dress Code Violation | | ☐ After School Detention |
| ☐ Forgery | ☐ Obtain transactivities | Date(s) Assigned: _____ |
| ☐ Handbook Violation | | |
| ☐ Inappropriate Object | ☐ Obtain peer attention | ☐ Saturday Detention |
| ☐ Inappropriate Language/Comment/Gesture | | Date(s) Assigned: _____ |
| ☐ Left Class Without Permission | ☐ Other _____ | |
| ☐ Left School Without Permission | | ☒ Out of School Suspension (OSS) |
| ☐ Late to Class (On 4th late per quarter) | | Date(s) Assigned: 3/22-25   3-6 |
| ☐ Late to School (On 4th late per semester) | | |
| ☐ Mobile Device Violation | | ☐ Removal from District Transportation |
| ☐ Abuse of Pass | | Date(s) Assigned: _____ |
| ☐ Subtle Display of Affection | | |
| ☐ Refusal to Cooperate with School Rule | | ☐ Loss of Privilege(s): _____ |
| ☐ Technology Violation | | |
| ☐ Unsafe Practice | | ☐ Behavior Contract |
| ☐ Assault on Student | | |
| ☐ Assault on Staff | | ☒ Referral to School Counselor |
| ☐ Fight | | |
| ☐ Threat | | ☒ Other _____ |
| ☐ Theft | | Removal from Play |
| ☐ Bullying | | |
| ☐ Vandalism | | Discipline Code: _____ |
| ☐ Drug/Alcohol Violation | | |
| ☐ Weapon Violation | | |
| ☒ Tobacco Violation | | |

Incident Detail Narrative (Completed by Referring Faculty/Staff Member)

Interaction w/ Ms. Hartenstine on 3/21/19.

Ms. Hartenstine felt threatened + disrespected by the recent

Administrator Signature: _____   Date: 3/21/19   Recent

☐ Entered into SchoolPLUS   Office Use Only   _____
☐ Parent                     ☐ Parent (Student File)   _____
                             Teacher                     Guidance

REV 7/12/18

**EXHIBIT**

OVSD 000000154

0183a

Case 5:19-cv-01873-MAK   Document 86-2   Filed 01/05/20   Page 163 of 186
Case 5:19-cv-01873-MAK   Document 86-2   Filed 01/05/20   Page 163 of 186
Case 5:19-cv-01873-MAK   Document 18-2   Filed 12/03/19   Page 160 of 181

| (5/10/2019) Tracy Shank - Re: Ferrizzi | Page 1 |

From:      Tracy Shank
To:        slyons@ovsdpa.org;
Date:      3/24/2019 11:03 PM
Subject:   Re: Ferrizzi

I would try to develop an understudy for him so when he pulls the week of the show for affect we are ready

>>> Stacy Lyons 03/24/19 22:56 PM >>>I do - would prefer that we make the change this week instead of the week of the show when he decides to act up

>>> Tracy Shank 03/24/19 10:53 PM >>>
Have a back up plan for Vinnie's part.

If this is anything like the rest of the year, he will continue to push the line as far as he can.

>>> Stacy Lyons 03/24/19 22:48 PM >>>Thanks for the intel

>>> Tracy Shank 03/24/19 10:46 PM >>>
Chris,
Please speak with Vinnie and have him bring in the contract.

If his behavior becomes problematic let Chris know and we will address it.

I do understand from a source that wishes to remain anonymous that he is reporting directly to two board members.

Vinnie has been know to ease drop on conversations with me, my office, Katie and other teachers.

Dr S

>>> Stacy Lyons 03/24/19 22:38 PM >>>Hi Tracy and Chris,
I hope you had a good weekend.

@Chris - thank you again for coming along to our Reading Eagle field trip. It was great getting to know you and I hope you enjoyed spending time with the drama kids. They truly had a great day!

I think Abby and Chris would agree that based on some of the behavior we saw from Vinny Ferrizzi, we may have a mole in our midst. It was apparent that at one point he was trying to ease-drop on our conversation. The kids are also being very cautious. I will continue to keep a close eye on this behavior.

In the beginning of each play or musical I have the kids and parents sign a contract. This is something that I started using a year ago not because of discipline issues but to address commitment issues. I always have some stragglers in completing the form and this show was not different. I was emailing the cast members and their parents into February and reminding them at rehearsals.

I received signed contracts from all of the cast members with the exception of Vinny. I have given him the

Joint Appendix 00306
OVSD 000000958

form twice, emailed it 5 times to both he and his parents. Vinny indicated several times that he forgot the form and would bring it in. With everything going on I have not emailed Vinny and his parents recently. I would like to request that Vinny and his parents sign the attached before he is allowed to return to the stage. It is only fair to the other cast members.

I think I would feel more comfortable if you were able to help me get the signed contract from Vinny. Is this something you can help me with?

I have connected with several female directors through a group that my daughter runs in DC and have received other examples of contracts that they have developed over time in their own programs. I'll be looking at revamping the attached for any future productions - I'll have you review and approve before implementing.

Thank you!
Stacy


Stacy Lyons
Director
OVHS Drama Department
slyons@ovsdpa.org
610-621-6588 (c)

| (6/10/2019) Tracy Shank - Fyi | Page 1 |

From:     Tracy Shank
To:       All.GWPOST2.OVSDDOM
BC        MJones@ovsdpa.org
Date:     3/24/2019 10:52 PM
Subject:  Fyi

*Musical rehearsals went much better this weekend.*
*Only two students have removed themselves from the show. One I removed because of his behavior and his girlfriend then quit.*

*The 3rd student who is and has been problematic, Vinnie F, is acting out and beginning to undermine other cast members, ease drop on conversations, and not follow directions. If it continues I will address it. The other students are beginning to complain about his negativity and immaturity.*

OVSD 000000960
D196a

(5/10/2019) Tracy Shank - Musical                                                                    Page 1

**From:**     Tracy Shank
**To:**       All;
**CC:**       Jms@bmflaw.com;
**Date:**     4/14/2019 10:34 AM
**Subject:**  Musical

Just an FY! -
The musical went very well. All 3 shows were outstanding,

Then last night Vinnie F was very negative with the cast and crew stating he took notes on everything,
someone is going down, and there is going to be a "big law suit ".

Students and parents were very upset,...set strike is today so I have instructed Stacy that if Vinnie shows
up just send him home.

OVSD 000000935
0187a

**From:** Chris Becker
**To:** Tracy Shank
**CC:** Dawn Cambria
**Date:** 4/2/2019 9:56 AM
**Subject:** Re: HH Phone Call 4/2/19

Thanks. I will continue to work hard and put our students first.
I hope you have a good day.
Back to art interviews!


Mr. Chris Becker
Principal
Oley Valley High School
610-987-4100 X6003
@OleyValleyHS


>>> Tracy Shank 4/2/2019 9:53 AM >>>
It is much bigger than this...but that is for me to handle.

I need you to keep running the high school and get the tasks accomplished that will be us forward for students.


>>> Chris Becker 04/02/19 09:43 AM >>>
Thanks for understanding.
I really believe this is coming from yesterday and an attempt to challenge our discipline dispositions.


Mr. Chris Becker
Principal
Oley Valley High School
610-987-4100 X6003
@OleyValleyHS


>>> Tracy Shank 4/2/2019 9:41 AM >>>
I understand.
A meeting will not be helpful.



EXHIBIT

OVSD 000000910

0193a

Once the student has met all the requirements for graduation they may graduate early.

-> Chris Becker 04/02/19 09:38 AM >>>
Thanks...I printed the email and have my handwritten notes in the folder.

I just spoke to Dawn a few moments ago...
My conversations with Mom have been very heated towards us and Stacy.
The original request was to meet with all three of us. Now- my impression
is that she wants to meet with you or you and I. However, the conversation today
did not give me the feeling whatsoever a meeting would be cordial and helpful.

Mr. Chris Becker
Principal
Oley Valley High School
610-987-4100 X6003
@OleyValleyHS

>>> Tracy Shank 4/2/2019 9:33 AM >>>
There is nothing that needs to be done.
~ ·cument your conversations; don't meet alone; and focus on the positives.

>>> Chris Becker 04/02/19 08:17 AM >>>
I wanted to type notes/quotations from my morning conversation this morning w/ HH mother...

7:34 am-
"Dr. Shank threatened my daughter...Suspension was level 3 offense....My daughter is not violent...
I want to speak to the board about the level 3 offense...then Dr. Shank...

"I proud of you people for bullying my daughter...like the special education paperwork...
"Don't understand what is going on at your school...letter is rediculous....She is an
A student"

"Can my daughter just graduate now?" - "No..we don't have the authority to just graduate
students"

. ake it away and I will go away".."
"This is bullying my daughter'"
"I don't care how much it takes...so figure it out if you want me to go away in 2 months..."

OVSD 000000911

0194a

Stacy Lyons- Lies about parents, record needs to be straight...discusses board meeting once again.....

We can talk tomorrow about how to proceed.....I will stop and visit Dawn later this morning as well....

Thanks,

Mr. Chris Becker
Principal
Oley Valley High School
610-987-4100 X6003
@OleyValleyHS

OVSD 000000912

0195a

Case 5:19-cv-01873-MAK   Document 86-2   Filed 01/13/20   Page 170 of 186
Case 5:19-cv-01873-MAK   Document 54   Filed 12/05/19   Page 170 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 167 of 181

Joint Appendix000313

)                                        )                                              )31

Jordan Eck, Haley Hartline, Vincent Ferrizzi (Plaintiffs) vs Stacy Lyons, Individually and as Employee of Oley Valley School District

Response Documents 1

Amended Complaint 17-35: Text Communications with Jared Ott, OVHS Facilities – March 19 and March 20, 2019





Jordan Lick, Haley Hartline, Vincent Ferrizzi (Plaintiffs) vs Stacy Lyons, Individually and as Employee of Oley Valley School District

Response Documents 1

Amended Complaint 73-75: Text Communication with Dr. Shank and Mr. Becker regarding students reporting that Vinny Ferrizzi upset other cast members



If he shows just send him
home.

I agree. No need for it

And once again- wonderful
job. I also heard yesterday
was awesome.

Thank you



# Central Berks Regional Police Commission

2147 Perkiomen Avenue, Reading, PA 19606
610-779-1100 (Office)   610-779-7135 (Fax)

**COMMISSION MEMBERS**

*Josh Nowotarski, Chairman, John Theodossiou, Vice-Chairman*
*James Cocuzzo, Todd Welkel, Thomas Staron, James Oswald*

### Right-To-Know Response Form

11/15/19

Joel A Ready, Esq.
8500 Allentown Pike, Suite 3
Blandon, PA 19510

Dear Mr. Ready:

Thank you for contacting Central Berks Regional Police Department with your request for information pursuant to the Pennsylvania Right-To-Know law.

We received a request from you for a record of any police reports, notes, re calls, emergency or non-emergency in regard to Jordan Eck, Haley, Hartline, &/or Vincent Ferrizzi. Your request is denied for the following reasons, as permitted by Section 708 of the Act.

The Central Berks Regional Police Department has denied your request, because no such record, regarding any of the persons listed on or between the dates listed, exists within the Central Berks Regional Police Department.

You have a right to appeal this denial of information in writing to Erik Arneson, Executive Director, Office of Open Records, Commonwealth Keystone Building, 400 North Street, 4th Floor, Harrisburg, PA 17120.

For criminal records of Central Berks Regional Police appeal to the District Attorney John Adams, Services Center 5th Floor, 633 Court Street, Reading, PA 19601.

If you choose to file an appeal you must do so within 15 business days of the mailing due date of the agency's response. See Section 1101. Please note that a copy of your original Right-to-Know request and this denial letter must be included when filing an appeal. The law also requires that you state the reasons why the record is a public record and address each of the reasons the Agency denies your request. Visit the Office of Open Records website at http://openrecords.state.pa.us for further information on filing an appeal. If you have further questions, please call Claudia Hurwitz, Open Records Officer. Please be advised that this correspondence will serve to close this record with our office as permitted by law.

Respectfully,
Claudia Hurwitz
Open Records Officer
2147 Perkiomen Avenue
Reading, PA 19606
610-779-1100

0178a

Joint Appendix00315



# OLEY VALLEY SCHOOL DISTRICT
## Oley, Pennsylvania

### AGREEMENT OF CO-CURRICULAR/EXTRA-CURRICULAR ASSIGNMENT

The Board of School Directors of the Oley Valley School District and Stacy Lyons hereby enter into the following agreement:

Stacy Lyons shall serve as the HS Play Director for the 2018-2019 school year.

| Base Salary | $2485.00 |
|---|---|
| Years of Service (4 Years) | $150.00 |
| Total Salary | $2635.00 |

The stipend shall be paid according to the attached pay form option selected (please return the pay form with your selected pay option along with this agreement letter to the Athletic Office).

By signing this agreement, the above-mentioned employee agrees to the following responsibilities:

a. To properly care for, use and store all equipment associated with the activity.
b. To properly request and care for all District facilities used by the activity.
c. To properly supervise students participating in the activity.
d. To strictly adhere to the policies and guidelines as outlined in the Building Handbook, District policy handbook, and job description.
e. To complete any additional duties that are assigned by the Principal and/or Athletic Director (for non-contracted personnel only).

This agreement must be renewed annually by the Oley Valley School Board.

Employee Signature:

_Stacy Lyons_

0205a
OVSD 000000857



# CORNERSTONE
# LAW ■ FIRM, llc

8500 Allentown Pike, Suite 3
Blandon, PA 19510

November 21, 2019

**Hon. Mark A. Kearney**
U.S. District Court for the Eastern District of Pennsylvania
Room 6613 U.S. Courthouse
601 Market St.
Philadelphia, PA 19106

**Sharon M. O'Donnell, Esquire**
Marshall, Dennehey, Warner, Coleman & Goggin
100 Corporate Center Drive, Suite 201
Camp Hill, PA 17011

Re:  **Submission of Video Evidence on Summary Judgment**
     **Jordan Eck, et al. v. Oley Valley School District, Case No.: 5:19-CV-1873**

Dear Judge Kearney:

On behalf of Plaintiffs in the above-referenced case, kindly receive by this correspondence the enclosed thumb-drive containing true and correct copies of videos that were produced for the record: (1) a Snapchat "fruit video" (20 seconds) and (2) Oley Valley High School surveillance video (April 20, 2019—24 minutes, 40 seconds), and (3) extracts of the forgoing surveillance video, limited to portions that were addressed by Defendant Tracy Shank during her deposition (**1 minute, 17 seconds**).

Your Honor's review of the forgoing videos is requested for purposes of Plaintiff Jordan Eck's Motion for Partial Summary Judgment, contemporaneously filed with the Court. Please have your Honor's staff contact my office if any technical glitches are encountered and the same need to be resubmitted.

Very truly yours,

**CORNERSTONE LAW FIRM, LLC**

By: _Joel A. Ready_
Joel A. Ready, Esquire
Counsel for Plaintiffs

8500 Allentown Pike, Suite 3 · Blandon, Pennsylvania 19510
*phone* 610.926.7875 · *fax* 484.930.0054 · joel@cornerstonelaw.us

C206a

Joint Appendix00317



0207a

Joint Appendix00318

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JORDAN ECK, HALEY HARTLINE,
and VINCENT FERRIZZI,
                            Plaintiffs,

        v.                                              NO.: 5:19-CV-1873-MAK
                                                        JURY TRIAL DEMANDED
OLEY VALLEY SCHOOL DISTRICT;
TRACY SHANK, individually and as
Superintendent of the Oley Valley School
District; CHRISTOPHER M. BECKER,
individually and as Principal of Oley Valley
High School; and STACEY LYONS,
individually and as employee of Oley Valley
High School,
                            Defendants.

JOINT REPORT OF RULE 26(f) CONFERENCE

The parties hereby submit the joint report of an attorneys' conference held on Wednesday,

August 7, 2019, as required by the Court's Order of Friday, July 26, 2019, and state the

following.

1.   The Parties' Description of the Case

     By the Plaintiffs: Each Plaintiff is a former student and recent graduate of the Oley

Valley School District, and were involved with the high school drama club under the leadership

of a teacher, Defendant Stacy Lyons. On March 19, 2019, having learned that Plaintiffs intended

to speak against her at a forthcoming School Board meeting, Mrs. Lyons sent a defamatory e-

mail to select students and their parents associated with the drama club. She falsely asserted that

Plaintiff Jordan Eck had violent tendencies of such an extent that "the police were called in," and

she asked for persons to speak in her support at the School Board meeting. Defendant Lyons also

asserted in the e-mail, "I have been working closely with Dr. Shank and the administration since

0196a

January," i.e., Defendant Tracy Shank, the Superintendent, concerning Plaintiff Jordan Eck and his mother. At a publicly held School Board meeting the next day, on March 20, 2019, Plaintiffs intended to share their viewpoints about Ms. Lyons' poor leadership of the drama club. The School Board restricted Plaintiffs' speech, claiming it would be "character assassination," while permitting other persons to speak favorably of Defendant Lyons.

Immediately after the School Board, Plaintiffs returned to the high school for a drama club rehearsal. Mrs. Lyons placed the premises on lockdown "for their safety," locking the doors so Plaintiffs could not enter, and began interrogating each student as to what was said about her at the School Board meeting. She eventually unlocked the doors so Plaintiffs could join them. Plaintiff Jordan Eck asked to speak with Mrs. Lyons privately. She was uncomfortable about that and asked for two other staff members, Maria Jones and Ms. Hartenstine, to be present for the conversation. They stood in a hallway. Jordan told Mrs. Lyons that they should patch things over and work together for the upcoming school play.

The next day, Dr. Shank and Defendant Christopher M. Becker, the high school principal, called Jordan into the office and imposed a three-day out-of-school suspension. The allegation was that, the previous evening, Jordan "lunged at" Ms. Hartenstine. The allegation was false, and Jordan was not permitted to present any witnesses in his favor. Furthermore, the conversation with Mrs. Lyons, Ms. Jones, and Mrs. Hartenstine occurred in the presence of a school security camera, and there was no indication that Shank and Becker had reviewed it. The three-day suspension coincided with the school play, thereby excluding Jordan from participating in it.

That same day, at approximately 10:00, Dr. Shank and Mr. Becker held a meeting with Plaintiffs Haley and Vinny and the rest of the drama club. Dr. Shank told the group, but staring directly at Haley, that if anyone has a problem with Mrs. Lyons, they could "leave right now."

Haley took that invitation, went to the school counselor and obtained excusal to go home. She later received in the mail an out-of-school suspension, retroactive to her excused leave, asserting that she committed a Level 3 violation. These violations include conduct such as "Threatening another student (verbal, written or inciting)" and "obscene and/or threatening calls or messages" and the like.

Finally, after the school musical ran on April 13, 2019, there was a cast and crew party afterwards. At that party, Mrs. Lyons gathered all the students and, in their presence, spoke to Plaintiff Vinny negatively about his having spoken against her at the School Board meeting. Later that morning, the drama club students returned to the school for a tear-down and clean-up event. At that event, Mrs. Lyons informed Vinny that she spoke with Dr. Shank and decided it was best for everyone's safety if he immediately left the premises, and she had him escorted off the premises by three men.

Consequently, within 24 hours of having spoken against Mrs. Lyons, Plaintiffs Jordan and Haley were suspended and removed from the school play and, shortly after, Vinny was given a de facto suspension by being excluded from the school premises. Plaintiffs allege retaliation for exercising their First Amendment rights under the U.S. Constitution, among other grounds for relief.

By the Defendants: Each Plaintiff is former student and recent graduate of the Oley Valley School District. Each Plaintiff was a very good student and enjoyed extracurricular activities. Plaintiffs Eck and Ferrizzi were both active in the drama club. Defendant Stacey Lyons was and remains the current Chair of the Drama Club, theatre director and student advisor. During the Plaintiffs' last year at the District, Defendant Lyons held auditions for the musical, "Newsies." Although Plaintiff Eck had his heart set on the lead, he was not chosen for

0198a

that part, but rather, another part Ms. Lyons felt he was better suited to perform. Plaintiff Eck
was very outspoken about his disappointment with Defendant Lyons' choice and between
himself and his mother brought the matter to the School Board during a public meeting. Ahead
of that meeting, Defendant Dr. Shank, the Superintendent of Schools, learned of Plaintiff Eck's
intentions, as well as those of his mother and Plaintiffs Hartline and Ferrizzi, both of whom were
close friends with Plaintiff Eck. Those intentions were to discredit and humiliate Defendant
Lyons at the public meeting, and to cast doubt on her ability to run and direct the Drama Club.
Defendant Shank interceded and strongly encouraged Plaintiffs not to disparage Defendant
Lyons in public and to present support for the musical and for Defendant Lyons' direction of it
and of them. Unfortunately, the Plaintiffs did not heed the advice of Dr. Shank and spoke out
against Defendant Lyons.

Following the Board Meeting, a closed rehearsal was held during which time Defendant
Lyons spoke with some of the members of the play, and some of them discussed what they saw
and heard at the board meeting which Lyons did not attend. Eventually, Plaintiff Eck joined the
rehearsal and a decision was made to go forward in solidarity to the production, if not to each
other.

Letting go of emotions became impossible and not long afterwards, Plaintiff Eck became
insubordinate and aggressive towards one of his teachers; Defendant Becker, the building
principal, had supervision over these matters and escalated them to the Superintendent for
disposal. Plaintiff Hartline became insubordinate to Dr. Shank during a meeting when Dr. Shank
admonished the students for their emotional uprising and strongly suggested that they learn to
cooperate with their drama club director; and Plaintiff Ferrizzi, was simply unwelcome by all

D199a

those who supported the drama club director and the production and he was quietly escorted off

the set during clean-up by some parents.

   Plaintiffs Eck and Hartline were given 3 day suspensions for their insolent behaviors

toward the professional and administrative staff.  Those suspensions have given rise to their

causes of action sounding in alleged first amendment retaliation, among others.   Plaintiff

Ferrizzi's cause of action arises from his escorted walk from the Newsies stage following the

play and during clean up.

   2.   STIPULATED FACTS

   a.   Plaintiffs were students at the Oley Valley High School.

   b.   Plaintiffs were involved in the High School drama club, and Mrs. Lyons was a
        teacher having responsibility and oversight of the drama club.

   c.   Mrs. Lyons was a teacher and employee of the Oley Valley High School.

   d.   Christopher M. Becker was the principal of the Oley Valley High School.

   e.   Dr. Tracy Shank was the Superintendent of the Oley Valley School District and *ex
        officio* member of the Oley Valley School Board.

   f.   Plaintiffs spoke against Mrs. Lyons at a publicly held School Board meeting on
        March 29, 2019.

   g.   Plaintiffs Jordan and Haley received written, out-of-school suspensions and were
        excluded from the school play.

   h.   Plaintiff Vinny received a de facto suspension in the nature of being directed to
        leave school premises and excluded from a drama club event.

3.   INFORMAL DISCOVERY

   Voluntary disclosures pursuant to Rule 26(a)(1)(A) have been exchanged.

4.   This is not a patent case.

5.   DISCOVERY TO BE TAKEN BY EACH PARTY

By the Plaintiffs: Plaintiffs will serve interrogatories, requests for production, and requests for admission upon each Defendant for liability and damages information, for video of the alleged incident in the hallway between Jordan and Ms. Hartenstine, and will depose each named Plaintiff and each named Defendant, any parent with knowledge of the facts and circumstance as averred in the Amended Complaint. Additionally, Plaintiffs may depose the School Board concerning the publicly-held meeting on March 20, 2019.

By the Defendants: Defendants will serve interrogatories and a request for production of documents upon each Plaintiff for liability and damages information and will depose each Plaintiff and any parent with knowledge of the facts and circumstances surrounding each Plaintiff's behavior leading up to the suspensions.

6.   ELECTRONIC DISCOVERY

No issues. Defense counsel represents that the high school's security camera footage has been preserved, as relating to the allegations in the Amended Complaint whether or not Plaintiff Jordan "lunged at" Ms. Hartenstine. This footage will be provided in a manner viewable on an ordinary computer.

7.   EXPERT WITNESS DISCLOSURES

The parties do not intend to use expert witness testimony at trial.

8.   SETTLEMENT OR RESOLUTION

The parties have already had preliminary discussions about the parameters of any future settlement. Plaintiff expects to have a demand to Defendants' counsel in the near future.

9.   TRIAL

D201a

*Plaintiffs' counsel has planned vacation from October 16 to November 1, and a trial from November 1 to 5, 2019. Defendants' counsel has planned vacations for February and September, 2020.*

10. AGREEMENT TO PROCEED WITH MAGISTRATE JUDGE

*The parties have no objection to Judge Heffley's involvement with the case.*

11. OTHER MATTERS

*Signed waiver of service of the summons for Defendant Christopher M. Becker has been requested but has not yet been returned. Pending before the Court is Defendants' Rule 12(b)(6) motion to dismiss.*

SUBMITTED BY:

CORNERSTONE LAW FIRM, LLC

BY: /s/Joel A. Ready
    Joel A. Ready, Esquire
    Attorney ID 321966
    8500 Allentown Pike
    Suite 3
    Blandon, PA  19510
    (610) 926-7875

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN, P.C.

BY: /s/Sharon M. O'Donnell
    Sharon M. O'Donnell, Esquire
    Attorney ID# 79457
    100 Corporate Center Drive
    Suite 201
    Camp Hill, PA  17011
    (717) 651-3503

0202a

Case 5:19-cv-01873-MAK   Document 86-2   Filed 01/13/20   Page 183 of 186
Case 5:19-cv-01873-MAK   Document 54   Filed 12/05/19   Page 183 of 186
Case 5:19-cv-01873-MAK   Document 48-2   Filed 12/03/19   Page 180 of 181

| Subject: | Need your help | Help |
| --- | --- | --- |
| Date: | 2019-03-19 15:32:51 | |
| | Download | |
| From: | Stacy Lyons | |
| To/Cc: | kellyandshawnconrad@aol.com | |

**View Message** | **View Source**

Hi Shawn,

I need your help. I've spent the last 2 months shielding the kids from some very horrible stuff happening behind the scenes with a student and his mother. Unfortunately the situation has escalated to the point that this student posted something against the other student and police were called in. This mother and her son want me fired and in the mothers words "she is going to destroy me" - all of this because her son was not cast as Jack.

I have been working closely with Dr Shank and the administration since January. This parent has made friends with Mrs Zackon on the school board. This is helping to fuel the fire.

Dr Shank let me know today that this parent is planning on attending the school board meeting tomorrow night at 7pm in the HS library.

I am reaching out to ask any and all parents that believe in this program and students that love the program to please show up to show your support. We are in jeopardy of losing this program.

Any questions feel free to call me 610-621-6588

Stacy Lyons
Director
OVHS Drama Department
slyons@ovsdpa.org
610-621-6588 (c)

Joint Appendix 00326

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Christine & Bernie Franckowiak" <christinefrancko...

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Rob & Erica Witt" <ericaw77@ptd.net>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Kerry Matteoli" <kmatteoli@icloud.com>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Jessica & David Kauffman" <jes0925@comcast.n...

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Beth Hoch" <sbsahoch@gmail.com>

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Mrs. Griffiths" <griffiths71201@gmail.com>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Rachel Kerper" <rachel.kerper@gmail.com>

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Brad Teeters" <Brad.teeters@gmail.com>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Cinamon Kopicki" <cinamonkopicki@yahoo.com>

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Jillian Prout" <symj48@aol.com>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Catherine Wagner" <cigosj@yahoo.com>

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Jere Stoudt" <jerdan6609@yahoo.com>

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Teresa Fegley" <mom80703@aol.com>

3.7K "Stacy Lyons" <slyons@ovsdpa.org>   "Adam Schanely" <aschanely@gmail.com>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Jennifer Schlegel" <jrschlegel@comcast.net>

3.8K "Stacy Lyons" <slyons@ovsdpa.org>   "Tracy Donoff" <tracydonoff@gmail.com>

4.0K "Stacy Lyons" <slyons@ovsdpa.org>   "Juti Bertin" <jsbertin@gmail.com>

4.5K "Stacy Lyons" <slyons@ovsdpa.org>   kellyandshawnconrad@aol.com

3.6K "Stacy Lyons" <slyons@ovsdpa.org>   kellyandshawnconrad@aol.com

12/03/2019   08:39                                              (FAX)                        P.002/003

# Central Berks Regional PD

## Incident Report Form

**23-19-02021**
03/19/2019
Department Information

**Primary Officer: JEREMY S. SMITH - JSS**

| | | | |
|---|---|---|---|
| ☐ Juvenile Involved | ☐ Investigation | ☐ Video Available | ☐ Gang Related | ☐ Paperless |
| ☐ Domestic Related | ☐ Suspects | ☐ Bias Crime | ☐ Accident | ☐ Administrative |
| ☐ Alcohol Involved | ☐ Arrests Made | ☐ Drugs Involved | ☐ Ready for DA / Prosecutor | ☐ Alarm Activated |

| Log Number | Incident Number | File Number | Case Number | UCR |
|---|---|---|---|---|
| 23-19-02021 | 1747 | | | |

| Incident Type | INFO | | Dispatcher | Source | District | Status |
|---|---|---|---|---|---|---|
| Department Information | | | | BERKS | OL | |

**Incident Date / Times** — Incident Occurred At or Between

| Date Received 03/19/2019 | Day Rec'd Tuesday | Rcvd 1044 | Disp 1047 | Arrv 1047 | Clrd 105B | Earliest Date and Time | Latest Date and Time |
|---|---|---|---|---|---|---|---|

| Disposition   COMP | Cleared by Exception | | ☐ Suspended |
|---|---|---|---|
| COMPLETED | | | |

| UCR Clearance | | UCR Occur Date | UCR Clear Date | UCR Count | UCR Human Traffic Code | UCR HT Count |
|---|---|---|---|---|---|---|

| Location | ☐ Intersection |
|---|---|

| 17  JEFFERSON ST | Cross Street | |
|---|---|---|
| OLEY PA 19547 | GPS Loc X | GPS Loc Y |

| Municipality: OLEY TWP | | |
|---|---|---|
| Business Name | Premise Code | Arson Value |

| Gang | Weather |
|---|---|

| Modus Operandi Coding | Victim: |
|---|---|
| Entry: | Property: |
| Exit: | Area: |
| Method: | Time of Day: |

**WEAPON USED:**

| Caller / Complainant Type | Normal ☐ | Anonymous ☐ | Hangup ☐ | Refused ☐ |
|---|---|---|---|---|

## RESPONDING / INVOLVED UNITS, OFFICERS, TIMES

| Division | Supervisor / ID | |
|---|---|---|
| | JUSTIN M. JOHNSON | JMJ |

| Unit Number | Officer / ID (Ofcr1 / Ofcr2) | | Officer / ID (Ofcr3 / Ofcr4) |
|---|---|---|---|
| | JEREMY S. SMITH | JSS | |

## COMMENTS / NARRATIVES

| Title |
|---|
| **DEPTINFO** |

| Narrative Created By / Creation Date | 03/19/2019 | Narrative Updated By / Update On | 03/19/2019 |
|---|---|---|---|
| JEREMY S. SMITH | | JEREMY S. SMITH | |

| Narrative Approved By / Approved Date |
|---|

Off Jeremy Smith #115
3/19/2019 @ 1251hrs

    I received a phone detail to contact Anne Marie Borovik, the guidance counselor for the school, about an

| 23-19-02021 | 03/19/2019 | ☐ | APPROVED BY: | PAGE 1 |
|---|---|---|---|---|
| IR1 1.6 | | | APPROVED ON: | |

# Central Berks Regional PD

## Incident Report Form

<div align="right">

**23-19-02021**
03/19/2019
**Department Information**

</div>

Incident between two students. She advised me that there was a Snapchat video involving a student named Jared. She said another student, Jordan, posted the video of Jared and added comments about certain fruits. She said Jared is allergic to the fruits that were mentioned in the post. She said there has been some animosity between them because Jared got the lead in the school play and Jordan did not. She did say that Jared's mother was aware of the incident and was going to contact police at her leisure. Borovik also mentioned that Jordan's mother was seen in the parking lot of a dance studio that both males attend even though Jordan was not present.

At the time of this report no reports have been made regarding the above information.

Nothing further

| 23-19-02021 | 03/19/2019 | ☐ APPROVED BY: | PAGE   2 |
|---|---|---|---|
| IRP 1.0 | | APPROVED ON: | |

Joint Appendix00329